UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS                    DOCKET NO. 15CV10198-ADB


AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY AND JURY
    TRIAL DEMAND


LISA SIEGEL BELANGER,

DEVORA C. KAISER,

                        Plaintiffs

v.

BNY MELLON ASSET MANAGEMENT, LLC,

BRIAN NAGLE,

in his official capacity with BNY Mellon and individually,

 BURNS & LEVINSON, LLP,

 LISA CUKIER, ESQ.,

in her official capacity with Burns & Levinson, LLP and individually,

 LAURA STUDEN, ESQ.,

in her official capacity with Burns & Levinson, LLP and individually,

 TARLOW BREED HART & RODGERS, PC,

 EDWARD TARLOW, ESQ.,

in his official capacity with Tarlow Breed Hart & Rodgers, PC and individually,

 ALBERT DeNAPOLI, ESQ.,

in his official capacity with Tarlow Breed Hart & Rodgers, PC and individually,

 CATHERINE WATSON, ESQ.,

in his official capacity with Tarlow Breed Hart & Rodgers, PC and individually,

 KAZAROSIAN COSTELLO & O'DONNELL, LLP,

1

MARSHA KAZAROSIAN, ESQ.,

in her official capacity with formerly Kazarosian Law Office and now Kazarosian Costello
        & O'Donnell and individually,

 WALTER COSTELLO, JR., ESQ.,

in his official capacity as a State actor, official capacity with former Law Office of Walter
        Costello, Jr. and with now Kazarosian Costello & O'Donnell, and individually,

BRIAN CUFFE, ESQ.,

in his official capacity as SJC Rule 1:07 court appointed guardian, as a private attorney
        and individually,

JAMES FELD, ESQ.,

in his official capacity as SJC Rule 1:07 court appointed conservator, as a private attorney
        and individually,

ROBERT LEDOUX, ESQ.,

in his official capacity with LAW OFFICE OF ROBERT A. LEDOUX,

 MAXA BERID, ESQ.,

in her official capacity as a State actor, official capacity with Elder Services of Merrimack
        Valley, Inc., official capacity with BERID & SCHUTZBANK, LLC, and
        individually,

BERID & SCHUTZBANK, LLC,

ELDER SERVICES OF MERRIMACK VALLEY, INC.,

THOMAS BARBAR, ESQ.,

in his official capacity as a State actor, official capacity with WILLIAMS BROOKS
        DERENSIS & Holland, and individually,

DIANE POWELL,

in her official capacity as a State actor, official capacity with Elder Services of Merrimack
        Valley, Inc., and individually,

2

SCOTT DAILEY,

in his official capacity as a State actor, official capacity with Elder Services of Merrimack
Valley, Inc., and individually,

MICHAEL SPRINGMAN,

in his official capacity as a State actor, official capacity with Elder Services of Merrimack
Valley, Inc., and individually,

CHERI MYETTE, ESQ.,

in her official capacity as a State actor and individually,

MICHAEL NOVACK, LICSW,

in his official capacity as a State actor, official capacity with ELDER RESOURCES, INC.,
and individually,

MARY ANN REMILLARD, ESQ.,

in her official capacity as a State actor and individually,

NORTHEAST HOSPITAL CORPORATION,

d/b/a BEVERLY HOSPITAL,

WHITTIER HEALTH NETWORK, INC., d/b/a WHITTIER PAVILION,

RICHARD GARMIL, ESQ.,

in his official capacity with Whittier Pavilion and individually,

MERRIMACK VALLEY HOSPITAL,

d/b/a STEWARD FAMILY HOSPITAL, INC.,

DR. JANICE FUNK,

In her official capacity as a private practitioner and individually,

DR. PING CUI,

in her official capacity as a private practitioner and individually,

PIERCE & MANDELL, PC

BRANDON SAUNDERS, ESQ.,

3

in his official capacity with Merrimack Valley Hospital, official capacity with Pierce &
 Mandell, and individually,

DR. KAI HAYES,

a/k/a Karla Hayes, in her official capacity with Merrimack Valley Hospital, and
 individually

DR. ROBERT PORTNEY,

in his official capacity as a private practitioner and individually,

DR. PETER W. COHEN,

in his official capacity as a private practitioner and individually,

KENNEY ENTERPRISES, LLC,

d/b/a RIGHT AT HOME,

BRENDA WOJICK, R.N.,

in her official capacity with Right At Home and individually,

SHERYL SIDMAN,

ALAN SIDMAN,

COMMONWEALTH OF MASSACHUSETTS,

Defendants

Nature of the central cause of actions

1. Plaintiffs seek relief from harm suffered as a direct result of an established
 systemic abuse of power violating the Due Process Clause of the Fifth and
 Fourteenth Amendments of the U.S. Constitution

2.    The central tenet in this Federal action is the continuous grave and irreparable deprivation of Plaintiffs' substantial liberty and property interests—which is still occurring—as a direct result of the Defendants' systemic abuse of power as public officials and agents of the Massachusetts Probate & Family Court, violating the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution.

3.    The Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution were "intended to prevent government 'from abusing its power, or employing it as an instrument of oppression.'"  Collins v. City of Harker Heights, Texas, 503 U.S. 115, 126 (1992).

4.    The customs and practices of the Massachusetts Probate & Family Court systemically violate the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution.

5.    The Plaintiffs have been substantially deprived of liberty and property interests from the Defendants' violation of the Fifth and Fourteenth Amendments of the U.S. Constitution's guarantee of a family's inalienable right to be free from unwarranted and unlawful government intrusion.

6.    Herein this Amended Complaint, Plaintiffs provide specific and concrete evidence that there is an established systemic pattern by Defendant officials associated with the Massachusetts Probate & Family Courts knowingly and intentionally engaging in unlawful acts of intrusion into the private affairs of citizens; specifically intending to dismantle the family unit and the sanctity of family integrity having no legitimate grounds do so.

7.    The underlying circumstances of this federal action involve Plaintiffs—and their 86 year-old father—having been unlawfully and unjustly stripped of their family's Fourteenth Amendment inalienable right for family members to live together; unlawfully and unjustly stripped of their family's inalienable right to see and communicate with each other without restrictions; unlawfully and unjustly stripped of their father's long-established expressed desire and intentions that Plaintiffs be his caregivers and facilitators of *his* needs and wants.

8.    Designated Defendants—individually and jointly—have intentionally and maliciously resorted to beyond the pale acts of retaliation against Plaintiffs Daughters for openly exposing designated Defendants' misconduct and for Plaintiffs having exercised their legal right to advocate and protect their father's constitutional rights, as well as, their family's and their own individual constitutional rights.

9.      Designated Defendants have resorted to acts of retaliation against Plaintiffs that shock and chill the conscience committed under the color of law —and continue to do so.

10.     The allegations and issues set forth by the Plaintiffs in this federal civil action *have not* been litigated by the Essex Probate & Family Court.

11.     The allegations and issues set forth by the Plaintiffs in this federal civil action *have not* been litigated by the Supreme Judicial Court.

12.     The issues raised in this federal complaint have nothing to do with dissatisfaction of judicial rulings made by the Essex Probate & Family Court in the underlying matters of In re Marvin H. Siegel,

13.     This federal action is not a matter that seeks any review of judicial rulings arguing innocent error of law or judgment.

14.     The sole and exclusive basis for the underlying Probate & Family Court matter of In re Marvin H. Siegel being a part of this federal civil action is to take remedial action for illegal acts committed by the Defendants under claimed color of law authority.

15.     Compounding the Supreme Judicial Court outright refusal to review the issues of illegal acts committed by the Defendants under claimed color of the law authority, the Clerks Office for the Supreme Judicial Court tampered with docket information regarding the underlying matters.

16.     Herein this Amended Complaint, Plaintiffs seek relief pertaining to issues that directly affect the public interest.

        Racketeer Influenced Corrupt Organization (RICO)

17.     This Federal action is wholly based on continuous grave harm inflicted upon the Plaintiffs and the general citizenry of Massachusetts—and continues to be inflicted upon the Plaintiffs and the general citizenry of Massachusetts—by the criminal enterprise that has been long embedded in the Massachusetts Probate & Family Court.

18.     The central cause of action in this Federal Complaint is RICO and is specifically based on the subset criminal enterprise that exists in the Essex Probate & Family Court.

19.     The above-described criminal enterprise specifically consists of two (2) common schemes carried out by officials of the Massachusetts Probate and Family Court:  1) embezzling from elders who become subjects of petitions for

6

guardianship and conservatorship and 2) embezzling through the probating of estates when people die.  Plaintiffs present specific and concrete evidence of court appointed guardians and conservators from the Massachusetts Probate & Family Courts are the major means to facilitate money laundering and embezzlement of funds.

20.     Plaintiffs establish that public officials of the Massachusetts Probate & Family Courts have specifically operated this criminal enterprise through *claimed* lawful authority.  Such purported claims of lawful authority are, in fact, long-established common law criminal offenses.

21.     Specific illegal acts that are outlawed for the general citizenry are treated differently when done by court ordered guardians and conservators.  The various MUPC statutes pertaining to authorized powers of court appointed guardians and conservators patently contain overly broad language—especially, the statutory provisions pertaining to the MUPC put in effect in 2009 and in 2012.

22.     The overly broad language in the MUPC statutes were deliberately put forth in the  statutes to veil the Legislature's condoning of established illegal offenses committed by court appointed guardians and conservators.

        JURISDICTION

23.     Plaintiffs seek injunctive and declaratory relief to end Defendants' continuous acts that have unlawfully and maliciously deprived the Plaintiffs of their substantive and procedural due process rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution—as well as, the Massachusetts Articles of Declaration and State Constitution.  Accordingly, this federal action is properly before this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, 28 U.S.C. § 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

24.     A substantial part of this federal action is properly before this Court based on diversity jurisdiction, involving Plaintiffs seeking injunctive relief and damages for independent and direct tortious actions of foreign corporations Defendant BNY Mellon and Defendant Merrimack Valley Hospital—breach of fiduciary duty, fraud, conspiracy, unjust enrichment, intentional infliction of emotional distress.

25.     This federal civil action is properly before this Court seeking to redress the deprivation of rights and privileges guaranteed by the Federal Constitution, pursuant to 42 U.S.C. § 1983 (intentional abuse of power by State actors); 42 U.S.C. § 1985(3) (Federal Conspiracy Claim); 18 U.S.C. § 162I (RICO); 18

7

U.S.C. § 1962(d) (RICO Conspiracy).  Civil rights claims are properly before this Honorable Court pursuant to 28 U.S.C. § 1391.

26.     The underlying federal constitutional deprivations, on which the above described cause of actions are based, include the First Amendment (retaliation for exercising legal rights), the Fourteenth Amendment (right to privacy and family sanctity); and State and Federal constitutional guarantees of substantive and procedural due process (Fifth and Fourteenth Amendments of the U.S. Constitution and Article X of the Massachusetts Declaration of Rights).

27.     State law claims raised under this federal action are also properly before this Court pursuant to 28 U.S.C. § 1367 as they are so enmeshed with the claims having original jurisdiction in this Court.  Therefore raised state claims form part of the same case and controversy under Article III of the United States Constitution.

28.     Furthermore, as shown herein, Plaintiffs have no adequate avenue for remedy of law in the State court.

29.     Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 where a substantial part of acts and omissions on which this action is based occurred in Massachusetts.

STANDING

30.     Plaintiffs (Lisa Siegel Belanger, Esq. and Devora Kaiser) and their families have been irreparably harmed by unjustified and unlawful acts inflicted by designated Defendants — which should *never* have taken place from the first instance—and is compounding gravely *with each and every day that passes.*

31.     Plaintiffs bring this federal action in their capacities as:

daughters of now 86 year-old Marvin H. Siegel (herein referred as "Father");

designated co-trustees of the declaration of trust, originally created by Father on January 5, 1982, named the "DSL Trust"—a copy of the DSL Trust is provided in Exhibit 3;

designated capacities as respective attorney-in-fact and successor attorney-in-fact, designated by Father in his Durable Power of Attorney on February 11, 2003 (herein referred as "2003 DPOA"—a copy of which is provided in Exhibit 4 and Father's written re-affirmation in writing and health care proxy executed on June 16, 2011); and

designated beneficiaries of Father's estate planning instruments, executed on February 11, 2003.

PARTIES

8

32.     Plaintiff Lisa Siegel Belanger (herein referred as "Daughter Lisa") and her family's (husband and two children) permanent residence is 15 Arrowhead Farm Road, Boxford, MA.

33.     Plaintiff Daughter Lisa and her family have been unlawfully and unjustly forced to vacate their permanent residence.  Plaintiff Daughter Lisa has been deprived of her Federal Constitutional rights to continue as caregiver for her father and right to absolute unrestricted communications and physical presence with her father.

34.     For 3 years and through the present, Plaintiff Daughter Lisa has been unlawfully and unjustly deprived of the above-described Federal Constitutional rights; with such deprivations entirely arising from ill-motives and illegal conduct by the designated Defendants (individually and jointly).

35.     Plaintiff Devora Kaiser (herein referred as "Daughter Devora") has been deprived of her Federal Constitutional rights to continue being closely involved with her father's care and by being subjected to severely restricted visitations with her father; such deprivations and restrictions have arisen entirely from the illegal conduct of the designated Defendants (individually and jointly).

36. Defendant BNY Mellon Asset Management LLC (herein referred as "BNY Mellon") (at the time called Mellon Private Asset Management) is the financial institution having physical custody and control of the DSL Trust since 1999 to manage as an investment account.  Defendant BNY Mellon is registered with the Secretary of State for the Commonwealth as a foreign corporation, based in Delaware and the principal place of business is 201 Washington Street, Boston, MA.

37. Defendant Brian Nagle resides in Brookline, MA.  At all times relevant, Defendant Brian Nagle was employed as Vice President and Senior Portfolio Manager for Defendant BNY Mellon—up until September of 2013.  At all times relevant, Defendant Brian Nagle was the direct and primary investment manager of the DSL Trust as an agent and representative for Defendant BNY Mellon.  As of September 2013, Defendant Brian Nagle is now Managing Director and Portfolio Manager at First Republic Investment Management East Coast.

38. Defendant Burns & Levinson, LLP is the law firm representing Defendant BNY Mellon in the matter of In re Marvin H. Siegel.  The below designated counsel and several other high ranking officials of Defendant Burns & Levinson, LLP have been intricately involved in fraudulent and deceptive acts set forth herein: Brian Bixby, Esq., Christopher Arnold, Esq., J. Boylan, Esq., Andrea Dunbar, Esq., and Michael Samarel, Esq.  The principal office for Defendant Burns & Levinson, LLP is at 125 Summer Street, Boston, MA.

9

39. Defendant Lisa Cukier, Esq. resides in Brookline, MA. She is a licensed attorney in the Commonwealth and is employed by the law firm Defendant Burns & Levinson, LLP. On behalf of Burns & Levinson, LLP, Defendant Attorney Cukier is counsel for Defendant BNY Mellon in the matter of In re Marvin H. Siegel.

40. Defendant Laura Studen, Esq. resides in Weymouth, MA.  She is a licensed attorney in the Commonwealth and is employed by the law firm Defendant Burns & Levinson, LLP. Defendant Attorney Studen is co-counsel for Defendant BNY Mellon.

41. Defendant Tarlow, Breed, Hart & Rodgers, P.C. (herein referred as "Law Firm TBHR") is the law firm that through fraud and deception became privately-retained counsel for Father (Marvin H. Siegel) on May 25, 2011.  In addition to below designated counsel, other members of TBHR who worked on the underlying matter include: Richard Breed, III, Karen McKenna, John Stuebing, Patrick Minnihan, and Jacqueline Scott.  The principal office is at 101 Huntington Avenue, Suite 500, Boston, MA.

42. Defendant Edward Tarlow, Esq. resides in Concord, MA.   He is a licensed attorney, as Partner and President of Law Firm TBHR.  At all times relevant, Defendant Attorney Tarlow served—and continues to serve—as a representative for Defendant Law Firm TBHR.

43. Defendant Albert DeNapoli, Esq. resides in Walpole, MA.   He is a licensed attorney employed by Defendant Law Firm TBHR, as well as being a shareholder and a director. At all times relevant, Defendant Attorney DeNapoli served—and continues to serve—as a representative for and on behalf of Defendant Law Firm TBHR.

44. Defendant Catherine Watson, Esq. resides in Norwood, MA.  She is a licensed attorney in the Commonwealth and employed by Defendant Law Firm TBHR.  At all times relevant, Defendant Attorney Watson served—and continues to serve—as a representative for and on behalf of Law Firm TBHR.

45. Defendant Marsha Kazarosian, Esq. is an individual residing in Haverhill, MA.  She is a licensed attorney in the Commonwealth and now a Partner at Kazarosian Costello & O'Donnell, LLP.  The principal location for Defendant Attorney Kazarozian's law office is 546 Main Street, Haverhill, MA. At all times relevant through December 2013, Defendant Attorney Kazarosian served as a representative of the Law Office of Marsha Kazarosian; thereafter, she served—and continues to serve—as a representative of, and on behalf of, Defendant Kazarosian Costello & O'Donnell, LLP.

46. Specifically because of fraudulent and deceptive acts of counsel committed by Defendant Law Firm TBHR, Father privately retained Defendant Kazarosian to represent him as legal counsel. Upon revelation of fraudulent and deceptive acts of Defendant Attorney Kazarosian, Father has explicitly stated his desire for Defendant Attorney Kazarosian to terminate her legal representation—and continues to express that desire.

10

Defendant Attorney Kazarosian has refused to comply with Father's request and the Essex Probate & Family Court has repeatedly refused to address Father's expressed desire and intent that Defendant Attorney Kazarosian be terminated as Father's counsel.

47. Defendant Kazarosian Costello & O'Donnell, LLP is the law firm that is currently designated as representing Father, where in December of 2013, Defendant Marsha Kazarosian, Esq. established the afore-referenced law firm with Defendant Walter Costello, Esq. and Kathleen O'Donnell, Esq.  In November of 2014, Attorney O'Donnell was appointed as a member of the Judicial Conduct Commission.   The Resident Agent for Defendant Kazarosian Costello & O'Donnell, LLP is Defendant Attorney Kazarosian, having the principal office at 546 Main Street, Haverhill, MA.

48. Defendant Brian T. Cuffe, Esq. resides in Newburyport, MA.  He is a licensed attorney in the Commonwealth with a private law practice at 430 Boston Road, Suite 105, Topsfield, MA.  Defendant Brian Cuffe was appointed guardian in the matter of In re Marvin H. Siegel by the Essex Probate & Family Court, pursuant to Supreme Judicial Court Rule 1:07.  He is paid at a private attorney's rate of $275 per hour with his fees being directly paid from the DSL Trust.  At all relevant times, Defendant Brian Cuffe has served—and continues to serve—as a court appointee and/or representative for, and on behalf of, Essex Probate & Family Court.

49. Defendant James Feld, Esq. resides in Woburn, MA and is a licensed attorney in the Commonwealth. Defendant Attorney James Feld was appointed conservator in the matter of In re Marvin H. Siegel by the Essex Probate & Family Court, pursuant to Supreme Judicial Court Rule 1:07.  He is paid at a private attorney's rate of $275 per hour, with his fees being directly paid from the DSL Trust.  At all relevant times, Defendant James Feld served—and continues to serve—as a court appointee and/or representative for, and on behalf of, Essex Probate & Family Court.

50. Defendant Walter A. Costello, Jr., Esq. resides in Swampscott, MA.  He is a licensed attorney in the Commonwealth and Partner of the law firm Kazarosian Costello & O'Donnell, LLP.  Defendant Attorneys Feld and Cuffe filed motions with the Essex Probate & Family Court requesting that they be allowed to privately retain the legal services of Defendant Attorney Costello to represent them (Defendant Attorneys Feld and Cuffe) in the matter of In Re Marvin H. Siegel as a direct result of Plaintiffs exposing Defendant Attorney Feld's and Cuffe's misconduct.  Defendant Attorney Costello's private legal services to act as counsel for Defendant Attorneys Feld and Cuffe have been entirely and directly paid from the DSL Trust.

51. Defendant Thomas Barbar, Esq. resides in Boston, MA.  He is a licensed attorney in the Commonwealth and a principal of the law office Deutsch Williams Brooks DeRensis & Holland.  Defendant Attorney Barbar's role in the matter of In re Marvin H. Siegel arose as a substitute for Defendant Attorney Costello.

11

52. For illegitimate reasons, in November/December of 2013, Defendant Attorney Walter Costello withdrew as counsel for Defendant Attorneys Feld and Cuffe and Defendant Attorney Barbar was unilaterally allowed to be substituted as counsel.  As with Defendant Attorney Costello, Defendant Attorney Barbar's private legal services are also directly paid for from the DSL Trust.  At all relevant times, Defendant Attorney Barbar has served—and continues to serve—as a representative for, and on behalf of, Defendant Attorney Cuffe and Defendant Attorney Feld.

40. Defendant Mary Ann Remillard, Esq. resides in Middlesex County.  She is a licensed attorney in the Commonwealth with a private law practice at 2 Gaythorne Road Methuen, MA.  Defendant Attorney Remillard filed her Notice of Appearance as private legal counsel for Defendant Attorney Cuffe on July 17, 2014.  Defendant Attorney Remillard's private legal services are being entirely and directly paid from the DSL Trust.

41. Defendant Robert A. Ledoux, Esq. is an individual residing in Danvers, MA.  He is a licensed attorney in the Commonwealth, whose law firm is at 30 Federal Street, Suite 200, Salem, MA.  Defendant Attorney Ledoux represents Plaintiffs' sister, Sheryl Sidman, in the underlying matter of In re Marvin H. Siegel.  At all relevant times, Defendant Attorney Ledoux served—and continues to serve—as a representative for, and on behalf of, Defendant Sheryl Sidman.

42. Defendant Maxa Berid, Esq. resides in Lowell, MA.  She is an attorney licensed in the Commonwealth and established in 2004 a private law practice—Berid & Schutzbank LLC—while simultaneously serving as General Counsel for Elder Services of Merrimack Valley, Inc. At all relevant times, Defendant Attorney Berid served—and continues to serve—as a representative for, and on behalf of, Defendant Elder Services of Merrimack Valley, Inc.  Defendant Attorney Berid's registration information with the Board of Bar Overseers does not, in any manner, identify her role as General Counsel for Defendant Elder Services of Merrimack Valley.

43. Defendant Elder Services of Merrimack Valley, Inc. (herein referred as "ESMV") is a quasi-private nonprofit corporation (quango) that provides various services geared towards the elderly.  Simultaneously, ESMV functions as a State designated protective service agency, which is governed under the Executive Office of Elder Affairs.  Defendant ESMV receives and investigates reports of elder abuse.  Defendant ESMV is at 360 Merrimack Street, Building 5, Lawrence, MA.  At all times relevant, Defendant ESMV has served—and continues to serve—as a representative for, and on behalf of, the Commonwealth of Massachusetts.

44. In 1984, Defendant Attorney Berid served as president for Defendant ESMV (Exhibit 13).  The Articles of Amendment specifically demonstrates the inherent conflict of interest by Defendant ESMV functioning as both a state protective agency and as a private corporation; as in its private corporate capacity it has stated that it has the specific

intention "to serve as temporary or permanent guardian, conservator, executor, administrator, or trustee."

45. Defendant Attorney Berid also served as president of Merrimack Valley Elderly Housing of West Newbury, Inc., which originated in 1983.

46. Defendant Attorney Berid has served on the Board of Directors for Neighborhood Legal Services, Inc. from 2004 *through the present*.  A high-ranking Clerk for the Essex Probate & Family Court, Julie Matuschak (also, a credentialed attorney) served on the Board of Directors for Neighborhood Legal Services, Inc., alongside Defendant Attorney Berid from 2004 throughout 2009.  Clerk Julie Matuschak has worked over twenty (20) years for the Essex Probate & Family Court.

47. Defendant Diane Powell resides in Swampscott, MA.  At all relevant times, Diane Powell served—and continues to serve—as supervisory personnel and/or representative for, and on behalf of, Defendant ESMV.

48. Defendant Scott Dailey resides in Haverhill, MA.  At all relevant times, Scott Dailey served—and continues to serve—as supervisory personnel and/or representative for, and on behalf of, Defendant ESMV.

49. Defendant Michael Springman is an individual whose residence is not known.  At all relevant times, Defendant Michael Springman served—and continues to serve—as a caseworker and/or representative for, and on behalf of, Defendant ESMV.

50. Defendant Cheri Myette, Esq. is an individual with residence unknown.  She is a licensed attorney with the Commonwealth, with a business address of 15 Lincoln Street, No. 259, Wakefield, MA. At all relevant times, Defendant Attorney Myette has served— and continues to serve—as a representative for, and on behalf of, Essex Probate & Family Court, as well as her own private law office.

51.Defendant Attorney Myette regularly accepts work as a court appointee—on the behalf of the Committee for Public Counsel Services (CPCS)—purportedly representing people being subjected to proceedings for being deemed incapacitated, being involuntarily committed to psychiatric facilities and being court ordered to take antipsychotics. Defendant Attorney Feld's financial filing of February 14, 2013 stated that Defendant Attorney Myette was paid <u>over $41,000</u>.

52.Defendant Michael Novack resides in Waltham, MA.  He is registered as a LICSW and works for Defendant Elder Resources, Inc.  Defendant Attorney Cuffe—in his capacity as court appointed guardian—hired Defendant Michael Novack in his official role with Defendant Elder Resources for contracted services as a geriatric case manager.  <u>Defendant Michael Novack and Elder Resources, Inc. are paid directly from the funds of the DSL Trust</u>.  (Exhibit 20) At all times relevant, Defendant Michael Novack has served—and

13

continues to serve—as a representative for, and on behalf of, Elder Resources; and as a representative for, and on behalf of, Defendant Attorney Cuffe; and as a representative for, and on behalf of, Essex Probate & Family Court.

53. Defendant Beverly Hospital, doing business as Northeast Hospital Corporation, has its principal office at 85 Herrick Street in Beverly, MA.

54. Defendant Whittier Pavilion is the psychiatric facility under the corporation Whittier Health Network, Inc., with principal office at 25 Railroad Square, Haverhill, MA.

55. Defendant Richard Garmil, Esq. resides in Haverhill, MA.  He is an attorney licensed in the Commonwealth with his private law practice at 3 Washington Square, Suite 220, Haverhill, MA.  At all relevant times Defendant Attorney Garmil has served—and continues to serve—as a representative of Defendant Whittier Pavilion; and as a representative of the Law Office of Richard G. Garmil. Defendant Attorney Garmil, also, has represented Defendant Merrimack Valley Hospital as private legal counsel in other probate matters in Essex Probate & Family Court.

56. In addition, in the matter of Mary Jane Bartlett v. Brian T. Cuffe (2012-J-0147), Defendant Attorney Garmil served as private legal counsel *for* Defendant Attorney Cuffe—which matter stemmed from further alleged misconduct by Defendant Attorney Cuffe in his capacity as a court appointed fiduciary.

57. Defendant Dr. Ping Cui resides in Acton, MA.  She is a private practicing geriatric psychiatrist at 288 Groveland Street, Suite C2, Haverhill, MA and is exclusively affiliated with Defendant Merrimack Valley Hospital.  Defendant Dr. Ping Cui was Father's treating psychiatrist commencing on or about, June 16, 2011 through January of 2012.

58. Defendant Dr. Janice Funk resides in Essex County.  She is a staff neuropsychologist at Whittier Rehab Hospital in Haverhill, MA and provides private services in her self-owned business called Neuroeducation, Inc. Dr. Funk's business address is 76 Summer Street, Haverhill, MA.

59. Defendant Merrimack Valley Hospital is a foreign corporation under Steward Family Hospital, Inc., with its principal office in Massachusetts is located at 500 Boylston Street, Boston, MA.  As a result of Defendant Attorney Cuffe's facilitation of Father being involuntarily committed to Defendant Merrimack Valley Hospital—under a Section 12—Defendant Merrimack Valley Hospital filed a motion with the Essex Probate & Family Court to become an intervening party in the underlying matter of In re Marvin H. Siegel.

60. Defendant Brandon Saunders, Esq. is an individual with his residence not known.  He is an attorney licensed in the Commonwealth and is employed by the law firm Pierce & Mandell, PC at 11 Beacon Street, Suite 800, Boston, MA.  Defendant Merrimack Valley Hospital privately retained Pierce & Mandell and assigned Defendant Attorney Saunders

14

as legal counsel for Defendant Merrimack Valley Hospital in the underlying matter of In re Marvin H. Siegel.  At all times relevant, Defendant Attorney Saunders served—and continues to serve—as representative for Defendant Merrimack Valley Hospital; and as representative for Defendant Pierce & Mandell.

61.Defendant Dr. Kai Hayes a/k/a Karla Hayes is an individual residing in Haverhill, MA and works for Defendant Merrimack Valley Hospital.  She holds herself out to be a geriatric psychiatrist, but is NOT Board certified in that field.  Dr. Kai Hayes was the admitting and treating doctor during the involuntary commitment of Father to Defendant Merrimack Valley Hospital. At all times relevant, Defendant Dr. Hayes served—and continues to serve—as a representative of Defendant Merrimack Valley Hospital.

62. Defendant Dr. Robert Portney resides in Boston, MA.  He is listed with the Board of Registration in Medicine as specializing in geriatric psychiatry and neuropsychiatry and is affiliated with Massachusetts General Hospital, McLean Hospital and Whittier Rehabilitation Hospital.   His business address is 6 Hearthstone Place, Andover, MA. Defendant Dr. Portney has been Father's treating psychiatrist commencing in January 2012 through the present.

63.Defendant Dr. Peter W. Cohen is an individual residing in Wellesley, MA and practices as a general psychiatrist, with qualifications in forensic psychiatry, with his primary work setting at Lemuel Shattuck Hospital.  His business address is listed as 43 Woodchester Drive, Chestnut Hill, MA.  Defendant Dr. Cohen's role was exclusively as a medical expert witness providing services to the designated defendant parties in the matter of In Re Marvin H. Siegel.

64.Defendant Dr. Cohen did not and does not have a doctor/patient relationship with Father prior to Dr. Cohen testifying as an expert witness for designated Defendants. Defendant Dr. Portney had already been engaged by Defendant Attorney Cuffe as treating psychiatrist for Father.  Yet, court ordered forced administering of antipsychotics had been based on an affidavit by Dr. Cohen, as if he were the treating psychiatrist for Father—with that fact specifically known to Judge Abber.

65.Defendant Kenney Enterprises LLC dba Right at Home is a private business providing home health care services, owned and established in 2002, by Jay Kenney of Marblehead, MA and Rosaleen Doherty-Kenney.  The Certificate of Organization states that the general character of the company's business is "non-medical senior home care."  The principal office is at 19 Front Street, Salem, MA.

66.Defendant Brenda M. Wojick, R.N. is a licensed registered nurse residing in Peabody, MA.   She is the original and direct nurse responsible for the care of Father (Marvin H. Siegel) and works on behalf of Defendant Kenney Enterprises LLC dba Right at Home. At

all relevant times, Defendant Brenda Wojick served—and continues to serve—as a representative of Defendant Right at Home.

67.Defendant Sheryl Sidman is the middle daughter of Marvin H. Siegel.  She resides in Wellesley, MA.  Defendant Sheryl Sidman has knowingly and deliberately engaged in acts of fraud and deception—individually and in concert with designated Defendants.

68.Defendant Alan Sidman is the husband of Defendant Sheryl Sidman and resides in Wellesley, MA.  Defendant Alan Sidman has knowingly and deliberately engaged in acts of fraud and deception—individually and in concert with designated Defendants.

69.The Commonwealth of Massachusetts is a defendant in this action pursuant to 42 U.S.C. § 1982 arising from deliberate and conscience-shocking acts and omissions by individual officials and agents that include: State elder protective service agency (ESMV), Essex Probate & Family Court, and the Supreme Judicial Court; such acts and omissions of State officials having occurred while acting in their specific designated official roles.

I.  STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTIONS

A.  Evaluation at Emergency Room of Defendant Beverly Hospital

70. Arising from the home care assistant's call to 911, the Boxford Police had Father taken by ambulance to the Emergency Room of Defendant Beverly Hospital.

71. Plaintiff Daughter Lisa and her husband immediately went to the Emergency Room of Defendant Beverly Hospital and informed the staff that she was attorney-in-fact, pursuant to Father's 2003 DPOA.

72. Notes in Defendant ESMV's computer system, input by Defendant Caseworker Springman on May 10, 2011, state that he asked Father who his power of attorney was and that Father stated that it was his daughter Lisa; and in Defendant Caseworker Springman's written report, called Investigation Summary and dated May 13, 2011, he stated: "Elder [Father] has a durable POA who is his daughter Lisa."

73. It was two (2) hours before the staff finally allowed Plaintiff Daughter Lisa to see Father.

74. During the clinical evaluation, the evaluator of Defendant Beverly Hospital became aware that Father's estate was valued at, approximately, $6 million.

75. The staff person for Defendant Beverly Hospital, who introduced herself as "the clinical evaluator," informed Plaintiff Daughter Lisa and her husband that an evaluation of Father had been already conducted and completed.

76. Prior to the evaluator of Defendant Beverly Hospital already having made a final decision that she was admitting Father to a psychiatric facility, the evaluator knew that

16

Father had an existing durable power of attorney; and that Plaintiff Daughter Lisa was attorney-in-fact for Father.

77. Prior to the evaluator Defendant Beverly Hospital already having made a final decision that she was admitting Father to a psychiatric facility, she did not seek information from Daughter Lisa; and the evaluator had already made a decision regarding Father's admission to a psychiatric facility, without any input from Daughter Lisa, in her capacity as attorney-in-fact.

78. The evaluator of Defendant Beverly Hospital did not inform Daughter Lisa that Father being admitted to Defendant Whittier Pavilion was an involuntary commitment.

79. The evaluator of Defendant Beverly Hospital informed Daughter Lisa and her husband that Father was being admitted to Defendant Whittier Pavilion based on a clinical diagnosis of Alzheimer's and Dementia; that the admission was to get a more extensive and detailed evaluation regarding a diagnosis of Alzheimer's and Dementia.

80. Daughter Lisa and her husband were not informed by the evaluator of Defendant Beverly Hospital that Defendant Whittier Pavilion was a psychiatric facility.

81. The evaluator of Defendant Beverly Hospital did not mention, in any manner, that antipsychotics would or could be a potential result of Father's admission to Defendant Whittier Pavilion.

B.  Involuntary admission of Plaintiffs' father to Defendant Whittier Pavilion

82. Father was transferred from Beverly Hospital's Emergency Room to Defendant Whittier Pavilion at, approximately, 4:00 a.m. on May 20, 2011 under G.L. c. 123, § 12.

83. Defendant Attorney Robert Ledoux has a long-established attorney/client relationship with Defendant Beverly Hospital.

84. Defendant Attorney Garmil acts as legal counsel for Defendant Whittier Pavilion; as well as, being regularly a court appointee of the Essex Probate & Family Court under SJC Rule 1:07.

85. From the inception of Plaintiffs' father's involuntary admission to Defendant Whittier Pavilion, Defendant Attorney Garmil and Defendant Whittier Pavilion were aware that Father had an estate valued at approximately $6 million.

86. From the inception of Plaintiffs' Father's involuntary admission to Defendant Whittier Pavilion, Defendant Attorney Garmil (and other staff of Defendant Whittier Pavilion) had knowledge that Plaintiff Daughter Lisa was the attorney-in-fact for Father, pursuant to Father's 2003 DPOA and that Father resided with Plaintiff Daughter Lisa and her family.

17

87. Having knowledge of Plaintiff Daughter Lisa's status as attorney-in-fact, Defendant Attorney Garmil, as a representative of Defendant Whittier Pavilion, prohibited Plaintiff Daughter Lisa from seeing Father at the inception of Father's involuntary admission.

88. A social worker from the Defendant Whittier Pavilion telephoned Plaintiff Daughter Lisa and informed her that she was not allowed to see Father because Defendant Attorney Garmil told the social worker that Father's 2003 DPOA was not a health care proxy.

89. Defendant Attorney Garmil had no valid basis to prohibit Plaintiff Daughter Lisa from seeing Father.

90. As a direct result of Defendant Attorney Garmil's and Defendant Whittier Pavilion's dishonoring Plaintiff Daughter Lisa's capacity as attorney-in-fact for Father, she immediately sought to retain private legal counsel as attorney-in-fact for Father.At no time did Defendant Whittier Pavilion seek to obtain information regarding family history or inquire from Plaintiff Daughter Lisa in its evaluation and treatment of Father.

91. Within four (4) days of Father's involuntary admission to Defendant Whittier Pavilion, Defendant Attorney Garmil filed a petition with the Haverhill District Court to have Father involuntarily committed for a six (6) month period at a psychiatric facility.

92. Defendant Attorney Garmil intentionally and knowingly concealed his filing of the six-month civil commitment petition from Plaintiff Daughter Lisa.

93. Defendant Attorney Garmil and his client—Defendant Whittier Pavilion and other clients/business contacts—would financially benefit from Father being court ordered to a long-term involuntary civil commitment.

94. Plaintiff Daughter Lisa inadvertently found out about the above-described petition for long-term civil commitment filed with Haverhill District Court on May 24, 2011.

95. The records of Defendant ESMV show that Defendant Attorney Berid and other staff of Defendant ESMV *knew*, on May 20, 2011, that Defendant Whittier Pavilion was going to seek a civil commitment in the Haverhill District Court based on Father *"not voluntarily [having] signed himself in."*  Defendant ESMV did not inform Plaintiff Daughter Lisa as to Defendant Whittier Pavilion's intent to pursue a civil commitment of Father.

96. The records of Defendant ESMV for May 20, 2011, and thereafter, show that Defendant ESMV had direct and repeated contact with Defendant Whittier Pavilion.

**C.  Conspired fraud and deception by Defendant Brian Nagle of Defendant BNY Mellon and Defendant Attorney Ed Tarlow to dismantle Father's 2003 DPOA to gain control of the DSL Trust for ill-gotten gain**

97. As explicitly stated in Father's 2003 DPOA, the attorney-in-fact is directed to use Father's funds to secure legal services on Father's behalf; therefore, Plaintiff Daughter Lisa called Defendant Brian Nagle of BNY Mellon to facilitate funding to retain legal counsel to defend Father against the afore-described petition.

98. On May 24, 2011, Defendant Brian Nagle was Vice President and Senior Portfolio Manager for Defendant BNY Mellon and direct and primary manager of Father's accounts.

99. Defendant Brian Nagle testified in court that, prior to May 24, 2011, he was aware that Defendant BNY Mellon had a physical copy of Father's executed 2003 DPOA and that Plaintiff Daughter Lisa had been Father's attorney-in-fact, under the 2003 DPOA, for at least eight (8) continuous years.

100. In early April of 2011, Father had verbally re-affirmed to Defendant Brian Nagle and other representatives of Defendant BNY Mellon the validity of his 2003 DPOA and that the 2003 DPOA still reflected his expressed intentions and desires.  Representatives of Defendant BNY Mellon confirmed in writing to Father the above-described re-affirmation in writing.

101. Defendant Brian Nagle graduated from law school and received a juris doctorate.  He has made public representations that he has legal knowledge and expertise regarding estate planning instruments and advance directives.

102. Massachusetts General Laws Chapter 201B, § 1 provides the definition of a durable power of attorney, which states that the very purpose of a durable power of attorney is to remain effective if the principal becomes disabled or incapacitated.

103. The nature of responsibilities and duties of Defendant Brian Nagle, in managing investment accounts for Defendant BNY Mellon, makes it that he knew—or should have known—that a durable power of attorney remains effective upon the disability or incapacity of a principal; that he was familiar—or should have been familiar—with Massachusetts law that a durable power of attorney remains effective upon the disability or incapacity of a principal.

i.  Conversation of May 24, 2011 between Plaintiff Daughter Lisa and Defendant Brian Nagle

104. Plaintiff Daughter Lisa specifically informed Defendant Brian Nagle as to the events that took place surrounding Father being involuntarily admitted and that she had already secured legal counsel to defend Father against being involuntarily committed.

105. Plaintiff Daughter Lisa requested Defendant Brian Nagle, as financial manager of Father's account with Defendant BNY Mellon, to transfer money into Father's checking

account for Plaintiff Daughter Lisa to be able to pay the retainer fee for legal counsel; that the funds requested were specifically to fight for Father's release from Defendant Whittier Pavilion and to *protect Father from Attorney Garmil's petition for a 6-month civil commitment*, which Defendant Brian Nagle confirmed in court.

106. Unwittingly, Plaintiff Daughter Lisa informed Defendant Brian Nagle that legal counsel had advised her to seek guardianship and conservatorship.

107. During that conversation, Defendant Brian Nagle led Plaintiff Daughter Lisa to believe that he (Brian Nagle) would comply with Plaintiff Daughter Lisa's request as attorney-in-fact for Father.

ii.      Defendant Brian Nagle called Father at Defendant Whittier Pavilion immediately following his conversation with Plaintiff Daughter Lisa

108. On that same day (May 24, 2011), after speaking with Plaintiff Daughter Lisa, Defendant Brian Nagle called Father at the psychiatric facility of Defendant Whittier Pavilion while Father was involuntarily committed and under lock-down.

109. Defendant Brian Nagle attested in-court that he had initiated the call to Father on May 24, 2011 to obtain his permission for Daughter Lisa to act as attorney-in-fact in the withdrawing of funds from Defendant BNY Mellon.

110. Defendant Brian Nagle did not inform Father during their conversation that Plaintiff Daughter Lisa requested a transfer of funds to be made to Father's checking account. Through specific omission, Defendant Brian Nagle intended for Father to think that Plaintiff Daughter Lisa asked to have money transferred to her own checking account.

111. Defendant Brian Nagle attested, through in-court testimony, that Father verbally revoked his 2003 DPOA during their conversation of May 24, 2011. Where Defendant Brian Nagle knew that Father had a prior and long-established validly executed durable power of attorney, and with attested knowledge that Father was under a 3-day involuntary commitment to a psychiatric facility, Defendant Brian Nagle knew it was improper for him seek purported authorization from Father regarding Plaintiff Daughter's Lisa's requests as attorney-in-fact.

112. Defendant Brian Nagle knew it was improper conduct for him to have relied on a supposed verbal revocation of a durable power of attorney, while acting in the capacity as Vice President of Defendant BNY Mellon.

113. At no time did Father request a specific attorney to be called, during the May 24, 2011 conversation between he and Defendant Brian Nagle.

114. Defendant Brian Nagle was made aware by Plaintiff Daughter Lisa that Defendant Richard Garmil, as a representative of Defendant Whittier Pavilion, had prohibited Plaintiff Daughter Lisa from seeing her Father.

115. Defendant Brian Nagle made statements to Plaintiff Daughter Lisa that he would be affirmatively taking steps to process a transfer of funds to Father's checking account.

116. At no time did Defendant Brian Nagle, or any agent of Defendant BNY Mellon, contact Plaintiff Daughter Lisa to inform her that Defendant BNY Mellon would not be complying with Plaintiff Daughter Lisa's request as attorney-in-fact of May 24, 2011.

iii.     Defendant Brian Nagle's telephone call on May 24, 2011 to Defendant Attorney Ed Tarlow of Defendant Law Firm TBHR

117. The only statements that Father made to Defendant Brian Nagle during their conversation of May 24, 2011 regarding getting him counsel was a general plea to get legal counsel so that he could get out of Defendant Whittier Pavilion.

118. In-court testimony of Defendant Brian Nagle shows that, prior to his calling Defendant Attorney Tarlow, Defendant Brian Nagle knew Plaintiff Daughter Lisa had already obtained legal counsel for Father.  Yet, on the same day (May 24, 2011), Defendant Brian Nagle called Defendant Attorney Tarlow, specifically, to have Defendant Attorney Tarlow become counsel for Father; that he called Defendant Attorney Tarlow to go see Father at Defendant Whittier Pavilion.

119. Defendant Brian Nagle testified in-court that, prior to May 24, 2011, he had personally known Defendant Attorney Tarlow and his associates, Defendant Attorneys Albert DeNapoli and Catherine Watson, for several years.

120. Defendant Brian Nagle came to know Defendant Attorneys Tarlow, DeNapoli and Watson through his official role with Defendant BNY Mellon.

121. Defendant Brian Nagle co-founded a magazine publication called "Family Business Association, Inc." with Defendant Attorneys Tarlow and DeNapoli.  Through Family Business Association, Defendant Brian Nagle specifically used and advertised his official position with Defendant BNY Mellon.  In addition, Defendant Brian Nagle, Defendant Attorney Tarlow, Defendant Attorney DeNapoli and Defendant Attorney Watson have, all, served together on the Board of Directors for "Family Business Association, Inc." for several years.

121. Based merely on Plaintiff Daughter Lisa informing Defendant Brian Nagle that upon advice of counsel she was *going* to petition for guardianship and conservatorship, Defendant Brian Nagle became concerned that the multi-million dollar account could

21

possibly be taken out of the custody of Defendant BNY Mellon to another financial institution.

122. With *no* indication given of *any* intention of a removal of the afore-described accounts from Defendant BNY Mellon, Defendant Brian Nagle deliberately called Defendant Attorney Tarlow for the specific purpose of having Defendant Attorney Tarlow physically go see Father to get documents signed that would oust Plaintiff Daughter Lisa as Father's attorney-in-fact and definitely secure Defendant BNY Mellon's custody of Father's funds.

iv.   Defendant Attorney Tarlow's and Defendant Attorney Watson's visitation with Father during 3-day involuntary commitment

223. On May 25, 2011—*the very next day* after Defendant Brian Nagle spoke with Defendant Attorney Tarlow—Defendant Attorneys Tarlow and Watson went to see Father while locked-down at Defendant Whittier Pavilion.

224. The above-referenced prepared documents included three (3) written instruments for execution: 1) a purported revocation of Father's 2003 DPOA, 2) a new durable power of attorney, naming Father's CPA as attorney-in-fact and 3) a retainer agreement for the legal services of Defendant Attorney Tarlow and his law firm.

225. Father's signing of the above-described documents on May 25, 2011 were notarized by Defendant Attorney Tarlow—of significance, Defendant Attorney Tarlow not being a disinterested party.

v.   The retainer agreement

226. The retainer agreement brought with Defendant Attorneys Tarlow and Watson did not contain even one reference about providing legal services to defend Father against the petition for a six-month civil commitment filed by Defendant Attorney Garmil on behalf of Defendant Whittier Pavilion.  (Exhibit 319). The only legal services expressed in the above-described retainer agreement had to do with was *future* estate planning and other financial related matters.

227. With knowledge of Father's multi-million dollar estate, Defendant Law Firm TBHR overtly allowed and intended for *court-appointed counsel* from the Committee for Public Counsel Services (CPCS) to represent Father in the pending petition filed in Haverhill District Court by Defendant Attorney Garmil, on behalf of Defendant Whittier Pavilion, which sought a six-month civil commitment.

vi.   Durable Power of Attorney

228. Defendant Attorney Tarlow and/or his agents drafted the durable power of attorney signed by Father on May 25, 2011—which was procured through fraud and deceit.

22

229. The durable power of attorney stated that the attorney-in-fact was Father's CPA, Bill Austin of Braver; however, on June 7, 2011, Defendant Attorney Tarlow and his agents represented in court that Father's CPA (Bill Austin) did not want to accept the role of attorney-in-fact.

230. Paragraph numbered 8 of the durable power of Attorney, signed by Father on May 25, 2011 stated:

*To pay any and all bills, accounts, claims and demands now or hereafter payable by me including, without limiting the generality of the foregoing, the power to settle or compromise any such bills, accounts, claims and demands, and to specifically approve payment of professional legal fees incurred by [Father] with counsel at Tarlow, Breed, Hart & Rogers, P.C., and to authorize Bank of New York Mellon to distribute funds in payment of said professional legal fees within thirty (30) days of receiving an invoice.*

231. Paragraph numbered 10 of the durable power of Attorney, signed by Father on May 25, 2011 stated:

*To act for [Father] in any business in which I have been, am now or hereafter may be engaged or interested.*

232. Paragraph numbered 12 of the durable power of Attorney, signed by Father on May 25, 2011 stated:

*To sell, manage, invest and reinvest any or all of [Father's] property as [Father's] said attorney-in-fact shall deem expedient, changing investments according to [Father's] said attorney-in-fact's judgment.*

233. Paragraph numbered 14 of the durable power of Attorney, signed by Father on May 25, 2011 stated:

*To borrow money in my name, and to give promissory notes or other obligations therefor, and to deposit as collateral, pledge as security for the payment thereof or mortgage any or all of my securities or other property of whatever nature.*

234. Paragraph numbered 15 of the durable power of Attorney, signed by Father on May 25, 2011 stated:

*To borrow upon or collect monies due from all insurance policies which now or in the future stand in [Father's] name.*

235. Paragraph numbered 18 of the durable power of attorney, signed by Father on May 25, 2011 stated:

*[]to employ specifically, TARLOW, BREED, HART & RODGERS, P.C. as counsel.*

23

236. Paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on May 25, 2011 allowed the attorney-in-fact to have unfettered discretion to act, regardless of Father's desires.

237. The paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on May 25, 2011 even authorized the attorney-in-fact to act contrary to Father's intentions or desires.

238. The paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on May 25, 2011 included the following language:

*. . . hereby giving and granting unto my said attorney –in-fact full power and authority to do and perform all and every act and thing whatsoever. . . . as fully to all intents and purposes as I might or could do if personally present.*

239. The paragraph entitled "Delegation of Powers; Compensation" of the durable power of attorney, signed by Father on May 25, 2011, allowed Defendant Attorney Tarlow—designated as attorney-in-fact—could delegate his powers to investment counsel, brokers, attorneys or "any other agent".

240. The DPOA stated:

*[Father's] said attorney-in-fact may deal with himself or herself or with any concern in which he or she may be interested as freely and effectively as though dealing with a third party.*

241. The paragraph entitled "HEALTH CARE PROXY" of the durable power of Attorney, signed by Father on May 25, 2011, designated that Father's attorney-in-fact would be given full HIPAA rights.

242. The paragraph entitled "HEALTH CARE PROXY" of the durable power of Attorney, signed by Father on May 25, 2011, designated the CPA to have complete access to any and all of Father's medical information and records.

243. Of significance, Father's 2003 DPOA unambiguously precluded the attorney-in-fact from being able to act with free reign.  The language of the 2003 DPOA precluded any attorney-in-fact from being able to dismantle Father's already well-established estate planning instruments.

244. Counsel from Defendant Law Firm TBHR did not have any intentions of providing legal services to protect Father against Defendant Whittier Pavilion's petition for a six-month civil commitment.

245. Through communications with Defendant Brian Nagle—acting on behalf of Defendant BNY Mellon, Defendant Law Firm TBHR knew that Father had validly

24

executed his desires and intentions in a durable power of attorney and trust on February 11, 2003.

246. In a signed pleading submitted to the Essex Probate & Family Court on June 7, 2011, Defendant Attorney DeNapoli stated that "[in] order to accomplish his goals of protecting and preserving [Father's] assets, [Father] may need only to finalize his estate plan and set up a trust with himself and the present holder of his funds, BNY Mellon, as co-trustee, to protect his assets and assure that his wishes are followed."

247. Defendant Attorney DeNapoli sent correspondence to counsel obtained for Father, in Plaintiff Daughter Lisa's capacity as attorney-in-fact, dated May 25, 2011, identifying the law firm of Defendant Law Firm TBHR as Father's newly retained counsel and stated that Father had revoked the 2003 DPOA on May 25, 2011.

248. Defendant Attorney Kazarosian filed an affidavit with the Essex Probate & Family Court on August 17, 2011, attesting that Father had thoughtfully, comprehensively and cohesively explained to her that the documents presented to Father and signed on May 25, 2011 were not knowingly and voluntarily executed by Father; that Father did not have knowledge of the content of the documents in which he signed.

249. Defendant Brian Nagle testified in court that when he called Defendant Attorney Tarlow on May 24, 2011 he asked Defendant Attorney Tarlow to become legal counsel for Father for the purpose of getting Father out of Defendant Whittier Pavilion.

250. However the purported retainer agreement drafted by Defendant Attorney Tarlow and Defendant Attorney Watson—and signed while Father was under lockdown in a psychiatric facility, via a three-day involuntary psychiatric commitment— is very detailed and specific as to the scope of legal services offered to Father by Defendant Law Firm TBHR *and specific* for *estate planning*.

251. There is no reference to, in any manner, regarding legal services to free Father from involuntary commitment at Defendant Whittier Pavilion.

252. As of May 20, 2011, records of Defendant ESMV show that Defendant Attorney Berid and staff of Defendant ESMV knew that Father was going to be given antipsychotics by Defendant Whittier Pavilion.

253. As of June 3, 2011, records of Defendant ESMV show that Defendant Attorney Berid and staff of Defendant ESMV knew the above-described manner in which Defendant Attorney Tarlow obtained the signed documents of May 25, 2011.

i.  Evidence bolstering ill-motives

254. Defendant Attorney Tarlow has a long-established pattern of unscrupulous and unconscionable acts in rendering estate-planning services whereby he has induced his clients to make him trustee and/or executor of their estate planning instruments.

255. Specifically in the matter of In re Marvin H. Siegel, Defendant Attorney Tarlow— and the Defendant Law Firm of TBHR—filed a motion seeking an Order allowing Defendant Attorney Feld (as conservator) to pay them approximately $110,000, for purported legal services.

256. Even Judge Abber knew that Defendant Attorney Tarlow's request for payment was so beyond the pale, that he denied the specific amount requested —but did issue an Order for payment to be issued to Defendant Law Firm TBHR for the amount of $6,500.00. This Order for payment to be made to Defendant Law Firm TBHR by Judge Abber was explicitly placed on the docket sheet of In re Marvin H. Siegel—in the entry dated 11/22/2011, stating:

*After review of all the submissions and the invoice the motion is allowed in the amount of $6,500.00. The court finds that the respondent did benefit from the services, but the time charged is excessive in light of the issues dated 11/21/11.*

257. The above-referenced electronic docket entry was subsequently altered by the Clerk's Office of the Essex Probate & Family Court. The written entry has been completely removed from the electronic docket for In re Marvin H. Siegel. The entry for 11/22/2011 was altered and in the place of the original entry now reads only as: "Motion to approve statement of payment form Allowed 11/21/2011".

258. There is no legitimate reason for the above demonstrated alteration of the docket for In re Marvin H. Siegel. The alteration of the docket was done with deliberate and knowing ill-motives; and done at the behest of designated Defendants.

259. Excessive billing for legal services is a violation of the Massachusetts Rules of Professional Conduct. The Board of Bar Overseers has published several opinions about excessive fees constituting professional misconduct.

260. Under the Massachusetts Judicial Canon of Ethics, judges are required to report known professional misconduct to the Office of Bar Counsel/Board of Bar Overseers. There are prior published decisions by the Board of Bar Overseers sanctioning attorneys for excessive billing.

261. As set forth above, Judge Abber explicitly used the word "excessive" to describe the afore-described billing submitted by Defendant Attorney Tarlow (and that of Defendant Law Firm of TBHR). Judge Abber reduced the afore-described payment by 95%—which is why the above discussed docket entry had been illicitly altered.

26

iv.   Evidence of prior concerted efforts of fraud by Defendant Attorney Tarlow and other members of Defendant Law Firm TBHR

262. In 1991 a civil action involving fraudulent conveyance of property was filed against Defendant Attorney Tarlow and other individuals affiliated with Defendant Law Firm TBHR.

263. Partners of Defendant Law Firm TBHR—Attorney Richard Breed and Attorney Jeffrey Hart—were also parties of direct acts of conveying their interest to their spouses and were thereby alleged to have specifically and deliberately engaged in acts to defraud creditors by such conveyances.

264. The above-described conveyances and transfer of interest took place, contemporaneously, with the previously discussed transactions by Defendant Attorney Tarlow as Trustee for the North Street Irrevocable Trust (Everett Cole, Jr. as settlor).

265. Metropolitan Life Insurance Company obtained a judgment in Suffolk Superior Court in September of 1991 for damages in the amount of $358,120.49 against Defendant Attorney Tarlow and the other individuals affiliated with Defendant Law Firm TBHR.

266. Defendant Attorney Tarlow and the other individuals affiliated with Defendant Law Firm TBHR, each, signed individual Agreement for Judgments for the sum of $51,500.

F.   **Conspired fraud and deception by Defendant BNY Mellon, Defendant Law Firm TBHR and Defendant Whittier Pavilion during litigation**

i.   *Overview*

267. Although Plaintiff Daughter Lisa is a practicing attorney, at the time Father had been involuntary committed on May 20, 2011 she did not practice probate law and did not have experience involving guardianships and conservatorships, mental health, or civil commitments.

268. Plaintiff Daughter Lisa as Father's attorney-in-fact sought Attorney Diane Long's private legal representation prior to Defendant Attorney Tarlow's afore-described visit to Father on May 25, 2011. Attorney Long's primary area of practice is in family and probate law.

269. Through counsel, Plaintiff Daughter Lisa was of the understanding that filing petitions for guardianship and conservatorship in Probate & Family Court was the sole available avenue to attempt to protect her father. Consequently, Attorney Long sought an emergency hearing, on behalf of Plaintiff Daughter Lisa (as Father's attorney-in-fact), in the Essex Probate & Family Court; which was held on May 27, 2011.  Also on May 27, 2011, Attorney Long filed petitions for guardianship and conservatorship and an affidavit

27

explicitly attesting that Plaintiff Daughter Lisa sought relief solely because of Defendant Whittier Pavilion's and Defendant BNY Mellon's refusal to honor Father's 2003 DPOA.

270. Attorney Long gave advance notice to Defendant Law Firm TBHR about the emergency hearing for May 27, 2011, which counsel on behalf of Defendant Law Firm TBHR did attend.

ii.        Court proceeding of May 27, 2011

271. The emergency motion and supporting Affidavit were presented on May 27, 2011 before Judge Mary Ann Sahagian, First Justice of the Essex Probate & Family Court.

272. Prior to May 27, 2011, Judge Sahagian had presided over multiple probate matters that have directly involved Defendant BNY Mellon and Defendant Brian Nagle, in his official capacity with Defendant BNY Mellon.

273. From at least 2005 through 2009, Defendant Brian Nagle—on behalf of Defendant BNY Mellon—was directly involved in certifying and providing financial reports to the Essex Probate & Family Court in the matter of In re Fred Hussey; and whose financial reports Judge Sahagian personally had presided over and issued judgments.

274. Through counsel, Plaintiff Daughter Lisa requested that the Essex Probate & Family Court revoke the previously described instruments obtained on May 25, 2011 by Defendant Attorneys Tarlow and Watson.

275. Demonstrating that Judge Sahagian knew that Attorney Long had presented substantial evidence of unscrupulous conduct by counsel of Defendant Law Firm TBHR and Defendant BNY Mellon is the fact that—despite Defendant Law firm TBHR's proffered DPOA of May 25, 2011—Judge Sahagian issued a temporary order that Father's financial accounts be frozen, but allowed the proffered DPOA to be used to access Father's funds for "health and medical expenses."

276. Had the affidavit submitted by Attorney Long not contained sufficient prima facie evidence of unscrupulous conduct by designated Defendants, Judge Sahagian would have had *no* reason to freeze Father's funds or limit the proffered DPOA by Defendant Law Firm TBHR.

277. The manner in which Judge Sahagian tailored the above-described order also shows that she was influenced by her prior dealings with Defendant BNY Mellon and Defendant Brian Nagle and showed bias in their favor as she *still* allowed the designated Defendants access to Father's funds.

278. The magnitude of Judge Sahagian's bias is demonstrated by her failure to make an emergency court appointment from the Court's list of certified court appointees to manage subsequent transactions for Father's "health and medical expenses"—the underlying

situation presented to Judge Sahagian at the hearing of May 27, 2011 is the epitome of when a court appointment is *supposed to* occur.

279. Judge Sahagian saw that the allegations against the designated Defendants were substantiated and consequently she did not want to be further involved in the matter of In re Marvin H. Siegel; therefore, at the hearing of May 27, 2011, she directed that the other filed motions and petitions in the matter of In re Marvin H. Siegel be assigned to Judge Abber.

280. At the hearing of May 27, 2011, Judge Sahagian scheduled the other temporary motions to be heard by Judge Abber on June 7, 2011.

iii.    Communications between Defendant Law Firm TBHR and Defendant Attorney Garmil/Defendant Whittier Pavilion through June 7, 2011

281. The invoice filed by Defendant Attorneys DeNapoli and Tarlow state that:

282. On 5/26/2011, there were multiple telephone conversations between Defendant Attorney Watson and Defendant Attorney Garmil; multiple telephone conversations between Defendant Attorney DeNapoli and Defendant Attorney Garmil.

283. On 5/31/2011, there were multiple telephone conversations between Defendant Attorney DeNapoli and Defendant Attorney Garmil; telephone conference with Defendant Attorney DeNapoli, Defendant Attorney Garmil and appointed counsel for Father (Joel Favazza) regarding the commitment petition filed in Haverhill District Court—conference involved "discussion of status and strategy".

284. On 6/1/2011,"further discussion" took place between Defendant Attorney DeNapoli, Defendant Watson and Defendant Attorney Garmil "relative to reviewing medical records, sending Durable Power of Authorization and release from holder of durable power of attorney (Father's accountant) to Attorney Garmil."

285. On 6/6/2011, there were telephone conferences involving Defendant Attorney Watson, Defendant Attorney DeNapoli, Defendant Attorney Garmil and CPCS Attorney Favazza; and, telephone call from Defendant Attorney Garmil to Defendant Attorney DeNapoli—discussion involving "issues concerning voluntary commitment."

iv.  Involvement of Defendant ESMV up through June 7, 2011

286. The records of Defendant ESMV show that on June 3, 2011, Defendant Daughter Sheryl informed Defendant Caseworker Springman that she and Plaintiff Daughter Devora had "written affidavits for [the hearing of June 7, 2011] requesting an outside party be guardian."

287. _Prior_ to the court proceeding held on June 7, 2011, Defendant ESMV had recorded in its electronic notes—input in the computerized system—that Plaintiff Daughter Lisa had an attorney representing her in the guardianship case named Diane Long out of Winchester, MA; that Defendant Attorney Tarlow was representing Father and that Father "had a new POA drawn up and named his Tax attorney and accountant Bill Austin his new POA removing his daughter Lisa."

288. In addition, prior to the court proceeding of June 7, 2011, Defendant ESMV had recorded the following information in its electronic notes:

_on 6/3/2011, Defendant Supervisor Dailey wrote that the two other daughters "do not support Lisa as Guardian/Conservator.  AV [Father] has been prescribed Depakote";_

_on 6/3/2011, Defendant Caseworker Springman wrote that he "left a message for the elder's [Father] atty requesting a call back regarding the elder's guardianship hearing";_

_on 6/6/2011, Defendant Supervisor Dailey wrote: "PSW has spoken with Tarlow and informed him of PS investigation.  Tarlow indicated that he is also looking into FE and requesting bank statements going back 12 months."_

v.  Court proceedings of June 7, 2011

Inquiry by Judge Abber as to how Defendant Attorney Tarlow had been retained to represent Father

289. Defendant Attorney DeNapoli intentionally gave the impression to Judge Abber that Father personally initiated and sought out Defendant Attorney Tarlow's legal representation because they had known each other for thirty (30) years, as attorneys sharing a suite—which was false.

290. Immediately after, Judge Abber conducted a series of inquiries that revealed Defendant Attorney DeNapoli's initial representation was false.

291. Judge Abber asked Defendant Attorney DeNapoli whether Father, _prior_ to May 25, 2011, had ever used Defendant Attorney Tarlow's legal services or that of his law firm; which Defendant Attorney DeNapoli stated that Father had not.

292. Defendant Attorney DeNapoli's answers to Judge Abber's successive questioning showed that Defendant Attorney Tarlow and Father had been only mere acquaintances—they just happened to have had offices in the same building.

Evidence arose in-court of prior suspect out-of-court judicial communications

294. The very first proceeding that Judge Abber presided over in the matter of In Re Marvin H. Siegel was June 7, 2011.  Judge Abber did not conduct an evidentiary hearing—he only entertained oral arguments by counsel.

30

295. Attorney Long began stating the specific details of the above-described fraudulent and deceptive conduct, but Judge Abber interrupted her *to ask her if she had a bond*.

296. Even though Attorney Long had been giving extensive details about Father being involuntarily committed to a psychiatric facility, Judge Abber could only focus on his seeing the actual paperwork for the bond.

297. Showing that Judge Abber's inquiry about the bond was so off topic, Attorney Long had to actually ask Judge Abber to repeat the question—which he did.

298. Even though Attorney Long promptly responded to Judge Abber's inquiry about the bond—informing him that she had already filed the bond and that it should be there in the court file, Judge Abber went on to perseverate on the issue of the bond. Judge Abber would not let Attorney Long continue with her presentation of the facts because he was so fixated on seeing, with his own eyes, the actual document.

299. The discourse regarding the above-referenced bond went as follows:

> Judge Abber:   You filed it this past Friday?
>
> Attorney Long:Well no, two Fridays ago when we originally filed--
>
> Judge Abber:   Do you have a copy of it?
>
> Attorney Long:   --the motions?
>
> Judge Abber:   No, it's not in here, right. Do you have a copy of it?
>
> Attorney Long: No, your Honor, without sureties on the bond.
>
> Judge Abber:   Do you have a copy of it?
>
> Attorney Long: I do. Yes, I'll have to dig it up out of the file. I can have my associates (indiscernible – low audio at 10:27:11) that I get out for you. So basically, that's what the motion (indiscernible—low audio at 10:27:17).
>
> Judge Abber:   Well, first of all, let's get back to the original motion. . . .

300. Within two very brief inquiries, Judge Abber went right back to the topic of money; he stated: "Where's the value of the estate?" Defendant Attorney DeNapoli responded: "The value of the estate is $6.9 million dollars."

301. The quoted discourse evidences that Judge Abber had been provided prior outside-of-court information by Defendants about Father's multi-million dollar estate.

302. At the proceeding held on June 7, 2011, Attorney Long did make Judge Abber aware of Father's 2003 DPOA.

31

303. G.L. c. 190B, § 5-503 states that a specific nomination of a guardian and/or conservator in a DPOA "shall" be abided by the judge—unless "for good cause or disqualification."

304. To reiterate, the proceeding of June 7, 2011 was the very first time that Judge Abber had presided in the matter of In re Marvin H. Siegel—and as shown by the audio court recording and transcript, Judge Abber summarily declared, in open court, on June 7, 2011 that he was definitively not going to permit any of the three daughters to be appointed guardian or conservator.

vi.    <u>Defendant Tarlow knowingly and intentionally made misrepresentations in pleadings submitted on June 7, 2011 to Essex Probate & Family Court</u>

305. Defendant Attorney DeNapoli *personally* drafted Defendant Daughter Sheryl's Affidavit. (Exhibit 328) In that affidavit drafted by Defendant Attorney DeNapoli, Defendant Daughter Sheryl attested:

*Since Lisa and her family has moved into my father's house, I have received calls from concerned friends about my father's condition in relation to Lisa and her family living [in Father's home] and using it as if it were her own home.  My Father has been very distraught over the filth, mess, and turmoil in the house since Lisa and her family moved in.*

306. In the affidavit signed by Defendant Attorney Tarlow and filed with the Essex Probate & Family Court on June 7, 2011, he explicitly stated that Father had reported the poor condition of his home—with such disrepair supposedly caused by Plaintiff Daughter Lisa—to the Boxford Board of Health.  (Exhibit 329—refer to page 7, Paragraph numbered 30(q)).

307. Defendant Caseworker Springman had been inside Father's home on multiple occasions during the time that Plaintiff Daughter Lisa and her family had been living with Father—contemporaneous with the above-described allegations made by Defendant Daughter Sheryl and Defendant Attorney Tarlow.  Proving that such allegations were entirely false, Defendant Caseworker Springman—where he personally had seen the inside of the home for himself—raised no concerns in his reports and notes of Father's living conditions or the conditions regarding the house.  In fact, Defendant Caseworker Springman made written notes affirmatively showing that Father's living condition was *more than* acceptable.

308. Upon Attorney Long having received the afore-described affidavit of Defendant Attorney Tarlow on June 6, 2011—the day *before* the scheduled hearing, she personally called the Boxford Health Department, on June 6, 2011, to verify the claim made by Defendant Attorney Tarlow.

32

309. The Administrator checked all records for the address of Father's residence and all records related to Father's name and informed Attorney Long that there was no record of any calls or other reports having been made. Attorney Long spoke to the Administrator for Boxford's Board of Health and submitted an affidavit regarding her discussions with the Administrator to the Essex Probate & Family Court on June 7, 2011.  (Exhibit 330).

> Defendants' malicious misuse of court information to disparage
> Plaintiff Daughter Lisa

309. Defendant Attorney DeNapoli submitted documentation from Land Court that consisted of a Complaint for foreclosure filed against Plaintiff Daughter Lisa's home in July of 2009—no other documentation was provided, just the Land Court docket sheet. Showing the intentional maliciousness of Defendant Attorney DeNapoli's misuse of such documentation on June 7, 2011, is the fact that *no further foreclosure proceedings had occurred after the filing of the complaint in July 2009*.

vii.   Acts of extortion by Defendant Attorney DeNapoli, as representative of Defendant Tarlow Breed Hart Rogers

310. A few days after the above-described court proceeding, on June 9, 2011, Defendant Attorney DeNapoli called Attorney Long (counsel for Plaintiff Daughter Lisa) to propose what he characterized as an "offer of settlement"—which just because he called it an "offer of settlement" does not make it so.

311. As previously set forth, Defendant Attorney DeNapoli knew that Plaintiff Daughter Lisa and her husband had been having continuous and grave financial difficulties due to severe physical injuries that Plaintiff Daughter Lisa first sustained in August of 2006.

312. When Defendant Attorney DeNapoli spoke with Attorney Long, and informed her that *if* Plaintiff Daughter Lisa would withdraw her petitions that she filed in the Essex Probate & Family Court (In re Marvin H. Siegel), *he* would facilitate Plaintiff Daughter Lisa *immediately* receiving $100,000 *from Father's estate*— he attempted to veil the bribe by stating that Defendant Daughter Sheryl and Plaintiff Daughter Devora would also receive $100,000 each.

313. When Attorney Long relayed the above-statements made by Defendant Attorney DeNapoli to Plaintiff Daughter Lisa who immediately responded that Defendant Attorney DeNapoli's "offer" was an outright bribe which Plaintiff Daughter Lisa without hesitation refused.

314. At that time, Plaintiff Daughter Lisa, also, conveyed to Attorney Long that Defendant Attorney DeNapoli's supposed settlement was in fact attempted extortion; that a monetary settlement was *not* consistent with this type of legal action—a petition for guardianship and conservatorship is *not*, in any manner, commensurate with tort actions that use

monetary settlements as a valid and legal custom and practice (such as a personal injury case or breach of contract claim).

315. Subsequent to Attorney Long's telephone conversation with Defendant Attorney DeNapoli informing him of Plaintiff Lisa's refusal to submit to extortion, he and Defendant Attorney Tarlow *re-checked* the status of the Complaint of foreclosure regarding property owned by Plaintiff Daughter Lisa and her husband.

316. The pleadings filed by Plaintiff Daughter Lisa explicitly detail the offered $100,000 to Plaintiff Daughter Lisa by Defendant Attorney DeNapoli in exchange for her dropping her filed petitions for guardianship and conservatorship.

317. In Defendant Attorney DeNapoli's affidavit, he explicitly admitted that he stated Plaintiff Daughter Lisa would receive $100,000 based on the condition that she were to *not* pursue her legal action seeking to validate Father's 2003 DPOA. Defendant Attorney DeNapoli expressed that he, intentionally and knowingly, made the $100,000 offer *based on his belief that Plaintiff Daughter Lisa was having financial difficulties*.

ix.  Court proceedings held on June 14, 2011

318. The scope of the court proceeding was a hearing for temporary guardianship and conservatorship.  The sole medical documentation submitted was a medical certificate submitted by Defendant Attorney Garmil, in his role as counsel for Defendant Whittier Pavilion.

320. The certifying doctor identified on the submitted medical certificate was Dr. Buculu, the psychiatrist who treated Father while involuntarily committed at Defendant Whittier Pavilion.

321. Unsolicited, Defendant Attorney Garmil proffered to Judge Abber that he had initiated a petition in the Haverhill District Court for a six-month involuntary commitment of Father to a psychiatric facility because Mr Marvin Siegel " refused to sign himself into the hospital."

322. Throughout that court proceeding of June 14, 2011, Judge Abber explicitly expressed that he was not going to appoint a guardian at this proceeding, even though the afore-described medical certification exceedingly expressed that Father lacked capacity.  Upset by Judge Abber's declaring that he was not going to appoint a guardian, Defendant Attorney Garmil initiated the below discourse with Judge Abber:

> Attorney  Garmil:     And I would suggest then, we are not going to be able to discharge Mr. Siegel until June 22nd when the judge of the Haverhill District Court - *because my client is not going to take the liability of discharging him - -*

> Judge Abber:  I understand - -

34

Attorney Garmil:  - - at this point.

Judge Abber:   I understand that fully.

Attorney Garmil:  Thank you.

Judge Abber:   And that, with all due respect, as you sit here, counsel, or stand here before me, and you equated this to an incarceration as well, I understand what needs to occur before he can be released, but maybe that gives everybody some time, including, Mr. Siegel to arrange for those support services twenty-four hours and for this family to possibly get together to unify for those support services so that we're not back here, and back here very quickly.

323. As demonstrated by the above discourse, Defendant Attorney Garmil made it clear to Judge Abber that, he—as private legal counsel for Defendant Whittier Pavilion—was not going to discharge Father based solely on the fact that a guardian was not going to be appointed.  Still, Judge Abber did not appoint a guardian at the proceeding held on June 14, 2011.

324. At the court proceeding of June 14, 2011, Defendant Attorney DeNapoli knowingly and maliciously made false and overwhelmingly baseless allegations that Plaintiff Daughter Lisa was financially exploiting Father.

325. During the court hearing of June 14, 2011, Defendant Attorney DeNapoli repeatedly made blanket baseless allegations that Plaintiff Daughter Lisa was financially exploiting Father.  Defendant Attorney DeNapoli made the allegations knowing full well that such statements were false in order to preclude her from being appointed guardian and conservator because she was an <u>obstacle</u> to Defendants financial exploitation of Father and their planned liquidation of his assets.

326. Defendant Attorney DeNapoli had access to Father's records from Defendant BNY Mellon *prior* to June 14, 2011.  Of significance, Defendant Attorney DeNapoli did not proffer any information from Father's financial records to support any inference of exploitation.

327. Defendant Attorney DeNapoli did not proffer any evidence from Defendant ESMV to support inference of exploitation by Plaintiff Daughter Lisa

328. Various counsel from Defendant Law Firm TBHR had discussions with Defendant ESMV *prior* to both above-described court proceedings of June 7, 2011 and June 14, 2011.  The following statements were contained in the invoices filed by Defendant Attorneys DeNapoli and Tarlow with the Essex Probate & Family Court:

328. On 6/2/2011, Defendant Attorney Watson received "telephone call *from* Elder Protective Services."

35

329. On 6/8/2011, Defendant Caseworker Springman wrote: "PSW spoke with Atty Tarlow who informed PSW that the hearing on guardianship and conservatorship was moved to next Tuesday and that they were working on getting the elder set up with independent living and also that they were investigating any potential FE and that they were requesting bank statements going back 12 months as well."

330. On 6/8/2011, Defendant Caseworker Springman wrote: "Sheryl stated that during the court session [June 7, 2011] that she did not think that Lisa was the best choice for the elder's guardian"; that Sheryl confirmed that the doctor for Defendant Whittier Pavilion did not feel that Father needed to be in a facility; that Sheryl stated that since Whittier "changed their stance and will be dropping commitment [] and the elder could be discharged in a couple of days; that "Sheryl stated that she was working with Atty Tarlow to find the elder a suitable place to go. . . they were looking for an assisted living facility for the elder to go to and will see if he likes it."

331. Judge Abber had personal knowledge of Plaintiff Daughter Lisa's appellate experience and explains why he was concerned about the flimsiness of Defendant Attorney DeNapoli's allegations against Plaintiff Daughter Lisa; that the issuance of a fiduciary court appointment based on what was presented on June 14, 2011, might not pass muster under appellate review.  At the time of the proceeding held on June 14, 2011, Judge Abber knew that he had full ability and opportunity to hold subsequent and imminent court proceedings and therefore did not appoint a guardian or conservator at the hearing of June 14, 2011.

332. It is evident that Judge Abber did not want to jeopardize the concerted ultimate objective of appointing a guardian and conservator, pursuant to SJC Rule 1:07—which could only occur by disqualifying Plaintiff Daughter Lisa as Father's nominated guardian and conservator.  Judge Abber *deliberately* chose to hold off on issuing any fiduciary court appointment, until he and the Defendants could make it look supposedly supported to oust Plaintiff Daughter Lisa as Father's nominated guardian and conservator.

333. On four (4) distinct and separate times, during the court proceeding of June 14, 2011, Judge Abber made declarations that the parties would, likely, "be back" in court very quickly.  It is evidenced that the above-described *repeated* statements made by Judge Abber—that "we" may be back in court very quickly—was his way of assuring the Defendants to not be concerned about his not having made the fiduciary court appointments at that time, *because* he would do so soon, just at another time.

334. As already set forth, Judge Abber had a prior history of demonstrated corruption in the matter of In re Esterina Milano.

xi.    Direct and overt action by Defendant Law Firm TBHR against expressed wishes of Father

36

335. Of significance, on June 7, 2011 Defendant Attorney Tarlow and Defendant Attorney DeNapoli filed affidavits and pleadings with the Essex Probate & Family Court that *emphatically represented that Father was competent.*

336. Defendants sought to have Father placed into a long-term care facility, despite Father's expressed wishes not to leave his home in Boxford

337. Defendant Attorneys DeNapoli and Defendant Attorney Tarlow explicitly represented in writing—by affidavit, on June 7, 2011, that they were aware of Father's wishes to remain in his own home; that Father, explicitly, *did not* want to go into an assisted care facility.

338. The previously discussed filed invoice by Defendant Law Firm TBHR contain the following statements that show Defendants' outright disregard for Father's expressed wishes—and overt adverse conduct:

*on June 8, 2011—the very next day after the court proceeding before Judge Abber— Defendant Attorneys DeNapoli and Tarlow asked Defendant Attorney Watson to research assisted living, skilled settings and independent living options for placement of Father; and*

*on June 8, 2011, Defendant Attorney DeNapoli had various conversations with Defendant Attorneys Tarlow and Watson "relative to status and strategy concerning finding a suitable location for Father."*

Designated Defendants sought a court ordered guardian and conservator against Father's expressed desires

339. On June 7, 2011, Defendant Attorney Tarlow and Defendant Attorney DeNapoli filed affidavits and pleadings that represented that Father was competent; and that Father did not need a guardian or conservator and that Father did not want a guardian or conservator.

340. Contrary to Defendants' above-described written attestation, on June 14, 2011, Defendant Attorney DeNapoli explicitly requested, in open court, that Father needed a guardian and conservator "to protect him from being exploited by any member of his family." Judge Abber explicitly pointed out in-court that Defendant Attorney DeNapoli was going against his own client's intentions.

341. Defendant Attorney DeNapoli then further stated: "We have a suggestion for guardian.  I know that Mr. Siegel does not believe that he needs a guardian, but I think he needs someone to protect him from the exploitation."

Father wanted Plaintiff Daughter Lisa and her family to permanently reside with him

37

342. Father explicitly and unequivocally stated in court, on June 14, 2011, that he wanted Plaintiff Daughter Lisa and her family to live with him.

343. After Father had expressed such desire in court, Defendant Attorney DeNapoli outright asked Judge Abber to have Plaintiff Daughter Lisa and her family removed from Father's home and prohibited from living with Father.  Again, Judge Abber expressly emphasized Defendant Attorney DeNapoli's overt contradiction of his own client.

### Father fired Defendant Law Firm TBHR

345. As previously set forth, on June 14, 2011, Judge Abber expressly stated that he determined that Father did not need a guardian or conservator and in effect ruled that he deemed Father competent.  Bolstering this fact are the electronic notes of Defendant ESMV.  (Exhibit 23 for the court-recorded audio and Exhibit 24 for the transcript).

346. The notes recorded in the computer system of Defendant ESMV, on June 21, 2011 and on July 7, 2011 by Defendant Caseworker Springman, documented that Defendant Attorney Berid had stated that Judge Abber, at the hearing on June 14, 2011, had made a ruling that Father was competent.

347. Two (2) days after the afore-described hearing of June 14, 2011, Father re-affirmed in writing on June 16, 2011 his 2003 DPOA and Plaintiff Daughter Lisa's capacity as his attorney-in-fact and health care proxy.  The staff of Defendant Whittier Pavilion *directly* facilitated and witnessed Father's afore-described re-affirmation.

348. Despite the in-court representations made on June 14, 2011 by Defendant Attorney Garmil—that Father would have to remain involuntarily committed at the Defendant Whittier Pavilion because of the lack of a guardian being court appointed— the very next day Plaintiff Daughter Lisa was notified by Defendant Whittier Pavilion (for the first time) that Father was going to be discharged within less than 48 hours, and that a 24/7 home healthcare agency needed to be put in place.

349. Father was discharged by the treating psychiatrist (Dr. Buluchu) for Defendant Whittier Pavilion on June 16, 2011.

350. On June 16, 2011 Father *personally* spoke with Defendant Attorney Tarlow by telephone, which Defendant Attorney Tarlow attested to in submitted affidavits to the Essex Probate & Family Court; that Father had informed Defendant Attorney Tarlow that he did not want Defendant Attorney Tarlow representing him and anyone associated with the Defendant Law Firm TBHR; that Defendant Attorney Tarlow said "okay" and then hung up.

351. Defendant Attorney Tarlow acknowledged and affirmed Father's termination of their legal services, upon which, Defendant Attorney Tarlow facilitated Father's case file to be picked up.

352. In the affidavit of Defendant Attorney Kazarosian—which she filed with the Essex Probate & Family Court (on August 17, 2011)—she attested that Father was, in fact, competent to fire Defendant Attorney Tarlow and Defendant firm TBHR.

353. In addition, Defendant Attorney Kazarosian attested in her affidavit as to the validity of Father's expressed claim that he did not fully knowingly and voluntarily agree to retain the services of Defendant Attorney Tarlow and Defendant Law Firm TBHR—that Defendant Attorney Tarlow and Defendant Law Firm TBHR resorted to deception and undue influence in obtaining Father's signature.

354. Defendant Attorney Kazarosian attested that she and her associate (Attorney Janet Dutcher) met with Father, alone, for two (2) hours.  Defendant Attorney Kazarosian described her meeting with Father as follows:

*"Siegel [Father], although forgetful of my name and Dutcher's on occasion throughout the conversation, (always with apologies), was well aware of all of the circumstances and orientations as I have set forth above [in paragraph 3].  He was very clear that and wanted to make sure that I understood that he is a very loud and passionate person when he speaks, that he was a trial lawyer for 50 years and is used to having his own way, that he often says things in the vernacular when angry but does not mean them literally, and gave me specific examples, such as, "I may say, I am so mad I just want to kill someone, but that doesn't mean that I want to kill anyone. . . .*

*I discussed Attorney Edward Tarlow ("Tarlow") with him [Father], and his role in this matter.  He was very adamant that he did not want Tarlow representing him and was very distrustful and angry.  I specifically discussed Tarlow's Affidavit that suggested in part that he did not want Belanger and her family living with him, as well as other statements and feelings that Tarlow attributed to him. . . .*

*He also expressed anger at ESMV and was extremely adamant that he did not want them involved, does not want their intervention, and believes it to be intermeddling and an affront to his intelligence and capabilities."*

*I asked him if he wanted to be represented at the hearing on August 17, 2011 and he was adamant that he wanted representation.  He appropriately asked me if there was any reason that I could think of as to why I should not be the one to represent him, he asked about any limitations that I thought I may have with regard to an appearance on this matter, he asked me if I could be forceful in my representation to the court as to his desires and intentions, and asked me if I had any concerns that would give me pause as to my representation.  I was impressed by this inquiry.*

39

*Dutcher and I formulated the opinion that he was not under duress, that he knew that he was asking our office to represent him, and that he was doing so in an informed and reasoned manner."*

G. Defendants' concerted efforts to manufacture incriminating evidence to oust Plaintiff Daughter Lisa as Father's attorney-in-fact and as nominated guardian

355. The statutory language of the MUPC rules provide the opportunity for a guardian and conservator, designated by the elder in formal written instruments, to be ousted based on the mere allegation that the nominee has exploited the elder.  Disqualification does not hinge on the outcome of the investigation; just *the mere initiation of an investigation* in and of itself gives the judge the ability to disqualify that person nominated by the elder.

356. As a matter of routine practice, court officials oust nominees *without* any formal court hearing or determination of exploitation made by elder protective service agencies. There is an established pattern of court officials using the MUPC rules to illicitly oust elders' explicitly nominated guardian and conservator.

i. Motive to fabricate allegations of financial exploitation against Plaintiff Daughter Lisa

357. Judge Abber outwardly expressed, during the court proceedings of June 7, 2011 and June 14, 2011, that it was *not* a matter of whether he would be putting a court appointed guardian in place—it was just a matter of *how soon*.

358. Ill-intentions harbored by Judge Abber is further confirmed where Defendant Caseworker Springman wrote the following notes regarding what Defendant Daughter Sheryl told him the very next day following the hearing of June 14, 2011:

> the Judge ruled that [Lisa and Donald] could stay as the elder expressed that he was fine having them at home with him.  *Sheryl reported that the judge made the statement that he was sure he would see everyone back in his court soon.*

359. Bolstering the existence of a pre-determined mindset held by Judge Abber is Defendant Attorney Berid's having stated, in a subsequent motion filed with Essex Probate & Family Court, that at the June 14, 2011 hearing Judge Abber "admonished the family [to] come up with a plan for their father's sake to care for him, because if they appear here again an independent person would be appointed the guardian/conservator."

360. Judge Abber did not make any fiduciary court appointment on June 14, 2011 because he knew that there were no facts to support such court appointments and did not want to risk a chance of appellate reversal.  Judge Abber held off on making such court appointments so that he and now-Defendants would have an opportunity to create superficially sufficient fabricated circumstances. Judge Abber has a prior pattern of such conduct; specifically, when he was co-guardian with Defendant Attorney Feld and

40

Defendant Attorney Cukier in the matter of In re Esterina Milano. In the role of General Counsel for Defendant ESMV, Defendant Attorney Berid had financial and non-financial gain to be had by Father becoming judicially deemed a ward of the State.

361. In addition, Defendant Attorney Berid had a prior established partisan relationship with Defendant Attorney Tarlow—specifically regarding the North Street Irrevocable Trust which also involved fraud and deception.

362. Plaintiff Daughter Lisa had exposed Defendant Attorney Tarlow's fraudulent solicitation of legal services for Father and Defendant Attorney Tarlow's fraudulent and deceptive execution of written instruments of May 25, 2011, Defendant Attorney Berid had a motive to protect Defendant Attorney Tarlow from incurring adverse consequences from his afore-described unlawful conduct. As such, the designated Defendants used false allegations of exploitation against Plaintiff Daughter Lisa to take the focus of financial exploitation *away* from Defendant Attorney Tarlow.

ii.  Evidence of out-of-court communications between Judge Abber and Defendants

363. Early on in the litigation of In re Marvin H. Siegel, it became evident that the Defendants had been filing pleadings without providing copies to Plaintiff Daughters and having covert ex-parte hearings. As a result, Plaintiff Daughters began making frequent and periodic review of the court files for In re Marvin H. Siegel.

364. There was a substantial lapse of time between the trial and the respective issuance of the written findings by Judge Abber (which were issued on October 22, 2012) during which Judge Abber had been illicitly given an un-redacted version of a 111-page packet of investigation notes and several formal written reports of Defendant ESMV. Plaintiffs were not given notice by the Defendants of their having given Judge Abber this un-redacted 111-page packet of investigation notes and reports, which Plaintiff Lisa came across only by happenstance.

iii.    Evidence of Defendants' intentional fraudulent and deceptive conduct with regard to Defendant ESMV investigation

365. The involvement of Defendant ESMV, in the matter of In re Marvin H. Siegel, *was not* initiated based on any allegation of financial exploitation by anybody.

Defendant ESMV's tainted investigatory conduct & collusion

366. Pursuant to 651 CMR 5.10, the stated overall purpose for Defendant ESMV's function of conducting investigations is the gathering of "*objective information*." The staff of Defendant ESMV intentionally did not seek objective information. They focussed on Father's wealth.

367. Throughout the "investigation" that was opened on April 1, 2011, staff of Defendant ESMV—individually and collectively—deliberately manipulated information (through direct acts and acts of omission) to create a falsely incriminate Plaintiff Daughter Lisa. She was correctly identified as an obstacle to their theft of Marvin Siegel's wealth.

368. Defendant Caseworker Springman stated in the notes that he input in the computer system of Defendant ESMV, on April 5, 2011, that Lt. Hazelwood reassured him that he "would be fine without police presence and suggested that he would be better without"; that the firearms had been removed from Father's home.

369. On April 6, 2011, without advance notice, Defendant Caseworker Springman and another caseworker came to Father's home.  Father had been sleeping.  Defendant Caseworker Springman input notes into the computer system of Defendant ESMV on April 6, 2011, stating that he and his co-worker had been greeted by Plaintiff Daughter Lisa; that Plaintiff Daughter Lisa had stated that she and her family had, in fact, moved in with Father to care for him.

370. Defendant Caseworker Springman wrote in the afore-referenced notes of April 6, 2011: "PSW [Defendant Caseworker Springman] that he would call back and make an appointment."

371. On April 7, 2011, Defendant Supervisor Dailey input notes into the computer system of Defendant ESMV, regarding the investigation concerning Father, and wrote: "Case reviewed; report of SN; Elder may have dementia or paranoia; Elder walks around with a gun."

372. The above quoted statement made by Defendant Supervisor Dailey that "Elder walks around with a gun" was false—Plaintiff Daughter Lisa made no statements, of any kind, that Father walked around home with a gun; nor did she make any statements where such a statement could be even inferred.

373. Where Defendant Supervisor Dailey's statement of "Report of SN" is followed by the quoted statement—"Elder walks around with a gun"—it is evidenced that Defendant Supervisor Dailey made such statement, *knowingly and deliberately*, so as to have a purported basis to support continued involvement by Defendant ESMV.

374. As previously set forth, the notes in the computer system of Defendant ESMV, as of April 1, 2011, recorded that the Boxford Police had *removed* Father's firearms from the residence—well in advance of Defendant Supervisor Dailey's notes made on April 7, 2011.  As evidenced, Defendant Supervisor Dailey knew, *at the time* he input the notes into the system, that the firearms *were no longer a concern*; and shows that Defendant Supervisor Dailey acted in a knowingly fraudulent and deceptive manner in pure bad faith.

42

375. Egregiously, in the same note input by Defendant Supervisor Daily on <u>April 7, 2011</u>, right underneath the above quoted statement, it is written: "Guns have been removed. Current LOR appears low as AV's [Father] needs are met."

376. Further overt acts of fraud and deception by Defendant Supervisor Dailey and other staff of Defendant ESMV are evidenced by the fact Father <u>had</u> <u>not</u>, yet, been interviewed by Defendant ESMV when Defendant Supervisor Dailey made a finding of "SN" on <u>April 7, 2011</u>.

377. In the afore-described packet of investigation notes and reports of Defendant ESMV that Defendants provided to Judge Abber—ex-parte—there were no notes regarding any attempted visit by Defendant Caseworker Springman to Father's home on <u>April 13, 2011</u>.

378. There is overt evidence of fabrication by Defendant Caseworker Springman when he input notes that he supposedly called Plaintiff Daughter Lisa and left a voice message to set up an appointment to come to the house. The manner in which the above notation was made evidences that it was input for the specific purpose of deception—this notation by Defendant Caseworker Springman was put under the designated heading of "4/11/2011", yet, before making the notations under that very heading, there is a recorded date stamp, stating <u>"4/13/2011"</u>; and, there is a date/time stamp immediately after the notation stating: <u>"4/13/2011"</u>.

379. Immediately following the above-described notation were notes for <u>April 22, 2011</u>; however, Defendant Caseworker Springman filed a written report, called Elder Interview on <u>April 21, 2011</u>—which the report states that it was updated on <u>April 22, 2011</u>. He, also, filled out a written report, called Functional Assessment on <u>April 21, 2011</u>—which he updated that report, as well, on <u>April 22, 2011</u>. As evidenced, there was continuous alterations in the notes of Defendant ESMV.

380. In the afore-described Elder Interview report of <u>April 21, 2011</u>, it is stated that a supposed interview was conducted with Father. Of significance the Elder Interview report *does not* state, one way or the other, whether Plaintiff Daughter Lisa was present during the supposed interview.

381. Other reports show much evidence that the supposed interview of Father, allegedly conducted by Defendant Caseworker Springman on <u>April 22, 2011</u>, was a complete fabrication. The written reports—Elder Interview and Functional Assessment—were blatant fabrications. The description of quotes attributed to Father by Defendant Caseworker Springman in his report of Elder Interview, dated <u>April 21, 2011</u> *and* <u>April 22, 2011</u> are *<u>identical</u>* to the notes he input dated <u>May 10, 2011</u>.

382. Defendant Caseworker Springman stated in his written report, regarding his interview with Defendant Daughter Sheryl on <u>April 22, 2011</u>: "The information given provided no solid evidence regarding the dtr's [daughter] allegations."

383. On April 25, 2011, Defendant Caseworker Springman spoke with Father's former bookkeeper (Kathleen Enos) who quit, promptly, after Plaintiff Daughter Lisa and her family moved in with Father.  Defendant Caseworker Springman filed a written report, purportedly describing his contact with Kathleen Enos on April 25, 2011—the report states it was *commenced* on April 25, 2011, that it was "updated" by Defendant Caseworker Springman on August 26, 2011 and states: "Information supports other collateral interview information and allegations.  There is still no solid evidence showing FE [financial exploitation]."

384. Defendant Supervisor Dailey stated in the notes of April 26, 2011 that he met with and consulted Defendant Attorney Berid.

385. On April 29, 2011, Defendant Supervisor Dailey input into the notes of Defendant ESMV that, supposedly, a "new allegation of FE reported during investigation." However, there is no intake report regarding the supposed new allegations of financial exploitation. Defendant Supervisor Dailey on April 29, 2011 stated: that the investigation was "extended"; that "AV is wealthy with extensive assets to look into"; "Decision on SN will be pended as well."

386. Contrary to the mandated regulations of 651 CMR 5.10, the investigation that was opened on April 1, 2011 by Defendant ESMV was not completed within the proscribed 30-day calendar period.  Of significance, Defendant ESMV kept the designated investigation open for its own personal and financial gain through the theft of Father's wealth.

387. Defendant Supervisor Dailey documented on May 11, 2011 that he had the article in the file regarding Defendant Daughter Sheryl's previously discussed psychotic episode in 2003  (car jacking and police chase); that he was informed of Defendant Daughter Sheryl having a history of mental illness.

388. Notes for May 13, 2011, input by Defendant Supervisor Dailey described the status of the investigation of April 1, 2011 as: "Open SN [Self Neglect], pending FE."  The Date/Time Stamp shows that the notes for May 13, 2011 had been modified on June 8, 2011—which was *after* Father had been involuntarily committed to Defendant Whittier Pavilion.

389. Of significance, the staff of Defendant ESMV (in particular: Defendant Caseworker Springman, Defendant Attorney Berid and Defendant Diane Powell) had been informed by Defendant Whittier Pavilion that it was planning to petition for long-term civil commitment.  Defendant ESMV did not notify Plaintiff Daughter Lisa about the petition for civil commitment.

390. On May 20, 2011, Defendant Caseworker Springman input notes into the computer system of Defendant ESMV, documenting: "SW [social worker] stated that the facility

would likely go to court and have a civil commitment as the elder has not voluntarily signed himself in."

391. Further evidencing illicit motives by the Defendants is the fact that the staff of Defendant Whittier Pavilion and Defendant Attorney Garmil completely left Plaintiff Daughter Lisa in the dark about plans for Father being discharged—where as previously set forth, *during* the hearing on June 14, 2011, Defendant Attorney Garmil made explicit representations that Father was not going to be released from Defendant Whittier Pavilion until a court appointment of a guardian.

392. Unlike Plaintiff Daughter Lisa, Defendant Daughter Sheryl had known, *on or before* June 8, 2011 that Father's discharge from Defendant Whittier Pavilion was imminent.  On June 8, 2011, Defendant Caseworker Springman had input notes into the computer system of Defendant ESMV stating that Defendant Daughter Sheryl had informed him that Defendant Whittier Pavilion had dropped the petition for civil commitment filed with the Haverhill District Court and that Father "could be discharged within a couple of days."  To re-iterate, Plaintiff Daughter Sheryl—and Defendant law firm TBHR—had that knowledge prior to the hearing of June 14, 2011.

393. On the morning of June 16, 2011, Plaintiff Daughter Lisa and Father's close friend, Steven Kapsalis, went to Defendant Whittier Pavilion to facilitate Father's discharge.  Prior to Father being discharged, the treating psychiatrist and various staff of Defendant Whittier Pavilion facilitated the notarization and execution of Father's written re-affirmation of his 2003 DPOA and health care proxy. Father re-affirmed his desire and intentions that were in his 2003 DPOA.

394. On June 16, 2011, Father was discharged from Defendant Whittier Pavilion and returned to his home in Boxford, to reside with Plaintiff Daughter Lisa.

395. In the notes of Defendant ESMV for June 21, 2011, it is recorded that Defendant Caseworker Springman had a conversation with Defendant Daughter Sheryl; upon which Defendant Caseworker Springman wrote that Defendant Daughter Sheryl had informed him that Defendant Attorney Tarlow was "working to file an emergency motion" regarding Father's terminating Defendant Attorney Tarlow's legal services.

396. As previously set forth as of May 24, 2011, Defendant BNY Mellon refused to honor Plaintiff Daughter Lisa's authority as Father's attorney-in-fact.  Where Father had spent *one month* involuntarily committed at Defendant Whittier Pavilion, Plaintiff Daughter Lisa was unable to pay Father's household and personal bills that continuously mounted. Consequently, when Father came home, he, personally, called representatives of Defendant BNY Mellon, and explicitly requested $50,000 be transferred to *his* account with Citizen's Bank.

45

397. Specifically where Defendants made blatant allegations that Plaintiff Daughter Lisa was trying to financially exploit Father, she and Father purposefully hired an unrelated and professional person to do the bookkeeping for Father's financial affairs.

398. A little over $16,000 of the $50,000 transferred from Defendant BNY Mellon went to pay the balance due for legal services rendered by Attorney Long, as counsel for Plaintiff Daughter Lisa, specific to her capacity as attorney-in-fact for Father under the 2003 DPOA—legal services which had been incurred only because of the previously discussed unlawful conduct of Defendant Attorney Garmil, on the behalf of Defendant Whittier Pavilion (in particular, Defendant Whittier Pavilion's filing of a petition for six-month civil commitment in Haverhill District Court on May 24, 2011).

399. Of significance, the GAL who was subsequently appointed by Judge Abber in 2013 confirmed in his report that Plaintiff Daughter Lisa *had not* engaged in *any* financial misconduct or other wrongdoing.

400. Plaintiff Daughter Lisa had multiple discussions with Michael Janko of Defendant BNY Mellon regarding the previously described misconduct of Defendant Brian Nagle. Michael Janko had deliberately misled Plaintiff Daughter Lisa to believe that he was removing Defendant Brian Nagle from Father's account because of the alleged misconduct—but it was all a ruse.

401. In the notes of Defendant ESMV for June 21, 2011, Defendant Caseworker Springman wrote that he consulted with Defendant Attorney Berid to discuss "the new developments in the case."

402. After Defendant Caseworker Springman's consultation with Defendant Attorney Berid, he wrote:

403. Atty Berid stated that due to the judge ruling the elder [Father] to still be competent that PSW [Michael Springman] *should go out and visit the elder and start the investigation from the beginning*.  Atty Berid stated that PSW should see when the emergency hearing initiated by Atty Tarlow was and if it was in the next couple of days to wait until after this hearing to see elder.  If not until next week Atty Berid suggested going out to see the elder this week and to interview him about the allegations.

404. The notes of Defendant ESMV for June 22, 2011 state that Defendant Daughter Sheryl called Defendant Caseworker Springman to inform him that Defendant Attorney Tarlow was not going to file for an emergency hearing, that, instead, he was filing a petition for instruction.

405. The relief sought by Defendant Attorney DeNapoli and Defendant Law Firm TBHR in the afore-referenced petition for instruction was to have Judge Abber (for the Essex Probate & Family Court) prohibit Father from terminating their legal services.  The

pleading was dated June 22, 2011 (however, no hearing was held on this petition and no judgment issued).

406. On June 27, 2011, Defendant Caseworker Springman and PSW Cyr visited Father at his home.  In the electronic notes of Defendant ESMV for June 27, 2011, Defendant Caseworker Springman wrote the following description about his interaction with Father:

*Elder came into the room well dressed and groomed.  Elder was wearing a button up shirt untucked and a pair of khaki pants with slippers.  Elder was using a cane to ambulate. PSW's introduced themselves and elder did not remember who PSW's were.  PSW explained the original reason that PSW came out to see him and that there had been a few subsequent visits.  Elder stated that he did not know PSW's and asked where PSW's were from.  PSW showed the elder his photo ID badge and explained ESMV.*

*Elder stated: "I don't know who the hell called you guys.  I don't need anything.  This is my house and I have everything I need."  PSW stated that there was a point in time when the elder was looking for services and also that the elder had been through a lot lately and that they were out to check to see that he had everything he needed.  Elder stated, "I do and I don't see why anyone called you guys.  I have everything I need and I am fine. Leave me your card and I will have my daughter call you if I need anything."  Elder then followed the PSW's out and shut the garage door as PSW's just got out of the garage after saying goodbye.*

407. After the above-described visit by Defendant Caseworker Springman, he consulted with Defendant Attorney Berid.  On July 11, 2011, Defendant Caseworker Springman input notes into the computer system of Defendant ESMV and described his discussion with Defendant Attorney Berid.  Defendant Caseworker Springman stated in his notes that Defendant Attorney Berid told him:

*that since the Judge ruled the elder to be competent that the case could not be pursued any further*.  Atty Berid suggested consulting with PSS Dailey as to whether or not to attempt one more visit.

408. In mid-July of 2011, the hired bookkeeper for Father's finances informed Plaintiff Daughter Lisa and Father that an immediate transfer of $15,000 was needed to avoid Father's checking account from being overdrawn.  Therefore, immediately, Plaintiff Daughter Lisa *and* Father called Defendant BNY Mellon to transfer funds to Father's checking account—again, Father *personally* requested the transfer of funds.  Defendant BNY Mellon refused to make the transfer of funds.

409. On July 15, 2011, there was email correspondence between Defendant Attorney Watson and Defendant Attorney Studen of Defendant BNY Mellon, which Defendant Watson provided the following description of the subject matter: "re: fund transfer request

47

by L. Belanger, case status with Marvin Siegel and forwarding petition for information and hearing transcript."

410. Also on July 15, 2011 there were telephone calls between Defendant Attorney DeNapoli and Defendant Attorney Studen, which discussion Defendant Attorney DeNapoli described as: "case status and BNY Mellon's current involvement in case."

411. Plaintiff Daughter Lisa made repeated attempts to resolve this above-described matter with Defendant BNY Mellon---with Plaintiff Daughter Lisa having reiterated that Father had been judicially adjudged to be competent at the proceeding held on June 14, 2011.

412. In addition, Father, personally, spoke with various representatives of Defendant BNY Mellon about his being very upset and distraught that Defendant BNY Mellon was denying him access to his own money and that he would take action against Defendant BNY Mellon.

413. Defendant Attorney Studen consulted with senior counsel, Brian Bixby, Esq. of Defendant Burns & Levinson on July 16, 2011, regarding how to deal with the requests made by Plaintiff Daughter in her capacity as attorney-in-fact pursuant to Father's 2003 DPOA.

414. On July 18, 2011, Michael Janko informed Plaintiff Daughter Lisa that he had been instructed that he was prohibited from speaking with her and directed her to speak with counsel for Defendant BNY Mellon (Defendant Attorney Laura Studen of Defendant Burns & Levinson).

415. Accordingly, Plaintiff Daughter Lisa called Defendant Attorney Studen and Defendant Attorney Studen refused to rectify the situation.

416. As a result of the misconduct by Defendant BNY Mellon, shortly thereafter Father—*personally*—went to Century Bank in Medford, MA for *consultation* about transferring his accounts from Defendant BNY Mellon to Century Bank.  Father was accompanied by the on-duty home health aide of Defendant Right At Home, along with Steven Kapsalis and Plaintiff Daughter Lisa. Father, on his own, chose Century Bank to consult with because he had personally known then-President Marshall Sloan for over forty (40) years.

417. On July 18, 2011, Defendant Attorney Studen and Defendant Attorney Cukier began illicitly scheming to harm the legal interests of Plaintiff Daughter Lisa.  Defendant Attorney Cukier stated that she, Defendant Attorney Studen and Attorney Bixby had been communicating by email to develop a "strategy" for "protection of Mr. Siegel's assets at BNY Mellon".

48

418. On that same day (July 18, 2011), Defendant Attorney Cukier stated that she had an *"emergency telephone conference"* with Defendant Attorney Tarlow of Defendant Firm TBHR "re Marvin Siegel".

419. Defendant Attorney Cukier described further "strategy" conferences and emails with Defendant Attorney Studen and other representatives of Defendant Burns & Levinson on: July 19, 2011, July 20, 2011, July 21, 2011 and July 22, 2011.  $6 million certainly focussed their minds.

420. Defendant Attorney Studen spoke to Defendant Daughter Sheryl on <u>July 22, 2011</u>. Defendant Daughter Sheryl also directly emailed Defendant Attorney Studen that same day providing her home telephone number, cellphone number, home address—as well as her husband's cellphone number and email.

421. Defendant Attorney Tarlow also spoke with Defendant Daughter Sheryl on <u>July 22, 2011</u> stating that Plaintiff Daughter Lisa was attempting to transfer all of Father's funds out of Defendant BNY Mellon.  Defendant Daughter Sheryl called Father to relay what she had been told by Defendant Attorney Tarlow and Defendant Attorney Studen.

422. During that conversation between Defendant Daughter Sheryl and Father, there were others present with Father who heard the conversation first-hand because the volume on Father's cellphone was set to the loudest volume due to his hearing loss.  Defendant Daughter Sheryl could be heard telling Father that he needed to call Defendant Brian Nagle because he would be able to confirm what she said.

423. As Defendant Daughter Sheryl had directed, Father called Defendant Brian Nagle. Defendant Brian Nagle arranged with Father to call Defendant Brian Nagle back for the *specific* purpose of recording their discussion. Defendants made their own informal transcription of this recorded call.

424. The transcription evidences there had been a *prior* conversation that had taken place between Defendant Brian Nagle and Father—not disclosed by Defendants—and that Defendant Brian Nagle stated: "As I said to you <u>before</u> we are not going to make any transfers without talking to you. . . ."

425. Of significance, Defendant Attorney Tarlow and his associates called Defendant Daughter Sheryl making the above-described allegations, <u>but did not call Father—*their own alleged client*</u>.

426. In fact, Defendant Brian Nagle tried to trick Father into stating that it was Plaintiff Daughter Lisa as to who was trying to steal his money.  Defendant Brian Nagle blatantly and flagrantly attempted to literally put the words in Father's mouth that Plaintiff Daughter Lisa was trying to steal his money.

49

427. Following is the portion of the transcript where Defendant Brian Nagle, overtly attempted to do so:

> Father: . . . . I'm ashamed to have to say it but all that is happening as I can see is that (inaudible) is trying to steal money from me
>
> Brian Nagle:   Who is
>
> Father:   I know you, I know you don't want to be a co-conspirator to it
>
> Brian Nagle:   Nah I
>
> Father:    So that's why we're having this conversation
>
> Brian Nagle:   I'm sorry who. . .who did you say I didn't hear is it Lisa
>
> Marvin:    I said my children I didn't start naming them individually
>
> Brian Nagle:   ok, ok
>
> (Defendants transcribed the call without punctuation).

428. The Defendants' self-transcription of the call shows that Father did not indicate anyone in particular as to who was trying to steal his money.  Repeatedly, Father spoke in terms of "his family" trying to steal his money.

429. The Defendants' transcription of the call also shows that Father was cognizant of Defendant Brian Nagle trying to get Father to say that it was Plaintiff Daughter Lisa who was trying to steal from him.

430. After Defendant Daughter Sheryl ended her call with Father she then called Plaintiff Daughter Devora to relay what she had been told by counsel from Defendant Law Firm TBHR regarding a supposed transfer of all of Father's money.  Defendant Daughter Sheryl had been incessant in hounding Plaintiff Daughter Devora to call Defendant Caseworker Springman to make a formal report; as Defendant Daughter Sheryl kept insisting, over and over, that *she* could not be the one to make *another* report to Defendant ESMV because she had done so before and they did not do anything.

431. Plaintiff Daughter Devora told Defendant Daughter Sheryl that she *did not* want to make the call because she was 3,000 miles away and did not have first-hand knowledge as to what was going on.  Plaintiff Daughter Devora could not handle Defendant Daughter Sheryl's non-stop begging and gave-in; as attested, in court, Plaintiff Daughter Devora had just moved from California to South Carolina and had been going through a very difficult period, causing her to be overwhelmed.  Consequently, Defendant Daughter Sheryl pressured Plaintiff Daughter Devora to call Defendant ESMV in her stead to relay what she had been told by Defendant Attorney Tarlow and his associates.

50

432. As evidenced by the notes and formal reports of Defendant ESMV, it was readily apparent that Defendant Caseworker Springman did not take stock in Defendant Daughter Sheryl's credibility—Defendant ESMV knew about Defendant Daughter Sheryl's high-profile psychotic episode in 2003.

433. Plaintiff Daughter Devora called Defendant Caseworker Springman, on that same afternoon (July 22, 2011), and relayed the above-described information—Plaintiff Daughter Devora had relied, entirely, on Defendant Daughter Sheryl's representations made to her as to the supposed on-goings.

434. The notes input into Defendant ESMV's computer system, on July 22, 2011, were input by Defendant Supervisor Dailey, and were labeled as "screening." The caption designated "Description" was followed by the statement: "New FE report filed on this date."

435. Defendant Daughter Sheryl also emailed Defendant Attorney Tarlow and his associates, and stated the following:

*Dear Ed, Al and Cathy,*

*There is finally some news to update you with. As you know, I have been communicating with Atty. Robert Ledoux for a few weeks now. I had been hoping to have an emergency meeting with the Judge at Salem Probate Court to let the Judge know that Lisa had changed my father's durable power of attorney to her and Steven Kapsalis and that she had fired you, his attorneys, but I couldn't persuade Bob to do that. Meanwhile, the certificate from Whittier Pavilion is no longer in effect.*

*Today, after learning that Lisa is trying to transfer all of my father's money out of Mellon Bank I attempted one more time to let Bob know that I need his help. I understand that after I spoke with him today, he spoke with your firm and he spoke with Atty. Laura Studen who is affiliated with Mellon Bank. . . .*

*One other thing that happened today is that Devora called and spoke to Mike Stringman [Springman] of Elder Services. She told him what Lisa is trying to do with my father's money and he had her speak with some type of "Crisis" department at Elder Services. They took information from Devora and discussed going to see my father.*

*I guess that's all for now. Please note that I am at Martha's Vineyard I will have my cell phone with me [] and I will take a laptop with me so that I can communicate by email also.*

*Thanks for keeping me updated.*

*Best regards, Sheryl.*

51

436. Defendant Daughter Sheryl—knowing that Plaintiff Daughter Devora did not have the financial resources to hire her own individual attorney—deliberately wanted Plaintiff Daughter Devora to be beholden to her.  In an email that Defendant Daughter Sheryl wrote to Defendant Attorney Ledoux, she stated:

*I understand that you will be filing an appearance on my behalf at Salem Probate Court first thing on Monday morning.  Can you also file an appearance for my sister Devora Kaiser.  I will be paying the full bill for your services, but I would like you to represent both of us.*

437. Defendant Attorney Ledoux did not, in any manner, explain to Plaintiff Daughter Devora about potential conflicts that could arise in his representing both she and Defendant Daughter Sheryl.

438. By December of 2011, an actual conflict of interest did arise in Defendant Attorney Ledoux's simultaneous representation of Plaintiff Daughter Devora and Defendant Daughter Sheryl.  With Plaintiff Daughter Devora living out-of-state, Defendant Daughter Sheryl deliberately did not keep Plaintiff Daughter Devora fully informed about the goings-on in the matter of In re Marvin H. Siegel and Defendant Attorney Ledoux did not contact Plaintiff Daughter Devora to keep her up-to-date.

439. On December 9, 2011, Defendant Attorney Ledoux joined in Defendant Attorney Cuffe's motion for a court order to force Plaintiff Daughter Lisa and her family out of their permanent home with Father.  Plaintiff Daughter Devora *had not been informed* that the afore-described motion had been filed, let alone the drafting of the motion.

440. Plaintiff Daughter Lisa believed that Plaintiff Daughter Devora *would not have wanted—let alone agreed—* to have Plaintiff Daughter Lisa (and her family) removed from Father's house.  Therefore, on December 10, 2011, Plaintiff Daughter Lisa called Plaintiff Daughter Devora to find out if she had actually authorized Defendant Attorney Ledoux to take such action.

441. That telephone conversation on December 10, 2011 was the first time that Plaintiff Daughter Devora had learned about a motion seeking to remove Plaintiff Daughter Lisa and her family from Father's house.  Plaintiff Daughter Devora confirmed that she did not want Defendant Attorney Ledoux to agree to the removal of Plaintiff Daughter Lisa and her family.

442. Plaintiff Daughter Devora emailed Defendant Attorney Ledoux on December 11, 2011—copy of email is provided in Exhibit 337, which stated:

*Dear Bob:*

52

*I learned on Saturday, December 10 that there is an emergency hearing scheduled for 9:00 A.M. on Monday, December 12, 2011, in Salem Probate and Family Court to have the Belanger family vacate the residence of my dad, Marvin H. Siegel, of 15 Arrowhead Farm Road, Boxford, MA.*

*As I stated early on, my wishes were not to have the Belanger family removed from my dad's residence because my primary concern, which still remains the same, is for my niece and nephew, Hana and Ethan Belanger.*

*My intention remains the same that appropriate arrangements can be made so that my sister, Sheryl and I can visit my dad at his home as desired.*

*Thanking you ahead of time for passing on this information tomorrow morning to all of the necessary parties: Brian Cuffe, James Feld, Maxa Berid, Marsha Kazarosian and Lisa's Attorney.*

443. A few weeks after the above-described email sent by Plaintiff Daughter Devora to Defendant Attorney Ledoux, she informed Defendant Daughter Sheryl that she (Plaintiff Daughter Devora) no longer wanted Defendant Attorney Ledoux to act as legal counsel for her—which Plaintiff Daughter Devora explicitly confirmed with Defendant Attorney Ledoux by email on January 15, 2012.

<u>Defendant Caseworker Springman manipulated the records of Defendant ESMV to make it appear as though he did not speak with Plaintiff Defendant Devora</u>

444. Evidencing the fact that Plaintiff Daughter Devora spoke with Defendant Caseworker Springman is Defendant Daughter Sheryl's confirming statements in her email to Defendants.

445. After Plaintiff Daughter Devora relayed the hearsay information from Defendant Daughter Sheryl to Defendant Caseworker Springman during their conversation on <u>July 22, 2011</u>, he told Plaintiff Daughter Devora that she needed to call the hot-line number and provide the information again.

446. Pursuant to 651 CMR 5.07, a report of elder abuse does not require that it be made *only* through the Elder Abuse Hotline—the regulation states that non-mandated reporters can make reports to "the Elder Abuse Hotline, a Protective Services Agency, <u>*or*</u> the Department."

447. It is suspect that there are *no* notes input into Defendant ESMV's computer system by Defendant Caseworker Springman.  Notes input into the computer system of Defendant ESMV for July 22, 2011 simply reference that a formal report was made to the hot-line.

448. It is suspect that the investigation that Defendant ESMV opened on <u>April 1, 2011</u> specifically pertaining to Father *extended* up and through <u>July 13, 2011</u>—with Defendant

Caseworker Springman as the primary investigator; yet, the Intake Report of July 22, 2011 designated that the case was "screened" by Defendant Supervisor Dailey—and with the subsequent investigations primarily conducted by Defendant Caseworker Springman.

449. When Defendant Caseworker Springman was explicitly asked at trial about his conversation with Plaintiff Daughter Devora on July 22, 2011, he *did not* deny that he spoke with Plaintiff Daughter Devora on July 22, 2011—he only testified that he had no recollection of the conversation; whereas Plaintiff Daughter Devora testified at trial that she did have such conversation as described above along with other corroborative evidence.

450. Defendant Caseworker Springman directed Plaintiff Daughter Devora to call the hot-line as a means to deceptively create an appearance as though Plaintiff Daughter Devora had originally called the hot-line on her own initiative—evidently intending to make her reporting appear to have been an emergency.

Suspect conduct of Defendants by refraining from filing a report with Defendant ESMV concerning the events of July 22, 2011

451. If statements by the designated Defendants made to Defendant ESMV—on and after July 22, 2011—were done in good faith, the designated Defendants' professional roles would have compelled their making a formal report to the District Attorney's Office and/or to Defendant ESMV.

452. If statements made by the designated Defendants to Defendant ESMV—on and after July 22, 2011—were done in good faith, the designated Defendants' had *no* legitimate reason for not contacting the District Attorney's Office and Defendant ESMV.

453. The designated Defendants failure to make a formal report to Defendant ESMV evidences that they, knowingly and deliberately, made false allegations against Plaintiff Daughter Lisa.

454. Defendant Caseworker Springman's notes, re-affirmed during his testimony at trial, input into the computer system of Defendant ESMV, demonstrate that neither Defendant BNY Mellon nor Defendant Attorney Studen initiated contact with Defendant ESMV regarding the supposed afore-described events of July 22, 2011.

455. The Intake Report for July 22, 2011 states that the official reporter initiating new allegations of financial exploitation was solely based on the call made by Plaintiff Daughter Devora.

456. Defendant Attorney Tarlow, Defendant Attorney Studen and Defendant Brian Nagle knew that the allegations—claiming Plaintiff Daughter Lisa attempted to transfer Father's accounts held with Defendant BNY Mellon, for her own use and without Father's

knowledge—was a complete fabrication.  In fact the designated Defendants all knew that Father had *personally* sought the transfer of $50,000 to his checking account with Citizen's Bank and that Father *personally* went to Century Bank and discussed the transferring of his account from Defendant BNY Mellon.

457. The very reason that Defendants did not make a formal report with Defendant ESMV was because of their above-described knowledge; they felt it was too risky in this particular situation to file a fraudulent report of financial exploitation with Defendant ESMV.

458. As previously set forth, Defendant Attorney Kazarosian filed a written attestation (on August 17, 2011), with the Essex Probate & Family Court, stating that Father had expressly conveyed to her that he was furious and outraged with Defendant BNY Mellon. (Exhibit 22).

459. The investigative notes and reports of Defendant ESMV show that Defendant Caseworker Springman *explicitly* and *repeatedly* confirmed that *there was no credible evidence to support an inference that Plaintiff Daughter Lisa had been exploiting Father*—even at the very lowest standard of proof: "reasonable cause". (April 1, 2011 up until July 22, 2011 (approx. 35 pages))

460. Designated Defendants wanted the records of Defendant ESMV to reflect that Defendant Daughter Sheryl and Plaintiff Daughter Devora were the parties directly responsible for making a report of "new" allegations to Defendant ESMV—and *not* the designated Defendants.  For lack of better wording, the designated Defendants seized the opportunity to "shoot from someone else's shoulder."

461. The Intake Report for 7/22/2011 documents that Plaintiff Daughter Devora stated that the sole reason for her calling Defendant ESMV on July 22, 2011 was because of the telephone call that she received from Defendant Daughter Sheryl.

Evidence of fraudulent acts after July 22, 2011

462. Defendant Caseworker Springman spoke with Defendant Attorney Studen and recorded the details of the conversation in the notes for July 26, 2011, which stated:

*Atty Studen stated that there was a demand for the total $6 million of his [Father's] retirement account to be moved to a Citizen's bank account in Boxford.  Atty Studen stated that this was requested by Lisa Belanger who stated that she was the elder's power of atty. Due to the recent history that the elder's account manager Brian Nagle was aware of Mellon then put a freeze on the account and informed Lisa Belanger that a court would have to order any money to be moved at this point.  Atty Studen stated that after the transfer of funds was denied Lisa Belanger had called Mellon Bank quite upset and threatened a lawsuit against them.  Atty Studen stated that this has yet to occur and that*

*after a week's time had passed Lisa Belanger had called up the bank again.  This time when Lisa had called she stated that she was frustrated with the bank also stated that she had sent a letter explaining why the bank should transfer the money.  Attorney Studen also stated that the elder had called and left a VM at Mellon Bank stating that he was removing all power of atty's and that everyone was trying to steal his money.*

463. Showing intended deception, it is not reported to _whom_ the supposed "demand" was made; Defendant Attorney Studen *does not* state _when_ the supposed "demand" occurred; and the referenced voice mail supposedly left by Father was never provided as evidence.

464. On July 26, 2011, Defendant Caseworker Springman and another caseworker went to Father's home.  Plaintiff Daughter Lisa was not home at the time.

465. In the notes for that visit, Defendant Caseworker Springman explicitly stated that _he first_ "informed Elder [Father] of the allegations in the report" and that:

*PSW [Defendant Springman] asked Elder if he was aware of the attempt to move his money.  Elder stated that he was but was unsure of who it was.  Elder stated, 'Who do you know it to be, because when I find out they are going to jail?'  PSW stated that it was reported to be his dtr Lisa and that she contacted Mellon Bank to have the $6 million moved.  Elder asked how much of his money was stolen and how much was still at risk. PSW stated that to his knowledge the Elder's assets were secure and that Mellon had frozen them.  Elder stated that this was good and asked again who had tried to move the money.  PSW told elder again that it was reported to be his daughter Lisa.  Elder again produced the account summary and handed it to PSW's again asking if they had seen this and was this what the report was about.  PSW stated that it was. . . .*

*Elder asked 7 times about whether or not his money was safe and asked 7 times as to which one of his daughters had been the one 'to look out for'.  PSW explained the report each time and that PSW was told that the elder's assets were frozen until notice from the court.  PSW was then asked about what he [Father] would do if he had no money to get basic needs.  PSW stated that the elder could call PSW if that occurred and that he would help.*

466. On July 28, 2011, Defendant Supervisor Dailey called Plaintiff Daughter Lisa and began questioning her about Father's finances.  In his notes, Defendant Supervisor Dailey explicitly stated that Plaintiff Daughter Lisa "was cooperative" and had answered his questions and that Plaintiff Daughter Lisa had expounded on the manner in which, for weeks, Defendant BNY Mellon had been unlawfully and unjustifiably denying Father access to all funds and that she was finishing up the drafting of a 93A Demand letter (consumer fraud procedural letter) that she was going to be serving Defendant BNY Mellon.

467. The notes input by Defendant Supervisor Dailey, on <u>July 28, 2011</u>, state that Plaintiff Daughter Lisa faxed him the afore-described 93A Demand letter at the office for Defendant ESMV; and that he had received it.

468. On July 28, 2011, Plaintiff Daughter Lisa sent the 93A Demand letter to the Chairman & CEO of Defendant BNY Mellon (Robert Kelly), President of Defendant BNY Mellon (Gerald Hassell) and Investment Management of Defendant BNY Mellon (Mitchell Harris).

469. Plaintiff Daughter Lisa also sent correspondence and a copy of the 93A Demand to then-U.S. Senator Scott Brown. The November 2011 invoice filed by Defendant Burns & Levinson with the Essex Probate & Family Court shows that Defendant Attorney Cukier billed for discussions and the drafting of a written response to Senator Brown. Plaintiff Daughter Lisa had not been provided any information whatsoever about the substance of the communications between Senator Brown and Defendant Burns & Levinson; which further evidence shows Defendants' improper use of influence.

470. July 28, 2011 was the first time that Defendant ESMV had directly broached Plaintiff Daughter Lisa about there being an investigation regarding financial exploitation.  In a very informal casual manner, Defendant Supervisor Dailey asked if *she* wanted to come into the office of Defendant ESMV to talk.  Defendant Supervisor Dailey did not, in any manner, state that Defendant ESMV was making a formal request to interrogate Plaintiff Daughter Lisa.

471. In the notes input by Defendant Supervisor Dailey into the computer system of Defendant ESMV, he had phrased the manner of his requesting Plaintiff Daughter Lisa to come in and speak with him as: "PSS [Defendant Supervisor Dailey] <u>*offered* </u>*to set up <u>visit* </u>*at ESMV for <u>next week</u> to <u>discuss</u> situation*."

472. Defendant Supervisor Dailey explicitly, described in the notes of Defendant ESMV regarding the response by Plaintiff Daughter Lisa as: "Lisa <u>*seemed interested*</u>, but did not want to set up a time just yet."

473. The very next statement written by Defendant Supervisor Dailey was:

*She [Plaintiff Daughter Lisa] also provided a CWI, named Steven Kapsalis [telephone number provided] who is a friend of AV [Father] for over 40 years.  Lisa wanted PS to contact him to hear his views on the situation.*

474. Of significance, Defendant Caseworker Springman intentionally manipulated the notes of Defendant ESMV to make it appear as though he interviewed Steven Kapsalis on July 29, 2011, when, in fact, that was a complete fabrication.  As evidenced in the notes, Defendant Caseworker Springman had set up a caption under the date of <u>July 29, 2011</u>.

Right *before and after* the description of the supposed interview, there were date/time stamps stating that it was input on <u>August 25, 2011</u>.

475. In further egregious deception, Defendant Caseworker Springman had inserted those notes one full week <u>*after*</u> *the hearing of August 17, 2011—when Judge Abber made the court appointments of guardian and conservator.*

476. Defendant Supervisor Dailey and Defendant Caseworker Springman met with Defendant Attorney Berid on <u>July 28, 2011</u> and reviewed the 93A Demand letter that had been faxed.  Defendant Supervisor Dailey wrote in the notes:

*Lisa accuses Mellon of Fraud and not handling AV's [Father] account properly.  This includes not honoring Lisa as Durable POA.*

*After review of the above info, ESMV may pursue a motion to intervene and look to seek a court order to have AV [Father] evaluated for competency and freeze on spending to include only AV's expenses.  **<u>Pending outcome of eval, a temp guardian/conservator might be needed</u>**.*

477. Defendant Caseworker Springman documented that Defendant Attorney Berid told him to call Defendant Attorney Studen (counsel for Defendant BNY Mellon) "on this matter to notify her of Lisa filing the 93A today."

478. Defendant Caseworker Springman documented that he carried out Defendant Attorney Berid's instructions on that same day. Defendant Attorney Studen then telephoned Defendant Attorney DeNapoli to update him.

479. Defendant Caseworker Springman then spoke with Defendant Attorney Tarlow and reported: "Mr. Tarlow stated that he did have 6 months of financial records but '<u>there were *no* signs of FE [financial exploitation] in those statements.</u>'"

480. Defendant Caseworker Springman documented, in the notes of Defendant ESMV, on <u>July 28, 2011</u>, that Defendant Attorney Berid had informed him that Plaintiff Daughter Lisa had called Defendant Attorney Studen (counsel for Defendant BNY Mellon) giving notification that Defendant Right at Home was threatening to stop services by the end of day (July 28, 2011).

481. Defendant Caseworker Springman documented, in the notes of Defendant ESMV, on <u>July 28, 2011</u>, that he spoke with the owner of Defendant Right at Home, Jay Kenney; that Jay Kenney stated that "he had not been paid a dime for the services that had been put into the elder's home to this point."

482. Jay Kenney's statement was knowingly completely false.  On <u>July 29, 2011</u>, Defendant Supervisor Dailey documented in the above-referenced notes of Defendant ESMV that an email was received from Rosalee Doherty of Right at Home stating that

Plaintiff Daughter Lisa, had, *in fact*, given Right at Home a check on June 17, 2011 for $5,376.00; that Plaintiff Daughter Lisa had signed the check as POA [Power of Attorney].

483. As documented in the notes of Defendant ESMV in the late afternoon of July 29, 2011, Defendant Supervisor Dailey had called Plaintiff Daughter Lisa about transactions regarding Father's accounts.  From the tone and manner in which Defendant Supervisor Dailey had been speaking to Plaintiff Daughter Lisa, she deduced that she was being accused of financial exploitation of Father.

484. Defendant Supervisor Dailey documented in the notes of Defendant ESMV, regarding the above-described conversation: "Plaintiff Daughter Lisa wanted to know 'what she was being accused of' and 'what that is based on'" but he *did not*—and would not—answer Plaintiff Daughter Lisa's direct question.  Instead: "PSS Dailey informed Lisa that PS was looking into reported concerns of how the elder's money was handled, such as bills (Right at Home) that were not paid, which jeopardized his services."

485. Defendant Supervisor Dailey documented that he then "offered to meet Lisa at Elder Services of the Merrimack Valley to further discuss allegations." Plaintiff Daughter Lisa, a practicing attorney, reasonably stated that she would come to Defendant ESMV's office to speak to them once Defendant Supervisor Dailey put that request in writing. At no time did Defendant ESMV send Plaintiff Daughter Lisa written communication about setting up a time to be interviewed.

486. On August 2, 2011 Defendant Caseworker Springman put together a formal written report for Defendant ESMV, called an Investigation Summary, in which he states: "Case was substantiated for Financial Exploitation."  Defendant ESMV did not inform the District Attorney's Office of their having a "substantiated" case of financial exploitation.

487. On August 3, 2011 Plaintiff Daughter Lisa faxed a letter describing the misconduct of Defendant BNY Mellon —as well as the misconduct of Defendant ESMV and Defendant Law Firm TBHR—and a copy of the 93A Demand letter to then-U.S. Senator Scott Brown. Subsequently, Plaintiff Daughter Lisa received a call from then-U.S. Senator Scott Brown's aide stating that Senator Brown was not able to "do anything".

488. On August 3, 2011, Plaintiff Daughter Lisa faxed Executive Director of Defendant ESMV (Rosanne DiStefano) a copy of the 93A Demand and a summary of her concerns. On that same day, Defendant Attorney Berid mailed out Plaintiff Daughter Lisa with Defendant ESMV's written *non-emergency* motion requesting a hearing be held to determine whether Essex Probate & Family Court would allow Defendant ESMV *to be able to* get a court order to have Father be evaluated regarding competency—*not* a hearing to determine whether there is probable cause that Father had been abused or exploited.

489. On <u>August 4, 2011</u>, Defendant Attorney DeNapoli called Defendant Attorney Berid, with Defendant Attorney DeNapoli having described the conversation as "*regarding status and strategy*."

iii. *Further* elder reported to Mellon bank that his "family is stealing his money" in a recorded phone call;

Right at Home (the private home health agency) had an outstanding balance of $17,456.00;

there was an unexplained disappearance of funds—as there was a transfer of $50,000 transferred into Father's Citizen's checking account and that Lisa "chose not to inform PSS Dailey where the money went"; and

there was a concern about the *evidence of intentional deception by designated Defendants*

490. Throughout the notes input into the computer system of Defendant ESMV from <u>April, 1 2011</u> up until <u>July 22, 2011</u>, the staff of Defendant ESMV <u>did</u> <u>not</u> use the standard classification of "alleged perpetrator" (AP) with regard to Plaintiff Daughter Lisa— outright to the contrary, Defendants continuously referred to her as "Participant" or "Other party" or by name.

     1.    The formal written reports for Defendant ESMV did not label Plaintiff Daughter Lisa as "perpetrator" <u>until</u> July 22, 2011.

     2.    There are *no* intervening notes between <u>July 11, 2011</u> and <u>July 22, 2011</u>.

Intentional deception evidenced in the Investigation Summary of 8/2/2011

491. Defendant ESMV stated in its Investigation of Summary (originated on 8/2/2011)— done by Defendant Caseworker Springman—that the determination of a substantiated case for financial exploitation against Plaintiff Daughter Lisa was based on the supposed following grounds:

validity of Father's re-affirmation of his 2003 DPOA.

492. Defendant Attorney Berid represented in court that the notes of Defendant ESMV state that a supposed substantiated finding of financial exploitation was made on <u>August 2, 2011</u>— which is the date that the afore-described Investigation Summary states was purportedly originated.

493. It is suspect that the Investigation Summary—which was originally created on August 2, 2011—documented that it was *"updated"* on <u>August 25, 2011</u>. As evidenced, the Investigation Summary was modified <u>*after*</u> Judge Abber had already made the court ordered appointment of Defendant Attorney Cuffe as guardian and Defendant Attorney

Feld as conservator.  Demonstrated is the deceptive manufacture of incriminating evidence and falsification of records.

494.    Conspicuous by its absence in the Investigation Summary is the original allegation by Defendant ESMV that Plaintiff Daughter Lisa attempted to move $6 million of Father's accounts out of Defendant BNY Mellon.

495.    Demonstrating Defendants' patently deliberate intent to fabricate evidence is the fact that Defendant ESMV's report stated that one of the supposed grounds for a substantiated finding of exploitation was Father calling Mellon Bank to report that "his family was stealing his money." Especially egregious is the fact that the notes and reports of Defendant ESMV continuously and repeatedly reflect a position that the agents of Defendant ESMV considered Father _not_ to be competent.

496.    Replete in the reports of Defendant ESMV is the continuous documentation that Defendant ESMV did not conduct any investigation of the information of exploitation by Defendant BNY Mellon and instead aided and abetted Defendant BNY Mellon in their fraudulent conduct.

497.    Defendant Caseworker Springman and Defendant ESMV knowingly and intentionally misused the outstanding balance owed to Defendant Right at Home as grounds for a "substantiated finding" when they already knew that the outstanding balance was solely caused by Defendant BNY Mellon refusing Father's personal request to transfer funds to _his_ Citizen's Bank account.

498.    Defendant Caseworker Springman and Defendant ESMV, knowingly and intentionally, falsely made representations that there had been an unexplained disappearance of funds.

499.    As explicitly documented in the notes of Defendant ESMV, Defendant Caseworker Springman had been informed by Defendant Attorney Tarlow on July 28, 2011 that he had the past six (6) months of Father's checking statements and that there were no signs of financial exploitation.

500.    In the notes of Defendant ESMV of July 29, 2011, Defendant Supervisor Dailey wrote that Lisa had told him that she could provide proof of where funds had been disbursed.  Defendant Caseworker Springman and Defendant ESMV knowingly and intentionally made false representations that Plaintiff Daughter Lisa "chose not to inform PSS Dailey where the money went."

### H.  Events following Defendant ESMV's motion to intervene

501.    As previously set forth, on June 14, 2011, the court proceeding before Judge Abber was a petition for temporary guardianship and conservatorship; whereby Judge Abber declared that a court appointed guardian and conservator were not warranted.

502.    Judge Abber had *repeatedly* expressed that he was certain that the matter of In re Marvin H. Siegel would "be back in court *very quickly*"; the matter of In re Marvin H. Siegel did return before Judge Abber on August 17, 2011 because of Defendant Attorney Berid pretextually filing a motion to intervene. (Exhibit 338B)

503.    Father had terminated the services of Defendant Attorney Tarlow and Defendant Law Firm TBHR.  After being served Defendant ESMV's motion to intervene, Father had Plaintiff Daughter Lisa search for another attorney to represent him.

504.    Based on representations held out to the public by Defendant Attorney Marsha Kazarosian and her reputation held out by legal professionals, Plaintiff Daughter Lisa—on behalf of Father—consulted with Defendant Attorney Kazarosian about representing Father at the scheduled hearing for Defendant ESMV's motion to intervene.

505.    Plaintiff Daughter Lisa told Defendant Attorney Kazarosian how Father had agreed to take the antipsychotic Seroquel because it was represented by the staff of Defendant Whittier Pavilion (on June 16, 2011) that *Father's discharge from Defendant Whittier Pavilion was conditioned upon Father doing so*.

506.    Defendant Attorney Kazarosian met with Father, on or about August 15, 2011, at her law office in Haverhill, MA.  Father was driven by a home health aide of Defendant Right At Home—as due to logistics Plaintiff Daughter Lisa drove in her own car to the appointment.  Father's long time friend, Steven Kapsalis, also came to Defendant Attorney Kazarosian's office for the appointment.

507.    Defendant Attorney Kazarosian met all together with Father, Plaintiff Daughter Lisa and Steven Kapsalis.  Defendant Attorney Kazarosian and her associate also talked with Father alone.  (Exhibit 8).

508.    Plaintiff Daughter Lisa explicitly conveyed to Defendant Attorney Kazarosian that she was being hired to protect Father from any and all intrusion by the State into Father's personal life; that Father was seeking representation to forcefully fight against any and all intervention by Defendant ESMV and to maintain the validity of his 2003 DPOA.

509.    Both Plaintiff Daughter Lisa and Father explicitly conveyed to Defendant Attorney Kazarosian that Father wanted Daughter Lisa involved in Attorney Kazarosian's representation of Father, to which Defendant Attorney Kazarosian did not object *until* later

having had a long meeting with Defendant Attorney Cuffe and other designated Defendants on or about October 5, 2011.

510.    Father explicitly conveyed to Defendant Attorney Kazarosian that he wanted Plaintiff Daughter Lisa and her family to permanently reside with him.

511.    Plaintiff Daughter Lisa gave Defendant Attorney Kazarosian the original affidavit from the home health aide of Defendant Right At Home who had been present when Defendant Caseworker Springman came to see Father on July 22, 2011 (Exhibit 339). The home health aide's affidavit stated:

> she was present when two men from Defendant ESMV came to Father's home;

> the two men from Defendant ESMV initiated the conversation with Father, saying: "We are here because we heard your having problems with your money";

> that the two men from Defendant ESMV led Father to believe that there was money "missing" from his bank and that they came to see Father telling him that they were there to help him get his money back;

> the two men from Defendant ESMV spoke in a manner as if  Plaintiff Daughter Lisa had been the one who stole the money and continued on, specifically and exclusively, talking about Plaintiff Daughter Lisa; and that

> the two men from Defendant ESMV instructed Marvin not to talk to Plaintiff Daughter Lisa about their conversation.

512.    Plaintiff Daughter Lisa provided Defendant Attorney Kazarosian written documentation as to the accounting of Father's bank accounts including a written statement by the bookkeeper handling Father's accounts showing Defendant BNY Mellon had directly been the source of the problems with Father's Citizen's Bank account.

513.    Defendant Attorney Kazarosian, on August 16, 2011, replied by email to Plaintiff Daughter Lisa, stating:

"I had the statutes although I appreciate you forwarding them.  But as far as attacking elder services tomorrow, I am not sure that is a good tact.  They may very well not be following procedure, *but they are only intervening right now*.  I would rather stick to keeping it simple. . .  that marvin is incompetent although forgetful, that unfortunately protective services investigator never spoke to you and relied upon the statement of a forgetful guy who was reacting to the guy's suggestion that you were stealing from [referring to the previously discussed recorded call with Defendant Brian Nagle on July 22, 2011]. . . ."

I.  Court proceeding of August 17, 2011

514.    At the beginning of the *non-evidentiary* hearing of August 17, 2011, Defendant Attorney Kazarosian had filed a notice of appearance stating that Father had retained her to be his attorney; while, at the same time, Defendant Attorney DeNapoli—on behalf of Defendant Law Firm TBHR—requested that Judge Abber rule on his petition asking for a court order precluding the firing of Defendant Firm TBHR.

515.    Defendant Attorney Kazarosian described in exceptional detail her observations that Father was competent; that Father expressed to her that he had been deceived by Defendant Attorney Tarlow and his associates; that the documents signed on May 25, 2011 was procured under duress and deception; that Father explicitly wanted Plaintiff Daughter Lisa and her family to permanently reside with him and to care for him; that Father's 2003 DPOA should be deemed valid and effective.

516.    Judge Abber permitted Defendant Attorney Kazarosian to appear on behalf of Father.  In addressing the petition filed by Defendant Law Firm TBHR, Judge Abber stated that there was no need to hear the petition because he was going to appoint a temporary conservator.

517.    Defendant Attorney Kazarosian attested that Father had personally told her that the documents brought to him by Defendants Attorney Tarlow and Watson and signed by him on May 25, 2011 were obtained by fraud and deception; that Father had signed those documents under coercion and duress.

518.    In Defendant ESMV's filed motion to intervene, it *did not* request that the hearing involve the appointment of a guardian and conservator

519.    Defendant ESMV's purported claim of a substantiated case for financial exploitation was documented to have occurred on August 2, 2011.  Defendant Attorney Berid scheduled the hearing for the motion to intervene 14 DAYS *after* this purported substantiated determination.  G.L. Chapters 19 and 20 provide procedural mechanisms that permit emergency proceedings *within 24 hours*.  As evidenced, Defendant ESMV's motion to intervene was not pursued as an emergency motion.

520.    The specific relief that Defendant Attorney Berid had enumerated in the motion to intervene consisted of:

to order a complete mental health evaluation of Father;

to appoint a GAL to investigate the issues of financial exploitation;

to appoint a GAL to determine whether Plaintiff Daughter Lisa and her family should be allowed to continue to reside with Father;

to allow the firm of Defendant Law Firm TBHR, and in particular Attorneys Tarlow, DeNapoli and Watson, to continue to represent Father; and

to order that all Home Health Agency Bills and household bills be presented to ESMV for approval and forwarded to BNY Mellon *until* a mental health evaluation is completed, when a temporary guardian is put in place. (Exhibit 338).

521.   Defendant Attorney Berid and Defendant ESMV—in the filed motion to intervene— did NOT request Judge Abber to issue an emergency order for an appointment of a guardian or conservator.

522.   The *only* requested type of relief sought by Defendant Attorney Berid and Defendant ESMV was permission to conduct certain underlined investigative measures and that the investigative measures were necessary *to be able to make a determination whether a court appointed guardian and conservator was warranted*.

523.   Further establishing that Defendant ESMV's motion did not, in any manner, request the appointment of a guardian and conservator is the fact that such proceedings require the presentation of a medical certificate stating that Father lacked capacity—which the *very essence* of Defendant Attorney Berid's motion to intervene was her asking for a court order *so that she would be able to obtain a medical certificate*.

524.   There was *no* medical certificate prepared for the proceeding of August 17, 2011. Of import, the medical certificate that had been *previously* submitted to the Essex Probate & Family Court by Defendant Attorney Garmil (on behalf of Defendant Whittier Pavilion) on June 14, 2011 was *no longer effective by* August 17, 2011, pursuant to the procedural rules for the Probate & Family Court.  A new medical certificate was required.

525.   The ill-motive of Judge Abber in ordering the temporary appointments of guardian and conservator is evidenced by the fact that Judge Abber, s*pecifically*, did not hold the scheduled hearing for temporary guardianship and conservatorship on  June 7, 2011 on the espoused basis that the provided medical documentation was not on the official standard form of the Probate & Family Court—yet, on August 17, 2011, *there was no medical documentation provided of any kind*.

526.   Defendant Attorney Berid and Defendant ESMV *did not* notify the District Attorney of any determination of a finding of reasonable cause to believe Father (Marvin H. Siegel) had been exploited given that pursuant to 651 CMR 5.19 the protective agency must report such determination to the District Attorney *within 48 hours*.

527.   Defendant Caseworker Springman testified in-court (on July 2, 2012) that Defendant ESMV had not reported *any* alleged misconduct regarding financial exploitation of Father to the District Attorney's Office. The written report for Defendant

ESMV—entitled Investigation Summary—dated <u>August 2, 2011</u> states that *no other* agencies were involved in the investigation.

528.  Defendant Attorney Berid's in-court opening remarks evidenced that the motion to intervene was filed for intended retaliatory purposes.  Defendant Attorney Berid explicitly stated that Plaintiff Daughter Lisa had complained against Defendant ESMV and Defendant BNY Mellon to the Attorney General and the Executive Office of Elder Affairs.

529.  The court record shows that Judge Abber attempted to give the appearance that the hearing was based on supposed emergency circumstances.  De facto, the subject matter of temporary guardianship and conservatorship <u>was</u> <u>not</u> initiated and not requested by Defendant ESMV, or any other party of In re Marvin H. Siegel.

530.  Judge Abber, *knowingly and intentionally*, used Defendant ESMV's motion to intervene as a pretext. Judge Abber's issuing the court appointments of a guardian and conservator was an outright sham.

**Evidence of collusion between Judge Abber and Defendants prior to the hearing of August 17, 2011**

531.  At the proceedings held on August 17, 2011, Judge Abber relied <u>solely</u> on mere arguments by opposing counsel.  There was no examination of witnesses.

532.  It was explicitly brought to Judge Abber's attention that Plaintiff Daughter Lisa was present and the court proceeding held on August 17, 2011 was brought under the dockets initiated by Plaintiff Daughter Lisa (ES11P1466GD and ES11P1465PM); however Judge Abber would not let Plaintiff Daughter speak in any manner.

533.  With Defendant Attorney Berid having made only blanket statements—and no concrete evidentiary support presented whatsoever—Judge Abber declared that he had made up his mind as to what action he would take.

534.  When Defendant Attorney Kazarosian attempted to convey that Father opposed the appointment of a guardian and conservator, Judge Abber directly stated to Defendant Attorney Kazarosian: "<u>Well, counsel, tell me whether your client was comfortable with his daughter taking $6 million dollars out of his bank account.</u>"

535.  Defendant Attorney Kazarosian indicated to Judge Abber that Plaintiff Daughter Lisa was present and should be permitted to address the allegations made against her in court.  The following in-court discourse took place:

> Attorney Kazarosian:  Your Honor, Lisa Belanger is here and I think she wants to address the Court as well--

66

Judge Abber:          No.

Attorney Kazarosian:  - - as a person of interest who can give information.

Judge Abber:  On what?

Attorney Kazarosian:  Well, there's some accusations that have been made that she's denying, as to requesting $6 million or not let anyone see her father.  And I think she has indicated that she wants to address those, because she denies them. The only other thing I would point out, Your Honor, is with regard to the durable power of attorney that was switched.  My client gave a durable power of attorney –

Judge Abber:  Counsel, I'm addressing the guardianship.

Attorney Kazarosian:  but - -

Judge Abber:  - - ordering a temporary conservator.  That's why I'm not willing to hear from Attorney Belanger on those issues.

536.    Judge Abber outright precluded Plaintiff Daughter Lisa from having the opportunity to rebut the allegations of financial exploitation made against her, in any manner.

537.    As previously set forth, Father nominated Plaintiff Daughter Lisa to be his guardian and conservator in his 2003 DPOA—which was directly brought to Judge Abber's attention by Defendant Attorney Kazarosian.  As a matter of law, Plaintiff Daughter Lisa was *entitled* to be heard regarding the allegations made against her; and that rebutting such allegations was a direct and material issue to the issue of guardianship and conservatorship.

538.    The fact that Defendant BNY Mellon did not initiate a call to Defendant ESMV lends credence to the fact that such allegation was completely fabricated.

539.    In Defendant ESMV's Investigation Summary of 8/2/2011—in the section listing the supposed grounds for a substantiated finding of exploitation of Father—there was no allegation that Plaintiff Daughter Lisa attempted to take $6 million from Defendant BNY Mellon; yet, Defendant Attorney Berid explicitly made that representation to Judge Abber.

540.    To-date, no evidence, *of any kind*, has been presented to support the above-described allegations against Plaintiff Daughter Lisa.

541.    As previously set forth, the GAL Report later filed by Attorney Dennis McHugh— *over* two (2) years later on November 18, 2013—shows that the above-described allegations made by Defendants against Plaintiff Daughter Lisa were falsely made *from inception*.  (Exhibit 340).

542.    Speaking volumes is that Judge Abber and Defendants knew that Plaintiff Daughter Lisa was a practicing attorney and, at no time, did they make a formal complaint against Plaintiff Daughter Lisa to the Board of Bar Overseers.

### iv.  The court appointment of Defendant Attorney Cuffe was predetermined before the hearing of August 17, 2011

543.    Several discourses took place during the court proceedings on August 17, 2011 showing pre-orchestration by Judge Abber, Defendant Attorney Ledoux and Defendant Attorney Cuffe.

544.    Following is the discourse of Judge Abber's ostensible process of selecting the actual person to be appointed temporary guardian:

| | |
|---|---|
| Judge Abber: | [To Attorney Berid] And who are you suggesting should be that guardian? |
| Attorney Berid: | I would pray the Court   -- I have no particular person in mind. |
| Judge Abber: | Attorney Ledoux, I assume you have somebody in mind? |
| Attorney Ledoux: | Sitting right there, Your Honor.  Brian Cuffe is well known to the Court certainly and he's well experienced in the area of guardianship law.  That's my suggestion. |
| Judge Abber: | So, you're not asking for your client? |
| Attorney Ledoux: | No your Honor, I am not. |

545.    As evidenced from the court record set forth above, Judge Abber's statement to Defendant Attorney Ledoux shows that Judge Abber was very concerned that the court record would reflect Defendant Attorney Ledoux's blaring suspicious response—as Judge Abber felt compelled to subsequently point out, on the record, that Defendant Attorney Ledoux's client (Defendant Daughter Sheryl) was not seeking to be guardian.

### v.  Judge Abber, personally, cherry-picked Attorney James Feld as court appointed conservator

546.    Regarding Judge Abber's ostensible process of selecting the temporary conservator, he spontaneously stated: "Attorney Upley, I know you've served as conservator.  Would you be willing to do so in this case?"  To which Attorney Upley responded affirmatively.

547.    Shortly thereafter, Defendant Attorney Kazarosian asked Judge Abber if she could have an opportunity to discuss something with Attorney Upley prior to his being appointed.

548.    While the court was in recess, Defendant Attorney Kazarosian discussed the appointment of conservator with designated Defendants, in their capacity as opposing counsel.  When court proceedings resumed, Defendant Attorney Kazarosian apprised Judge Abber about the discussions amongst the Defendants, and stated:

> *We*, have agreed that, if you are going to appoint a temporary guardian, we have no objection to Brian Cuffe, although [Father] continues his objection. If you are going to appoint a temporary conservator, *we* have discussed the appointment of David Aptaker.

549.    Showing the fact that the discussion of the appointment of David Aptaker had arisen purely from Defendant Attorney Kazarosian's closed discussion with designated Defendants—*to the exclusion of Plaintiff Daughter Lisa*, Judge Abber responded to Defendant Attorney Kazarosian's above statement:

> Is there some reason why the person that I had indicated that I might select is not appropriate?"

The issue was then discussed at sidebar—inaudible to Plaintiff Daughter Lisa and the court audio recording system.

550.    Attorney Upley then identified himself during the court proceedings and indicated that he still wanted to be appointed.  Upon which Judge Abber stated: "Well, let's just deal with the guardianship for right now?  Is any one seeking authorization to admit to a nursing facility at this time?"

551.    *Unsolicited*, Judge Abber declared that he was revoking the existing health care proxy executed by Father—in which Father had made Plaintiff Daughter Lisa his health care proxy.  To re-iterate, Plaintiff Daughter Lisa was precluded from being heard at the hearing.

552.    Defendant Attorney Cukier asked Judge Abber, in court, if she could provided him with the names of *her* proposed persons to be appointed conservator.  Judge Abber stated

that she could provide three (3) names.  In doing so, she gave the following names: Joseph Kropp of Gilmore, Reese & Carlson; Rebecca Benson of Margolis & Bloom; and Katherine O'Connor of Eckel, Morgan & O'Connor.

553.    Judge Abber did not declare who he would be appointing as temporary conservator—in court, he indicated that he would do so outside of the hearing by the end of the day.

554.    As evidenced, Defendant Attorney Cukier did not name Defendant Attorney James Feld—and *no other* opposing counsel (Defendants) had made any specific request.

### vi. Evidence of ill-motives by Judge Abber for selecting Defendant Attorney Feld to be appointed temporary conservator

555.    Substantiating documentation that Judge Abber selected Defendant Attorney Feld *based on his own preference* is the prior existing and close relationship amongst Judge Abber, Defendant Attorney Feld and Defendant Attorney Cukier in their collaboration as co-fiduciaries in the previously discussed matter of In re Esterina Milano; as well as, the previously discussed conduct of Judge Abber that occurred during the court proceeding of June 7, 2011—specifically, pertaining to his erratic inquiry of Attorney Long regarding finding a copy of the filed Bond.

556.    Suspect is that Judge Abber did not make a specific appointment of a temporary conservator during the court proceeding of August 17, 2011.   Not having made the temporary appointment of conservator, Judge Abber then instructed Attorney Upley to file *his* bond anyway; stating: "because I can't release this without a bond."   Attorney Upley confirmed that he would do so.

557.    Highly suspect is that Judge Abber knew that Father already had estate planning instruments executed in February of 2003, and he (Judge Abber) had stated—while commenting on the problem with a limited bond: "But we may need to file an estate plan at some point."

558.     No specific appointment of conservator was made upon the closing of the court proceeding.  Notes input into the computer system of Defendant ESMV by Defendant Caseworker Springman on August 17, 2011 state that Defendant Attorney Cuffe had been appointed as guardian—*there was no mention as to the appointment of a conservator*.

559.    The notes input by Defendant Diane Powell on the following day (August 18, 2011) had a portion of an email, having been copied and pasted, from Defendant Attorney Berid.  In that email, Defendant Attorney Berid stated that Defendant Attorney Cuffe had reported that "the Judge appointed Attorney Jim Feld of Woburn as the conservator."

70

560.   *Minutes later*, Defendant Diane Powell put in subsequent notes that stated:

> Met with ESMV legal and was updated from a legal standpoint as far as what took place in court yesterday.  Attorney Brian Cuff[e] appointed *but we are awaiting conservator being appointed*.

As evidenced, the subsequent notation by Defendant Diane Powell shows an intent to deceive, as the *previous inclusion* of the email from Defendant Attorney Berid had stated that Defendant Attorney Feld *already* had been appointed.

561.   Plaintiffs *did not* receive contemporaneous notification by the Essex Probate & Family Court about Judge Abber having selected Defendant Attorney Feld as conservator.

### J.   Subsequent to the court proceeding of August 17, 2011, overt acts by Defendant Attorney Kazarosian against Father's expressed desires and intentions

562.   Father's express and vehement desire for his representation by Defendant Attorney Kazarosian was to fight any and all incompetency proceedings and to return home to live with Daughter Lisa Siegel Belanger and her family (husband and two young children).

563.   Defendant Attorney Kazarosian *did not* take any legal recourse, of any kind, to vacate the orders issued by Judge Abber of August 17, 2011 and has failed to do so through the present. Defendant Attorney Kazarosian continues to fail to represent Father in any manner consistent with Father's expressed desires and intentions after the court proceeding of August 17, 2011.

564.   Father was so vehement about wanting Defendant Attorney Kazarosian to pursue legal action to vacate the orders issued by Judge Abber on August 17, 2011 that he had Plaintiff Daughter Lisa email Defendant Attorney Kazarosian—that same afternoon—about setting up an immediate appointment to meet with her.

565.   The next day, late in the afternoon on August 18, 2011, Defendant Attorney Kazarosian emailed Plaintiff Daughter Lisa the following response:

> I am still in a settlement conference *but can tell you that all of the research in the world is not going to change Abber's mind right now. I think that the best approach from my experience is to craft a letter to the conservator and guardian* explaining how your dad had given you a dpa years ago, that it went uninterrupted and without concern until the break that he had, that he was accosted at Whittier Pavilion and given documents to sign that interrupted it and that were self serving, and the other issues that I outlined in my proposed order, *and to let the appointees make recommendations to the court*. . .

566.    Defendant Attorney Kazarosian also emailed the following:

Even if this goes away, I can guarantee that ESMV will come back and ask again, so it is better for him to put this to bed with the temporary appointments...IMHO.

567.    As evidenced, *the very next day after the hearing*, Defendant Attorney Kazarosian abandoned her promise to represent Father in the manner that *he* wanted to be represented. Defendant Attorney Kazarosian implemented a strategy of "play along to get along"— knowing full well that the designated Defendants, inherently, acted in capacities that were adversarial to the expressed desires and intentions of Father.

*568.*    After the court proceeding of August 17, 2011, Defendant Attorney Kazarosian did not see Father until August 31, 2011—when Defendant Attorney Cuffe had scheduled his first visitation with Father for that day.  When Defendant Attorney Kazarosian came to Father's home on August 31, 2011, *she did not speak with Father alone.*

569.    Even more egregious, in court proceedings that were held *after*            August 17, 2011, Defendant Attorney Kazarosian engaged in conduct that diametrically went *against* Father's expressed desires and intentions.  (Exhibit 341A and Exhibit 341B).

570.    When Defendant Attorney Kazarosian began manifesting the attitude and outwardly held position that Father *was not* competent, pursuant to the professional rules promulgated by the Board of Bar Overseers she had an ethical duty to terminate her representation of Father *at the point* of having determined that she could not carry out the objectives that Father had hired her to do.

571.    It became patently obvious that Defendant Attorney Kazarosian was engaging in actions directly adverse to Father's expressed desires and intentions.  Father had explicitly requested that Defendant Attorney Kazarosian terminate her legal representation of him. She overtly refused to comply with Father's request in an email directly to Defendant Attorney Cuffe:

> Attached is a copy of a note from Marvin Siegel faxed to me this afternoon, attempting to terminate my services because it is his understanding that I have not articulated his wishes.  Also attached is an affidavit from his friend, Steve Kapsalis.  Brian, since receiving this fax from Marvin, I have confirmed with you that you are not terminating my services, and since as guardian, only you (or Judge Abber) can do so, I will continue as Marvin Siegel's counsel until there is an order from the Court that I cease my representation. (Exhibit 342A).

572.    Defendant Attorney Kazarosian had an ethical duty to inform the Essex Probate & Family Court about Father's faxed request that she terminate her representation of him. She did not do so.

573.     Defendant Attorney Cuffe—in his capacity as guardian—had an ethical duty to inform the Essex Probate & Family Court about Father's faxed request that she terminate her representation of him.  He did not do so.

574.     Plaintiff Daughter Lisa and Plaintiff Daughter Devora, in open court, informed Judge Abber that Father had requested that Defendant Attorney Kazarosian terminate her representation of him.  Judge Abber refused to address that issue.

575.     Over more than two (2) years of litigation before Judge Abber, Plaintiffs have repeatedly and continuously raised that Defendant Attorney Kazarosian has violated her duty owed to Father and has aided and abetted in the trampling of Father's State and Federal Constitutional rights with such trampling of rights condoned and directly facilitated by Judge Abber.

576.   While Plaintiff Daughter Lisa resided with Father, Defendant Attorney Kazarosian had not kept Father informed as to the on-goings of the litigation by written correspondence or by telephone. (342B).

### K.  Defendants' misuse of court proceedings to facilitate illicit activity

### i.  Father's established desire and intention that Plaintiff Daughter be intimately involved in his personal affairs

577.     Prior to any involvement by the State, Father had firmly established his intention and desire that Plaintiff Daughter Lisa and her husband be involved in the handling of his personal affairs.  Each and every Defendant had knowledge of Father's above-described expressed intention and desire.

578.     As previously set forth, Father had validly and deliberately executed a durable power of attorney in February of 2003 in which he declared Plaintiff Daughter Lisa as attorney-in-fact and Plaintiff Daughter Devora as successor attorney-in-fact.

579.     *But for* the unlawful conduct of designated Defendants, Father's 2003 DPOA would still be in effect through the present day.

580.     Throughout the years of litigation of the matter of In re Marvin H. Siegel, Plaintiff Daughters had repeatedly requested the State courts to specifically address the validity of Father's 2003 DPOA but the courts refused to do so.

581.     At the court proceeding held on June 14, 2011, Judge Abber outwardly expressed that there was no concern of undue influence regarding Father's 2003 DPOA.

73

582.    As previously set forth, at the court proceeding of June 14, 2011 (and repeatedly throughout the litigation of In re Marvin H. Siegel), Plaintiff Daughter Lisa—through counsel—requested that the validity of the purported DPOA executed by Defendant Attorneys Tarlow and Watson on May 25, 2011, while Father was under the initial 3-day involuntary commitment at Defendant Whittier Pavilion be litigated; repeatedly, Judge Abber refused to do so.

583.    At the court proceeding held on June 14, 2011, without any evidentiary hearing, Judge Abber explicitly stated that Father was competent to execute the DPOA of May 25, 2011 and ruled that it was effective.

584.    Two days later, on June 16, 2011, Father executed a re-affirmation of his 2003 DPOA and health care proxy directly in front of the staff of Defendant Whittier Pavilion and re-instituted Plaintiff Daughter Lisa as his attorney-in-fact.  The validity of the re-affirmed DPOA and health care proxy has not been litigated in the State courts.

585.    At the court proceeding on August 17, 2011, *without any evidentiary hearing*, Judge Abber revoked the reaffirmed DPOA and health care proxy.  The revocation was unlawful in terms of being procedurally defective; specifically, based on the failure to provide the required safeguards of due process and violating the constitutional protection of the sanctity of family relations.

586.    Plaintiff Daughter Lisa and her family had moved in to live with Father, permanently, at the beginning of April 2011.  Defendant Right At Home began providing services on June 17, 2011.

587.    Attested by Father's long-time friend, Steven Kapsalis, Plaintiff Daughter Lisa and her family had been actively involved in helping Father with his personal affairs, long *before and after* Father's involuntary commitment to Defendant Whittier Pavilion.

### ii. Defendant Attorney Cuffe began his court appointment as guardian with a charade

588.    As previously set forth, Plaintiff Daughter Lisa was informed by the staff at Defendant Whittier Pavilion that Father's discharge was conditioned upon Father having a home health care agency in the home 24/7 and Father's being compliant with the prescribed medication.

589.    As previously set forth, Plaintiff Daughter Lisa was given less than 48 hours to hire a home health care agency, and, therefore was not afforded adequate time to independently research health care agencies.  Due to the time constraints and the afore-described representations made to Plaintiff Daughter Lisa, she hired the services of the health care agency specifically recommended by the staff of Defendant Whittier Pavilion—which was Defendant Right At Home.

74

590.    Defendant ESMV has had a long-established working relationship with Defendant Right At Home—which Defendants did not disclose to Plaintiffs.

591.    Defendant Right At Home is a business contributor to Defendant ESMV.

592.    At the inception of Defendant Attorney Cuffe's appointment, he gave an outward impression that he was allowing Plaintiff Daughter Lisa to be involved with Father's care. For example, he asked Plaintiff Daughter Lisa to set up an appointment for Father to be seen by Defendant Dr. Cui; upon Plaintiff Daughter Lisa doing so, Defendant Attorney Cuffe emailed her stating:

> Hi Lisa, great job!  Thank you for your help.  I contacted Dr. Cui's office this morning to tell them about my role.  I will try to be present for your father's appointment on September 9th.  Let me know if any problems come up. Brian.(Exhibit 343).

593.    Defendant Attorney Cuffe subsequently emailed Plaintiff Daughter Lisa stating that he could not be present for Father's appointment with Defendant Dr. Cui, and asked if Plaintiff Daughter would attend Father's appointment.

### iii.  Manifested adversarial posture by Defendants

594.    It became evident that Defendant Attorney Cuffe only intended for Plaintiff Daughter Lisa's involvement in Father's care to consist of being a puppet.  Defendant Attorney Cuffe sought Plaintiff Daughter Lisa to perform obsequious menial tasks; however, he did not have any tolerance for unsolicited family input.

595.    At no time did Defendant Attorney Cuffe seek input from Father's daughters.  To the contrary, his pattern of conduct shows that he has—with concerted efforts of other designated Defendants—overtly *sought to exclude* the daughters from having any input into personal decisions made for Father.  Defendants have continuously taken *extra-added* efforts to conceal information from the daughters.

596.    For example, Plaintiff Daughter Lisa had discovered that Defendants had been making—under stealth—burial plans for Father.  Plaintiff Daughter Lisa only learned of the Defendants making burial plans for Father when some bare descriptions in Defendants' submitted invoices for payment to the Essex Probate & Family Court had made reference to burial plans.  (Exhibit 344).

597.    When Plaintiff Daughter Lisa and her family were still living with Father, Plaintiff Daughter Lisa, *specifically*, did not act in any manner that conflicted with Defendant Attorney Cuffe's supposed role as guardian.

598.    As advised by Defendant Attorney Kazarosian, Plaintiff Daughter Lisa took *added extra effort* to *not* impinge upon Defendant Attorney Cuffe's supposed authority as

75

guardian.  Evidencing that fact is a copy of the email that Plaintiff Daughter Lisa sent to Defendant Attorney Cuffe requesting that she be able to speak with Father's primary care doctor.  Exhibit 345A and Exhibit 345B.

599.    The above-described email sent by Defendant Attorney Cuffe shows that Plaintiff Daughter Lisa did not just take matters into her own hands; that she had *requested* permission from Defendant Attorney Cuffe to speak with Dr. Ellenbogen—which, Defendant Attorney Cuffe did not allow Plaintiff Daughter Lisa to do so.

600.    The only type of acts that Plaintiff Daughter Lisa and her husband had engaged in upon the court appointments of Defendant Attorneys Cuffe and Feld was that of *voicing* their concerns regarding Father's safety and for Father to be treated with dignity and respect.

601.    On or about September 23, 2011, Plaintiff Daughter Lisa became concerned when Father was having a consistent cough, over a period of days—at no time did any of the aides of Defendant Right At Home show any concern or acknowledgment regarding Father's persistent coughing.

602.    The FDA issued a Black-Box warning to not have elders with dementia use antipsychotics—specifically because of the risk of fatality due to increased susceptibility to pneumonia and other respiratory related illness.

603.    Father was seen by Dr. Ellenbogen and it was determined that Father had pneumonia.

604.    Plaintiff Daughter Lisa sent a detailed email to Defendant Attorney Cuffe on September 24, 2011, raising her concerns for Father's safety that the staff of Defendant Right At Home had not showed any initiative in recognizing that Father needed to be seen by his doctor—and that if she were not there to have picked up on it, that Father would have been in a more precarious situation.

605.    In that same above-described email, Plaintiff Daughter Lisa had brought to Defendant Attorney Cuffe's attention that one of the aides had been noticeably sick—with a cough.  Plaintiff Daughter Lisa described in the email that when the aide had arrived at the home, the aide was so visibly sick that, immediately, Plaintiff Daughter Lisa asked her to call Defendant Right At Home to notify the agency that she was ill, so that she could go home.  The aide told Plaintiff Daughter Lisa that she had already called Defendant Right At Home and had informed the agency that she was too sick to work, and that the agency said that she had to work because it was too short of a notice to find a replacement.

606.    Plaintiff Daughter Lisa also emailed Defendant Attorney Cuffe about Father needing to be examined by the ophthalmologist because Father was complaining that his

eyes were causing him discomfort and that Father was having angst because of his severe hearing loss and that he needed hearing aids that felt comfortable to him.

607.    In Defendant Attorney Cuffe's responding emails, he expressed exasperation that Plaintiff Daughter Lisa was bothersome with her raising the above-described types of concerns regarding her Father.

608.    On September 27, 2011, Plaintiff Daughter Lisa's husband (Donald Belanger) had emailed Defendant Attorney Cuffe as well as Defendant Attorney Feld providing a detailed description of inappropriate conduct by various home health aides of Defendant Right At Home that was becoming commonplace.  Donald Belanger described the following in his email to Defendant Attorney Cuffe:

>        the constant changing of staff, causing Father confusion;

>        finding Father crouched up in his chair in the living room late into the night/early morning—showing that the aide did not bring Father to his bedroom to get changed and into bed to sleep;

>        there were times that aides on the overnight shift had fallen asleep on the couch in Father's bedroom—when the aides are, specifically, supposed to remain awake during that shift;

>        one of the aides assigned to the overnight shift was only seventeen (17) years old;

>        there were times that an aide from the overnight shift would leave early—*before* the 7:00 AM shift, leaving the entry door unlocked.

609.    Plaintiff Daughter Lisa and her husband had requested that Defendant Attorney Cuffe hire a new home health care agency because of concerns for Father's well being, physically and emotionally. Defendant Attorney Cuffe gave Defendant Right At Home a copy of Plaintiff Daughter Lisa's and her husband's emails requesting the termination of Right At Home's services.

610.    Plaintiff Daughter Lisa had directly emailed Defendant Attorney Kazarosian about the incidents and explicitly raised concerns about Father's health being put at risk. Defendant Attorney Kazarosian did not in any manner address the described incident.

611.    As evidenced in the affidavit of Defendant Caseworker Springman, submitted by Defendant Attorney Cuffe at the court proceeding on November 8, 2011, Plaintiff Daughter Lisa's husband had reported to Defendant Caseworker Springman that there had been multiple incidents where staff of Defendant Right At Home had fallen asleep while on duty.

612.    Evidencing the fact that Plaintiff Daughter Lisa and her husband were not disruptive in the manner that they were seeking a change of agency providing home health care services is the above-referenced affidavit of Defendant Caseworker Springman, in which, Defendant Caseworker Springman described Plaintiff Daughter Lisa's husband having stated to him that he and Plaintiff Daughter Lisa were "meeting with Attorney Cuffe to _suggest_ a new agency that had impeccable credentials."

613.    In mid-October of 2011, Defendant Attorney Cuffe had sent out an email stating that he had hired the services of Defendant Michael Novack to assist him in carrying out his responsibilities as guardian; showing that Defendant Attorney Cuffe did feel that Plaintiff Daughter Lisa was exposing his inadequacy in addressing Father's needs. (Defendant Attorney Cuffe had hired Defendant Michael Novack as "geriatric care manager" in the matters of In re James and Hope Pentoliros).

614.    During the period of time that Defendant Attorney Ledoux was representing Plaintiff Daughter Devora, he stated to Plaintiff Daughter Devora that Defendant Attorney Cuffe was going to make Plaintiff Daughter Lisa's life a living hell if she did not stop bothering him.

### iv.  Open change in attitude by Defendant Attorney Kazarosian towards Plaintiff Daughter Lisa after she retained new counsel

615.    As stated by Defendant Attorney Kazarosian, in her own words, she had been communicating with Father _through_ Plaintiff Daughter Lisa.  Plaintiff Daughter Lisa had kept Defendant Attorney Kazarosian apprised of the inappropriate conduct of Defendant Attorney Cuffe and Defendant Right At Home.  Instead of taking corrective action, Defendant Attorney Kazarosian expressly took an approach of "play along to get along".

616.    From the pattern of Defendant Attorney Kazarosian's emails, Plaintiff Daughter Lisa saw that Defendant Attorney Kazarosian's conduct was suspect and decided to obtain counsel to specifically represent herself in the matter of In re Marvin H. Siegel.  (Exhibit 346)

617.    Early in the morning of October 5, 2011, Defendant Attorney Kazarosian responsed to Plaintiff Daughter Lisa's email regarding details of inappropriate conduct by Defendant Attorney Cuffe; in that email Defendant Attorney Kazarosian stated:

> I am not happy with Brian, and I have had a bit of a run in myself with him on this. But the court is NOT going to change him right now. The best thing to do in my opinion is to lie low and ride this out through Nov 8, and then see about getting someone else appointed if the judge decides to extend, and [I] think he will extend. Judge was not happy about whatever perceived behavior he thought was occurring, and I also made a stink about the first suggestion that he had. So

78

> I advise that we ride it, and try to make it Brian's decision that he may not be the best guy for the job given his schedule.

618. Later in the day on <u>October 5, 2011</u>, Defendant Attorney Kazarosian emailed Plaintiff Daughter Lisa and informed her that she had a long meeting with Defendant Attorneys Cuffe and Feld; and in that email, Defendant Attorney Kazarosian spoke *in support of* Defendant Attorneys Cuffe and Feld.

619. On or about October 7, 2011, Plaintiff Daughter Lisa informed Defendant Attorney Kazarosian that she had obtained independent counsel to represent her specific legal interest in the matter of In re Marvin H. Siegel. Defendant Attorney Kazarosian's attitude *quickly* turned openly hostile towards Plaintiff Daughter Lisa.

### v. Evidence of temporary orders sought by Defendant Attorney Cuffe being based on illicit motives

620.    As previously established, the common modus operandi of court appointed fiduciaries—issued under SJC Rule 1:07—to facilitate illicit <u>liquidation</u> of assets is to use tactics to conceal any real details concerning the affairs of the elder from family members.

621.    Defendant Attorney Cuffe—along with concerted efforts of other designated Defendants—scheduled an appointment for Father to be evaluated by          Dr. Bruce Kaster for November 2, 2011.  The sole purpose for Defendants seeking that Father be examined by Dr. Bruce Kaster was to obtain medical certification that would support the already unlawful court ordered guardianship and conservatorship. Dr. Kaster is located in the *very <u>same</u> office suite* as Defendant Michael Novack.

> 622.    Designated Defendants knew, <u>on August 17, 2011</u>, that Judge Abber had made the temporary appointments of guardian and conservator *without* having a *requisite* medical certification.

> 623.    Of significance, Defendants did not seek a medical certification from Dr. Bulucu, who had purportedly completed the *original* medical certificate that was submitted by Defendant Attorney Garmil (on behalf of Defendant Whittier Pavilion) during the guardianship and conservatorship proceedings held on <u>June 14, 2011</u>; the same court proceeding in which Judge Abber stated that Father *did not* need a guardian.

> 624.    Given the fact that Dr. Bulucu discharged Father despite Defendant Attorney Garmil's in-court representation that Defendant Whittier Pavilion would not discharge Father without a court appointed guardian, it is suspect that the Defendants did not seek an updated medical certificate from Dr.

Bulucu because his discharge of Father indicated that he would not be willing to act as a puppet for the Defendants—which establishes a motive for Defendants wanting to have Father examined by a doctor who would be "willing" to fill out the report in a manner desired by the Defendants.

625. Evidencing illicit motives by Defendants are the large *number of* doctors that Defendant Attorney Cuffe had contacted in terms of obtaining medical certification to support guardianship and conservatorship—(Drs Jane Funk, Naseer, Cui, Ellenbogen, Gray, Stakes, Krell, Kraft, Fitsel).

626. According to Defendant Attorney Cuffe's invoice submitted to the Essex Probate & Family Court, he did not contact Dr. Bruce Kaster, any time, from August of 2011 through October of 2011.

627. Further evidencing ill-motives by designated Defendants is the fact that Defendant Attorney Cuffe did not bring Father to be evaluated by any of them prior to the already scheduled proceeding of November 8, 2011 which specifically pertained to the continuation of temporary guardianship and conservatorship.

628. Suspect is the fact that given the substantial contact between Defendant Attorney Cuffe and Dr. Funk in September of 2011 that Father had not been scheduled to be evaluated by Dr. Funk for the medical certificate needed for the court proceeding of <u>November 8, 2011</u>—especially, when Dr. Funk had <u>*previously*</u> evaluated Father on the day he was being discharged from Defendant Whittier Pavilion—June 16, 2011, <u>*at*</u> the Defendant Whittier Pavilion.

629. Late at night on November 1, 2011, Father and Plaintiff Daughter Lisa were told by the aide for Defendant Right At Home—*for the first time*—that Father had a medical appointment early the next morning in Newton, MA, a substantial distance from Boxford, MA.

630. Designated Defendants had foreseeability that Father would be caused emotional upset the next morning because of his personal make-up and would take a toll on Father and cause him to suffer unnecessary anxiety and confusion. This was all well known to Defendant Attorney Cuffe, Defendant Attorney Kazarosian, Defendant Michael Novack and the staff of Defendant Right At Home.

631. An email sent from Defendant Michael Novack was recorded in the notes of Defendant ESMV (input on January 4, 2012), in which it stated that "Marvin *continues* to go to bed late and sleep late."

632. The only response by Plaintiff Daughter Lisa and her husband to the above-described sudden announcement was their calling Defendant Right At Home to voice their concerns—nothing more.

633. On or about <u>November 3, 2011</u>, Defendant Attorney Cuffe, joined by Attorneys Kazarosian, Ledoux, and Berid, filed an emergency motion with the Essex Probate & Family Court requesting a *temporary order* to:

Prohibit[] the Petitioner, Lisa Belanger or her husband Donald Belanger from any way interfering with having Marvin H. Siegel prepared and taken to an appointment with Bruce Kaster, PHD on Wednesday, November 9, 2011. Further the undersigned requests that the Order also state that no party and/or agent speak to Marvin H. Siegel about this appointment with the exception of his attorney, Marsha Kazarosian, and his Guardian, the undersigned.

(Exhibit 347). A hearing date for the motion was set for November 8, 2011.

634. Defendant Attorney Cuffe also filed a motion on November 3, 2011, asking for permission to file a medical certification late regarding the court order to continue the temporary guardianship and conservatorship. Defendant Attorney Cuffe based his motion solely on the allegation that Plaintiff Daughter Lisa had obstructed Defendant Attorney Cuffe's ability to obtain a medical certificate.

635. Defendant Attorney Cuffe knew that the allegations he made in his motion to file a medical certificate late were false and misleading.

636. Between November 2, 2011 and November 4, 2011, it became evident that Father was having a sudden problem with incontinence—which is, also, another prevalent side-effect of Seroquel and Risperdal (and other antipsychotics) reported by the FDA. Father *did not* have any problems with incontinence *prior* to his taking Seroquel and Risperdal—now a continuous issue for Father through the present.

637. Father's problem with incontinence was not an emergency situation and, therefore, Plaintiff Daughter Lisa called Father's primary care doctor (Dr. Ellenbogen in Boston) to see if an appointment could be scheduled.

638. Dr. Ellenbogen agreed to see Father, late afternoon, on November 4, 2011. Plaintiff Daughter Lisa's husband had knee surgery so she was at the doctor's with her husband and unable to take Father herself. So she requested that Defendant Right At Home take Father to the appointment, but Defendant Right At Home informed her that the agency did not have the capability to do so.

81

639.    As documented by the notes of Defendant ESMV for November 4, 2011, Plaintiff Daughter Lisa informed Defendant Supervisor Dailey of the situation. Defendant Supervisor Dailey stated that he could have Father go by ambulance to get checked out for the incontinence issue at the local emergency room, however, Plaintiff Daughter Lisa *explicitly replied* that this was *not* an emergency and that if needed she would call and get an appointment for a different day.  Plaintiff Daughter Lisa specifically stated that to have Father go by ambulance would cause Father unnecessary angst.

640.    The next evening—which was a Saturday (November 5, 2011), Defendant Attorney Cuffe *called an ambulance* to have Father brought to the local hospital's emergency room, even though there had been no incident of any kind having occurred.  Defendant Attorney Cuffe made the call for an ambulance *without* any notice to Plaintiff Daughter Lisa and her husband.

641.    When Defendant Attorney Cuffe called for the ambulance, he said the reason for Father needing to go to the emergency room was because of "increased confusion and incontinence."  He said that Father had "increased confusion" knowing that it was a lie—and deliberately did so because there was no actual reason for his calling for an ambulance.  (Exhibit 348).

642.    When the ambulance arrived Father became very upset and did not want to go to the hospital, especially by ambulance.  Father was so upset that the paramedics called the Chief of Boxford Fire Department (Chief Stickney), who came to the home to talk to Father.

643.    In the Boxford Fire Department Report, it was documented by Chief Stickney, personally, that he cancelled the ambulance because he discovered that there was no emergency requiring Father to go to the hospital.  Chief Stickney wrote:

Talked with Marvin Siegel and Marvin was doing very well.  I have known Marvin Siegel for years and was doing very well and it was good to see him.  Fire Department not needed C1 cancelled Lyons.  No problem.

644.    That following Monday, on November 7, 2011, Plaintiff Daughter Lisa took Father to the local hospital to be examined.  Father was diagnosed with pneumonia—it has been also reported that Father has suffered from pneumonia and other respiratory issues on the following subsequent dates of April 22, 2012 and May 3, 2012.  (Exhibit 349).

645.    Through counsel (Greg Hession), Plaintiff Daughter Lisa had filed an opposition to Defendant Attorney Cuffe's motion for temporary orders and the late filing of a medical certificate, which was sent to Defendant

Attorney Cuffe as well as, Defendant Attorneys Kazarosian, Feld, and Berid on <u>November 5, 2011</u>.  (Exhibit 350).

646.    Counsel showed that Plaintiff Daughter Lisa and her husband *had not* obstructed Defendants' taking Father to be evaluated by Dr. Bruce Kaster and had shown that Father not having been evaluated was *exclusively the fault of* Defendant Attorney Cuffe.

647.    Even more so, Plaintiff Daughter Lisa's written Opposition showed that Defendant Attorney Cuffe had engaged in suspect conduct; as it was shown that                 Dr. Kaster was located in the *very same office suite* as Defendant Michael Novack and that Defendant Attorney Cuffe sought the services of Dr. Kaster after first seeking so many different doctors beforehand to file a medical certificate in the matter of In re Marvin H. Siegel, who all clearly refused.

648.    In notes of Defendant ESMV, input by Defendant Caseworker Springman on <u>September 21, 2011</u>, is an email that he received from Defendant Attorney Berid relaying statements made by Defendant Attorney Cuffe:

Further Marvin will need to be seen for a med cert [medical certificate], as he is on anti-psychotic medication. The guardianship papers will have to be amended.  *Brian [Brian Cuffe] is thinking of asking Dr. Funk to do the cert, and see if she can go to Marvin's home.  He has less confidence in Dr. Cui doing it*.  He would like Mike for you to continue for a while visiting and checking on things.

649.    Further solidifying Defendants' illicit motive is the fact that Defendant Attorney Cuffe deceptively submitted additional motions and affidavits to Judge Abber on November 8, 2011—these motions were *not* served to Plaintiff Daughter Lisa or her counsel.

650.    With Defendants knowing—prior to the scheduled hearing—that counsel for Plaintiff Daughter Lisa had raised the suspect relationship between Dr. Kaster and Defendant Michael Novack in the written opposition, Defendant Attorney Cuffe had drafted another version of the motion for temporary orders which was deceptively submitted to Judge Abber. (Exhibit 351)

651.    The originally filed motion (November 3, 2011) was a request that was specifically tailored to an anticipated examination, specifically limited to Dr. Bruce Kaster, whereas, the modified version of the request for temporary orders—which was deceptively and secretly given to Judge Abber at the court proceeding—*completely eliminated* any mention of Dr. Bruce Kaster and was changed to be an open-ended, carte-blanche order for

Plaintiff Daughter and her husband to "not interfere" with the on-goings of
Father's affairs.

652.    Further showing Defendants' deliberate deception and illicit motives is the
        fact that after Plaintiff Daughter Lisa's counsel filed the opposition,
        Defendant Attorney Cuffe did not take Father to any subsequent
        appointment to be seen by Dr. Kaster.

653.    Defendants deliberately filed the motion for temporary orders for the
        specific purposes of prejudicing and inflaming Judge Abber's bias against
        Plaintiff Daughter Lisa; to use in furtherance of Defendants' illicit scheme
        to obtain court ordered removal of Plaintiff Daughter Lisa and her family
        from Father's home.

654.    Judge Abber _did_ _not_ conduct an evidentiary hearing at the November 8,
        2011 proceeding.  Representations made by Defendants and the affidavits
        of Defendant Caseworker Springman and Defendant Michael Novack were
        submitted at the court proceeding, knowingly based wholly on totem-pole
        hearsay.  Plaintiff Daughter Lisa was not afforded the opportunity to
        challenge the veracity of the representations made.

655.    As a matter of law, the temporary orders allowed by Judge Abber on
        November 8, 2011 were unlawfully issued in terms of being issued based
        on collusion with designated Defendants and being procedurally defective.
        Judge Abber intentionally and deliberately—based on ill-motive—deprived
        Plaintiff Daughter of the procedurally required safeguards of due process;
        that the language of the order was unconstitutionally vague and over broad;
        and violated the constitutional protections of the sanctity of family
        relations.

vi.  Evidence showing false allegations of disruption made by designated Defendants,
        where—in actuality—Plaintiff Daughter Lisa was lawfully and reasonably
        exposing their unsafe and improper care of her Father

656.    It was not until _after_ the court appointment of Defendant Attorney Cuffe as
        guardian did steady problems begin to occur with the home health aides
        from Defendant Right At Home.

657.    After Defendant Attorney Cuffe's court appointment as guardian on August
        17, 2011, frequent changes in the assignment of home health aides of
        Defendant Right At Home first occurred. The unsolicited and abrupt

changes to the scheduling of home health aides were very confusing for Father and caused him unnecessary emotional harm.

658.   As documented in the notes of Defendant ESMV (November 3, 2011)—by a staff person not usually associated with Father's matter (Brian Sanborn):

She [Plaintiff Daughter Lisa] has consistently asked vendor [Defendant Right At Home] to stop sending new workers into the home as the elder needs routine as he has dementia.  Dtr [Plaintiff Daughter Lisa] stated that she is aware of enough workers that the elder knows who are willing to do the shifts, but the agency continues sending new workers.

659.   Consequently, Plaintiff Daughter Lisa and her husband researched other home health care agencies.  They had asked Defendant Attorney Cuffe to use the Chelsea Jewish Community agency—an agency that specifically incorporated Jewish customs and traditions. Defendant Daughter Sheryl had solely objected to Plaintiff Daughter Lisa's request because a friend of Plaintiff Daughter Lisa's was an employee for that agency—the friend was *not employed as a caregiver*, but in an administrative capacity.  Defendant Attorney Cuffe assured Defendant Daughter Sheryl (by email) not to worry that he was not going to go along with Plaintiff Daughter Lisa's request*;* telling Defendant Daughter Sheryl that *he* had sole authority to make changes.

660.   In fact, Defendant Attorneys Cuffe and Feld made sure to give "holiday gifts" to the staff of Defendant Right At Home *funded from Father's estate*.

661.   Defendant Attorney Cuffe had financial and other personal incentives in making sure that Defendant Right at Home remain as the service provider, which were not then known to Plaintiff Daughter Lisa and her husband.

L.  Retaliation for Plaintiff Daughter Lisa exposing Defendants' knowingly unlawful administration of antipsychotics to Father

**662.**    In mid-August of 2011, Plaintiff Daughter Lisa had been informed by the home health aide that Defendant Daughter Sheryl had called Father in which it could be heard that the conversation consisted of convincing Father that he should not take the antipsychotic Seroquel.  Thereafter, Father openly expressed to Plaintiff Daughter Lisa and the employees of Defendant Right At Home that he no longer wanted to take Seroquel.

**663.**   As previously set forth, Plaintiff Daughter Lisa did not have professional legal experience involving mental health or civil commitments or procedural requirements regarding medication.

85

**664.** When it was brought to the attention of Defendant Nurse Brenda Wojick of Defendant Right At Home—in mid-August of 2011—that Father no longer was willing to take the Seroquel voluntarily, Defendant Nurse Wojick represented to Plaintiff Daughter Lisa that the standard customary and routine practice and regulations required that the family member crush the antipsychotic—not the home health care agency.

665. Where it was represented to Plaintiff Daughter Lisa by the staff of Defendant Whittier Pavilion that Father's discharge had been conditioned on Father taking the prescribed Seroquel, Plaintiff Daughter Lisa unwittingly believed Defendant Nurse Wojick without knowing that the directed procedure was unlawful.

666. On August 30, 2011, Defendant Caseworker Springman—on behalf of Defendant ESMV—came to Father's home.  Defendant Caseworker Springman recorded his notes about the visit; in which, he stated that he had been informed by Father and Donald Belanger (Plaintiff Daughter Lisa's husband) that the doctor at Defendant Whittier Pavilion told them that if Father did not remain on Seroquel that he would be put back into the hospital.

667. Defendant Caseworker Springman documented, in the above-referenced notes:

AV [Alleged Victim, meaning Father] and Mr. Belanger stated that they did not agree with this and that they both stated that AV [Father] wished to go to Beth Israel for any treatment, as he always has.

668. By early October of 2011, when designated Defendants' hostile attitude became evident, Plaintiff Daughter Lisa decided to obtain private counsel (Greg Hession).   In late November of 2011 through her counsel Plaintiff Daughter Lisa discovered that Defendant Nurse Wojick had lied to her about what was proper and lawful medication administration procedures.

669. It was through counsel that Plaintiff Daughter Lisa first learned of "Roger's authority" or "Roger's Rule"—the mandate that guardians and health care agencies are *not* allowed to facilitate or give prescribed antipsychotics by concealed means to a person who is not wanting to take it—and that the Roger's case set forth the procedural requirements mandated when a person under guardianship needs to be medicated with antipsychotics. The guardian must *first* obtain a court order authorizing the concealed use of antipsychotics, *before doing so*—which court order can be sought on an emergency basis.

86

670.  On July 31, 2011, Defendants (Kazarosian, Cuffe and Feld) were informed by Plaintiff Daughter Lisa and her husband regarding Father not willing to take the prescribed Seroquel and the unlawful representations made by Defendant Nurse Wojick to Plaintiff Daughter Lisa about crushing the Seroquel.

671.  Defendant Attorney Cuffe—having worked as a guardian for over fifteen (15) years—had actual knowledge, as of August 31, 2011, that Father was refusing to voluntarily take the antipsychotic Seroquel and that Defendant Right at Home was giving him crushed and concealed Seroquel.

672.  From the inception of Defendant Attorney Cuffe's appointment as guardian, he *directly authorized and oversaw* the home health aide agency's crushing of the Seroquel to conceal it in our Father's food.

673.  On September 20, 2011, Defendants (Attorney Berid, Diane Powell and Caseworker Springman) met "to discuss the case and status."  Defendant Diane Powell input notes into the computer system of Defendant ESMV describing the afore-described meeting.  She documented that the following was discussed:

Defendant Caseworker Springman reported that Aids were putting the prescribed antipsychotic, in a crushed form, on Father's cereal;

A court date had been scheduled for November 8, 2011;

A new medical certificate was needed—"Guardian is going to ask Dr. Funk to do a home visit.  Back up plan is Dr. Qui [Cui].  PSS suggested psychiatrist who is a director for ABU.  Unsure of his name.  PSS to check with Trish Lavoi at MVH ABU to determine if he has a private practice."

674.  On September 21, 2011, Defendant Caseworker Springman input notes into the computer system of Defendant ESMV that he had been informed by Donald Belanger that Father was not willing to take the prescribed antipsychotic.  Defendant Caseworker Springman documented that he spoke with a supervisor at Defendant Right At Home, who confirmed that Father was not willing to take the prescribed antipsychotic.

675.  Also, on September 21, 2011, Defendant Caseworker Springman documented in the notes of Defendant ESMV that Defendant Dr. Ping Cui left a voice mail for him wherein she stated that Plaintiff Daughter Lisa had told her that Defendant Daughter Sheryl had called Father trying to convince him not to take his Seroquel, which led to Father's resistance.

676. <u>On September 22, 2011</u>, Defendant Diane Powell documented in the notes for Defendant ESMV that she spoke with Defendant Jay Kenney, owner of Defendant Right At Home and that Defendant Jay Kenney told her that Plaintiff Daughter Lisa was crushing the prescribed antipsychotic and the aides of Defendant Right At Home put it in Father's cereal.

677. On <u>November 8, 2011</u>, Judge Abber had knowledge that Father was not willing to take the prescribed Seroquel and that the Seroquel was being crushed and put in Father's food—this was *explicitly decribed in detail* by Defendant Caseworker Springman, in his affidavit that was submitted to Judge Abber *by* Defendant Attorney Cuffe.

678. When Daughter Lisa had been apprised of the Roger's Rule in <u>late November of 2011</u>, her counsel emailed Defendant Attorney Cuffe and Defendant Attorney Kazarosian (counsel for Father) raising the issue of the impropriety of the antipsychotic Seroquel being given to Father.  (Exhibit 352).

679. Without responding to that email, Defendant Attorney Cuffe directed the staff of Defendant Right at Home to stop crushing and concealing the Seroquel.

680. The *very next day* Defendant Nurse Wojick sent out the following email to other staff and to Defendant Attorney Cuffe:

"Through an email from Marilyn [Staff] that I received, we will no longer be able to 'hide' Marvin's seroquel from him, meaning that we cannot crush it and put it into his food without knowing it.  According to his guardian/social worker, we must let him know that we are giving this to him, and tell him what it is.  I went over to discuss this with him."     (Exhibit 353).

681. Days later Defendant Nurse Wojick came to the house unannounced to see Father specifically for the purpose of persuading Father to willingly take the Seroquel.

682. Plaintiff Daughter Lisa was present at the kitchen table when Defendant Nurse Wojick spoke with Father during the afore-referenced unannounced visit.  Plaintiff Daughter Lisa was not asked to leave.

683. To obtain consent, Defendant Nurse Wojick had a legal and professional obligation to fully inform her patient about the medicine at issue.

88

684.     Defendant Nurse Wojick repeatedly and purposely refrained from telling Father the name of the medicine. (Exhibit 355). Plaintiff Daughter Lisa thus said to Father: "Ask her what the name of the medication is."

685.     Defendant Nurse Wojick indicated, in the afore-mentioned email, that Father *remembered* that Seroquel was the medication he was given back in May of 2011 when he was at Defendant Whittier Pavilion.   Defendant Nurse Wojick stated that Father was engaging in a normal conversation like any other average functioning person:

Marvin [Father] wanted to have a list of the side affects.  He felt that doctors prescribe things just to prescribe them and only takes vitamins and does not want to take anything else.

686.     Corroborated by Defendant Nurse Wojick's above statements, she intentionally kept the known side-effects of Seroquel out of the conversation because of Father having mental capacity, which was even better off the Seroquel.

687.     Defendant Nurse Wojick explicitly told Father that she did not know what the side-effects were and that she would get him the information. Defendant Nurse Wojick is a licensed registered nurse and in fact knew what the side-effects for Seroquel were.

688.     In her email, Defendant Nurse Wojick stated that she had <u>no</u> intention of providing Father information about the side effects of Seroquel:

I told him [Father] I could get the side effects to him, but I am going to leave that to the pharmacy or to Dr. Cui since she prescribed it.

689.     Defendant Nurse Wojick told Father that Seroquel was used to help him sleep.

690.     The statement made by Plaintiff Daughter Lisa was *after* repeated, blatant, flagrant and deliberate acts by Defendant Nurse Wojick to deceive Father and to not have Father be fully informed.

691.     Father continued to personally and vehemently express that he did not want to take Seroquel and on <u>December 6, 2011</u> took the entire stock of Seroquel and flushed it down the toilet—*with no* involvement of Plaintiff Daughter Lisa or her husband in any manner.

692.   Defendant Attorney Cuffe filed an ex-parte emergency motion, on December 9, 2011, seeking a court order to "temporarily" vacate Plaintiff Daughter Lisa and her family from Father's residence.  (Exhibit 356).

693.   Without Plaintiff Daughter Lisa being present, Judge Abber scheduled a hearing for Defendant Attorney Cuffe's motion to vacate to be heard on December 12, 2011.

694.   Where Plaintiff Daughter Lisa and her family had resided with Father, they were able to observe—*first-hand*—the manner in which Father was being mistreated by Defendant Attorney Cuffe, as guardian, and the staff of Defendant Right At Home.  As established, Defendant Attorney Cuffe and other designated Defendants had illicit motives for not wanting Plaintiff Daughter Lisa to bear witness to their mistreatment of Father.

695.   When Judge Abber did not agree on June 14, 2011, Defendant Attorney Berid and designated Defendants again, on August 17, 2011, requested Judge Abber to remove Plaintiff Daughter Lisa and her family from Father's house.  Conspicuously, Judge Abber again *did not*.

696.   Notes of Defendant ESMV, input on November 3, 2011 by Defendant Diane Powell, state that Defendant Michael Novack formally recommended that Plaintiff Daughter Lisa "be removed from the home" and on the 8th to Judge Abber that if Plaintiff Daughter Lisa refused to leave that Father be placed in a long-term care facility for Alzheimer's. Again, at the court proceeding of November 8, 2011, Judge Abber *refused*.

697.   Evidencing improper and distorted bias against Plaintiff Daughter Lisa by Defendant ESMV, Defendant Diane Powell stated in the above-described email:

Dtr Cheryl and her husband were appropriate in the courtroom *but* dtr Lisa started to *sob* towards the end of the hearing.

698.   As previously set forth, drugging elders with antipsychotics is a key component in the Defendants' modus operandi, leading to their ultimate objective of liquidating the elder's assets for Defendants' unlawful personal financial gain.

December 12, 2011 court hearing

699.   Through counsel, Plaintiff Daughter Lisa filed a written opposition to Defendant Attorney Cuffe's motion to vacate wherein Plaintiff Daughter

Lisa detailed Defendant Attorney Cuffe's long-established and knowing unlawful conduct of drugging Father with Seroquel in a concealed manner because Father was not willing to take it.  (Exhibit 357, 23, 24).

700.    Judge Abber had knowledge, on November 8, 2011, that Father was being given antipsychotics against his will—crushed up and put in cereal—and that the Defendants were *overtly taking part* in the concealed administering of Seroquel without a Roger's order.

701.    On <u>December 12, 2011</u>, Judge Abber directly asked Defendant Attorney Cuffe if he "had Roger's Authority" to authorize the antipsychotic to be crushed up into Father's food.

702.    Defendant Attorney Cuffe responded that he had not sought a Roger's Order.  He made in court admissions acknowledging that he had actual knowledge that Father had been receiving antipsychotics (Seroquel) by being crushed and concealed in his food.

703.    Defendant Attorney Cuffe then went on to make general and broad statements about his attempts to obtain the medical certificate from Defendant Dr. Cui as treating psychiatrist for Father.

704.    Defendant Dr. Cui was aware that Plaintiff Daughter Lisa was an attorney and was adamantly fighting for Father's rights; explaining Defendant Dr. Cui's reluctance to provide the above-described affidavit sought by Defendant Attorney Cuffe.

**705.**    Defendant Attorney Cuffe made blanket and general representations about failed attempts to obtain another psychiatrist to provide the needed medical certification.

706.    Of grave significance, designated Defendants did *in fact* obtain a medical certificate from Defendant Dr. Funk, on or about, December 2, 2011—but, decided not to submit it *at* the above-described hearing.  Defendant Attorney Cuffe made in-court representations as though Dr. Funk's signed medical certificate never even existed.

707.    Through deception Defendants had filed it with the Essex Probate & Family Court on December 12, 2011—no notice provided to Plaintiff Daughters.

708.    Designated Defendants did not give any notice or indication to Plaintiff Daughter Lisa that there was a medical certificate from Defendant Dr. Funk.  The only reason that Plaintiff Daughters subsequently found out

about the medical certificate is because Plaintiff Daughter Lisa subsequently found it in the court files for the matter of In re Marvin H. Siegel.

709.     The medical certificate signed by Defendant Dr. Funk stated that she examined Father on December 2, 2011—which is the date that she signed the completed certificate.

710.     Plaintiff Daughter Lisa and her family were still residing with Father at the above-designated date.  There was no indication that Father had been taken to see Defendant Dr. Funk nor had Defendant Dr. Funk come to see Father at the house.

711.     There is affirmative evidence through Defendant Attorney Cuffe's invoices that show that Father was not actually seen by Defendant Dr. Funk on December 2, 2011, as certified.  Defendant Attorney Cuffe's invoice for the relevant time period *does* *not* in any manner mention Dr. Funk, while he had extensively documented his contact with Defendant Dr. Funk (and the numerous other doctors) on *prior dates*.  (Exhibit 282)

712.     Other grave and material problems with Defendant Dr. Funk's representations in her signed medical certificate of December 2, 2011:

Defendant Dr. Funk stated that Father had been admitted to Beverly Hospital (on May 19, 2011) because family members called the police. It is indisputable that *family members had not called the police.  Family members were not even present at the time of the supposed incident*.

Defendant Dr. Funk stated that the psychiatric evaluation performed by              Dr. Pierre Mayer "revealed Mr. Siegel to be generally cooperative".

Defendant Dr. Funk stated that Seroquel was a tranquilizer. Seroquel is classified as an ANTIPSYCHOTIC by the FDA.

Defendant Dr. Funk stated that when she first evaluated Father (May 24, 2011) "his baseline IQ as obtained on the Weshler Test of Adult Reading was 122 a score at the 93rd percentile"; when she evaluated him the second time (June 16, 2011)—after being given antipsychotics and *less* than 2 months later—that Father's IQ score declined to 85; and when she evaluated him for the third time (December 2, 2011), Father's IQ was supposedly 79.

Defendant Dr. Funk stated: "Mr. Siegel requires cues to feed and dress himself." The notes and investigation reports of Defendant ESMV overwhelmingly shows that representation to be outright false.

92

Defendant Dr. Funk stated: "Mr. Siegel opposes the appointment of a
guardian/conservator.  He has made his wishes known in previously executed
documents including a health care proxy and power of attorney," She was
directly aware of Father executing the re-affirmation of his 2003 DPOA and
health care proxy re-affirming Plaintiff Daughter Lisa as his attorney-in-fact on
June 16, 2011 , the same day as her second evaluation.

Defendant Dr. Funk checked the box that stated that Father had "poor social skills." The
notes and investigation reports of Defendant ESMV overwhelmingly shows
that representation to be outright false.

Defendant Dr. Funk checked the box that stated Father *was not* a patient under her
continuing care and treatment.

713.    As evidenced, the Defendants had ill-motives in concealing Defendant Dr.
Funk's medical certificate of December 2, 2011.

714.    De facto, without a court issued order, it is unlawful to give a person
antipsychotics through concealed means.

715.    De facto, at the proceeding of December 12, 2011, Judge Abber was
presented hard cold facts that Father was being unlawfully administered
antipsychotics.  Judge Abber *did not* take any action regarding the unlawful
facilitation of antipsychotics by Defendant Attorney Cuffe and other
designated Defendants.

716.    Due to ill-motives, Judge Abber overtly precluded Plaintiff Daughter Lisa
from being adequately heard at the proceeding of December 12, 2011.
There was no evidentiary hearing conducted.

717.    Judge Abber ruled from the bench and granted the designated Defendants'
blatantly fraudulent motion.  Plaintiff Daughter Lisa and her family were
ordered to vacate their residence by December 16, 2011—which gave them
4 days to move out.

718.    The written order issued by Judge Abber, on December 12, 2011, was an
order to *only* vacate the residence by December 16, 2011.  (Exhibit 356).
De facto, the Order of December 12, 2011, was not a restraining order or a
stay away order.  Even more so, it was designated as a *temporary* order.

719.    The fact that Plaintiff Daughter Lisa and her family were allowed to remain
in the residence for 4 more days shows that Judge Abber knew that it was
false and fabricated that Plaintiff Daughter Lisa was harmful to Father; and,

that there was no legitimate emergency for her and her family to be forced out of their home.

720.   There was no order that Plaintiff Daughter Lisa and her family could not see Father.

721.   Further corroborating that there were no restraining orders issued of any kind—no 209A, no stay away order and no supervised visit—is the email sent by Defendant Attorney Cuffe *to* Defendant Attorney Kazarosian; which was recorded and input into the notes of Defendant ESMV on January 17, 2012 documenting that when Father was being taken away by ambulance to be involuntary committed at Defendant Merrimack Valley Hospital, Father had called Plaintiff Daughter Lisa on his cell phone begging her to help him and told her that he was being taken to Defendant Merrimack Valley Hospital.

722.    Plaintiff Daughter Lisa and her husband immediately went to see Father *at* Defendant Merrimack Valley Hospital.  Defendant Attorney Cuffe emailed Defendant Attorney Kazarosian stating that Plaintiff Daughter Lisa and her husband went to see Father at the hospital "without asking" him.  Defendant Attorney Cuffe stated in his email to Defendant Attorney Kazarosian:

I want any visits to be supervised by a paid professional.  How do you feel about this?

        —to which, Defendant Attorney Kazarosian expressed that Defendant Attorney        Cuffe had her full support.

723.   De facto, if there had been any restraining or court imposed supervised visitation orders issued by Judge Abber on December 12, 2011, Defendant Attorney Cuffe would not be asking Defendant Attorney Kazarosian whether he *should seek* supervised visitation.

Defendant Attorney Cuffe then filed a motion regarding a Complaint for Contempt against Plaintiff Daughter Lisa *under stealth*— Exhibit 358 is a copy of notice that Attorney Cuffe provided to designated Defendants and *not* to Plaintiff Daughter Lisa.

in the afore-described notice, Defendant Attorney Cuffe stated that the Complaint for Contempt was based on supposed violation of the order issued by Judge Abber on November 8, 2011—not December 12, 2011 (the court order of November 8, 2011 was not, in any manner, a restraining or no contact order—Exhibit 351).

Judge Abber issued a "guilty" judgment against Plaintiff Daughter Lisa at the court
proceeding on January 30, 2012—with no evidentiary hearing conducted of any
kind. Defendant Attorney Cuffe was awarded attorney's fees against Plaintiff
Daughter Lisa.

Defendant Daughter Lisa, knowing that she had not committed any wrong-doing and that
the conduct of Judge Abber, Defendant Attorney Cuffe and other designated
Defendants were de facto unlawful, did not pay any money to Defendant
Attorney Cuffe for the awarded fees.  Evidencing consciousness of guilt on the
part of Defendant Attorney Cuffe, he *has not—at any time—filed any action or
motion against Plaintiff Daughter Lisa for nonpayment of the awarded
attorney's fees*; and

further consciousness of guilt regarding the afore-described events was demonstrated at
the court proceeding on June 9, 2013, before Judge Amy Blake when Defendant
Attorney Kazarosian started to raise the issue that Plaintiff Daughter Lisa had
not paid the afore-described awarded fees to Defendant Attorney Cuffe.
Defendant Attorney Kazarosian abruptly decided to drop the subject entirely
(the court audio recording for June 9, 2013 is provided in previously referenced
Exhibit 23).

M.  Defendants schemed to have Father involuntarily committed under          Section 12
to further facilitate financial exploitation of the DSL Trust

i.  Motive for fabrication and overt acts of deceit in furtherance

724.    Defendant Attorney Cuffe's own in-court representations made on
December 12, 2011 and January 24, 2012 show he had extraordinary
difficulty in securing a private practicing doctor to give him a medical
certificate.

725.    Father's treating psychiatrist since January of 2012 (Defendant Dr.
Portney) *in actuality*, is not a private practicing psychiatrist; but rather,
works *for* various hospitals and nursing homes.  (Exhibit 359).

726.    Evidencing that the involuntary commitment of Father on
January 13, 2012 was a fabricated scheme by Defendants is Defendant
Attorney Cuffe's in-court descriptions of exhausting his resources in the
attempt to find a doctor willing to give him a medical certificate.

727.    Further proving that Father's involuntary commitment was solely for illicit
means was Defendant Attorney Cuffe having stated to Judge Abber that he
(Defendant Attorney Cuffe) specifically sought out Defendant Dr.
Portney's services to obtain medical certification for a Roger's Order.

728.    Of significance, Defendant Attorney Cuffe further stated that
        Defendant Dr. Portney *was not willing* to provide such medical
        certification.  Defendant Attorney Cuffe stated in court that involuntary
        commitment proved most convenient:

                        Then the hospital took over, if you will, seeking the
        immediate Rogers authority, because their psychiatrist, Dr. Hayes
        (phonetic), wanted to institute the antipsychotic immediately.

729. Defendant Dr. Portney had been previously involved in the matter of Antoinette
Carpinone along with Defendant Attorney Berid—on behalf of Defendant ESMV.
(Exhibit 87).

730. It was imperative that Defendant Attorney Cuffe obtain the requisite medicate
certificate because Plaintiff Daughter Lisa had openly exposed Defendant Attorney
Cuffe's unlawful concealed administering of antipsychotics to Father.

731. Replete throughout the court record of In re Marvin H. Siegel, it was evident to
Defendants that Plaintiff Daughter Lisa was not going to stop litigating this issue.
Therefore, Defendants were not confident that this matter would be quietly swept under
the State Court rug.

732. *Without a private practicing psychiatrist* to provide the requisite medical certificate
for forced administration of antipsychotics, the *only other way* to obtain it was to have a
provider from a psychiatric facility do so and the *only way* to accomplish that was an
involuntary commitment under a Section 12. Happily the Defendants had an old friend in
Defendant Merrimack Valley Hospital.

733. It is highly suspect that soon after Plaintiff Daughter Lisa and her family had been
unlawfully ordered out of their home with Father, that Father had been involuntarily
admitted under Section 12 to the adult behavioral unit of the Defendant Merrimack Valley
Hospital on January 13, 2012.

### ii.  Affirmative evidence that Father was, in fact, *not* assaultive or threatening on January 13, 2012

### Incriminating evidence against designated Defendants in the notes of Defendant ESMV

734. Defendant ESMV's representative Defendant Caseworker Springman noted on
December 29, 2011:

> Elder is reported to be doing well and the situation at home is relaxed.  There is no reports as to elder becoming agitated with staff.

735. The chronological notes of Defendant ESMV show that there were <u>no </u>notes between the period of January 4, 2012 through January 17, 2012.  Therefore, the lack of notes shows that Father did not engage in any assaultive or threatening manner.

736. Boxford Police Report overwhelmingly refutes any notion that Father was behaving aggressively or in a threatening manner—even more so, the police report evidences that Father was, in fact, *not* acting aggressively, in any manner

737. A copy of the Boxford Police report for January 13, 2012 is provided in Exhibit 360.  The police report evidences that the police officers observed Father to be calm and cooperative.

738. The officer's reporting of the supposed events at issue is based, <u>*solely*</u>, on what Defendant Right at Home's aide told the officers.  The police report provided *no* independent corroboration, of any kind, as to the veracity or accuracy of the aide's story.

739. *Contrary* to the claims made by the aide, the police officer reported that when they came to the house, the home health aide was in a very excited state and *<u>Father was not</u>*.  The police officer explicitly stated in his report that it appeared that the situation had defused; that Father "was oriented to person and place" and that Father "kept denying there had been a confrontation."

740. As previously set forth, the afore-referenced police report described Father as being very cooperative.  The officer stated in his report:

[Father] was asked to have a seat on the stretcher, in which he did under his own power.  No force needed to have [Father] transported by Lyons Ambulance.

**750.** The police officer stated in the above-referenced report that Father had been taken to Defendant Merrimack Valley Hospital under a Section 12 supposedly "due to [a]ssaultive and threatening manner"; yet, the police officer demonstrated in his report that there was no corroborative evidence of such alleged behavior—showing Defendants' illicit conduct given Defendant Michael Novack's mass email to designated Defendants and Plaintiff Daughter Devora (excluding Plaintiff Daughter Lisa), stated that Father's admitting diagnosis on January 13, 2012 was "dementia with psychosis." Exhibit 361

**751.** Defendant Attorney Cuffe's invoice filed with the Essex Probate & Family Court shows that the following people were involved in pre-orchestrating Father's involuntary commitment: Defendant Attorney Kazarosian, Marilyn

Staff, Defendant Michael Novack, Amanda Coburn, LICSW of Defendant Merrimack Valley Hospital.

iv.  Fraud and deception in claims that Father has hallucinations and delusions

752.    The 111-page compilation of investigative notes and other related formal written reports of Defendant ESMV prior to January 13, 2012 do not record even once Father having hallucinations or delusions.

753.    In the 111-page compilation of notes of Defendant ESMV, the very first statement pertaining to Father having hallucinations is from January 17, 2012 after Father had been involuntarily locked up in a psychiatric ward at Defendant Merrimack Valley Hospital *for over 3 days* and had been excessively and unnecessarily drugged with various antipsychotics against his will.

754.    During that time period, it is recorded in the notes of Defendant ESMV— input on January 17, 2012 by Defendant Caseworker Springman:

Elder reported to be refusing meds and that the elder has available Seroquel 50 mg every two hours PRN.  Elder is also reported to have Trazadone, Ativan and oxybutin available for pain.  Elder reported to be expressing delusions as he is stated that people were watching him through his window.

755.    Any hallucinations and delusions are the direct and exclusive result of Defendant Merrimack Valley Hospital administering antipsychotics and other medicines to Father against his will.

756.    Designated Defendants, individually and jointly, facilitated the illegal and unwarranted administration of antipsychotics and other medication to Father in order to claim that Father was having hallucinations and delusions so as to support Defendants' filings of a petition for long-term civil commitment of Father with the Haverhill District Court and motion for court ordered forced administration of antipsychotics till they have looted all his wealth.

757.    Defendants have an established pattern of engaging in the above-described type of conduct as previously described in the matters of In re Dorothy Orndorff and In re Regina Ianolfo.

vi.       The timeline of documentation proves conscious fraud

758.    On January 24, 2012, Defendant Attorney Cuffe made intentional misrepresentations to Judge Abber that Father having been involuntary

committed to Defendant Merrimack Valley Hospital on January 13, 2012 was completely unexpected.

759. Defendant Attorney Cuffe outright lied when he made the above-described in-court representations—his invoices filed with the Essex Probate & Family Court show that he had *substantial _prior_* communications with the staff of Defendant Merrimack Valley Hospital, pre-orchestrating Father's being involuntary committed to Defendant Merrimack Valley Hospital.

760. Defendant Attorney Cuffe's filed invoices state that on January 11, 2012 he made calls *to the adult behavioral unit* of Defendant Merrimack Valley Hospital, along with faxing Father's medical record to Defendant Merrimack Valley—*2 days _prior_* to the involuntary commitment.  (Exhibit 282).

761. Defendants made in-court statements that Father had been a direct admit to the Adult Behavioral Unit (ABU) of Defendant Merrimack Valley Hospital.

762. Evidencing the calculated deception by Defendant Attorney Cuffe is his having billed for speaking with Defendant Amanda Coburn (licensed social worker for Defendant Merrimack Valley Hospital) in mid-October of 2011—months before Father's involuntary commitment to Defendant Merrimack Valley Hospital.  Of significance, Father was not a patient of Defendant Merrimack Valley Hospital prior to the involuntary commitment. Defendant Attorney Cuffe's call to Defendant Amanda Coburn in October of 2011 was when he was desperately trying to find a psychiatrist to provide a medical certificate to secure court ordered forced administration of antipsychotics.

763. Further establishing the magnitude of intended illicit acts is the fact that Father had been previously involuntarily admitted to Defendant Whittier Pavilion—there was no logical reason for Defendant Attorney Cuffe's contact with Defendant Merrimack Valley Hospital given Father having *prior* treatment provided by Defendant Whittier Pavilion.

764. Where Father had prior treatment with Defendant Whittier Pavilion just *months earlier*, Defendant Attorney Cuffe's contact with staff of Defendant Merrimack Valley Hospital—two days prior to the 911 call is highly suspect.

765. Defendant Attorney Cuffe had specific motives for *wanting to keep* Father from being taken to Defendant Whittier Pavilion as he knew Dr Buluchu had previously refused to partake in unlawful conduct.

766. In addition, Defendant Attorney Garmil happens to serve as private legal counsel for, <u>both</u>, Defendant Merrimack Valley Hospital and Defendant Whittier Pavilion—which evidences the illicit nature of Defendant Attorney Cuffe's call to Amanda Coburn in October of 2011; especially where Defendant Attorney Cuffe's invoice shows that he spoke to Defendant Attorney Garmil just beforehand.

767. Defendant Amanda Coburn (LICSW) and Defendant Attorney Saunders were also directly involved in the probate matter of In re James and Hope Pentoliros—as were Defendant Attorneys Cuffe, Ledoux and Berid.

768. *Just one day* after Father had been involuntarily committed, Defendant Michael Novack sent a mass email (to the exclusion of Plaintiff Daughter Lisa) stating: "Marvin has been medication compliant".  (Exhibit 361).

769.  Then the day after that (on January 15, 2012) Defendant Michael Novack sent a *subsequent* email that supposedly Father had a violent episode that is alleged to have necessitated Father's being injected with antipsychotics. (Exhibit 361).

770. It is suspect that Defendant Michael Novack sent a *subsequent* email stating that Andrew Tarasuck, LICSW of Defendant Merrimack Valley Hospital informed him that the "process" had been initiated to obtain a court order for forced administration of antipsychotics—which Defendant Michael Novack expressly indicated the court order was based on the alleged incident of <u>January 15, 2012</u>.

771. Of crucial significance, Defendant Michael Novack—in his own words in the afore-referenced email—described the supposed incident of January 15, 2012 as Father having struck a male staff person *because of the sole reason that Father was being forced to take antipsychotic medication against his will*; which Defendant Michael Novack stated the supposed incident led to *Father being restrained in a "geri-chair" and injected with antipsychotic medication*.

772.  The email sent by Defendant Michael Novack solely set forth facts of Father's conduct *exclusively* describing Father *as trying to defend himself* because he was being forcibly given antipsychotics.


N.  Illicit manner in which Defendants sought court order for forced administration of antipsychotics

100

Defendants deceptively attempted to avoid having Judge Abber presiding over the court order for forced administration of antipsychotics

1932.   On January 17, 2012—prior to the above-described hearings seeking Roger's Authority, Defendant Attorney Brandon Saunders, in his capacity as private counsel for Defendant Merrimack Valley Hospital, filed a motion to intervene and a motion to expand guardian's authority, pertaining to the matter of In re Marvin H. Siegel.

1933.   At the time that Defendant Attorney Saunders filed the above-described motion, the electronic docket for In re Marvin H. Siegel showed that Judge Abber was the presiding judge in the matter of In re Marvin H. Siegel.  As previously set forth—and as acknowledged in the motions, Defendant Attorney Saunders had direct prior communications with Defendant Attorney Cuffe; which means that Defendant Attorney Saunders *knew* that Judge Abber was the presiding judge.  Having such knowledge, it is suspect that Defendant Attorney Saunders deliberately brought the motions before Judge Sahagian and not Judge Abber. Despite the effort Judge Sahagian scheduled the matter to be heard before Judge Abber on January 24, 2012.

Illicit use of filing petition for civil commitment in District Court

1934.   There is a pattern of conduct wherein the Defendants automatically file a petition for long-term involuntary civil commitment with the District Court when the 3-day involuntary commitment, under G.L. 123, § 12, is about to expire. As previously set forth, Defendant Attorney Garmil used the same tactic when Father's 3-day involuntary commitment in Defendant Whittier Pavilion Hospital was about to expire.

1935.   Defendants repeatedly made in-court statements—on January 24, 2012— that patently show Defendant Merrimack Valley Hospital's filing of the petition for civil commitment was purposefully done for illicit purposes. The nature and tone of the statements were specifically intended to sway Judge Abber to issue a court order for forced administering of antipsychotics; statements expressing that if Judge Abber did not issue the order that the matter would "have to" go to Haverhill District Court where Father would be subject to a long-term involuntary commitment in a psychiatric facility.

1936.   Defendant Attorney Myette began describing to Judge Abber the Defendants' supposed reasons for their seeking a court order for forced administration of antipsychotics, having stated:

101

. . . because of the complexity of the situation, the staff wasn't able to offer the Seroquel without the Rogers in place.  So the petitioner filed the petition to commit, set to be heard last Friday.  We asked for a one week continuance, which is all that Dr. Hayes was willing to give, so that we could hear this matter, in hopes of getting the Rogers temporarily in place.  And then the hospital would withdraw their petition to commit, so that Mr. Siegel could return home with the Rogers authority, with the Seroquel treatment in place.

1937.   Defendants' ill-intentions were demonstrated through statements made by Defendant Attorney Saunders when Judge Abber had asked whether he had provided copies of Defendant Dr. Hayes's affidavit to all of the parties.  At first, Defendant Attorney Saunders expressed that he had not done so because he has expressed that he thought another person was going to "circulate" the documents for him—but before specifically identifying that person, inexplicably, Defendant Daughter Sheryl interjected and started explaining that she never said that she was going to do that. After Defendant Daughter Sheryl's interjection, Defendant Attorney Saunders then stated:

Okay.  This was very - - *in the interest of trying to avoid a commitment,* this has all been a very abbreviated process.  And I apologize if formality, you know, I tried to get as much information as to as many people possible under the circumstances, you know.

1938.   Even Judge Abber expressed the defective nature of Defendant Dr. Hayes's affidavit:

Judge Abber:        I understand.  But I need a clinician's affidavit and a medical certificate regarding the Rogers - an affidavit - something.  I don't have enough.  I'm just telling you.  So everything needs to be re-served.  Now I don't want to extend this past Monday again.  But when can these people expect service, so they can properly prepare for a hearing at 2:00 in Lawrence, on Monday?

Other suspect acts in obtaining court order for forced administration of antipsychotics

1939.   Plaintiff Daughter Lisa did not receive any notice that Defendant Merrimack Valley Hospital had filed the petition for civil commitment in Haverhill District Court.  Defendants attempted to hold a Roger's hearing without notifying Plaintiffs.  Just by happenstance, Plaintiff Daughter Lisa found about the hearing and was present.

1940. Defendant Attorney Cuffe knowingly and falsely stated that Plaintiff Daughter Lisa was the one who filed a petition for Roger's authority when in fact she had raised Defendant Attorney Cuffe's misconduct for violating the Roger's Rule.

1941.  Evidencing that Defendant Attorney Saunders and Defendant Attorney Cuffe were working with ill-motives in concert is the fact that Defendant Attorney Cuffe had Defendant Attorney Saunders file the motion to expand guardian's authority which is not the norm where Defendant Attorney Cuffe was guardian and would be expected to file the motion—*not* Defendant Merrimack Valley Hospital.

1942. Bolstering the suspect nature of such conduct is Judge Abber's inquiry at the court hearing on January 24, 2012:

[W]hat I have in front of me is a motion to expand the authority of the temporary guardian.  And I'm curious, Counsel, why this wasn't brought by you, Attorney Cuffe?  Is there some reason for that?  ....because it seems to me very strange that an appointed temporary guardian wouldn't petition himself.

1943. Defendant Attorney Cuffe stated in-court that "Dr. Hayes wanted to institute the antipsychotic immediately."  Defendant Dr. Kai Hayes was the psychiatrist whom Defendant Merrimack Valley Hospital used to support its petition seeking court ordered forced use of antipsychotics for Father.

1944. Defendant Dr. Hayes was also involved in the matter of In re Hope Pentoliros. Defendant Dr. Hayes was also the prescribing doctor for Dorothy Orndorff, who died after just a few of months of being forced to take antipsychotics, with Defendant Attorney Garmil acting as private counsel for Defendant Merrimack Valley Hospital.

1945. The medical certificate and affidavit submitted by Defendant Attorney Saunders had not been given to Plaintiffs and *was* *not* given to Plaintiffs at that time.

1946. Judge Abber declared that the affidavit of Defendant Dr. Hayes was grossly defective. Naturally defendants wanted to conceal it from Plaintiff Daughter Lisa.  However, Judge Abber openly elaborated that the affidavit and medical submitted by Defendant Dr. Hayes was defective because it stated "Seroquel, 50 milligrams as needed every two hours, with an alternate of Risperdal."  Judge Abber expounded further, stating:

I can't have a treatment plan that says "as needed," so we're going to have to continue this.  Can everyone be there Monday in Lawrence at two o' clock . . . .

Has anybody read this medical certificate and this medical certificate. . . .  I don't know
  that it's enough here, Counsel.  Frankly, they're very very general.  There's
  nothing specific in here.  I'm not sure that I would have enough.

1947. Judge Abber stated in court that he did not want Defendant Merrimack Valley
Hospital using Defendant Dr. Hayes as the certifying doctor for the petition for court
ordered forced administering of antipsychotics.

Defendants' incriminating conduct at the proceeding of January 30, 2012 (Exhibit 24)

  **1948.**  Plaintiff Daughter Lisa raised, in court, that no evidentiary hearing had ever
    been held to determine the level of Father's capacity.  Judge Abber
    summarily dismissed the raised issue.

1949. Instead of advocating for Father's well-known desires, Defendant Attorney
Kazarosian made in-court representations that Father told her that he was "glad" to take
the Seroquel because "he was very clear that he did not want to engage in the behavioral
issues that people are alleging he engaged in, if, in fact, there was something he could take
to alleviate that."  As previously established, Defendant Attorney Kazaosian's statements
were knowing and intentional misrepresentations.

1950.In each of the medical certificates completed by Defendant Dr. Hayes,  Defendant
Dr. Cohen and Dr. Land, the only claimed basis for having Father involuntarily committed
on January 13, 2012 was the supposed incident of January 13, 2012, described in the
Boxford Police Report.

1951.At the hearing on January 30, 2012, despite Judge Abber's previously described
admonition, Defendant Merrimack Valley Hospital *still relied* on Defendant Dr. Hayes as
the certifying doctor for the petition—a new affidavit and certificate from Defendant Dr.
Hayes was submitted by Defendant Attorney Saunders, with Defendant Dr. Hayes, again,
putting in the prohibited PRN.

1952.Designated Defendants' ill-motives are evidenced by the affidavit of Defendant Dr.
Hayes where:

Defendant Dr. Hayes listed only Defendant Attorney Cuffe as to whom she spoke with in
  her evaluation of Father;

Defendant Dr. Hayes falsely stated that Father had not experienced any adverse side-
  effects from Seroquel. Defendant Attorney Cuffe already knew that Father had
  suffered serious side-effects, such as recurrent pneumonia and incontinence;

Defendant Dr. Hayes stated: "He has one daughter who has interfered with past attempts
  to treat his illness and behaviors.  Currently, there is a restraining order

104

prohibiting contact with him"—as previously set forth, no restraining order prohibiting contact with Father had been issued;

Defendant Dr. Hayes did not provide any factual statements to support the broad statement that Father was having hallucinations or delusions;

Defendant Dr. Hayes did not provide any specific facts to show Father was violent or a threat to himself or others—the only specific facts stated was Father defending himself from being forced to take antipsychotics that he did not want or need.

1953.   Defendant Dr. Portney started treating Father *weeks prior* to the involuntary commitment of Father.  Of significance, Defendant Attorney Cuffe who had previously stated in court that Defendant Dr. Portney was not willing to provide an affidavit for forced administering of antipsychotics for Father, *specifically represented* that Defendant Dr. Portney did not want to do so because he had seen Father only <u>once</u>.

1954.   Defendant Dr. Cohen stated in his written affidavit that he had seen Father only *once*—on <u>January 28, 2012</u>, *2 days before* the hearing.  Judge Abber had explicitly ruled that he did not want to have the Defendants use Defendant Dr. Hayes as the certifying doctor; that the Defendants were to get a different doctor.

1955.   Defendant Dr. Cohen's Affidavit was substantially duplicative to that of Defendant Dr. Hayes.  Defendant Dr. Cohen listed the people with whom "conferred": the affidavit, medical certificate and progress notes of Defendant Dr. Hayes; the <u>notes</u> of Andrew Tarasuk (LICSW with Defendant Merrimack Valley Hospital); and the medical certificate of Defendant Dr. Janice Funk, PH.D.—indicating that he *did not* speak directly with any of these people.

**1956.**   As previously set forth, Defendant Attorney Cuffe obtained a medical certificate from Defendant Dr. Funk that was dated December 2, 2011—but did not present the medical certificate and he overtly made it appear as though it did not even exist.  It is suspect that Defendant Dr. Cohen relied on Defendant Dr. Funk's medical certificate, dated December 2, 2011.

**1957.**   Like Defendant Dr. Hayes, Defendant Dr. Cohen stated:

One daughter and son-in-law are alleged to have interfered with prior attempts to treat Respondent and are presently prohibited by the Court to have contact with him without a monitor.

1958. Of import, Father has <u>3 daughters</u>—<u>not two</u>.  Plaintiff Daughters Lisa and Devora *had not* been contacted by Defendant Dr. Cohen.

1959. Dr. Land stated in his Affidavit that he too had seen Father only *once*—on <u>January 9, 2012</u> and "conferred" with Defendant Michael Novack, Defendant Attorney Cuffe and Andrew Tarasuk. Plaintiff Daughters were <u>*not*</u> contacted by Dr. Land.

> 1960.  Of significance, Andrew Tarasuk (LICSW of Defendant Merrimack Valley Hospital) had previously worked for Defendant ESMV.  (He is listed in the 2007-2008 Annual Report of Defendant ESMV)  Accordingly, he had a previous established working relationship with Defendant Attorney Berid.

1961. As petitioner Defendant Merrimack Valley Hospital's submission of medical affidavits contained material and substantial misrepresentations, Plaintiff Daughters filed a motion to dismiss the Roger's Hearing. (Exhibit 362)

1962. Plaintiff Daughter Lisa's motion to dismiss was summarily denied at the beginning of the court proceeding; however, Judge Abber, *himself*— in his additional handwritten written findings—showed that Plaintiff Daughter Lisa's claims were indeed true and valid. Judge Abber explicitly hand-wrote the following:

The treatment plans proposed by Dr. Hayes are not considered by the Court.    (Exhibit 363).

1963. It is suspect that Defendant Attorney Saunders merely submitted the affidavit of Defendant Dr. Hayes without producing the witness.

1964.  It is also suspect that the new treating psychiatrist (Defendant              Dr. Portney) hired by Defendant Attorney Cuffe—would not provide a medical certificate and did not appear to testify at the court proceeding of January 30, 2012.  Instead, designated Defendants hired two professional paid witnesses to testify: Dr. William Land and Defendant Dr. Peter Cohen.

1965. Upon cross-examination by Plaintiff Daughter Lisa, Defendant Dr. Cohen testified that he <u>*did not review*</u> any records from Defendant Right At Home.

1966. When Plaintiff Daughter Lisa raised the importance of obtaining information from the aides—as they are the people who have the most constant with Father, Defendant Dr. Cohen stated:

Um, there wasn't any opportunity for me to do so.  I just became involved in this case in this past week.

1967. As previously set forth, Defendant Dr. Cohen attested that Seroquel is commonly used "to induce sleep".

106

1968. When Dr. Land was asked by Defendant Attorney Berid what would happen to Father if he did not receive antipsychotics, Dr. Land testified:

I think - - it's certainly an – a longer hospitalization – that's at a minimum.  I think that he's on a locked psychiatric unit right now.  I think without treatment, there's certainly a chance he will stay there for *an indefinite period of time*.

**1969.**   Plaintiff Daughter Lisa had asked Dr. Land to give specifics and not mere generalizations of agitation, which he then testified:

that apparently it occurred while he [Father] was at home, with a home health aide and that 911 was called.  That he eventually was escorted to the hospital.  That there was allegedly assault – an assault and he landed up in four-point restraints, which I think is quite significant for an 83 year-old man to land up in four-point restraints.

1970.   Dr. Land confirmed that he had _not_ personally observed any alleged assault by Father—that _his_ described accounts were from what he was told by *others*.

1971.   As previously set forth, the Boxford Police Report stated that Father was *extremely* cooperative and calm when the police arrived.

1972.   Of significance, Defendants *did not* have *any* of the people who supposedly observed Father's "assaultive behavior" testify—and those people were *easily* available to testify, given the fact that the supposed people who observed such assaultive behavior were home health aides of Defendant Right At Home and staff of Defendant Merrimack Valley Hospital.

1973.   Further bolstering the ill-motives of designated Defendants is that the home health aide (Mary Roche) of Defendant Right At Home—who was the very person who *made the 911 call* and made the afore-described allegations against Father—_was present in court_.  Defendant Attorney Cuffe had _subpoenaed_ Mary Roche to testify at the contempt proceedings against Plaintiff Daughter Lisa which was scheduled during the same court proceedings for the Roger's motions on  January 30, 2012.  (Exhibit 24).

Evidence of Defendants' ill-intended use of Drs. Cohen and Land

1974.   Defendant Dr. Cohen and Dr. Land are doctors whose medical practice is largely based on getting paid to be professional witnesses, otherwise known as "hired guns."

1975.   Defendant Dr. Cohen and Dr. Land were well known to Defendant Attorney Ledoux.

107

1976.   Defendant Attorney Ledoux and Defendant Attorney Berid knew   Dr.
Land from his involvement in the previously referenced 2008 probate
matters pertaining to Antoinette Carpinone. (Exhibit 364).

1977.   The curriculum vitae for Defendant Dr. Cohen that was provided to
Plaintiff Daughters had omitted Dr. Cohen's affiliation with Beverly
Hospital.  Such omission was intentional and deliberate.  (Exhibit 365).

1978.   Defendant Attorney Myette, also, was acquainted with Defendant
Dr. Cohen as he had stated, in subsequent court proceedings, that he had
worked for many years with a person who is a *mentor* to Defendant
Attorney Myette—being Attorney Valerie Jacoby; that Valerie Jacoby had
used his services, about a dozen times, for expert witness testimony.

1979.   Defendant Dr. Cohen's testimony shows that he has very little working
experience with elders diagnosed with Alzheimer's and dementia.  His
experience as an expert witness is almost exclusively limited to supporting
involuntary commitment of people and forced treatment with
antipsychotics on behalf of hospitals.

1980.   Defendant Dr. Cohen's treatment order had the starting dosage of Seroquel
be 50 mg up to 250 mg; Dr. Land's treatment order had the starting dosage
be 25 mg up to 300 mg.

1981.   Defendant Attorney Cuffe wrote the antipsychotic dosage as: "Seroquel up
to 300 mg per day" in his proposed Findings and Order to be signed by
Judge Abber. Judge Abber crossed out the dosage and hand-wrote his own
dosage order - "initial dosage of 25 mg twice per day up to 100 mg per
day."  (Exhibit 363).

1982.   Showing ill-motives is Defendants' seeking Father to be given the
*maximum amount* of antipsychotics proposed by professional paid
witnesses who were *not* Father's treating doctors.  Further compounding
the egregiousness of Defendants actions is the fact that they knew Father
had been receiving 12.5 mg of Seroquel, twice a day.

1983.   The changes made by Judge Abber in Exhibit 363 evidences consciousness
of guilt of Father being unlawfully and unjustly forced to take
antipsychotics.

Additional knowingly false in-court statements and adverse conduct against Father by his
own attorneys—Defendant Attorneys Kazarosian and Myette

108

1984. Defendant Attorney Myette falsely represented to Judge Abber that Father did very well with no reports of adverse effects when he was taking Seroquel after his discharge from Defendant Whittier Pavilion (which time period was May of 2011 through late November of 2011).

1985. Defendant Attorney Kazarosian—*Father's own attorney*—<u>objected</u> to Plaintiff Daughter Lisa seeking to admit the Boxford Police Report of January 13, 2012 to rebut the allegation that Father was violent.

Explicitly raised Federal Due Process deprivations

1986. Plaintiff Daughter Lisa explicitly raised the issue that no evidentiary hearing has been conducted to determine the level of Father's capacity.

1987. Plaintiff Daughter Lisa explicitly repeatedly raised that she and Plaintiff Daughter Devora had been precluded from obtaining their own independent medical examination of Father.

O.  Continued fraud and deception relating to continued court ordered forced administrating of antipsychotics and other sought court orders

1988. The electronic notes of Defendant ESMV state that Father was discharged from Defendant Merrimack Valley Hospital on February 3, 2012. The electronic notes of Defendant ESMV, input by Defendant Caseworker Springman (on February 7, 2012) state that Father was reported to be doing well at home.

1989. The electronic notes of Defendant ESMV for February 7, 2012 state that Defendant Diane Powell had directly spoken with the provider—but does not specifically state to whom she spoke; she stated that it was reported that Father was "doing well" and "medication compliant".

1990. Defendant Attorney Cuffe's invoices show that since <u>January of 2012</u> Father spoke with Defendant Dr. Portney on *one occasion* during the relevant time period: <u>February 14, 2012</u>—<u>the same day that Defendant Attorney Cuffe filed his motion seeking a court order to force Father to be placed into a long-term locked-down facility</u>.  (Exhibit 366—which was not addressed until the court proceeding of March 27, 2012).

1991. Defendant Attorney Cuffe stated that Father needed to be placed into a long-term care facility specifically on the claim that Father supposedly was

too fearful to go up to the second floor of the home where Father's bedroom was located.

1992.   Submitted invoices for Defendant Attorneys Cuffe and Feld show that they actively started looking to place Father into a long-term facility starting in October of 2011.  (Exhibit 282).

1993.  On February 14, 2012, Defendant Diane Powell input into the notes of Defendant ESMV:

Elder [Father] is back in his home with 24 hour care from Right At Home.  Elder is taking his medications.  Home situation is much more calm w/o dtr living in the home.  Dtr is not allowed to contact elder.  Elder is doing well and stable at this time.

1994.  On February 15, 2012, Defendant Diane Powell input into the notes of Defendant ESMV that she had just been informed that Defendant Attorney Cuffe had filed the afore-referenced motion to force Father out of his home into a long-term care facility.  Defendant Diane Powell made the notation "he won't go upstairs, shower, etc."

1995.  *Literally* 2 minutes later Defendant Diane Powell put in new notes into the computer system of Defendant ESMV that supposedly Father—all of a sudden—was "refusing to shower, go upstairs and participate in PC".

*1996.*  Undeniably Defendant Diane Powell engaged in fraud with designated Defendants as her previous notes stated there were no problems.

*1997.*  On February 16, 2012, Defendant Michael Springman stated in the notes of Defendant ESMV:

There's also a question of the elders [Father] safety at home as the Seroquel he is taking has not alleviated his aggression entirely.  Elders reported to have become verbally aggressive toward a woman in the waiting room at his doctor's office and also towards his geriatric care manager [Defendant Michael Novack].

*1998.*  On February 22, 2012, Defendant Diane Powell sent an email to Defendant Attorney Berid—which was copied into the notes of Defendant ESMV that stated:

Maxa,

Mike went to see Mr. Siegel yesterday in his home and *he appears to be doing well*.  He was focused on Mike going to the papers with him and helping him "expose what is going on", but other than that he was calm.  *Mike and I are a little concerned because he was calm yesterday, doing well with private pay aid and*

110

> *the stair issue has been resolved.*   They have added a safety bar to his stair/chair lift and <u>he is now going upstairs to be showered</u>.  At this point, I am not sure why placement is needed.

*1999.* On February 23, 2012, Defendant Michael Springman input into the notes of Defendant ESMV that he spoke with the case manager of Defendant Right At Home:

Elder [Father] is reported to be doing well, taking his medication, going upstairs again, and having no issues with staff.

2000. As previously set forth, on or about <u>March 16, 2012</u>, Plaintiff Daughter Lisa filed the previously described emergency civil action with the Single Justice of the Supreme Judicial Court.

2001. Defendant Attorney Cuffe's invoices show that he spoke with Defendant Dr. Portney on <u>March 20, 2012</u> and that Defendant Attorney Cuffe filled out the medical certificate *for* Dr. Portney and faxed it to him.

2002. Evidently Defendant Dr. Portney did not agree with the content of the medical certificate faxed to him by Defendant Attorney Cuffe—as Defendant Attorney Cuffe's invoice states that he received a new report from Defendant Dr. Portney on <u>March 21, 2012</u>, which Defendant Attorney Cuffe had subsequent telephone calls about with Defendant Dr. Portney.

2003. As revealed by Plaintiff Daughters' much later discovery, Defendant Attorney Cuffe did not find the reworked medical certificate by Defendant Dr. Portney desirable as *the very next day* (March 22, 2012) Defendant Attorney Cuffe's invoice shows that he called Defendant Dr. Funk.

2004. Defendant Attorney Cuffe's invoice shows that on <u>March 22, 2012</u> he billed for preparing his motion requesting that the anticipated court order for <u>March 27, 2012</u> to continue forced antipsychotics be issued without the filing of a medical certificate—that he be allowed to file a medical certificate at a non-specified later date (which proved to be fabrication by Defendant Attorney Cuffe).

2005. There were no further statements of alleged aggression issues with Father in the notes of Defendant ESMV *until* <u>March 23, 2012</u>—given the timing of the above-described events with Defendant Attorney Cuffe it is highly suspect that Defendant Diane Powell suddenly, input notes into Defendant ESMV's computer system that purportedly Defendant Attorney Myette told her that, a week prior, Father had *supposedly* hit one of the home health aides with his cane.

2006. Of significance, the notes of Defendant ESMV—input on <u>March 23, 2012</u> by Defendant Caseworker Springman—state that the home health aide (Massiel Gomes) of

Defendant Right At Home had reported to Defendant Caseworker Springman that Father had been excessively tired and sedated, sleeping a lot, until the recent change in Father's medication where he seemed more alert and energetic.

**2007.**On March 23, 2012 Defendant Caseworker Springman stated that the home health aide (Massiel Gomes) reported to him that Father was still going upstairs to sleep in his bedroom and to shower.

Court proceeding held on March 27, 2012 (Exhibit 23,24)

2008.   Evidencing Defendant Attorney Saunder's and Defendant Merrimack Valley Hospital's consciousness of guilt is their filing of a motion seeking the *withdrawal* of Defendant Merrimack Valley Hospital as a party to the matter of In re Marvin H. Siegel _solely_ based on the assertion that the litigation in this matter was too "costly" to Defendant Merrimack Valley Hospital.  (Exhibit 367).

2009.   Plaintiff Daughter Lisa explicitly brought to Judge Abber's attention that the court appointments of guardian and conservator that he made on August 17, 2011 had contravened the constitutional guarantees of Due Process; that there was no evidentiary hearing to make any determination regarding Father's competency.

2010.   The subject of Defendant Attorney Cuffe's having unlawfully facilitated the forced administering of antipsychotics to Father—with the concerted efforts of designated Defendants was again brought to Judge Abber's attention by Plaintiff Daughter Lisa.

2011.   Plaintiff Daughter Lisa raised the issue to Judge Abber that she and Plaintiff Daughter Devora had been precluded from being able to obtain an independent medical examination of Father so that they have a full and adequate opportunity to present their case.  And, *again*, Judge Abber denied Plaintiff Daughters the ability to have Father examined by their own expert.

Evidence of illicit conduct regarding medical certificate for Roger's hearing of March 27, 2012

2012.   The motion to extend that was presented in court by Defendant Attorney Cuffe on March 27, 2012 was not served properly upon Plaintiff Daughters. The first notice that Plaintiff Daughters had was in court on March 27, 2012—which Plaintiff Daughter Lisa explicitly informed Judge Abber and was disregarded.

112

2013.   Judge Abber accepted the misrepresentations that were made during the proceeding of January 30, 2012.

2014.   Defendant Attorney Cuffe *did not* proffer *any* reason for his supposed inability to obtain a medical certificate from Defendant Dr. Portney—in fact, Defendants had repeated their conduct that took place with the proceeding of December 12, 2011 where Defendant Attorney Cuffe represented in court that there was *no* medical certificate, but Plaintiff daughter Lisa later discovered a medical certificate completed by Defendant Dr. Funk date-stamped as "December 12, 2011" in the court files for In re Marvin H. Siegel.  This time. Plaintiff Daughter Lisa later found a completed medical certificate by Defendant        Dr. Portney that was date stamped as being filed on "March 27, 2012".

2015.   *On the same day* as the hearing of March 27, 2012 and with *no* notice given to Plaintiffs, Defendant Attorney Cuffe had also filed his Report of Monitor *with an attached medical report from* Dr. Robert Portney.

2016.   Further evidence of egregious deception by Defendants is that the medical report from Defendant Dr. Portney that was submitted with Defendant Attorney Cuffe's Report of Monitor shows that Father was being given HALDOL covertly.

2017.   As previously set forth, Judge Abber *knew* that Defendant Attorney Cuffe had previously represented—on multiple occasions in January of 2012— that Defendant Dr. Portney was the treating psychiatrist of Father; yet, Judge Abber *completely disregarded* Defendant Attorney Cuffe's explicit statement that he was *going to get the medical certificate from* Defendant Dr. Funk and that Father was *scheduled* to see Defendant Dr. Funk on April 2, 2012.

2018.   Even more so, Plaintiff Daughter Lisa *explicitly* brought to the attention of Judge Abber that Defendant Attorney Cuffe had plenty of time to obtain a medical certificate from Father's treating psychiatrist, Defendant Dr. Portney, where it had been represented that Defendant Dr. Portney *saw Father on* February 14, 2012.  Judger Abber immediately responded that Plaintiff Daughter Lisa's objection was "duly noted" and that Defendant Attorney Cuffe's motion was allowed.

2019.   Affirmatively establishing designated Defendants' illicit conduct, as previously set forth—and unbeknownst to Plaintiff Daughters at that time—Defendant Attorney Cuffe had*, in fact,* received a medical certificate from Defendant Dr. Portney on or about, March 21, 2012, which was the

medical certificate later found by Plaintiff Daughter Lisa in the court files of In re Marvin H. Siegel.

2020. Bolstering that Defendant Attorney Cuffe had originally filled out the medical certificate for Defendant Dr. Portney are the facts that the filed medical certificate shows that Defendant Attorney Cuffe had faxed it to Defendant Dr. Portney on March 20, 2012 and handwritten changes made to the medical certificate by Defendant Dr. Portney.  Showing deliberate fraud is the fact that Defendant Attorney Cuffe made in-court representations that he had _no_ medical certificate.

2021. Defendant Attorney Cuffe showed illicit motives in deliberately concealing information that Defendant Dr. Portney wanted to _reduce_ Father's dosage of antipsychotics—as evidenced by Defendant Dr. Portney's handwritten changes to the medical certificate.

2022. Defendant Dr. Portney crossed out Defendant Attorney Cuffe's typewritten statements regarding prognosis without treatment.  Defendant Dr. Portney added the handwritten statement that by taking medication Father could "possibly live on his own without assistance"; and he added the handwritten statement that by taking medication, Father could "get the right back to make his own informed decisions with respect to health needs."

2023. Defendant Attorney Cuffe had deliberately intended to conceal risks of Father taking antipsychotics.

2024. Defendant Attorney Cuffe had filled in the dosages for the antipsychotics, which Defendant Dr. Portney completely revised and gave significantly decreased dosages and the complete elimination of Zyprexa.

2025. Defendant Attorney Cuffe filed a medical certificate _by_ Defendant Dr. Janice Funk _on_ April 13, 2012—which notice was _not_ given to Plaintiff Daughters of this filing.

2026. Of significance, Defendant Dr. Funk did not specify any particular medical provider with whom she spoke and _no proposed treatment plan_ was provided with the medical certificate.

2027. Defendant Dr. Funk did not see or examine Father on April 2, 2012— which is evidenced by the invoices submitted by Defendant Attorney Cuffe. Defendant Dr. Funk's medical certificate, dated April 2, 2012, is virtually identical to the medical certificate that she signed on December 2, 2011.

114

2028.  Defendant Attorney Cuffe specifically stated in his invoice that he, personally, provided Defendant Dr. Funk with Father's medication list—*not* from Father's medical providers.

2029.  Of significance, Defendant Dr. Funk stated that she spoke with friends and family in her completing the medical certificate for April 2, 2012—however, Defendant Dr. Funk *did* *not* contact Plaintiff Daughter Lisa, Plaintiff Daughter Devora or Steven Kapsalis.

Continued pattern of subterfuge regarding certifying doctor for court ordered forced administering of antipsychotics

2030.  Notes for Defendant ESMV—input by Defendant Diane Powell on April 25, 2012—indicate that Defendant Dr. Portney had appeared in Essex Probate & Family Court in an unrelated matter; with Defendant Diane Powell stating:

Dr. Portney apparently upset Judge Sahagian, when he was sworn in by saying that he swears to tell the truth as much as anyone can.  She walked off the bench and told counsel to speak to him.  He also claims to have cured the elder of her mental illness with his treatment.  We are going to get a new dr to treat Marvin [Father].

2031.  As set forth, Defendants made overt in-court representations in January of 2012 and March of 2012 that Defendant Dr. Portney was—and supposedly is and continues to be—the treating psychiatrist for Father; however, Defendants pattern of conduct evidences that they have used Defendant Dr. Portney as a mere front.  Defendant Dr. Portney was *not* the certifying doctor for court ordered forced antipsychotics issued in January of 2012, March of 2012, June of 2012, October 2012, and July of 2013.

2032.  In June of 2012, with outwardly made representations by Defendant Attorney Cuffe that Defendant Dr. Portney was still Father's treating psychiatrist, Defendant Attorney Cuffe submitted a medical certificate completed by Defendant Dr. Peter Cohen in which Defendant Dr. Cohen stated that he relied on the *progress notes* of Defendant Dr. Portney and the *medical certificate* of Defendant Dr. Funk.

2033.  Defendant Dr. Cohen gave the following treatment order:

Risperdal, 1 mg by mouth every other day alternating with 0.75 mg,; with the alternative of Risperdal Consta, 25-50 mg by intramuscular injection every two weeks and Seroquel, 25-50 mg by mouth at bedtimes *as needed* for agitation (up to 100 mg/day).

115

i.  Court proceeding of July 13, 2013

2034.   In <u>June of 2012</u> as a result of Plaintiff Daughter Lisa's continuous in-court exposure of criminal misconduct by Defendant Attorney Cuffe and Defendant Attorney Feld—in their respective official capacities as Court appointed guardian and conservator—they sought court orders allowing them to retain private counsel to *represent them* at all proceedings in the matter of In re Marvin H. Siegel and to have such counsel be paid directly from Father's estate; which Judge Abber and Judge Blake allowed. (Exhibit 368).

2035.   From June 11, 2012 through December of 2013, Defendant Attorney Walter Costello represented Defendant Attorneys Cuffe and Feld in the matter of In re Marvin H. Siegel.

2036.   Defendant Attorney Kazarosian—Father's own attorney—had solicited the services of Defendant Attorney Costello to represent Defendant Attorneys Cuffe and Feld.   Defendant Attorney Kazarosian and Defendant Attorney Costello have a long and close social relationship evidenced by their mutual and high profile memberships with the Massachusetts Bar Association, Essex Bar Association, Massachusetts Association for Trial Attorneys and the like.   Their professional working relationship was so enmeshed that in December of 2013 they formed a new law office together (Kazarosian, Costello & O'Donnell).

2037.   On July 13, 2013, Defendant Attorney Cuffe filed a Motion to Amend and Extend Roger's Order.  (Exhibit 369).

2038.   Despite Defendant Attorney Costello's well-established role in this serious litigation, he did not give any advance notification of his inability to be present because then Plaintiff Daughters would have known to attend the July 16, 2013 hearing.

2039.   Plaintiff Daughters were *never* notified that there was a "substitution" of counsel for Defendant Attorney Costello, in representing Defendant Attorney Cuffe at the July 16, 2013 hearing  The evidence set forth shows that Defendant Attorney Costello did not appear on behalf of Defendant Attorney Cuffe because Defendant Attorney Costello *knew* of illicit acts engaged in by his client involving the afore-described motion to amend and extend forced use of antipsychotics.

2040.   <u>July 16, 2013</u> was the <u>*first time*</u> Attorney Solomon made any appearance in this matter of In re Marvin H. Siegel—which underlying litigation has gone on, actively, *for more than two (2) years.*  Even more so, Attorney Solomon

emphasized during the hearing that this was going to be a *"one-time"* limited appearance.  (Exhibit 370).

2041.  As set forth, Defendant Attorney Costello—who had been specifically "appointed" counsel to represent Defendant Attorneys Cuffe and Feld—and who has routinely and continuously attended so many hearings in such capacity for well over a year, gave *no notice whatsoever* that he was having an attorney take his "stead".  Even more egregious, Defendant Attorney Costello had someone who was completely unrelated to the underlying matter and unknown to Plaintiff Devora and Plaintiff Lisa.

2042.  *And no inquiry was made by Judge Abber during the hearing as to Defendant Attorney Costello's absence—despite the record's demonstration that such lack of appearance by Defendant Attorney Costello would reasonably be of concern to a presiding judge*; especially, when this hearing involved the forced used of antipsychotics on an elderly person who now had repeated bouts of pneumonia from Seroquel.

2043.  The manner and tone in which Judge Abber addressed the appearance of Attorney Solomon for Defendant Attorney Costello overwhelmingly demonstrates that Judge Abber *knew* *prior* *to the hearing* of this "substitution of counsel" through ex-parte communications with opposing counsel.  Judge Abber also outright stated that he had a *substantial personal relationship* with Attorney Solomon.

2044.  Plaintiff Daughters *only* found out about Attorney Solomon's appearance *after* the hearing was held—*and through their inadvertent discovery.*

2045.  Plaintiff Daughter Lisa wrote a letter to Attorney Solomon, dated July 24, 2013, directly stating the fact that Plaintiff Daughters were not served with the Roger's motion.  In Attorney Solomon's written response, he *did not deny* the fact that Plaintiff Daughters were not served—*in fact, he made statements that were overtly incriminating*.  (Exhibit 371).

The motion to extend and amend contained consciously false information

2046.  The motion to amend and extend Roger's hearing shows that the BBO number that is located under Attorney Solomon's typed name is *not* Attorney Solomon's actual BBO number—it is in fact, that of Defendant Attorney Garmil.  This is evidenced by the handwritten Notice of Appearance form filled out by Attorney Solomon that contained his true information.  (Exhibit 372).

117

2047.   Defendant Attorney Garmil's telephone number is listed on the formal motion to extend and amend treatment order; however, Attorney Solomon has his own separate law office.

2048.   Defendant Attorney Garmil's established working and personal relationship with Defendant Attorney Cuffe and the designated Defendants explains why Defendant Attorney Garmil intentionally and deceitfully used the name of different counsel (Attorney Solomon) corresponding with Defendant Attorney Garmil's actual address, telephone number *and BBO number*.

2049.   Ill-motives of the designated Defendants and collusion are evident by the fact that Attorney Solomon used Defendant Attorney Garmil's letterhead in his written response to Plaintiff Daughter Lisa after she had *already* explicitly sent a letter describing their unethical and unprofessional conduct, regarding the motion to amend and extend treatment order.

**2050.**   Designated Defendants had not provided copies of their filed motion to amend and extend to Plaintiffs, as required by law; and Defendants did not provide notice to Plaintiffs that the filed motion had been scheduled to be heard on July 16, 2013—again, Plaintiff Daughters only found out about the motion and hearing through inadvertence.

## Attorney Solomon had a substantial conflict of interest with Defendant Attorney Richard Garmil

2051.   As previously set forth, Attorney Solomon openly held himself out to be part of Defendant Attorney Garmil's law practice. (Exhibit 371)

2052.   Defendant Attorney Garmil was intricately involved early-on in the underlying guardianship/conservatorship matter of In re Marvin H. Siegel, as counsel for Defendant Whittier Pavilion and had filed a petition for a 6-month involuntary commitment of Father to a psychiatric ward.  (Exhibit 373).

2053.   Defendant Attorney Cuffe, as guardian, has a fiduciary obligation to *not* take actions that *adversely conflict* with the interests of Plaintiffs' father. Attorney Solomon had an inherent conflict of interest by having acted as private counsel for Defendant Attorney Cuffe—especially, with Attorney Solomon serving on behalf of the Law office of Richard Garmil, as Defendant Attorney Garmil was an official party in the underlying matter of In re Marvin H. Siegel and having *filed court action seeking long-term involuntary commitment of Plaintiffs' father to a psychiatric facility.*

118

Evidence of Judge Abber and designated Defendants having colluded in concealing notice of the July 16, 2013 hearing from Plaintiffs

2054. Judge Abber knew that Defendants had not filed a motion for short order of notice—standard and formal civil procedural requirement for conducting an expedited hearing; even more so, Judge Abber had previously issued *his own specific order* for *added* procedural <u>time</u> requirements for filing motions in the matter of In re Marvin H. Siegel.  (Exhibit 374).

2055. Defendant Attorney Cuffe and Attorney Solomon did not submit the required affidavits per the Order *issued by* Judge Abber. The Order *explicitly* stated that counsel was required to state in an affidavit accompanying the filing of the motion that the non-moving parties were served and that the non-moving parties did not send an objection or opposition.

2056. Judge Abber, in his own handwriting—on Defendant Attorney Cuffe's motion to amend and extend treatment order—wrote: "no family members present."  (Exhibit 375).

2057. The submitted court audio recordings show that Judge Abber knew that Plaintiff Daughter Lisa's absence was due to deception—that Plaintiff Daughters' absence was <u>*not*</u> voluntary and knowing.

2058. Judge Abber had actual knowledge that Defendants had not given proper notice to Plaintiff Daughters about the motion and the scheduled date for it to be heard.

Compounded evidence of Defendants' deliberate fraud and deceit

2059. Judge Abber brought up the issue about his having a conflict of interest with Attorney Solomon, who was appearing as counsel for Defendant Attorney Cuffe.  Judge Abber stated that Attorney Solomon had represented *a family member* of Judge Abber's.

2060. The above-described conflict of interest had <u>*not*</u> been presented in any written motion. Plaintiff Daughters did not find out about the conflict of interest until <u>*after*</u> the hearing was held.

2061. After Judge Abber made such statement of the nature of conflict, the court audio recording shows that *immediately* afterward, Judge Abber made it evident that he and Defendant Attorney Myette had *already* discussed the issue of the conflict of interest outside of court.

119

<u>The audio of the July 13, 2013 hearing shows that Judge Abber, de facto, did not even personally *read* the medical documentation submitted</u>

2062.   Judge Abber's decision for the above-referenced court proceeding was *solely* based on verbal representations by Attorney Solomon—who had <u>*no prior familiarity or involvement*</u> whatsoever in the then two (2) year-long matter.

**2063.**   Judge Abber exclaimed that he was very surprised upon hearing Attorney Solomon's description of the alternating manner of taking the Risperdal— Judge Abber *explicitly* stated <u>*that this was the first time that he had ever seen this particular alternating manner of treatment*</u>.

2064.   The <u>PRIOR</u> <u>Treatment Order of June 24, 2012</u> *and* <u>October 22, 2012</u> that Judge Abber himself signed, states the primary treatment as:

1 mg by mouth <u>every other day</u> (quod) alternating with 0.75 mg quod.  range: 0-6 mg by mouth daily.

2065.   And despite Judge Abber being the *only* judge to have issued treatment orders in this matter—which has been four (4) times—the audio overwhelmingly depicts how taken aback Judge Abber was when Attorney Solomon described the alternating pattern in which the medicine was to be given.

2066.   Judge Abber explicitly stated:

1 mg on one day, and the next day would be .75 mg, and then back to the 1 mg, followed the next day with .75 mg.

2067.   Attorney Solomon then confirmed that Judge Abber had a correct understanding of what he had just described as the alternating dosage, and immediately thereafter is when Judge Abber stated in a surprised tone of voice: <u>"I've never seen that before</u>."

2068.   As set forth, *no one* responded to Judge Abber's remark about his first time seeing an order for an alternating dosage— even though the Roger's Order that <u>*he*</u> signed <u>on October 22, 2012</u> specifically stated that it was an alternating dosage.  Of significance, where no family members were present *due to the deliberate intentions of designated Defendants,* Plaintiff Daughters were prevented from bring that fact to Judge Abber's attention; but Plaintiff Daughters did report it to the Board of Bar Overseers to no avail.

120

Evidence of ex-parte communications *prior* to the hearing between opposing counsel and Judge Abber and the sudden appearance of Sumi Dolben

2069. Defendant Attorney Cuffe's "filed" motion solely *represented that Defendant Dr. Portney is the Affiant Clinician for the Roger's Order.* Defendant Attorney Cuffe in no way refers to anybody by the name of Sumi Dolben.  At no other time during the years of litigation had Sumi Dolben's name ever been mentioned.

2070.  Yet, undeniably, Judge Abber's *written findings* explicitly state that he based the Roger's Order on an affidavit and treatment plan completed by Sumi Dolben—and not on any such documentation relating to Defendant Dr. Portney.

2071. As seen from Judge Abber's "Findings" for the court proceeding of July 16, 2013, the physical appearance of the typewritten name of Sumi Dolben in the document itself shows that the appearance of her name cannot be dismissed or minimized as an innocent mistake.  (Exhibit 375).

2072. The evidence shows that Judge Abber did not rely on any documentation from Defendant Dr. Portney; instead he relied on a supposed affidavit from Sumi Dolben, RN.  (Exhibit 376).

2073. It is damning that Judge Abber did not identify in his written findings Sumi Dolben's relationship to this case or her occupation. Sumi Dolben is a nurse—and is *not* affiliated with Defendant Dr. Portney's office.

2074. Sumi Dolben does have a direct working relationship with and shares the same address as Defendant Michael Novack.  (Exhibit 377).

2075. Crucially, Plaintiff Daughter Lisa has on multiple occasions retrieved the court files at the Salem Probate Court for In re Marvin H. Siegel and there is NO affidavit by Sumi Dolben in the court file. There is no treatment plan by Sumi Dolben in the court file either.

2076. The above evidence shows that Sumi Dolben was used by designated Defendants for illicit purposes.  The suspiciousness of such conduct is even more heightened by the fact that the documents explicitly referenced by Judge Abber are NOT IN the court file and not able to be located by the Clerk's Office.

2077. Registrar Pamela Casey O'Brien explicitly stated to Plaintiff Daughter Lisa (in the presence of another person) that there is nothing that she can do to address the "missing" documents referenced by Judge Abber in his

121

findings.  Registrar Casey O'Brien explicitly stated to Plaintiff Daughter Lisa (in the presence of that third person) that if Judge Abber chooses to keep custody of that documentation it is beyond the scope of her responsibilities as Registrar.

2078. Registrar Casey O'Brien refused to sign an affidavit regarding the above-described statements.

2079. There can be no innocent or benign explanation for Defendant Attorney Cuffe giving Judge Abber medical documents attested by Sumi Dolben instead of—or even, in addition to—Defendant Dr. Portney's "Affidavit of Clinician".

2080. Designated Defendants have an established pattern of not wanting to submit documents signed by Defendant Dr. Portney.

2081. Plaintiff Daughter Lisa explained to Defendant Dr Portney that there was documentation tending to show that the medical certificate filed with his signature by Defendant Attorneys Cuffe and Solomon was intentionally altered.  (Exhibit 378).

2082. Designated Defendants used Sumi Dolben for actual treatment because Defendant Dr. Portney did not agree to do what designated Defendants wanted him to do. Defendant Dr. Portney's voice mails left for Plaintiff Daughter Lisa provide extensive and specific concrete information to bolster this conclusion.

2083. .

### Audio of the court proceedings shows that Judge Abber and Designated Defendants discussed the findings for the Roger's hearing prior to the July 16, 2013 hearing

2084. Further evidencing the willfulness of Judge Abber's misconduct in holding the court proceeding of July 16, 2013 is the fact that *Judge Abber* already had possession of typed up written "Findings" _while the hearing_ was being held.

2085. Of significance, the actual written document that Judge Abber referenced at the hearing were his "Findings"—_not proposed findings_ submitted by counsel.  (Exhibit 375).

P.  Evidence that the court appointments of Defendant Attorney Cuffe and Defendant Attorney Feld were the result of collusion and with deliberate intention to embezzle money from the DSL Trust

122

2086. Defendant Attorney Ledoux made false representations while acting as counsel for Plaintiff Daughter Devora that Defendant Attorneys Cuffe and Feld did not have any intentions or desire to be made permanent court appointments.  Defendant Attorney Ledoux stated in the email:

Neither of these attorneys [Defendant Attorney Cuffe and Defendant Attorney Feld] are stakeholders in this case and I know that Atty Cuffe feels that he should not be the substitute petitioner.  We can, however, discuss this when we meet. (Exhibit 379).

2087. Father explicitly expressed in the advance directives and estate planning instruments of <u>February of 2003</u>—and re-affirmed in writing on June 16, 2011—that he wanted Plaintiff Daughter Lisa to be his attorney-in-fact; *and that should any reason that Plaintiff Daughter Lisa become unable to continue in such capacity that <u>Plaintiff Daughter Devora was to be the successor attorney-in-fact</u>.*

2088. Father explicitly stated his desire and intention for Plaintiff Daughter Lisa to be his guardian if necessary—specifically, having stated in the 2003 DPOA that he "nominate[d]" Plaintiff Daughter Lisa as his guardian.

2089. Father's 2003 DPOA remained effective for over *eight (8) years*, including the afore-referenced time period in which Father had been involuntarily evaluated by Defendant Beverly Hospital.  But for the previously described fraudulent conduct by Defendants, Father's 2003 DPOA would still be in effect.

i.   Deliberately overt intentions to dismantle Father's advanced directives and estate planning instruments

2289. Defendant Attorney Feld stated in his invoices that he and other designated Defendants have extensively consulted with Attorney Maria Baler to draft new estate planning instruments for Father. Defendant Attorney Cuffe had consulted with Attorney Maria Baler to draft new estate planning instruments in the matters of <u>In re Robert Pigeon and In re Gertrude Pigeon</u>. (Exhibit 102).

2290. Defendant Attorney Kazarosian filed a motion—joined in by designated Defendants—and made numerous false and fraudulent representations to dissolve the DSL Trust.  Defendant Attorney Kazarosian attempted to have Judge Abber hear the above-described motion without notice to Plaintiffs on October 10, 2012.  Judge Abber did not rule on the motion ex-parte and scheduled a hearing for October 22, 2012.  (Exhibit 380, 23).

2291. Plaintiffs specifically identified the false and fraudulent representations in a filed written memorandum of opposition. (Exhibit 381).

2292. Defendant Attorney Kazarosian's motion contained deliberate falsehoods about the conditions of Father's house. Plaintiff's opposition included photographs of Father's house evidencing Attorney Defendant Kazarosian's deliberate misrepresentations. (Exhibit 382).

2293. Demonstrated by the audio recording of the court proceeding on October 22, 2012—*before* the case was called, Judge Abber's clerk (Peter Krosunger Esq.) can be heard whispering to Judge Abber that Plaintiffs had submitted an opposition with photographs. The Clerk informed Judge Abber that he believed Plaintiffs gave copies to opposing counsel and that he (the Clerk) would give the photographs back to Plaintiffs if Judge Abber desired.

2294. At the end of the hearing, Judge Abber openly stated in court for the Clerk to return the attached photographs to Plaintiffs. Plaintiff Daughter Lisa formally objected, on the record, specifically to Judge Abber's keeping the written joint opposition but making her take back the photographic proof. Plaintiff Daughter Lisa explicitly stated to Judge Abber that he was dismantling a complete record of evidence which had been submitted to the Court—which the Judicial Conduct Commission and Board of Bar Overseers have been made aware of by Plaintiff Daughters.

ii.   Deliberate falsified financial filings in the matter of In re Marvin H. Siegel facilitated by the above-described relationships

2295. Defendant Attorney Feld–with the concerted efforts of designated Defendants—filed a Petition for Order of Complete Settlement in a deceptive and fraudulent manner; which Plaintiff Daughter Lisa explicitly brought to Judge Abber's attention at the court proceeding on December 11, 2012. (Exhibit 23).

**2296.** As previously set forth, the Inventory filed by Defendant Attorney Feld on November 7, 2011 (but date-stamped as filed on "Jan 19 2012"), stated that Plaintiffs' father's total value of personal property was supposedly "$3,987.60" and that the total real estate value as "$.00". When Defendant Attorney Feld filed a subsequent Inventory on January 18, 2013, the Schedule of Personal Property (on page 1) stated: "$5,572,767.69" and the Schedule of Real Estate stated the value of real estate as: "$.00". (Exhibit 27).

Account filed on November 5, 2012

124

2297. Through deceptive proceedings with Judge Ricci, on October 25, 2012, Defendant Attorney Feld made in-court statements that he used up the $1 million that had been initially placed in his possession.

2298. Defendant Attorney Feld submitted information that over $450,000 of the $1 million was expended on supposed legal costs. (Exhibit 18). Defendant Attorney Feld, also, checked the box "Final Account"—and left the checkbox designated "Annual" blank.

2299. In the first Account filed by Defendant Attorney Feld (in November 2012), he stated that Receipts and income was: "$994, 994.15"; that Payments and Debts were: "$994,994.15"; and that the Balance of Assets was: "$.00".

Petition for Order of Complete Settlement

2300. From the inception of Defendant Attorney Feld's court appointment as conservator and Defendant Attorney Cuffe's as court appointment as guardian, designated Defendants had overt and actual knowledge of Father's updated Will of 2003. (Exhibit 6) which explicitly stated that Father had deliberately and intentionally omitted Susan J. Miller (adopted step-daughter) as an heir, removing Susan J. Miller from having any interest in his estate whatsoever.

2301. Against Father's explicitly expressed and known desires and intentions, Defendant Attorney Berid—with joint concerted efforts of designated Defendants—sought to have Susan Miller included as an interested party in the matter of In re Marvin H. Siegel; which was allowed by Judge Abber on June 11, 2012. (Exhibit 23)

2302. Defendant Attorney Berid has an established pattern of engaging in fraudulent and deceptive acts in multiple probate matters including committing forgery in the matter of In re Joseph O'Shea.

2303. Defendant Attorney Berid submitted a purported affidavit of Susan J. Miller (Exhibit 383). Plaintiff Daughters have multiple and original documents actually handwritten by Susan Miller (aka Susan Siegel) that shows the afore-described affidavit by Defendant Attorney Berid is a forgery.

2304. The supposed signature of Susan Miller on the affidavit is consistent with that of Defendant Attorney Berid.

2305. Designated Defendants knew that Father explicitly expressed in writing, long ago, that he did not want Susan J. Miller to obtain any benefit in any

manner from his estate; yet, on the second page of the petition for complete settlement, Defendant Attorney Feld represented that the *sole* interested parties in the matter of In re Marvin H. Siegel were: 1) Susan Miller and 2) Defendant Attorney Cuffe (court appointed guardian)—in the space designated for listing interested parties, there were 3 spaces allotted and the *third line was left completely blank,* consciously omitting Plaintiff Devora and Plaintiff Lisa.

2306.   Defendant Attorney Feld—and his then counsel Defendant Attorney Costello—did not serve the petition for complete settlement upon Plaintiff Daughters as mandated by MUPC § 5-418B.

2307.   Designated Defendants deliberately facilitated the altering and tampering of information contained in the electronic docket system of the Essex Probate & Family Court regarding the matter of In re Marvin H. Siegel.

2308.   As previously set forth, Defendant Attorney Berid has had a long-established extra-judicial relationship with Julie Matuschak (high ranking administrator in the Clerk's Office for the Essex Probate & Family Court). Court records for In re Marvin H. Siegel and numerous other probate matters show Julie Matuschak's involvement.

2309.   The dockets for the matter of In re Marvin H. Siegel originally listed Father's residential address as Boxford, Massachusetts (as Father has resided in Massachusetts all his adult life).  (Exhibits 37 and 38).

2310.   Contemporaneous with Defendant Attorney Feld's filing of his petition for order of complete settlement in November of 2012, the electronic docket for the conservatorship of In re Marvin H. Siegel (ES11P1465PM) showed a change of Father's original Massachusetts address to "1025 Border Rd. Los Altos, CA  94022"  (Exhibit 38).

2311.   The changed address for Father—pertaining to ES11P1465PM—is the residential address of Susan J. Miller.

2312.   In court on June 11, 2012, Plaintiff Daughters brought this fraud to the attention of Judge Abber.

2313.   Further incriminating evidence of consciousness of guilt was subsequently provided by designated Defendants through their filing of a motion seeking Judge Amy Blake to cover up their fraudulent and deceptive acts.  (Exhibit 35 – Plaintiffs' Opposition describes the incriminating conduct in Exhibit 36).

Evidence of designated Defendants' false statements made in Financial Plans filed with the Essex Probate & Family Court

2314.   Evidencing further fraudulent and deceptive conduct, Defendant Attorney Feld—as court appointed conservator—filed more than *one* Financial Plan in the matter of In re Marvin H. Siegel for the year <u>2013</u>.  (Exhibit 385).

2315.   Defendant Attorney Feld filed a Financial Plan on <u>January 18, 2013</u> and, then, another one on <u>February 14, 2013</u>.  The first Financial Plan and the subsequent one have virtually identical information —even to the extent, on page 5, the certification of the veracity in completing the Financial Plan is dated—and typewritten: "January 18, 2013."

2316.   The only difference between the two (2) above-described Financial Plans is *<u>the addition of a Return of Service</u>* from the Sheriff, stating that a copy of the Financial Plan was served on Marvin Siegel at his residence <u>on January 30, 2013</u>.

2317.   Ill-motives are bolstered by the fact that Judge Abber, Defendant Attorney Feld and Defendant Attorney Cukier had a substantial and enmeshed working relationship as co-guardians in the matter of In re Esterina Milano—which Plaintiff Daughter Lisa had openly raised in-court on December 11, 2012 before Judge Abber.

2318.   Defendant Attorney Feld did not serve Plaintiffs a copy of the Financial Plan filed on <u>January 18, 2013</u>—Plaintiffs discovered the Financial Plan through a chance review of the court file.  In addition, Defendant Attorney Feld and Defendant Attorney Costello refused to provide Plaintiff Daughters access to the requested financial information despite the Plaintiffs being *Co-Trustees* of the <u>DSL Trust</u>.

2319.   Defendants Attorneys Feld and Cuffe refused to testify as witnesses in the trial of permanent guardianship and conservatorship—which such refusal is evidence of consciousness of guilt.

**2320.**   Even though Defendants Attorneys Feld and Cuffe were on the witness list of the Pre-trial Conference Report of March 27, 2012 and Plaintiff Daughters had served them with subpoenas to testify, Judge Abber quashed the subpoenas. Multiple times at other court proceedings where Plaintiff Daughter Lisa requested their testimony to challenge their veracity, Judge Abber precluded it.  (Exhibit 386; also, refer to audio for the proceedings of March 27, 2012 in prior referenced Exhibit 23).

2321.   Incriminating evidence of fraudulent and deceptive acts in the financial handling of Father's estate are contained in the invoices filed by Defendant Attorney Feld (Exhibit 282) which show a suspect pattern of transfer transactions from Defendant BNY Mellon to the fiduciary account held by Defendant Attorney Feld.

127

**2322.** The transfers reflected in Defendant Attorney Feld's <u>invoices</u> do not reconcile with the transfers recorded in his <u>Account</u>, filed on <u>February 14, 2013</u>.  The transfers in the fiduciary Account are as follows:

9/1/2011 - $50,000

9/1/2011 -  $50,000   (2nd transfer)

10/7/2011 - $50,000

11/3/2011 - $50,000

11/25/2011 - $55,000

12/19/2011 - $50,000

1/25/2012 - $50,000

2/10/2012 - $50,000

3/2/2012 - $50,000

4/30/2012 - $50,000

6/5/2012 - $50,000

6/25/2012 - $50,000

7/17/2012 - $125,000

7/24/2012 - $50,000

8/9/2012 - $70,000

8/31/2012 - $50,000

**2323.** Defendant Attorney Feld filed a deliberately false Account in <u>August of 2014</u> stating that it was the <u>First and Final Accounting</u> for the matter of In re Marvin H. Siegel.

2324. The Account filed by Defendant Attorney Feld on <u>February 14, 2013</u> states that the <u>ending balance</u> was:  $994,994.15.

2325. The next Account in succession, filed on <u>August 25, 2014</u>, states that the <u>beginning</u> <u>balance</u> is: $5,572,767.69.

128

2326.  There is no explanation in the Account of <u>February 14, 2013</u> for the clear discrepancy.

2327.  Defendant GAL McHugh certified in his filed report with the Essex Probate & Family Court (Exhibit 340) that he had no concerns regarding such pleadings and filings.

2328.  Defendant GAL McHugh breached his fiduciary duty and violated the rules of the MUPC as an investigator and overseer as a court appointee of SJC Rule 1:07 and that he did so knowingly and intentionally to aid and abet the furtherance of designated Defendants' exploitation of the DSL Trust.

2329.  Judge Abber knowingly and intentionally violated the rules of the Massachusetts Judicial Canons of Ethics in order to aid and abet the designated Defendants' looting of the DSL Trust.


1.  In the 1980s, court appointed conservators expressly did not have statutory authority to make wills for elders—see In the matter of Wanda W. Jones, 379 Mass 826 (1980). Now it is standard custom and practice for Massachusetts court appointed conservators and guardians to be given authority to dismantle advance estate planning instruments.

2.  Designated Defendants—individually and jointly—have intentionally and maliciously resorted to beyond the pale acts of retaliation against Plaintiffs Daughters for openly exposing designated Defendants' misconduct and for Plaintiffs having exercised their legal right to advocate for and protect their father's constitutional rights, as well as their family's and their own individual constitutional rights.  (Exhibit 1).

3.  The underlying circumstances of this federal action involve Plaintiffs—and their 86 year-old father—having been unlawfully and unjustly stripped of their family's Fourteenth Amendment inalienable right for family members to live together; unlawfully and unjustly stripped of their family's inalienable right to see and communicate with each other without restrictions; unlawfully and unjustly stripped of their father's long-established expressed desire and intentions that Plaintiffs be his caregivers and facilitators of *his* needs and wants.

A.  Necessitated urgent and immediate ex-parte relief sought by Plaintiffs to stop the continuing fraud and deception by designated Defendants that is gravely jeopardizing Father's health and the DSL Trust


i.  Defendants are intentionally subjecting Plaintiffs' father to unnecessary risk of fatality and accelerating his progression of dementia by Defendants' knowingly obtaining unwarranted and unlawful court ordered forced administering of antipsychotics

1.  Designated Defendants knowingly and intentionally are subjecting Plaintiffs' father to unnecessary and excessive use of court ordered forced administration of antipsychotics as set forth in detail herein this Complaint.

2.  Designated Defendants have, knowingly and intentionally, jeopardized Father's health and increased risk of death by forced administration of antipsychotics, namely Seroquel, Risperdal and Haldol (especially given Father also takes medicines such as Trazadone, Ativan, Neurontin etc.). The FDA has declared that elders diagnosed with dementia should <u>NOT</u> be given antipsychotics.  The well known dangers have been held out to the public through legal actions brought in 2010 and 2011 by Attorney General Martha Coakley against multiple drug manufacturers for having promoted the use of antipsychotics in the elderly.

3.  Defendants' own statements and conduct including in-court testimony by Defendant Dr. Peter Cohen unequivocally demonstrate that Father is being forced to ingest antipsychotics with Father having <u>*NO*</u> underlying diagnosis of any psychiatric or mood disorder—the forced administering of antipsychotics is based <u>*SOLELY*</u> on the diagnoses of Alzheimer's dementia in flagrant contravention of FDA warnings and began even before an eventual court order.

4.

5.  The Massachusetts appellate courts have emphasized that antipsychotics "are used for treating psychoses, like schizophrenia."  <u>In re Linda</u>, 401 Mass. 783, 787 fn1 (1988).

6.  In <u>1988</u>, the Supreme Judicial Court declared that the forcible injection of antipsychotics is extraordinarily intrusive, stating, in <u>Guardianship of Roe</u>, 383 Mass. 415, 436:

"We can identify few legitimate medical procedures which are more intrusive than the forcible injection of antipsychotic medication."

7.      In <u>1991</u>, the Massachusetts Supreme Judicial Court declared that the side-
        effects of antipsychotics are frequently devastating and often irreversible.
        <u>Guardianship of Weedon</u>, 409 Mass. 196.

8.      Designated Defendants have unlawfully and unjustly subjected Father to
        court ordered injected antipsychotics—such court orders having been
        issued by Judge Jeffrey Abber (then of the Essex Probate & Family Court).

9.      Defendant ESMV's written records document—*before* Father had been
        forced to take antipsychotics in May of 2011—that Father was very capable
        of independent activities at that time; such as self-care, handling of
        medication, use of the telephone, and the ability to walk with the mere use
        of a cane.  His above-average intellectual functioning *before* forced
        administration of antipsychotics is reflected in the records.

10.     The above-described physical and mental capabilities pertaining to
        Plaintiffs' father is also documented in the written attestation by Defendant
        Attorney Marsha Kazarosian, which was submitted to the Essex Probate &
        Family Court as well as in the records of Defendant Whittier Pavilion and
        Defendant Right At Home.  (Exhibit 22).

11.     As a result of continuous court ordered forced administration of
        antipsychotics, Plaintiffs' father's emotional and physical quality of life has
        *rapidly* declined.  Medical treatises well establish that Seroquel and
        Risperdal *accelerate* the deterioration of an elder's cognitive function.

12.     Overwhelming evidence shows that until <u>December 16, 2011</u>, Plaintiffs'
        father had been ambulatory and had been regularly engaging in activities
        outside of his home.  After December 16, 2011—and through the present
        day, Plaintiffs' father has been—through the conscious action of designated
        Defendants—*a prisoner in his own home*.

13.     Provided in Exhibit 25 are copies of multiple letters sent by designated
        Defendants to multiple family and *friends* of Plaintiffs' father which have
        imposed unjustified unlawful restrictions on *anyone* who wants to see
        Plaintiffs' father.  In these letters designated Defendants make specific
        unlawful and unjustified threats to Plaintiff Daughters *and the listed family
        and friends*.

14.     The specified ex-parte injunctive relief sought by Plaintiff Daughters is
        literally time sensitive.  Defendants have caused Plaintiffs to have been
        unlawfully and unjustly stripped of *3 years* of precious time with their
        father; and, Father has lost that time with his daughters, his grandchildren

131

and friends—time and quality of life that can *never* be replaced. Throughout Plaintiffs have vigorously and unwaveringly sought accountability for Defendant's criminal conduct—through *many and various* legal avenues at State level.

15.     Father's existence, as of December 16, 2011, has consisted of an isolated, medicated, sedentary life—*solely* because of Defendants' greed, vindictiveness, and utter lack of conscience.

16.     Plaintiff Daughters seek from this Court immediate restoration of unrestricted and unhampered physical presence and communications with their 86 year-old Father—to allow Plaintiffs to spend the remaining time they may have left together *without* unlawful and malicious retribution.

17.     Since 2005, the FDA has issued the above-described black-box warning regarding antipsychotics that are *specifically* based on the increased risk of fatality for elders due to pneumonia. Designated Defendants know that Plaintiffs' father has had recurring pneumonia *since* his having been administered antipsychotics.

18.     Imminent risk of death and other irreparable physical and emotional harm to Plaintiffs' father is evidenced by the most recent court proceeding held on July 17, 2014, before Judge Amy Blake (then) of the Essex Probate & Family Court.  Designated Defendants used fraud and deception in seeking a continued court order for forced administration of antipsychotics.


ii.  Most recent fraud and deception relating to continued court ordered forced administrating of antipsychotics issued on July 17, 2014

19. Plaintiff Daughters were not served a copy of Defendant Attorney Cuffe's motion and supporting documents to extend and amend court ordered forced antipsychotics in the matter of In re Marvin H. Siegel, until after court proceedings had already been called into session on July 17, 2014.  As a matter of law, designated Defendants were required to give Plaintiffs a copy of the motions and supporting documentation at least 7 days in advance of the scheduled court proceeding.

20. In addition, Defendant Attorney Cuffe did not provide Plaintiff Daughter Lisa a complete set of documents that he had given to Judge Blake and referenced in his motion.  Designated Defendants did not provide Plaintiffs the affidavit of the treating psychiatrist, Defendant Dr. Portney.

21. As evidenced in the audio recording during the court proceeding of July 17, 2014, Plaintiff Daughter explicitly informed Judge Amy Blake that Defendant Attorney Cuffe—and his counsel—had failed to give her a copy of Defendant Dr. Portney's affidavit.

22. Prior to the court proceeding of July 17, 2014, designated Defendants submitted an already completed court order for forced administration of Risperdal and a blank pre-designated signature line for Judge Amy Blake.

23. The court recording for the proceeding of July 17, 2014 shows that the afore-described treatment order submitted to Judge Blake exceeded the dosage prescribed by Defendant Dr. Portney—which was explicitly handwritten in Defendant Dr. Portney's affidavit.  As evidenced, designated Defendants had a motive for concealing Defendant Dr. Portney's affidavit and Defendants knowingly and intentionally attempted to conceal Defendant Dr. Portney's affidavit from Plaintiffs.

24. Furthermore, Defendant Dr. Portney's affidavit stated that Plaintiffs' father had not suffered any adverse side-effects from being on Seroquel—to the contrary, overwhelming evidence shows that Defendant Dr. Portney knew that such statement was false; that he had specific knowledge that Father, in fact, has suffered adverse side-effects from taking Seroquel—which was, also, well-known to designated Defendants (Attorney Marsha Kazarosian, Attorney Brian Cuffe, Attorney Robert Ledoux, Attorney Cheri Myette, Attorney Maxa Berid, Attorney Thomas Barbar, LICSW Michael Novack).

iii.  Fraudulent and deceptive financial filings by Defendant Attorney Feld and condoned by the Essex Probate & Family Court

25. From the inception of the matter of In re Marvin H. Siegel (May 27, 2011) in the Essex Probate & Family Court, filed pleadings through counsel—on behalf of Plaintiff Daughter Lisa in her capacity as attorney-in-fact for Father—provided overt information that Plaintiffs' father's personal estate was valued *over $6 million* and that his real estate was valued over $860,000.

26. As evidenced by the court record for In re Marvin H. Siegel, Defendant Attorney Feld knew the above-described reported values of Father's estate from *the very start of his court appointment* as conservator. He filed a Bond, in the matter of In Re Marvin H. Siegel, on August 25, 2011, in which he stated that the estimated value of real estate was "$726,500.00"— and then, again, on October 24 2012.  The Essex Probate & Family Court had issued a bond for $1 million to Defendant Attorney Feld.

133

27.    Even though Defendant Attorney Feld was given a bond for $1 million, in the very *first* Inventory filed by Defendant Attorney Feld on November 7, 2011, he stated—and signed under the pains and penalties of perjury—that Plaintiffs' father's total value of personal property was supposedly "$3,987.60" and that the total real estate value as "$.00".

28.    It was *after* Plaintiff Daughter Lisa exposed the suspect conduct of Defendant Attorney Feld to the Essex Probate & Family Court on December 11, 2012 that Defendant Attorney Feld changed his financial statements to reflect the approximate true multi-million dollar value of Father's estate.

29.    Defendant Attorney Feld did not serve Plaintiffs with copies or notice of the afore-described filings, which is evidenced in the court audio recording for the proceeding held on December 11, 2012.  Plaintiffs discovered the filings *solely* through inadvertence when Plaintiffs randomly reviewed the electronic dockets for In re Marvin H. Siegel.  (See prior referenced Exhibit 23 for the court audio recording of December 11, 2012 and Exhibit 24 for the transcript).

30.    Of significance, the Inventory was dated by Defendant Attorney Feld as being completed by him on November 5, 2011, but the document has a filing date-stamp for Essex Probate & Family Court as "Jan 19 2012".

**31.**    A petition for order of complete account were filed on November 5, 2012 and was filled out by Defendant Attorney Feld and labeled as: "First and Final Account" for ES11P1465PM.


**101.** The bottom of the first page of the afore-described Account, in handwriting, states that the Account consisted of "20 pages"; however, the Account (dated November 5, 2012) that exists in the court files for the matter of In re Marvin H. Siegel only has three (3) pages out of supposedly 20.  Attorney Feld filed another Account in February of 2013. (Exhibit 28).

**102.**    Conspicuously, the petition for order of complete account—which Defendant Attorney Feld filed recently on August 25, 2014—was overtly labeled as: "First Annual Account" for the matter of In re Marvin H. Siegel (ES11P1465PM).  (Exhibit 29).

**103.**    Plaintiff Daughters explicitly brought designated Defendants' illicit conduct—with specific regard to financial matters—to the direct attention

of           Judge Abber and had done so on multiple occasions, through in-court statements and in written pleadings.

104. Written pleadings by Plaintiff Daughters explicitly raising illicit conduct regarding financial management by Defendant Attorney Feld to the direct attention of Judge Abber include:

joint motions filed by Plaintiff daughters requesting discovery and an evidentiary hearing for the removal of Defendant Attorney Feld as temporary court appointed conservator and Defendant Attorney Cuffe as temporary court appointed conservator (Exhibit 30);

joint opposition to petition for order of complete settlement—which Defendant Attorney Feld filed the petition on November 5, 2012 (Exhibit 31);

joint opposition filed by Plaintiff Daughters on December 11, 2012 (Exhibit 32).

**105.** After 2 years of Judge Abber presiding over the matter of In re Marvin H. Siegel and sitting in the Essex Probate & Family Court, on or about December 5, 2013, he was suddenly relocated to Middlesex Probate & Family Court. Plaintiff Daughters did not learn of Judge Abber's departure until attending court on December 30, 2013.

106. Designated Defendants involved in the litigation of In re Marvin H. Siegel knew about Judge Abber no longer being the presiding judge in the matter of In re Marvin H, Siegel; with designated Defendants deliberately and jointly concealing this information from Plaintiff Daughters.

107. Of significance, Judge Abber's re-assignment to Middlesex Probate & Family Court occurred after Plaintiff Daughters had filed several formal written complaints to the Office of Bar Counsel setting forth illicit concerted conduct involving Judge Susan Ricci—who was also sitting as a judge in the Essex Probate & Family Court.  Conspicuously, *at the very same time* that Judge Abber was relocated on December 5, 2013, Judge Ricci was relocated to Worcester Probate & Family Court.

108.  Judge Amy Blake became the presiding judge in the matter of In re Marvin H. Siegel (until her recent appointment to the Appeals Court on July 17, 2014).

109. During the time period that Judge Blake presided over the matter of In re Marvin H. Siegel, Plaintiff Daughters explicitly brought to Judge Blake's attention designated Defendants' illicit conduct—through in-court statements and in written pleadings.

135

**110.** Judge Blake overtly disregarded substantial evidence of illicit conduct by designated Defendants and made actual rulings and issuance of orders *in favor* of designated Defendants to the detriment of Plaintiff Daughters and Marvin Siegel.  (Exhibit 34).

**111.** Soon thereafter, Defendant Attorney Feld and Defendant Attorney Barbar filed a motion explicitly asking Judge Blake to:

amend the date of the petition for order for complete settlement (prior referenced Exhibit 28) that was filed on November 5, 2012, changing the stated date of November 5, 2012 to November 2, 2012;

delete the check mark in the box of the second line of paragraph 6; and

delete the names and addresses of Susan Miller and Brian T. Cuffe in the boxes immediately beneath the second line. (Exhibit 35)

Judge Blake rubber-stamped their fraudulent motion.

112. Plaintiff Daughters filed a joint opposition, substantiated and proved that the designated Defendants had outright asked Judge Blake to use the judicial process to unlawfully alter pleadings for the purpose of covering up evidence of designated Defendants' criminal conduct. (Exhibit 36)

**113.** There is an established pattern of illicit tampering and altering of electronic docket entries in the matters of In re Marvin H. Siegel.  Dockets for ES11P1466GD are provided in Exhibit 37 and ES11P1465PM are provided in Exhibit 38.

136

C.  Well established awareness by Legislators (state and federal) and the American Bar Association of financial exploitation and abuse of elders by court appointed guardians and conservators

The magnitude of invasiveness by having a court appointed permanent guardian is illustrated by the Supreme Judicial Court's statement that "the permanent guardian stands in the place of the ward in making decisions about the ward's well-being."  Guardianship of Lon Hocker, 439 Mass. 709 (2003).

116. In September of 2010, Congress' GAO published the results of its study in its issuance of *Report to the Chairman, Special Committee on Aging, U.S. Senate—Guardianships (Cases of Financial Exploitation, Neglect, and Abuse of Seniors).*

117. On page 8 of the *Report to the Chairman, Special Committee on Aging, U.S. Senate—Guardianships (Cases of Financial Exploitation, Neglect, and Abuse of Seniors)*, the GAO found that a significant factor for financial exploitation by court appointed/public guardians and conservators being so prevalent was the courts' failure to oversee guardians after their appointment and that there was a problem peculiar to court appointed public guardians and conservators because these appointees serve multiple roles with *conflicting fiduciary interests*.

II.  Overview of criminal enterprise embedded in the Massachusetts Probate & Family Court

A.  Broad scope

153.It is well-established by the First Circuit Court of Appeals in U.S. v. Boylan, 898 F.2d 230 (C.A. 1  (Mass) 1989), that, as a matter of law, a governmental agency can constitute a criminal enterprise, specifically regarding Racketeer

Influenced and Corrupt Organizations (RICO).  In U.S. v. Boylan, the Boston Police Department constituted an enterprise whereby through illicit activities several police officers had engaged in conduct that was strikingly similar with a significant degree of connectedness and done in the course of carrying out their official duties as police officers.

154. The overall criminal scheme conducted within the Massachusetts Probate & Family Court system is financial exploitation and asset liquidation.  The main facilitators of this financial exploitation scheme are attorneys, judges and administrative staff of the Probate & Family Courts.  The scope of the enterprise includes racketeering activities carried out through the usual and ordinary course of duties for these various court officials and their agents under a pretext of lawful authority and the overwhelming lack of real oversight.

155. There are two (2) separate distinct avenues that court officials use to facilitate financial ill-gotten gains: 1) the management of guardianship and conservatorship and 2) the administration/liquidation of estates upon death.

156. The usual course of guardianships, conservatorships, and estate administrations of decedents involve routine court appointments made pursuant to Supreme Judicial Court Rule 1:07 (herein SJC Rule 1:07) and consisting of: guardian, conservator, guardian ad litem (herein GALs), counsel for the person deemed incapacitated, Roger's counsel for the incapacitated, and monitors for court-ordered forced administration of antipsychotics.

157. As a matter of routine custom and practice, judges of the Massachusetts Probate & Family Courts grant court appointed fiduciaries complete and exclusive control over a judicially-deemed-incapacitated person.

158. Each Massachusetts Probate & Family Court physically possesses and maintains its own individual list of people certified to act as SJC Rule 1:07 court appointees. (Exhibit 64)

159. An extraordinarily large percentage of Massachusetts Probate & Family Court judges and SJC Rule 1:07 court appointees are mutual members of local probate and family law chapters of the American Inns of Court.

B.  Established pattern of illicit conduct by designated Defendant attorneys who regularly provide private estate planning services while acting as court appointees for the Massachusetts Probate & Family Courts

138

160.   A significant percentage of attorney disciplinary cases involve attorneys who engage in self-dealing tactics for financial gain when providing private legal services to a client involving guardianship, conservatorship and estate administration of decedents.  Disciplinary proceedings reported by the Board of Bar Overseers, overwhelmingly, have consisted of privately prepared estate planning instruments—wills, trusts, durable power of attorneys, and health care proxies.

i.   Specific and concrete illustrations of improper use of the Massachusetts Probate & Family Courts by privately retained counsel

Defendant Attorney Robert Ledoux

161.   Defendant Attorney Ledoux provided private legal estate planning services for Ernest Latour, having drafted Mr. Latour's Will, in which Defendant Attorney Ledoux was named as the guardian for Mr. Latour's disabled son. (Exhibit 65).

174. Subsequently Defendant Attorney Ledoux filed a petition for conservatorship and guardianship over Ernest Latour (his own client) in the Essex Probate & Family Court. (Exhibit 66) Defendant Attorney Ledoux represented that he and his co-petitioners were bringing the petition as private individuals having a personal relationship with Mr. Latour under the category of "relatives or friends" of Ernest Latour.  Defendant Attorney Ledoux and his co-petitioners provided their personal residential addresses, not their business address.

175.With regard to the petition for conservatorship filed in November of 2002, the co-petitioner was identified as Linda Serpa.  Neither Defendant Attorney Ledoux nor Linda Serpa had a personal relationship with Ernest Latour.

176.Contemporaneously Defendant Attorney Ledoux had been serving as private legal counsel for the City of Salem, Massachusetts.

177.It is suspect that Linda Serpa became an employee of the City of Salem in 2003 after signing as co-petitioner with Defendant Attorney Ledoux.   Given Defendant Attorney Ledoux's capacity as legal counsel for the City of Salem, he had the motive and opportunity to get Linda Serpa a job with the City of Salem in exchange for her illicit role as co-petitioner in the matter of Ernest Latour.

178.Defendant Attorney Ledoux also filed a Bond in the matter of In re Ernest Latour in which Defendant Attorney Ledoux had Defendant Attorney Cuffe

personally certify that Defendant Attorney Ledoux was "qualified" to be a surety.
(Exhibit 67).

179. In the petition for guardianship Defendant Attorney Ledoux and his co-
petitioner (this time Attorney Lynch) again represented that they were bringing the
petition for guardianship as individuals having a personal relationship with Ernest
Latour. Again Defendant Attorney Ledoux and his co-petitioner provided their
personal addresses, not their law office address.

180. A separate court docket had been opened to probate the estate when Ernest
Latour died, designated as Docket No. ES04P1399VE1; however, the Clerk's
Office for the Salem division of the Essex Probate & Family Court has repeatedly
represented that there is no existing file or docket in the computer system for the
above-stated docket number.  (Exhibit 68.  Note the consistent crossing out of that
docket number on the various court records).

Defendant Attorney Lisa Cukier

181.    Specific illicit conduct as privately retained counsel is evidenced in a
lawsuit that was brought by Woodlawn Nursing Home against Defendant
Attorney Cukier for her intentional omission in filing for Medicaid benefits
on behalf of her 90 year-old client, Eleanor Mulligan.  It was a civil action
for fraud (Middlesex Docket No. MICV96-5259).  (Exhibit 69). A copy of
the 93A Demand letter sent to Defendant Attorney Cukier by counsel for
the nursing home is provided in Exhibit 70—which describes in detail
intentional misconduct by Defendant Attorney Cukier.

182.    At the time of the above lawsuit, Defendant Attorney Cukier was a solo
practitioner.  She retained Defendant Burns & Levinson to defend her. It
speaks volumes that <u>Defendant Burns & Levinson offered Defendant
Attorney Cukier a job soon thereafter</u>.

183.    Counsel from Defendant Burns & Levinson who had been representing
Defendant Attorney Cukier (David Hatem, Esq.) also had been representing
then-Attorney Jeffrey Abber for legal malpractice during that time period—
Jeffrey Abber was appointed to the bench many years later in 2010.
(DiPierro v. Abber, Docket No. MICV1995-00062).

184.    Peggy Sullivan of Mystic Valley Elder Services had personally referred 90
year-old Eleanor Mulligan to Defendant Attorney Cukier who then had
Eleanor Mulligan execute a durable power of attorney (DPOA).  The
DPOA stated that Defendant Attorney Cukier was attorney-in-fact for
Eleanor Mulligan, her own client.  (Exhibit 71).

140

185.   Defendant Attorney Cukier sent a letter to Eleanor Mulligan's brother (Vincent Mulligan) stating "As you know, Peggy Sullivan of <u>Mystic Valley Elder Services</u> recommended to Miss Mulligan that she sign a durable power of attorney and retain me to perform necessary duties *that she cannot now manage*."(Exhibit 72).

186.   The afore-referenced DPOA, signed by Defendant Attorney Cukier's client, is dated May 10, 1995.  In the letter to Mr. Mulligan, dated June 2, 1995, Defendant Attorney Cukier expressed that Eleanor Mulligan *did not have presence of mind* to be able to handle her own personal affairs; it is suspect that <u>if that assertion were true, it would stand to reason that Eleanor Mulligan did not have the presence of mind to sign the afore-described DPOA</u>. In addition, the legitimacy of the DPOA signed by Ms. Mulligan is questionable where Defendant Attorney Cukier used a social worker to witness the signing of the DPOA.

187.   It is conspicuous that Eleanor Mulligan entered a nursing home on June 1, 1995, just weeks *after* signing the DPOA making Defendant Attorney Cukier attorney-in-fact.  Defendant Attorney Cukier also stated in the afore-described letter to her client's brother:

[] I will be sending you copies of each correspondence I send to others that is in any way related to my financial management of Ms. Mulligan's affairs.  I will also send you my statements for payment of my services which I bill at a rate of $100.00 per hour.  *You do not have to pay my bill; I will pay myself from your sister's assets*, but I will send you a copy of the bill so you will know exactly what I receive for my work as soon as I get it.


Defendant Attorney Edward Tarlow

Estate of Richard R. Vazza

188.   Defendant Attorney Tarlow committed fraud upon the court in the matter of Estate of Richard R. Vazza (Suffolk Probate 07P-1667-EP1).  In March of 1993, Defendant Attorney Tarlow prepared estate-planning instruments for Richard R. Vazza; he drafted and executed the Will for Richard R. Vazza. (Exhibit 73).

189.   At the time Richard Vazza's financial worth was in excess of $20 million. Defendant Attorney Tarlow was named in Richard R. Vazza's Will as co-executor, along with Richard R. Vazza's then wife and children.

141

190.    Defendant Attorney Tarlow's conscious pre-meditated illegal conduct is evidenced in the following provisions of the above-described Will:

Provision 3.2 which states: "No one dealing with my executors need inquire concerning the validity of anything that they purport to do or need see the application of any money paid or any property transferred to, or upon order of, my executors";

Provision 4.1 gives unconscionable unfettered discretion in the "retaining and investing of stocks, shares and obligations of corporations, unincorporated associations (including, but not limited to, capital investments in joint ventures and limited or general partnerships), trusts and investment companies, common trust funds or securities."  The provision *explicitly* and *expressly* gives the executor(s) permission to make investments that are "in such amounts, upon such terms, and of such character [] that *would not be considered proper for executors to make or retain" and "that might violate the principles of investment diversification"*; and

Provision 4.3 states that the executors are permitted to "hold bonds, shares or other securities in bearer form, or in the name of the executors or in the name of a nominee, *without* indication of *any fiduciary* account in a bank, *without* indication of *any fiduciary* capacity."

191.    In addition to Defendant Attorney Tarlow drafting the above described Will for Richard R. Vazza, he also *acted as the notary for the execution of the Will*—purportedly certifying that *his own client* signed the Will of his own free will and full knowledge; *the very document that explicitly made Defendant Attorney Tarlow a co-executor*.

192.    The above-described Will explicitly declared that Richard Vazza was a resident of Florida.  In addition, on April 27, 2007, Richard Vazza filed his written attestation in his then-pending divorce matter in Norfolk County that his primary domicile was Florida.  (Exhibit 74). Defendant Attorney Tarlow acted as notary for Richard Vazza's execution of this affidavit that his primary domicile was in Florida.

193.    Two (2) months after Richard Vazza's having executed this affidavit, Richard Vazza suddenly and unexpectedly died on July 10, 2007.

194.    On August 7, 2007, Defendant Attorney Tarlow commenced the estate administration for Richard Vazza in the Suffolk Probate & Family Court, filing an Affidavit of Domicile attesting that Richard Vazza's primary

domicile was <u>Massachusetts</u> which *explicitly contradicted* the affidavit of Richard Vazza filed in the divorce matter with Norfolk County.   (Exhibit 75).

195.   Subsequently the adult children of Richard Vazza obtained independent counsel and filed a motion to dismiss Defendant Attorney Tarlow's petition for probate and for release of Will.  They did so because Defendant Attorney Tarlow had filed false information in the filed pleadings to begin probate of the estate for Richard R. Vazza. (Exhibit 76)

196.   Defendant Attorney Tarlow knowingly and deliberately prepared and filed false information with the Suffolk Probate & Family Court and knowingly and deliberately committed perjury.

North Street Irrevocable Trust

197.   In January of 1977, Defendant Attorney Tarlow prepared and drafted an irrevocable trust for Everett N. Cole, Jr., called the North Street Irrevocable Trust—Everett N. Cole, Jr. was owner of real property located at 937 North Street, Tewksbury, MA.  (Exhibit 77). Defendant Attorney Tarlow was declared *sole* Trustee of such Irrevocable Trust.

198.   Everett N. Cole, Jr. was induced to transfer the property of 937 North Street, Tewksbury, MA to Defendant Attorney Tarlow as if Defendant Attorney Tarlow were a private individual—it was *not* transferred to Defendant Attorney Tarlow in his capacity as an attorney for Everett N. Cole, Jr.

199.   The Irrevocable Trust provided that Defendant Attorney Tarlow, as sole Trustee, could act "with the same freedom and lack of restriction as the Donor [Everett N. Cole, Jr.] would have were he the sole individual owner thereof of free of trust"; that Defendant Attorney Tarlow was not *in any manner* restricted "by the degree of risk and/or speculation involved" and had authority "to borrow money, and to encumber or hypothecate trust property by mortgage, by deed or trust, pledge or otherwise."

200.   Everett N. Cole, Jr. signed the execution of the above-described Irrevocable Trust on January 17, 1977.  Two (2) days later on January 19, 1977, Defendant Attorney Tarlow took out a personal loan for $38,000 using estate property in the above-described Irrevocable Trust as collateral. (Exhibit 78).   In November of 1987, Defendant Attorney Tarlow took out a loan for $120,000 with Bank Five for Savings using estate property in the above-described Irrevocable Trust as collateral.  (Exhibit 79).  In June of

143

1988, Defendant Attorney Tarlow took out another loan for $35,000 with Bank Five Savings using estate property in the above-described Irrevocable Trust as collateral.  (Exhibit 80).

201.   In 1989 the daughter of Everett N. Cole, Jr. filed a civil action against Defendant Attorney Tarlow in her capacity as beneficiary to compel Defendant Attorney Tarlow to provide her an accounting for the Irrevocable Trust.  (Exhibit 81). The Irrevocable Trust explicitly provided that Defendant Attorney Tarlow would at a minimum affirmatively provide the beneficiaries an accounting.

202.   It is suspect that Defendant Attorney Tarlow did not file an Answer to the Complaint until almost *three (3) years later* in 1992.  (Exhibit 82).

203.   In Defendant Attorney Tarlow's filed Answer to the above-referenced Complaint, he denied that he did not provide an accounting—however, he *did not* affirmatively claim to have provided an accounting.

204.   In this civil action Defendant Attorney Tarlow was represented by Defendant Attorney DeNapoli.  After the commencement of the above-described civil action, which was *one (1) year prior* to his filing the above-referenced Answer, Defendant Attorney Tarlow took out another loan for $87,000 with Bank Five Savings using estate property in the Irrevocable Trust as collateral.  (Exhibit 83).

205.   Also in July of 1998, Defendant Attorney Tarlow assigned leased property in the Irrevocable Trust to Bank Five Savings.  (Exhibit 84). Over two (2) years *after* the civil action was brought but *before* filing an Answer, it is suspect that Defendant Attorney Tarlow resigned as Trustee.  (Exhibit 85).

206.   Defendant Attorney Maxa Berid was a party formally named in a civil action involving the North Street Irrevocable Trust.  Defendant Attorney Berid had represented Everett Cole, III in his divorce and the sale of marital property. The civil action naming Defendant Attorney Berid was brought in Middlesex County—which Complaint explicitly identified Defendant Attorney Tarlow as co-trustee of North Street Irrevocable Trust with Everett Cole, Jr.  (Exhibit 86).

II.  DEFENDANTS' USE OF INFLUENCE—FOSTERED THROUGH EXCLUSIVE MEMBERSHIPS—TO FACILITATE ILLEGAL ACTS

A.  Evidence of Defendants' incestuous-like relationships as SJC Rule 1:07 court appointees

144

i. Long-established relationships

207. In <u>2003</u>, Defendant Attorney Cuffe personally signed a bond certifying and vouching for Defendant Attorney Ledoux's qualification to be a surety in the matter of <u>In re Ernest Latour.</u>

208. In <u>2007</u>, Defendant Attorney Ledoux was the petitioner for guardianship and conservatorship, with Defendant Attorney Cuffe court appointed as GAL, in the matter of <u>In re John Polando</u>.

209. In <u>2008</u>, multiple matters spawned from Defendant ESMV's filing of protective orders pertaining to Antoinette Carpinone (ES08P2785PM, 09P0361GI, 09P2332), which involved *numerous* designated Defendants. Judge Amy Blake was the primary presiding judge throughout.

ii.　Depth of embedded incestuous-like relationships illustrated by the matters relating to Antoinette Carpinone

210. In 2008, Defendant ESMV filed protective orders alleging that Antoinette Carpinone (then 91 years-old) was being financially exploited by her sister, Lillian Schiavoni (then 90 years-old).

211. Defendant Attorney Berid filed her appearance as legal counsel for Defendant ESMV, along with Attorney Eric Schutzbank as co-counsel—as previously set forth, they also operated a completely separate and distinct private law firm, Defendant Berid & Schutzbank, LLC., specifically in the area of probate and domestic law which creates direct conflicts of interest because of Attorney Berid's and Attorney Schutzbank's role as counsel for a State agency that is inescapably intertwined with the Probate & Family Court.

212. Defendant Attorney Berid and Attorney Schutzbank received from the estate of Antoinette Carpinone <u>payment as though they were working in a private capacity</u>, even though their role was designated as acting for Defendant ESMV.  (Exhibit 87).

213. Defendant Diane Powell of Defendant ESMV was also actively involved in the matters of Antoinette Carpinone.

214. As stated by Defendant Attorney Berid in her signed pleadings Judge Blake had "ordered Petitioner [Defendant ESMV] to file a Conservatorship Petition requesting that Susan Hubbard be appointed as Conservator (as recommended by the GAL)."

145

215.    Attorney Susan Hubbard was Defendant Attorney Cuffe's suite-mate and was court appointed as conservator and co-guardian over Antoinette Carpinone.  For several years, Attorney Hubbard and Defendant Attorney Cuffe have shared a small two-room office suite, with both regularly accepting SJC Rule 1:07 court appointed work.

216.    In <u>February of 2009</u> Attorney Hubbard, as conservator, filed with the Essex Probate & Family Court a Bond certifying that Antoinette Carpinone had "0" value in real estate and $17,000 in personal assets.  That Bond shows that Defendant Attorney Cuffe had *vouched and signed for Attorney Hubbard as a personal surety*.  (Exhibit 88).

217.    It was on record prior to February of 2010 that Antoinette Carpinone and her sister (Lillian Schiavoni) were joint owners of the house in which Antoinette Carpinone resided.

218.    When Attorney Hubbard subsequently became permanent conservator she filed a subsequent Bond (in <u>February of 2010</u>) stating that Antoinette Carpinone *had "0" value in terms of <u>both</u> personal assets and real estate*— evidencing Attorney Hubbard having knowingly and deliberately made false representations.  (Exhibit 89).

219.    Provided in Exhibit 90 is documentation by the court appointed GAL indicating that Attorney Hubbard—as conservator—used Antoinette Carpinone's estate to engage in *<u>reverse mortgage</u>* transactions.  Also provided is the filed Inventory showing six figures worth of assets.

220.    In April of <u>2009</u>, Defendant BNY Mellon was also involved in the guardianship matter of Antoinette Carpinone.  The GAL had sent letters of inquiry and certified appointments to Defendant BNY Mellon.  (Exhibit 91).

221.    <u>Asset liquidation</u> is the main objective of the criminal enterprise embedded in the Probate & Family Court.  Consistent with this established pattern, Defendant ESMV *<u>initiated</u>* court action then sought judicial declaration of the sisters as being incapacitated, followed by removal of Antoinette Carpinone and other occupants from the residence.

222.    Provided in Exhibit 92 are proposed court orders for liquidation filed by Attorney Hubbard and an Order issued by Judge Blake authorizing Attorney Hubbard to take out an equity loan.

223.    On March 21, 2011, Attorney Hubbard sought and received from Judge Amy Blake a court order for DNR/DNI pertaining to Antoinette Carpinone

146

which was *NOT* initiated or wanted by involved family members. Antoinette Carpinone died on March 24, 2011.  (Exhibit 93).

224.  In June of 2010, Defendant Attorney Ledoux became involved in the guardianship matter pertaining to Antoinette Carpinone as private counsel representing Philip Schiavoni (nephew of Antoinette Carpinone). Defendant Right At Home had also been involved from July of 2010 to February of 2011.  (Exhibit 94).

iii.  Carry-over of embedded relationships in probate matters contemporaneous with that of In re Marvin H. Siegel

Matters regarding Robert and Gertrude Pigeon

225.  In 2007, Robert G. Pigeon had a gradual loss of memory. Dr. Janice Funk (neuropsychologist) began seeing Robert Pigeon (then 88 years-old) as a client through her affiliation with Whittier Rehabilitation Hospital.

226.  Robert Pigeon and his wife Gertrude (then 86 years-old) resided in their own house, which they had owned for approximately 60 years.  Their son (Robert A. Pigeon) as well as nieces and part-time professional visiting nurses helped them with all their needs.

227.  Robert G. Pigeon (the Father) owned an electrical business for over 40 years with his son working with him full-time.  The daughter (Ann Cox) seasonally resided in Maine and Florida.  (Exhibit 95)

228.  Robert Pigeon (Father) had long used John Cleary, Esq. as an attorney for his personal affairs.  In 1984, he had Attorney Cleary prepare and execute his Will; and then in February of 2009 he had Attorney Cleary prepare and execute a health care proxy and durable power of attorney that designated his son (Robert A. Pigeon) as his attorney-in-fact.  In addition, Robert Pigeon had transferred his ownership of the business to his son.

229.  Months later, in April of 2009, the daughter (Ann Cox) had returned to New England for the season.  She felt slighted because her brother had been deemed attorney-in-fact by their father, where she then became intent on rifling through her father's financial affairs. In June 2009, the daughter brought her father to a notary to execute a written revocation of those afore-described instruments; after doing so, the daughter made a report to Defendant ESMV that her brother was financially exploiting her father.

230.  Defendant ESMV investigated and permitted Robert G. Pigeon (Father) to execute, through Attorney Cleary, a re-affirmation of the original durable

power attorney that was executed in February of 2009.   Subsequent to that, in October of 2009, the daughter took her father to Attorney Faith Delaney and had him sign a new durable power of attorney. Thereafter, Defendant ESMV had instructed the son (Robert A. Pigeon) to obtain a geriatric evaluation of his father and then initiate guardianship proceedings—which the son did.  (Exhibit 96).

231.   However, it is evident that Defendant ESMV also instructed the son to retain the private legal services of Attorney Thomas Schiavoni and his law partner Attorney Mary McGee.  Attorneys Schiavoni and McGee have well-established partisan relationships with Defendant ESMV and Defendant Attorney Cuffe in other probate matters.

232.   Attorney Schiavoni filed a petition for the son to be appointed guardian on November 23, 2009 and specifically set forth that the son was attorney-in-fact for his father through existing written durable power of attorney and health care proxy.

233.   On December 17, 2009, instead of the son (Robert A. Pigeon) being appointed as temporary guardian and conservator, Judge Ricci issued an order appointing Defendant Attorney Cuffe as guardian.  (Docket No. ES0932243PM).

234.   It is readily apparent that Attorney Schiavoni sandbagged his own client (son Robert A. Pigeon), as Attorney Schiavoni *had contacted* Defendant Attorney Cuffe *prior* to Defendant Attorney Cuffe being officially court appointed as guardian.  The court proceeding in which Defendant Attorney Cuffe was appointed took place on December 17, 2009.  Attorney Schiavoni *billed* for teleconferencing and communicating by email with Defendant Attorney Cuffe on December 8, 2009; as well as having *prior* communications on December 9, 2009 and December 15, 2009. (Exhibit 97).

235.   Compounding the suspect nature of these communications is the fact that Attorney Schiavoni's invoice shows that, beginning on December 17, 2011, he started to use only the identifier of guardian—*no longer referring to Defendant Attorney Cuffe by name*.

236.   In April of 2010, Defendant Attorney Cuffe facilitated the removal of Robert and Gertrude Pigeon from their home and placed into the long-term care facility, Methuen Village—subsequently Defendant Attorney Cuffe separated Robert and Gertrude; moving Robert to Sutton Hill Nursing Home in Andover, MA.

237.   Robert and Gertrude Pigeon's primary care physician was changed by Defendant Attorney Cuffe to a person identified as "Dr. Soma" in an email from Defendant Attorney Cuffe's agent, Defendant Michael Novack, LICSW. (Exhibit 98).

238.   In September of 2010, Gertrude Pigeon having apparently been diagnosed with dementia and Alzheimer's and placed in Methuen Village, Defendants began giving Gertrude Pigeon antipsychotics (Risperdal)—based on the medical certificate provided by Defendant Dr. Janice Funk.

239.   As previously set forth, Defendant Dr. Funk is listed as a clinical psychologist—who lists her office address as the same address as that of Defendant Whittier Pavilion (76 Summer Street, Haverhill, MA). Defendant Dr. Funk is reported to be ranked in the top 5% of clinical psychologists to *receive* *payments from Medicare*. The reported *average* total Medicare payment received by clinical psychologists, nation-wide, in 2012 was $12,989 and in Massachusetts was $13,167. In 2012, Dr. Funk's total Medicare payment received was $115,641.

240.   In November of 2010, Defendant Attorney Ledoux—at the behest of Defendant Attorney Cuffe—petitioned for guardianship of Gertrude Pigeon; however, Defendant Attorney Ledoux withdrew his petition because the son objected. (Exhibit 99).

241.   In January of 2011, Defendant Attorney Cuffe specifically filed a petition requesting that his suite-mate, Attorney Hubbard, be appointed as conservator for Gertrude Pigeon. (Exhibit 100). On behalf of Daughter Ann Cox, Defendant Attorney Cukier filed specific written objections to the court appointment of Attorney Hubbard due to her being Defendant Attorney Cuffe's suite-mate. (Exhibit 101).

242.   In March of 2011, Defendant Attorney Garmil was court appointed as guardian for Gertrude Pigeon by Judge Abber.

243.   In April of 2011, Daughter Ann Cox hired Defendant Attorney Cukier to represent her as counsel—in which Defendant Attorney Cukier petitioned that she herself be appointed conservator. (Exhibit 95).

244.   Despite previous estate planning executed prior to Robert and Gertrude Pigeon being deemed wards of the State, designated Defendants actively planned on creating new estate planning instruments for Robert and Gertrude Pigeon. Defendant Attorney Cuffe conferred with Attorney Maria Baler of the law firm Samuel, Sayward and Baler LLC for new estate planning strategies. (Exhibit 102).

149

245.   Designated Defendants also conferred with Attorney Baler in the matter of
       In re Marvin H. Siegel, *actively* and *fervently* pursuing ways to dismantle
       the DSL Trust and to create new estate planning instruments.  (Exhibit
       103).

246.   Robert Pigeon died on March 11, 2012 and Gertrude Pigeon died on May
       24, 2012.  It is suspect that the Essex Probate & Family Court estate
       administration matter for Gertrude Pigeon is designated as being "closed"
       and the estate administration for Robert G. Pigeon is designated as
       "active"—where Robert Pigeon died 2 months *prior to* Gertrude Pigeon.
       Of significance, Robert G. Pigeon had VA benefits showing that the reason
       for the discrepancy in status (Active vs. Closed) is because the Defendants
       are still collecting Robert Pigeon's Federal VA benefits.  (Exhibit 104).

## Matters of In re James and Hope Pentoliros

247.   James and Hope Pentoliros were husband and wife, having three adult sons
       (George, Perry and Larry).  George Pentoliros has held himself out to be a
       practicing medical doctor and Perry Pentoliros was retired, having had a
       business in real estate development.  Court records did not specify Larry
       Pentoliros' career history.

248.   George Pentoliros has held himself out to the public as a doctor associated
       with Amesbury Village Nursing Home as well as Lahey Clinic.  (Exhibit
       106 - there is _no_ record of licensure in Massachusetts for George
       Pentoliros).

249.   Public information shows "Dr. George Pentoliros" working for "Lahey
       Amesbury, 24 Morrill Pl., Amesbury, MA" and having purportedly
       graduated medical school from "Universidad Autonoma De Guadalajara,
       Facultad De Medecicina"—apparently George Pentoliros did not pursue the
       added procedural requirements mandated by the Commonwealth of
       Massachusetts.  (Exhibit 107).

250.   George Pentoliros, also used a medical license number that is not valid.  He
       was identified as the certifying doctor on his aunt's death certificate (Helen
       Kichu—Hope Pentoliros's sister); however, the medical license number is
       not registered with the Commonwealth of Massachusetts.  Helen Kichu
       purportedly died at home in October of 2009.   (Exhibit 108).

251.   The Will filed with Essex Probate & Family Court in the estate
       administration matter of Helen Kichu bequeathed a substantial greater
       portion of the estate to George Pentoliros.  (Exhibit 109).

252. In November of 2010, Hope Pentoliros executed a Trust, as settlor—and deemed the three sons to be <u>equal</u> beneficiaries, *but naming only Perry and Larry as successor co-trustees*; showing ill-motives of George Pentoliros against his brothers. (Exhibit 111).

253. Around April of 2011, James Pentoliros' physical and mental condition had declined making care at home not feasible; consequently he was admitted to the VA in Bedford, MA.  As a result Hope Pentoliros wanted to return to her own home (16 Longview), to which Larry and Perry abided by her wishes.

254. In September of 2011, George and his son (Tyler) alleged to Defendant ESMV that Perry was financially exploiting their mother. Invoices of multiple counsel show that representatives of Defendant ESMV involved in the matters of James and Hope Pentoliros included: Defendant Attorney Berid, Defendant Caseworker Springman and Defendant Diane Powell.

255. On October 11, 2011, Tyler Pentoliros (George's son) retained Attorney Dennis Spurling to draft a durable power of attorney naming Tyler Pentoliros as attorney-in-fact for his grandmother Hope, which Tyler had Hope sign.  Through Attorney Spurling, Tyler Pentoliros filed a petition for guardianship over Hope Pentoliros on October 21, 2011.  (Exhibit 112).

256. On January 24, 2012, Defendant Merrimack Valley Hospital filed a petition specifically requesting that Tyler Pentoliros be appointed guardian of James Pentoliros—the manner in which the petition was sought is suspect of illicit intent where the petitioner was identified only as Beth Dymek, LICSW. There was no reference of any kind made regarding Defendant Merrimack Valley Hospital, yet the address listed for Beth Dymek was that of Defendant Merrimack Valley Hospital.

257. The attorney who signed the petition was Suzanne Fuchs of the law firm of Pierce and Mandell—which is the *very same* law firm that employs Defendant Attorney Saunders.  Defendant Attorney Saunders was directly involved in the matter of James Pentoliros, acting as counsel for Defendant Merrimack Valley Hospital.  (Exhibit 113).

258. On January 31, 2012, Judge Ricci appointed counsel for James Pentoliros (Attorney Daniel Zampino) in April of 2012, Attorney Zampino sought court ordered removal of Tyler Pentoliros as guardian.

259. On February 1, 2012, Attorney Renee Lazar of Bedford, MA, was court appointed by Judge Ricci to act as "counsel" for Hope Pentoliros. Attorney

Lazar's conduct was *not consistent* with the intentions and desires of Hope Pentoliros.

260.  On April 25, 2012, counsel for Hope Pentoliros (Attorney Renee Lazar) filed a motion for temporary guardianship to specifically place Hope Pentoliros in a nursing home—in which she explicitly requested that Defendant Attorney Ledoux be court appointed as guardian.  (Exhibit 114).

261.  Also at the court proceeding of April 25, 2012, Judge Ricci appointed Attorney Paul Gormley as guardian and conservator for James Pentoliros. Attorney Gormley had represented in his filing for Bond that the value of James Pentoliros's personal assets and real estate as being "0"—where the circumstances show that he knew full well that the estate was of substantial value.  (Exhibit 115).

262.  Defendant Attorney Ledoux filed a Bond with the Essex Probate & Family Court as guardian for Hope Pentoliros (on August 25, 2012) in which he represented that the value of Hope Pentoliros's personal assets and real estate were: "0".  As set forth above, Defendant Attorney Ledoux knew that the estate was of substantial value.  (Exhibit 116).

263.  On or about August 1, 2012, based on a verbal court order from Judge Ricci to Defendant Attorney Ledoux, Hope Pentoliros was *involuntary* admitted to the psychiatric ward of Defendant Merrimack Valley Hospital and then placed in Amesbury Village.

264.  On August 3, 2012, Defendant Attorney Cuffe was court appointed by Judge Ricci as GAL in the matters of James and Hope Pentoliros.  When Hope Pentoliros died on March 4, 2013, Defendant Attorney Cuffe's interim report shows that Defendant Attorney Ledoux and Attorney Gormley knew the true value of the estate of James and Hope Pentolirios prior to their filing of their Bonds.  (Exhibit 117).

265.  On August 6, 2012, by ex-parte, Defendant Attorney Ledoux again went before Judge Ricci regarding the removal of Hope Pentoliros from her home.  Defendant Attorney Ledoux submitted a handwritten affidavit (on August 6, 2012) stating that he had previously requested a court order for Hope Pentoliros to be removed from her home at the court proceeding held on August 1, 2012 and that Judge Ricci had given a *"verbal order"* to do so—and explained that he was back before Judge Ricci because he needed the court order for removal to be put in writing.  (Exhibit 118).

266.  Defendant Attorney Ledoux explicitly explained:

"Since that date [August 1, 2012] the undersigned, together with all other counsel & elder services have attempted to find a way to remove her [Hope Pentoliros] from her home.

If the court issues the requested order, it is the intention of the undersigned to visit the building inspector's office in Haverhill seeking condemnation of the family home or in the alternative visit the Haverhill District Court seeking apprehension under the provisions of Mass. General Laws Chap 123 § 12c."

267.     On <u>August 29, 2012</u>, counsel for Perry and Larry Pentoliros (Attorney William Sullivan) filed a motion requesting that their mother be permitted to return to her home; that the sons would hire full-time professional home health care—*to be selected by the guardian*, so that their mother could live in her own home.  (Exhibit 120). Furthermore, counsel certified that he spoke with the Haverhill Health Inspector (Lisa Rosario) and he was informed an inspection had been done of Hope Pentoliros's home  (16 Longview) and documented the home to be in "excellent condition".

268.     No action was taken by the Essex Probate & Family Court as to the above-described filed motion and supporting affidavit; however, on <u>September 6, 2012</u>, Judge Ricci issued a court order allowing Defendant Attorney Ledoux's request to retain Defendant Michael Novack as "a geriatric care specialist" to evaluate "possible residential placement."  (Exhibit 121).

269.     On <u>October 4, 2012</u>, Judge Ricci issued a court order that *all* the court appointees in the matters of James and Hope Pentoliros were to be paid *directly from the private estate* of James and Hope Pentoliros and explicitly stated that the court appointees were to be paid from the private estate starting at the inception of their appointments, *<u>not</u> the date of the court order*.  (Exhibit 122).

270.     In early <u>November of 2012</u>, based on ill-motives, Attorney Lazar sought and received from Judge Ricci a court order for son Perry Pentoliros to be subjected to a "mental examination" to supposedly determine whether he would be a suitable caregiver for his mother.  (Exhibit 123).

iii.  Additional evidence of enmeshed relationships revealed in the matter of        In re Marvin H. Siegel

271.     In the matter of In re Marvin H. Siegel, the previously discussed Defendants now played the following roles:

Defendant Attorney Garmil represented Defendant Whittier Pavilion;

Defendant Attorney Saunders represented Merrimack Valley Hospital;

Defendant Attorney Cuffe was court appointed as guardian;

Defendant Attorney Feld was court appointed conservator;

Defendant Attorney Ledoux represented Defendant Daughter Sheryl;

Defendant Attorney Berid represented Defendant ESMV (with involvement of Defendant
    Caseworker Springman and Defendant Diane Powell); and

Defendant Attorney Cukier represented Defendant BNY Mellon.

272.    In the underlying matter of In re Marvin H. Siegel (ES11P1466GD,
ES11P1465PM, and ES11E0075QP), Judge Abber had been the presiding
judge commencing on June 7, 2011 up and through December 4, 2013.
Judge Abber, Defendant Attorney Feld and Defendant Attorney Cukier
worked together as co-fiduciaries in the matter of In Re Esterina Milano,
from 2009 through 2010—which is set forth in detail herein the attached
Exhibits.

273.    Defendant Attorney Studen, counsel for Defendant BNY Mellon, directly
solicited the legal services of Defendant Attorney Ledoux to represent
Defendant Daughter Sheryl.

274.    Defendant Attorney Cuffe had engaged in a substantial amount of services
from Attorney Baler with intent to change Father's already executed estate
planning—as he did in the matters regarding Robert and Gertrude Pigeon.

275.    Defendant Whittier Pavilion facilitated Father being treated as an outpatient
by a private practicing psychiatric doctor—Defendant Dr. Ping Cui—when
Father had been discharged.  Defendant Dr. Cui was also involved in the
probate matter of In re Regina Ianalfo, in which Defendant Attorney
Garmil was court appointed guardian for Regina Ianalfo who was dosed
with antipsychotics suddenly just as her funds were depleted and Medicare
was to be billed.

276.    For illicit reasons described herein, Defendant Attorney Cuffe replaced
Defendant Dr. Ping Cui with Defendant Dr. Robert Portney as treating
psychiatrist for Father.  Defendant Dr. Portney is also affiliated with
Defendant Whittier Pavilion.

277.    Defendant Dr. Portney had been involved in the previously discussed
matters of Antoinette Carpinone—Defendant Attorney Berid, on behalf of

154

Defendant ESMV had Defendant Dr. Portney evaluate Antoinette Carpinone (described in further detail herein).

278.  Defendant Attorney Cuffe terminated Father's personal primary care doctor (Dr. Ellenbogen) and *all* of Father's other <u>long-held</u> personal medical specialty providers (urologist, dermatologist, gastroenterologist, neurologist et al).  Defendant Attorney Cuffe then replaced Father's primary care doctor with Dr. Spencer Amesbury—who has a *long-established* working relationship with Defendant Attorney Cuffe's suitemate, Attorney Susan Hubbard.

279.  For several years, Dr. Amesbury and Attorney Hubbard have been members together on the Board of Health for the Town of Ipswich. (Exhibit 125)

280.  Dr. Amesbury certified the death certificate of Hope Pentoliros— yet, he *was not* the doctor obtained by designated Defendants to provide a letter purportedly supporting Defendant Attorney Ledoux's zealous pursuit for a court-ordered DNR/DNI.

281.  Dr. Amesbury is listed as a family practitioner with Medicare. And reported to be ranked in the <u>top 10%</u> of family practitioners to *<u>receive</u> payments from Medicare*.  The reported *average* total Medicare payment received by family practitioners, nation-wide, in 2012 was $33,324.10 and, in Massachusetts, was $27,168.  In 2012, <u>Dr. Amesbury's total Medicare payment received was</u> <u>$158,546.02</u>.

282.  A wrongful death suit was brought against Dr. Amesbury for care that he provided for Harborside Healthcare in Essex Superior Court (Docket No. ESCV2010-01833)—which resulted in Dr. Amesbury agreeing to a settlement out-of-court.  (Exhibit 126).

283.  Dr. Amesbury was also the attending physician in a probate matter where Defendant Attorney Cuffe had been court appointed as special administrator for decedent Mary Walker.  (Exhibit 127)


B.  Evidenced tendency of designated judges of the Essex Probate & Family Court involving bribery and illicit collusion

i.  Improper use of judicial status by Judge Jeffrey Abber and Judge Susan Ricci to financially benefit the Massachusetts Association of Guardian ad Litems (MAGAL)

284. MAGAL is a professional association which membership is exclusively comprised of people certified to accept court appointments as GAL.

285. Provided is a copy of a flyer for a <u>fundraising</u> event held by MAGAL in Exhibit 134—which the specific purpose of the flyer was to sell tickets to the fundraising event, featuring Judge Abber and Judge Ricci as key speakers for the event. The graphics for the flyer had a Madi Gras theme, with the caption of "Let the Good Times Roll" translated in French.

ii. Engaging in prohibited membership by Judge Jeffrey Abber and Judge Amy Blake

286. Judge Jeffrey Abber and Judge Amy Blake are listed as current members of the American Association of Matrimonial Lawyers (AAML). Provided in Exhibit 136 are copies of recent <u>individual profiles</u> on the AAML website for Judge Abber and Judge Amy Blake.

287. As explicitly stated in the membership information distributed by the AAML, judges who are actively sitting on the bench are supposed to be prohibited from being members.  (Exhibit 135).

Evidenced improprieties in Judge Abber's listed profile with the AAML

288. Judge Abber <u>does</u> <u>not</u> identify himself as a judge in his existing "profile" with the AAML—as previously set forth, AAML states that a *member cannot be a sitting judge*.

289. Judge Abber's contact information gives his address as: 105 Salem Street, Malden, MA—which is the address of his former law practice. 105 Salem Street is also property that Judge Abber still co-owns with Attorney John Todisco.   (Exhibit 137). Attorney John Todisco operates his law practice and is registered with the BBO with his office listed as 105 Salem Street, Malden, MA.  (Exhibit 138).

290. Judge Abber lists his telephone number in his profile with AAML as:  781-324-4711—which is the <u>same telephone number for John Todisco's law office</u>, as evidenced by Attorney Todisco's registration information with the BBO.

Evidenced improprieties in Judge Blake's listed profile with the AAML

291. Like Judge Abber, Judge Blake *<u>does</u> <u>not</u>* identify herself as a judge.

156

**292.** Judge Blake's contact information listed with the AAML was the then *address of the Salem Division of the Essex Probate & Family Court*. Conspicuously, Judge Blake only provides the address and deliberately *omitted* the designation of the address being the location of the Essex Probate & Family Courthouse in Salem, MA.

C.  Evidence of designated Defendants' actual use of bribery in the matter of In re Marvin
       H. Siegel


293. At the court proceeding held on January 24, 2012, in the matter of In re Marvin H. Siegel, Judge Abber stated that he wanted *all* motions, in this matter, to be solely brought before him and not before other judges.

294. Judge Abber presided over the trial, pertaining to permanent guardianship and conservatorship.  The trial was conducted on the *separate and individual* days of: June 27, 2012, June 29, 2012, July 2, 2012 and a half-day on July 11, 2012.

295.At the court proceeding held on October 22, 2012, Defendant Attorney Feld submitted to Judge Abber a written motion to increase amount of funds by *another* $1 million. (Exhibit 139)

296.Judge Abber had *specifically* and *directly* asked Defendant Attorney Feld (conservator) if there was a problem with the existing bond in this matter.  Defendant Attorney Feld led Judge Abber to believe that there was *no issue* with the existing Bond; which led Judge Abber to state that he would have his clerk (Peter Krosunger, Esq.) prepare the paperwork for the additional $1 million for when he (Judge Abber) returns from vacation.  (The audio is in Exhibit 23).

297. Defendant Attorney Feld responded by overtly inquiring how long        Judge Abber would be away.  When Judge Abber said he would be away for        two (2) weeks Defendant Attorney Ledoux quickly interceded and stated that "if needed" the administrative clerk, Julie Matuschak (clerk and former Board Member with Defendant Attorney Berid) could do it for Judge Abber while he was away—to which Judge Abber indicated that this was acceptable if an *urgent* situation arose.

298. Confirming the fact that Judge Abber had ended the hearing of October 22, 2012 with the specific understanding that there was *no existing urgency* to issue an additional $1 million bond at that time, Judge Abber left the above-described submitted Bond unsigned, and with a single-line crossed through the rubber-stamp for allowance or denial. (Exhibit 139)

Ex-parte dealings between designated Defendants and Judge Ricci on        October 24, 2012 & October 25, 2012

157

299.   On October 22, 2012, Judge Abber issued permanent decrees and orders for permanent guardianship and conservatorship in the matter of In re Marvin H. Siegel..

300.   Even though Judge Abber had held a court proceeding, in the matter of In re Marvin H. Siegel during the *morning* of October 22, 2012, he waited until the very end of the day to issue the above-described decrees and orders.

301.   On October 24, 2012, *without any notice* to Plaintiff Daughters, Defendant Attorney Feld, Defendant Attorney Cuffe and Defendant Attorney Ledoux requested Judge Ricci to vacate the afore-referenced permanent decrees issued by Judge Abber on October 22, 2012.

302.   Defendant Attorney Feld and Defendant Attorney Cuffe specifically requested in writing for Judge Ricci to issue brand new decrees with *new and additional* provisions granting them greater powers.  (Exhibit 140).

303.   Defendant Attorney Cuffe and Defendant Attorney Feld did not proffer in any manner that their requested relief involved any urgent circumstances necessitating their bringing these motions before Judge Ricci.

304.   Defendant Attorney Feld requested that Judge Ricci issue (2) Bonds in the matter of In re Marvin H. Siegel, totaling $6.7 million—(one for $1 million and the other for $5.7 million). (Exhibit 141)

305.   Defendant Attorney Cuffe did not *proffer* any evidence to support his assertion that Judge Abber intended to have the decree of permanent guardianship give unlimited authority to the guardian.  As previously set forth, Judge Ricci *did not* preside over the trial for permanent guardianship and conservatorship, which evidences the inherent unethical and unprofessional nature of Judge Ricci vacating Judge Abber's issuance of the above-described permanent decrees.

Established outside-of-court relationship between designated Defendants         and Judge Ricci

306.   For several years up until December 5, 2013, Judge Susan Ricci had been sitting as a judge in the Essex Probate & Family Court. Judge Ricci and Defendant Attorney Ledoux had served years, *together*, on the Supreme Judicial Court's Mental Health Legal Advisory Board.

307. Lending support to the existence of ulterior motives by Defendant Attorney Ledoux and Judge Ricci, it is demonstrated that—as a matter of practice— the Mental Health Legal Advisory Committee *does not truly advocate on behalf of incapacitated individuals*.  A prime example is in Fazio v. Fazio, 375 Mass. 394, fn9 (1978), where the Mental Health Legal Advisory Committee filed an amicus brief *arguing that the ward should be deemed mentally ill*.

308. Judge Ricci, Defendant Attorney Cuffe (guardian), and Defendant Attorney Ledoux are all members of the MBF Society of Fellows.

309. There is established prior illicit outside-of-court communications involving Judge Ricci and designated Defendants in the previously described matters of James and Hope Pentoliros.  This is evidenced by the handwritten note made by Judge Ricci, which Plaintiff Daughter Lisa found in the public court files for the matters of James and Hope Pentoliros.  (Exhibit 142).

Surreptitious court proceeding held by Judge Ricci on October 25, 2012

310. Designated Defendants obtained a court proceeding before Judge Ricci on October 25, 2012 without any notice to Plaintiff Daughters—with deliberate intentions and acts to keep Plaintiff Daughters from knowing that such proceeding was held.

311. Plaintiff Daughter Lisa learned about the ex-parte proceeding out of mere happenstance when she had obtained updated docket sheets for review and saw that the ex-parte hearing was held. The court audio recording is in Exhibit 23.

312. In the court audio recording, right at the very start of the proceeding— *immediately* after the identification of the case (In re Marvin H. Siegel), the *very first words* spoken by Judge Ricci were: "This case goes under, no good deed goes unpunished."

313. It is well established that Judge Ricci's above-described comment was specifically directed at Plaintiffs—and at Plaintiff Daughter Lisa, in particular; as the court record shows Plaintiff Daughter Lisa had *repeatedly and continuously* presented evidence, in open court, of Defendants' and Judge Abber's misconduct; as well as Plaintiff Daughters having submitted concrete documentation of misconduct to the Office of Bar Counsel and to the Judicial Conduct Commission.

314. *Prior* to October 25, 2012, Plaintiff Daughter Lisa made an in-person report to the Judicial Conduct Commission regarding misconduct by Judge Abber.

159

315. Judge Ricci had previously served a six-year term as a member of the Judicial Conduct Commission, having served two (2) years as Chair; while, First Justice Mary Ann Sahagian of the Essex Probate & Family Court had been serving on the Judicial Conduct Commission—and continues to do so through the present.

316. Judge Ricci's immediate comment at the proceeding of October 25, 2012— "this case goes under no good deed goes unpunished"—evidences that Plaintiff Daughter Lisa's discussion with counsel at the Judicial Conduct Commission had been relayed back to Judge Ricci.

317. In addition, prior to October 25, 2012, Plaintiffs filed a civil action with the Supreme Judicial Court, seeking emergency injunctive and declaratory relief that was wholly based on misconduct by Judge Abber and designated Defendants. (Exhibit 143).

318.   Throughout the entire proceeding of October 25, 2012, Judge Ricci and the designated Defendants engaged in malicious bantering and laughter.

319.    The *only* reason that the court proceeding took place was out of necessity to cover up for the fact that Judge Ricci had made a mistake on the decrees and orders that she had signed the day prior (October 24, 2012).

320.    Heightening the illicit nature of the proceeding were Judge Ricci's undeniably fabricated statements as to *supposedly why* Judge Abber asked her to sign the afore-described decrees and orders.  (Set forth herein is solid and concrete evidence that Judge Abber de facto *did not* ask Judge Ricci to act on his behalf).

321.    During the ex-parte proceeding, the discussion that took place amongst Defendants Attorneys Feld, Defendant Attorney Ledoux and Judge Ricci involved them outright stating that Judge Ricci had inadvertently signed her own name on the decree—that she should have signed Judge Abber's name.

322. In the audio court recording of October 25, 2012—at the time it was explicitly made known that Judge Ricci was actually signing the new decrees of permanent guardianship and conservatorship—Defendant Attorney Ledoux stated to Judge Ricci that she could "now retire on this case."

323. The very manner in which Defendant Attorney Cuffe and Defendant Attorney Feld sought Judge Ricci to amend the permanent decrees shows that they knew Judge Abber did not have any intention to implement the changes made; further evidencing the very reason why a monetary incentive was needed to have Judge Ricci facilitate designated Defendants' requested decrees and orders.

160

Established evidence that Judge Abber, in fact, had *no* knowledge of the events of October 24, 2012 and October 25, 2012

324.  When Plaintiff Daughter Lisa informed Judge Abber in court on December 11, 2012, about what had taken place while Judge Abber was on vacation, his reaction unequivocally showed he had absolutely no clue about the ex-parte proceedings of October 25, 2012.

325.  Judge Abber outright requested that Defendant Attorney Feld explain *why* he went to Judge Ricci, while he (Judge Abber) had been on vacation.

326.  The audio recording of December 11, 2012 evidences that Judge Abber *de facto* did NOT ask Judge Ricci to act on his behalf—affirmatively proving that          Judge Ricci LIED when she *explicitly* made the representation during the ex-parte proceeding of October 25, 2012.  The evidence shows that she purposefully misrepresented that Judge Abber had supposedly asked her to act on his behalf because the electricity supposedly went out in the courthouse at 10:30 a.m. on October 22, 2012 and he was immediately leaving for vacation. In fact there had been no power cut.

327.  The audio recording shows that Judge Abber expressly indicated that he was not leaving until the end of the day and Judge Abber had no administrative problems because he had, personally, issued other orders and judgments later that day on October 22, 2012.

D.  Evidence of bribery in the matters of James and Hope Pentoliros

i.  Overview

328.  From February 1, 2013 through February 14, 2013, Defendant Attorney Ledoux—as court appointed guardian for Hope Pentoliros—*personally* and *fervently* sought a DNR/DNI court order.  (Provided are copies of Defendant Attorney Ledoux's initial motions for DNR/DNI and other contemporaneous motions in Exhibit 144).

329.  Hope Pentoliros's sons did not initiate or take an active role in seeking a DNR/DNI.  The audio recordings of February 6, 2013, February 14, 2013 and February 20, 2013 show that Defendant Attorney Ledoux's pursuit of a DNR/DNI court order was *solely* motivated for financial ill-gotten gain. (Exhibit 145).

330.  Bolstering the existence of ill-motives by Defendant Attorney Ledoux in seeking a DNR/DNI is the previously described manner in which

161

Defendant Attorney Ledoux had forced Hope Pentoliros out of her home and into a long-term care facility; and the fact that Defendant Attorney Ledoux—on February 5, 2013—*1 day before filing the motion for DNR/DNI*, Defendant Attorney Ledoux filed a Complaint for Contempt against son Perry Pentoliros to force him to turn over *lawfully* possessed funds of over $1.3 million to Defendant Attorney Ledoux. (Exhibit 146).

ii. Details of ex-parte hearing before Judge Ricci on February 6, 2013

331.Judge Ricci was the presiding judge over the matters of In re Hope Pentoliros and In re James Pentoliros. She held a court hearing regarding Defendant Attorney Ledoux's motion for a DNR/DNI on February 6, 2013. (Exhibit 145).

332.Defendant Attorney Ledoux's sole claimed reason for his pursuit of a DNR/DNI Order was based on Hope Pentoliros having pneumonia.

333. In court Defendant Attorney Ledoux represented to Judge Ricci that he had been informed that Hope Pentoliros was in "full code" and that the doctors gave her "six (6) months to live"— again, on the basis of having pneumonia.

334.Further evidencing that Defendant Attorney Ledoux had been fabricating the state of Hope Pentoliros to obtain a court order for a DNR/DNI is the fact that counsel for Hope Pentoliros (Attorney Renee Lazar) explicitly represented—at the hearing of February 6, 2013—that she had just visited, days prior, with Hope Pentoliros and that Hope was "alert" and "very happy to see [counsel]." Attorney Lazar explicitly represented that Hope Pentoliros was able to have an intelligible conversation with her.

335.It is suspect that Attorney Lazar explicitly represented that Hope Pentoliros had expressed personally wanting a DNR/DNI Order, where Attorney Lazar had described Hope Pentoliros as being lucid and cognizant.  It is suspect that if the above-described representations made by Attorney Lazar were true, the usual and customary practice for counsel would have been to submit an affidavit from Hope Pentoliros stating that it was her true desire and intention. It speaks volumes that Attorney Lazar did not submit her own affidavit as to her afore-described representations regarding the wishes of her client.

336.It is highly significant that Hope Pentoliros had previously executed estate planning instruments and advance directive instruments and at that time did not set forth an intention or desire for DNR/DNI, especially where it is customary and routine practice for the subject matter of DNR/DNI to be contemplated when executing these type of written instruments.

162

337. Well in advance of guardianship proceedings Hope Pentoliros and James Pentoliros had executed written instruments designating their sons (Perry and Larry Pentoliros) to make health care decisions for them in August 2012. Court appointed counsel for Hope Pentoliros (Attorney Renee Lazar) had Judge Ricci revoke such powers with no supportable basis.  (Exhibit 147).

338. Also suspect is that Defendant Attorney Ledoux represented to Judge Ricci that sons (Larry and Perry) "did not object" to a court order for a DNR/DNI.  Such wording—that the sons did not object—shows that Defendant Attorney Ledoux knew that the sons had not assented to the motion for a DNR/DNI Order.

339. Showing the disingenuousness of Defendant Attorney Ledoux seeking a DNR/DNI court order and his giving a false impression that the sons had assented to the DNR/DNI order is the fact that Defendant Attorney Ledoux made no objection or plea for expediency of time when Judge Ricci had continued the hearing for a DNR/DNI to a date 2 weeks away.

340. Despite Defendant Attorney Ledoux having represented that the DNR/DNI court order was urgent, Judge Ricci could be heard flipping the pages of her schedule and outright asked if the "DNR and DNI Order could wait until [February] 20th" because she was not going to be in court over the next week.

341. Defendant Attorney Ledoux led Judge Ricci to believe that he had no objection to the date of February 20, 2013 (just like Defendant Attorney Feld had not objected to Judge Abber's waiting to issue the Bond until Judge Abber's return from vacation).

iii.  Defendant Attorney Ledoux obtained ex-parte hearing before Judge Abber seeking an emergency DNR/DNI Order

342. Defendant Attorney Ledoux did not wait for the afore-described pre-scheduled hearing with Judge Ricci.  Instead, within a week he obtained an ex-parte hearing before Judge Abber on February 13, 2013 and February 14, 2013.  (Exhibit 148).

343. The audio recording reflects Defendant Attorney Ledoux actually getting exasperated with Judge Abber for showing hesitation in rubber-stamping the motion for a DNR/DNI order.  (Exhibit 145).

344. Defendant Attorney Ledoux stated to Judge Abber that he "guaranteed" Hope Pentoliros was "not going to make it another day".  (Hope Pentoliros died, approximately, 3 weeks later of sepsis—not pneumonia).  Out of desperation, Defendant Attorney Ledoux blurted out that getting this DNR/DNI court order was really all about $5 million.

163

345.The audio recording of the February 14, 2013 hearing shows that Defendant Attorney Ledoux continued to persist; upon which, Judge Abber re-iterated that if Defendant Attorney Ledoux would just get written representations of assent by Hope Pentoliros' sons to the motion for a DNR/DNI, that he (Judge Abber) then had no qualms about issuing the DNR/DNI Order.

346.When Defendant Attorney Ledoux told Judge Abber that                    Hope Pentoliros was just transferred to the Portsmouth Regional Hospital in New Hampshire and that the three (3) sons were on their way to the hospital, Judge Abber suggested to Defendant Attorney Ledoux to call over to the hospital and have them fax over their assents to the DNR/DNI.

347.Conspicuously, Defendant Attorney Ledoux obtained a faxed letter from counsel for two (2) of the sons—not the sons themselves, and not in the form of an affidavit by counsel—simply stating (again) that the sons "did not object" to the DNR/DNI Order.  (A copy of a letter faxed from counsel—not the sons—is provided in Exhibit 149).

348.On that same afternoon as the hearing held on February 14, 2013, Judge Abber did, in fact, issue the DNR/DNI order for Defendant Attorney Ledoux—even though, Defendant Attorney Ledoux had not provided the written assent as had been originally a condition imposed by Judge Abber to receive the DNR/DNI court order.  As evidenced Judge Abber's abdication is suspect and gives strong support that he issued a court ordered DNR/DNI because of receiving monetary and/or personal benefit.  (Exhibit 151).

349.The originally scheduled hearing with Judge Ricci for February 20, 2013 was still held. During the hearing of February 20, 2013, Defendant Attorney Ledoux lied to Judge Ricci—he told her that he attempted to get a DNR/DNI Order in her absence but that he did not need the DNR/DNI order after all because Hope Pentoliros' medical condition had turned around and so Hope Pentoliros had returned to the nursing home.

350.Further bolstering the conclusion of Defendant Attorney Ledoux bribing Judge Abber are the following facts: Judge Abber was not the presiding judge in that matter; the context of the afore-described discourse between Judge Abber and Defendant Attorney Ledoux in court on February 14, 2013; and representations made by Defendant Attorney Ledoux to Judge Ricci in court on February 20, 2013.

E.  Suspect routine pattern of Defendant Attorney Ledoux seeking court ordered
        DNR/DNIs—on his own and not at the request of family members

In re Alba Corona  (ES13P0665GD)

351. Alba Corona was an 86-year-old woman, who lived independently in Florida, having family members in Massachusetts.  She had a husband and a daughter, who reside in Marblehead, MA and a son in Medford, MA.

352. Defendant Attorney Ledoux sought a court ordered DNR/DNI for Alba Corona—again, such court order was not pursued by Alba Corona's family.

353. On March 19, 2013, as private counsel for North Shore Medical Center, Defendant Attorney Ledoux filed a motion to appoint a temporary guardian for Alba Corona.  He explicitly requested in the afore-described motion to appoint Attorney Susan Hubbard as temporary guardian.  (Exhibit 152).

In Re Henry Sawicki and In Re Anna Sawicki

354. Defendant Attorney Ledoux, as private counsel for North Shore Medical Center, formally filed petitions for guardianships over—husband and wife—Henry and Anna Sawicki.  (In re Henry Sawicki is docket no. ES07P2662GC1 and In re Anna Sawicki is docket no. ES072178GC1).

355. Defendant Attorney Ledoux specifically requested Defendant Attorney Garmil be made court appointed guardian over Henry Sawicki; Attorney Faith Delaney as court appointed counsel; and then-Attorney Karen Kearns (now a judge of the Massachusetts Probate & Family Court) as GAL.  Defendant Attorney Ledoux requested that Attorney Susan Huibbard be appointed as guardian for Anna Sawicki  (Copies of Defendant Attorney Ledoux's petitions and motions are provided in Exhibit 153).

356. Despite Henry and Anna Sawicki having three (3) children, Defendant Attorney Ledoux sought individual and separate court orders—as counsel for the hospital—for court ordered DNR/DNI and withdrawal of life support regarding Henry and Anna Sawicki.

357. Despite Kenneth Sawicki, son of Anna and Henry Sawicki, objecting pro se to a court ordered DNR/DNI, it was still granted.  (Exhibit 154).

F.  Defendants' use of relationship with medical facilities to prey on patients who appear to have no close family relations

358. Defendant Attorney Ledoux and his employee, Attorney Katelyn Lynch , filed a petition for guardianship over John Polando (Docket no. ES07P1489GI1) in which

165

Defendant Attorney Ledoux specifically requested then-Attorney Kearns to be court appointed guardian. They made it appear as though they were petitioning as friends of John Polando and used their residential addresses.  (Exhibit 155)

359. The medical report filed in the matter made it appear as though Polando had no family. *(Exhibit 156).*

360. Defendant Attorney Ledoux and Attorney Lynch certified in the above-described petition for guardianship that "[a]fter due and diligent search no heirs at law could be found"; however that representation made by Defendant Attorney Ledoux and Attorney Lynch was apparently knowingly false, as Defendant Attorney Ledoux and Attorney Lynch filed an amended petition *on the very same day* that they filed the original petition for guardianship.

361.   The specific reason necessitating the amended petition was to add John Polando's children as known kin of John Polando—the children *all having lived locally*.  Evidently, the children found out about the court proceeding through other means.  (Exhibit 157).

362. Evidencing that Defendant Attorney Ledoux and Attorney Lynch had ill-motives in certifying that no heirs could be found is the fact that Defendant Attorney Ledoux and Attorney Lynch sought to be heard by the court through an ex-parte hearing—had Defendant Attorney Ledoux and Attorney Lynch genuinely believed that there were no existing heirs, they would have felt no *need* to overtly ask the court to hold concealed court proceedings.

G.  Pattern of suspect concerted conduct involving the Essex Probate & Family Court and various local medical/nursing facilities

i.  Overview

363.   There is an established pattern whereby medical facilities and social workers file as petitioners, seeking guardianship and conservatorship over elderly patients; in addition, the medical facilities and social workers make requests for specific attorneys to be court appointed as guardians and conservators—even when they have actual knowledge of an elder having existing caring family members.

364.As previously set forth, Massachusetts Probate & Family Court judges routinely—as a matter of custom and practice—issue judicial decrees giving SJC

166

Rule 1:07 court appointed guardians and conservators complete and exclusive control over the elder and the elder's assets.

365.The testimony of Kathleen King, Director, Health Care—given before the Subcommittee on Health, Committee on Energy and Commerce, House of Representatives—shows that "medical facilities (such as medical centers, clinics and practices) and durable equipment suppliers were the most frequent subjects of criminal fraud cases in Medicare, Medicaid and CHIP in 2010.  Hospitals and medical facilities were the most frequent subjects of civil fraud cases."  (Exhibit 158).

366.There is an established pattern involving attorneys who are regular SJC Rule 1:07 court appointees such as Defendant Attorney Ledoux and Defendant Attorney Garmil who simultaneously provide private legal representation for medical facilities and/or medical providers.

367.In view of Massachusetts Probate & Family Court judges routinely issuing court ordered plenary authority to SJC Rule 1:07 court appointed guardians and conservators, the opportunity and incentive for kickbacks is substantial where there are SJC Rule 1:07 court appointees having business relationships with medical facilities and medical providers.  As set forth, there is an inherent pecuniary interest for medical facilities and medical providers to have their services used and/or services referred to their affiliates. There is a pattern of court appointed fiduciaries choosing medical placements and other medical treatment services connected with their pre-existing relationships with medical facilities and medical providers.

368.Court appointed guardians and conservators have a fiduciary obligation to carry out the elders' desires and intentions, pursuant to G.L. c 190B, §§ 5-309 and 5-401; however, there is a pattern whereby SJC Rule 1:07 court appointees disregard the wishes and intentions of families pertaining to placement and/or medical treatment.

ii.  Specific examples of suspect racketeering specifically facilitated through designated Defendants' use of their close professional ties to medical facilities and nursing homes

In re Dorothy Orndorff

**369.**    Dorothy Orndorff died on <u>February 5, 2010</u>.

370.On February 8, 2010, a court review was still held in the matter of In Re Dorothy Orndorff; as if Dorothy Orndorff were still alive.

371. On the same day of the court proceeding, February 8, 2010, Attorney Paul Gormley filed his affidavit in support of his motion to extend the existing guardianship over Dorothy Orndorff and for forced court ordered administration of antipsychotics. (Exhibit 161).

372. The Affidavit filed by Attorney Paul Gormley is date-stamped February 8, 2010 showing that he physically submitted and filed the Affidavit on the same day as the court hearing.

373. Attorney Gormley attested in this Affidavit that he was assenting to Defendant Attorney Garmil's motion to extend temporary guardianship (with Roger's Authority). Attorney Gormley stated that Dorothy Orndorff was "not objecting to or demonstrating non-compliance with any of her current medications or course of treatment."

374. The role of Nurse Catherine Michaud is also suspect as may be seen from the record.

iii. Other illicit cases specifically involving Nurse Catherine Michaud and the Essex Probate & Family Court

In re Panagiota Galmiadis

375. Catherine Michaud was the petitioner in the estate administration matter of In re Panagiota Galmiadis (ES11P0375EA). The docket sheet for Panagiota Galmiadis does not list a date of death. (Exhibit 167).

376. Catherine Michaud filed a Voluntary Administration Statement in the matter of Panagiota Galmiadis. She identified herself as "caretaker" in the afore-described statement, and listed her address as "22 Lafayette Street, Marblehead, MA"—which is the address for Lafayette Rehabilitation and Skilled Nursing Facility. (Exhibit 168).

377. The Voluntary Administration Statement states that the Domicile of Death for Panagiota Galmiadis was "5 Puritan Lane, Swampscott"—which is handwritten on top of white-out. The Statement states that Panagiota Galmiadis had a son named "Andrew Galmiadis" with an address of "5 Puritan Lane, Swampscott MA."

378. The filed Death Certificate also lists Panagiota Galmiadis' residence as "5 Puritan Lane."

168

379. Andrew Galmiadis is a fictitious name—the Registry of Deeds evidences that 5 Puritan Lane in Swampscott, MA is a single-family residence belonging to Andrew Galbadis and Anna Karatzoglou.  (Exhibit 170).

380. The afore-described Voluntary Administration Statement states the personal needs account as "$198.85" on February 14, 2011—yet, like the matters with Dorothy Orndorff, over three (3) years later, the matter of ES11P0375EA is still deemed "active" in the Probate & Family docket system.  Like the afore-discussed matter with Dorothy Orndorff, there is a basis to believe that the designated court appointees are still receiving and cashing government benefit checks for Panagiota Galmiadis.

In Re Charles Bennett

381. Catherine Michaud was the petitioner in the matter of In re Charles Bennett (ES10P1950EA). As with In re Panagiota Galmiadis, the docket sheet for In re Charles Bennett does not list a date of death and no Certificate of Death was filed. (Exhibit 171)

382. The place of death for Charles Bennett is Marblehead—the same city as Lafayette Rehabilitation and Skilled Nursing, and connected to Catherine Michaud.

383. The afore-referenced docket sheet for Charles Bennett shows that the estate administration file was opened on July 2, 2010 and that case too is deemed "Active" in the Essex Probate & Family Court computer docket.

H.  Partisan relationships between SJC Rule 1:07 court appointees and professional organizations

384.    Senior Partners for Justice is an intimate association that focuses on providing in-court "pro bono" involvement with guardianship and conservatorship matters.  (Exhibit 173)

385.    Senior Partners for Justice openly holds out to the public about the intimate involvement amongst <u>all</u> its members.

386.    Defendant Attorney Maxa Berid served on the Board of Advisors for Senior Partners for Justice.

**387.**    Defendant Attorney Lisa Cukier has been involved in Senior Partners for Justice as a Mentor and a Pro Bono GAL.

388.    Defendant Attorneys should have been disqualified by the Court from serving together on the same case due to extra-judicial relationships.

I.  Misuse of influence amongst State agencies specifically designated for the elderly

   **i.**  General conflict of interest

654.   There is an established pattern that staff from various elder protective service agencies initiate guardianship and conservatorship proceedings in the Probate and Family Courts.  An example of such conduct include representatives of North Shore Elder Services as petitioner in the matter of In re Elizabeth Dunn (ES11P2190PM and ES12P2213GD).  (Exhibit 174).

655.   The corporate bylaws for Defendant ESMV show that one of the specific objectives for Defendant ESMV as a corporation is to act as guardian and conservator.  (Exhibit 175).

656.   Other evidence of improper incentives for Defendant ESMV to have elders judicially deemed incapacitated is the booklet that Defendant ESMV distributes to the public, called "The Green Book." (Exhibit 176).

657.   Pursuant to 651 CMR 5.10, one of the objectives for an elder service protective agency is to conduct an investigation to *establish whether there is a basis for offering services* *if the existence of abuse is confirmed*.

658.   Governmental funding given to agencies—like Defendant ESMV—are proportionately determined by the *amount* of services provided; demonstrating an inherent incentive for elder service agencies to make false and baseless <u>administrative</u> findings of abuse.  For elder protective service agencies to generate the use of their services, it necessitates judicial determination that the elder is incapacitated—which is accomplished through petitions of guardianship and conservatorship to the Probate & Family Courts.

  ii.  Attorney Referral List distributed by North Shore Elder Services

659.   Evidencing a well-established partisan relationship between court appointees and elder protective services agencies is the fact that North Shore Elder Services, Inc. distributes a referral list of private attorneys who focus on probate and family law and who *also* work as court appointees for the Probate and Family Court in the very same county that North Shore Elder Services covers.  (Exhibit 177).

660.   Defendant Attorney Ledoux is one of the attorneys on the afore-described referral list distributed by North Shore Elder Services.

661.    Of significance, the afore-described referral list is exceedingly limited given the large number of attorneys who practice probate and family law in a very sizeable county.

**iii.**    Representatives of elder protective services as private attorneys working as SJC Rule 1:07 court appointees

666.As previously set forth, Defendant Attorney Berid has worked as a court appointee, specifically as *a private attorney* of Defendant Berid & Schutzbank—having nothing to do with her official capacity as counsel for Defendant ESMV.  For example, when she was court appointed as GAL in the matter of In re Joseph O'Shea, she specifically listed her private law practice address.

667.    Defendant Attorney Berid was, also, court appointed SJC Rule 1:07 GAL by the Essex Probate & Family Court in the matter of In re guardianship of Wayne Clouthier (ES08P1387GI1).  (Exhibit 178).

668.    Defendant Attorney Berid was court appointed as SJC Rule 1:07 GAL by the Essex Probate & Family Court in the matter of In re Helen Learned (ES238281). In the matter of In re Helen Learned, Defendant BNY Mellon was petitioner and trustee.  (Exhibit 179).

J.  Defendants' improper use of influence with the Judicial Conduct Commission

i.  The trend in disciplinary actions by the Judicial Conduct Commission

1.    The established pattern of disciplinary action taken by the Judicial Conduct Commission consisted of the following situations:

In 1989, Appeals Court Justice Frederick Brown received a public reprimand for comments he made criticizing the NAGE and its then president (Kenneth T. Lyons) to counsel for the Labor Relations Union, during oral argument.  Justice Brown was ordered to recuse himself from any future cases involving NAGE and Kenneth Lyons.  Two (2) prior times, Justice Brown had received official warnings for "injudicious and intemperate remarks"—resulting in a "confidential letter of concern" and "a confidential informal adjustment."

In 2005, Judge Robert Murray of the Juvenile Court entered into an agreement to a suspension for one year without pay and a $50,000 fine for having engaged, for a 6-month period of time, in "inappropriate conduct directed toward two female employees of the Juvenile Court."

In 2006, Judge Santo Rumer of the District Court entered into an Agreed Disposition for having improperly having placed a spectator in custody and stipulated

that he recognized "that it is ordinarily preferable to issue a prior warning before placing a spectator in custody."

In 2010, the Judicial Conduct Commission and Judge Diane Moriarty entered into a Conditional Submission Upon Acknowledged Evidence, which was filed with the Supreme Judicial Court.  Official proceedings against Judge Moriarty commenced in <u>2007</u> *with a Complaint filed by the Supreme Judicial Court and another Complaint filed anonymously.*  Judge Diane Moriarty was charged with: conducting improper ex parte hearings, displaying discourtesy toward parties appearing before her, creating an appearance of bias and lack of impartiality, and failing to be faithful to the law in her handling of several District Court criminal matters.  Having entered into the afore-described agreement, Judge Moriarty's sanction consisted of monitoring by the Commission for two (2) years.

ii.  Written complaint submitted by Plaintiffs in March of 2014

2.On March 27, 2014 Plaintiff hand-delivered a 118-page complaint and accompanying documentation to the Judicial Conduct Commission and reported specific and concrete evidence of grave misconduct by: Judge Jeffrey Abber, Judge Susan Ricci, Judge Amy Blake and Judge Peter DiGangi.

3.      In addition to afore-described complaint of March 27, 2014 setting forth misconduct having occurred in the underlying matter of In re Marvin H. Siegel, the Plaintiffs described with indisputable and solid evidence a prevalent *pattern* of illicit concerted conduct by the designated judges and Defendants in other unrelated probate court matters.

4.As previously set forth, Judge Susan Ricci served a 6-year term as a member of the Judicial Conduct Commission, serving the last two (2) years as Chair; and Judge Mary Ann Sahagian currently sits as a member of the Judicial Conduct Commission.

5.Both Judge Ricci and Judge Abber served under Judge Mary Ann Sahagian as First Justice of the Essex Probate & Family Court for years until early December of 2013.  Judge Blake has served under Judge Sahagian for several years and did so through July of 2014—when Judge Blake was appointed to the Appeals Court.

iii.  Response by the Judicial Conduct Commission

6.Almost two (2) weeks after Plaintiff Daughter Lisa hand delivered the 118-paged Complaint, two (2) CDs and the four (4) individual hand-written forms for each judge, Plaintiff Daughter Lisa received a letter, dated April 9, 2014, from Howard Neff, III on behalf of the Judicial Conduct Commission.

172

7. It took two (2) weeks for the Judicial Conduct Commission to send a letter stating that it "cannot docket or investigate" the submitted 118-paged Complaint because "a separate complaint form must be used for each judge against whom you wish to file a complaint." (Exhibit 182).

8. Plaintiff Daughter Lisa and the individual who accompanied her, physically handed the above-described four (4) hand-written completed and signed forms to the same receptionist, who originally physically took the 118-paged Complaint and two (2) CDs.

9. Evidencing ill-motives by the Judicial Conduct Commission in the above-described letter of April 9, 2014 is the fact that, in the very first sentence of the letter, Attorney Neff explicitly identified each of the very four (4) judges, about whom Plaintiff Daughter Lisa had already submitted individual and separate standard complaint forms to the Judicial Conduct Commission.

10. Attorney Neff enclosed four (4) blank standard complaint forms with his letter of April 9, 2014 that were identical to the previously described standard forms that Plaintiff Daughter Lisa had filled out in hand-writing—in the reception area of the office of the Judicial Conduct Commission—and had directly handed to the receptionist.

11. On April 14, 2014, Plaintiff Daughter Lisa replied in writing to Attorney Neff notifying him that she had, in fact, complied with the filing of four (4) separate and individual forms for each of the above-referenced judges.

12. Enclosed with the above-described letter of April 14, 2014, Plaintiff Daughter Lisa, again, filled out four (4) mailed complaint forms of the Judicial Conduct Commission—one for each individual judge.

13. In each individual complaint form of the Judicial Conduct Commission, Plaintiff Daughter Lisa referenced and incorporated the 118-paged complaint and the two (2) CDs. In fact Plaintiff Daughter Lisa set forth specific page numbers from the 118-paged complaint that applied to each individual judge in the complaint forms enclosed in the reply of April 14, 2014.

14. Again it took almost two (2) weeks for the Judicial Conduct Commission to respond to Plaintiff Daughter Lisa. Again Plaintiff Daughter Lisa was informed: "This office cannot docket a complaint alleging misconduct against all four judges."

15. On May 2, 2014, Plaintiff Daughter Lisa responded—in writing—to Attorney Neff's letter on behalf of the Judicial Conduct Commission, dated April 24, 2014. This time Plaintiff Daughter Lisa asked Attorney Neff to

specifically state exactly what she needed to do to have him accept her written complaints.

16. Plaintiff Daughter Lisa received a letter from Attorney Neff, on behalf of the Judicial Conduct Commission, dated May 20, 2014—asserting that Plaintiffs cannot file a complaint that has more than one judge's name mentioned in it. This of course is impossible when the alleged acts involve two or more judges and their concerted acts of misconduct are inextricably intertwined.

17. Of significance, Attorney Neff's afore-described letter of May 20, 2014 further evidences that his repeated refusals to accept the Plaintiffs' written complaints stem from ill-motives, where he explicitly confirmed that he has, in fact, "reviewed all submissions" and Plaintiff Daughter Lisa has, in fact, complied with the "protocol" of having submitted separate and individual complaints for each of the four (4) above-referenced judges.

18. Ill-motive is evident by the fact that, contemporaneous with Plaintiffs' submitting of the written complaints of March 27, 2014, Judge Amy Blake's appointment to the Massachusetts Appeals Court was in process.  Judge Amy Blake was nominated by Governor Patrick on June 23, 2014 and her appointment to the Appeals Court was unanimously confirmed on July 16, 2014.

19. Judge Amy Blake has been a member of the Massachusetts Family & Probate American Inn of Court.  (Provided in Exhibit 23 is the audio court recording of June 9, 2014, wherein Judge Amy Blake states that she is supposedly no longer a member of the Massachusetts Family & Probate American Inn of Court, she—in fact—confirms her affiliation).

K.  Defendants' improper use of influence with Board of Bar Overseers and Office of Bar Counsel

i.  Established connections between Defendants and Board of Bar Overseers and Office of Bar Counsel

20.     The following Defendants have spent several years as hearing officers for the Board of Bar Overseers: Defendant Attorney Kazarosian, Defendant Attorney Ledoux, and Defendant Attorney Costello.  Defendant Attorney Costello also has been utilized by the Board of Overseers as a special prosecutor.

174

21.     Defendant Attorney Kazarosian, Defendant Attorney Ledoux, Defendant Attorney Berid and Defendant Attorney Cuffe are members of the exclusive MBF Society of Fellows.

22.     The following counsel on behalf of the Office of Bar Counsel and the Board of Bar Overseers are also members of the MBF Society of Fellows:

Karen D. O'Toole, Associate General Counsel for the Board of Bar Overseers

Jeffrey Woolf, Esq. – Assistant General Counsel for the Board of Bar Overseers (Louis D. Brandeis Fellow)

Thomas A. Kenefick, III, Esq. – Board of Bar Overseers

Lisa Arrowood, Esq., Board of Bar Overseers (Life member)

Linda G. Bauer, Esq., Assistant Bar Counsel  (Life member)

Kenneth Luke, Esq., Assistant Bar Counsel (Life member)


Susan Strauss Weisberg, Assistant Bar Counsel (Life member)

Daniel Crane, Esq., Former Chief Counsel for the Office of Bar Counsel

ii.  Obligations of Bar Counsel

23.     Bar counsel has a duty to investigate misconduct when presented with evidence providing "reasonable cause" that an "attorney poses a threat of substantial harm to his clients or prospective clients."  S.J.C. Rule 4:01, § 12A; In the matter of Lawrence J. Kenney, 86-10 BD (decision date August 3, 1988, pp. 1, 8).

24.     Rule 4:01 further provides for Bar Counsel to investigate and the Board of Bar Overseers to hear *any allegation* that an attorney has violated the canons and disciplinary rules regulating the practice of law."  In the matter of Lawrence J. Kenney, 86-10 BD (decision date August 3, 1988 at 8).

25.     Records that an attorney is required to maintain as a court-appointed fiduciary "have assumed 'public aspects' which render them at least analogous to public documents."  In the matter of Lawrence J. Kenney, 86-10 BD (decision date August 3, 1988 at 10).


iii.  Complaint submitted by Plaintiffs on March 28, 2014

175

26.     On <u>March 28, 2014</u>, Plaintiff Daughter Lisa served by hand a 118-page written complaint and supporting documentation to the office of the Board of Bar Overseers directly to the attention of the Chair, Attorney Lee Dunham. (Exhibit 183)

27.     Although General Counsel for the Board of Bar Overseers, Michael Fredrickson, wrote to Plaintiff Daughter Lisa that an investigation was "opened" against Bar Counsel Constance Vecchione as a result of the complaint filed on March 28, 2014—he stated that the investigation was "stayed" until the Judicial Conduct Commission takes action (the Judicial Conduct Commission having received the same underlying complaint and supporting documentation).

28.     The various written correspondence between General Counsel (Attorney Fredrickson) and Plaintiff Daughter Lisa demonstrate overt obstructive acts by the Board of Bar Overseers with regard to Plaintiffs' submitted complaint of March 28, 2014.

vi.  Subsequent events evidence Bar Counsel's acknowledgment of misconduct

29.     Plaintiffs submitted a written complaint to Bar Counsel Constance Vecchione on <u>November 15, 2013</u>—and had previously reported judicial misconduct.

30.     On or about <u>December 5, 2013</u>, both Judge Abber and Judge Ricci had been abruptly "reassigned" to other counties—Judge Abber was moved to Middlesex County and Judge Ricci to Essex County.

31.     On <u>December 4, 2013</u>, an Order was issued for a pre-trial conference to be held in the matter of In re Marvin H. Siegel to take place on December 30, 2013.  Without any notice to Plaintiff Daughters, Judge Abber began his "new" assignment in Middlesex County the following day on December 5, 2013.  (Exhibit 186).  Plaintiff Daughters were NOT sent notice of the order scheduling the pre-trial conference.

32.     Plaintiffs were not provided *any* notice, *of any kind*, that Judge Abber was no longer presiding over In re Marvin H. Siegel until Plaintiff Daughter Lisa appeared in court on December 30, 2013.  To reiterate, Judge Abber had been the presiding judge in the matter of In re Marvin H. Siegel for over two (2) years.

L.  Explicit confirmation by Registrar O'Brien that Plaintiffs were not served notice of the ordered Pre-Trial Conference issued by Judge Abber

33. The court records regarding the matters of In re Marvin H. Siegel show a long and continuous pattern of illicit conduct by designated Defendants and Judge Abber deliberately and deceptively excluding Plaintiffs from being present at court proceedings regarding matters of In re Marvin H. Siegel.

34. Registrar Pamela Casey O'Brien explicitly confirmed to Plaintiff Daughter Lisa and an unrelated third-party—in person—that notice of the Order for Pre-Trial Conference _had not_ been sent out to Plaintiffs but that notice had been sent out to all other parties.

35. The event that initiated Plaintiff Daughters finding out about the scheduled pre-trial conference was when Plaintiff Daughter Lisa had received scant correspondence from Defendant Attorney Barbar on or about December 13, 2013.  Attorney Barbar's letter set forth one date and time that designated Defendants had selected to have a required outside-of-court pre-trial meeting for the afore-referenced pre-trial conference.  (Exhibit 187).

36. Upon reviewing the court files for In re Marvin H. Siegel, Plaintiff Daughter Lisa found the Order for Pre-Trial Conference and the Notice of Pre-Trial Conference. Immediately, Plaintiff Daughter Lisa went to the Clerk's Office and asked to speak with Registrar Pamela Casey O'Brien.

37. Plaintiff Daughter Lisa showed the afore-described documents to Registrar O'Brien, whereupon Registrar O'Brien turned the Order over and directed their attention to the back of the Order and explained that the lack of Plaintiffs' initials signified that the notice had not been mailed to Plaintiffs.

38. Registrar O'Brien explicitly stated that the Clerk's Office had not sent out the notice to Plaintiffs because the notices were directly and exclusively sent out by the secretary for Judge Abber—_not_ by the Clerk's Office. Registrar O'Brien stated that the notice for the Order for the pre-trial conference had nothing to do with the Clerk's Office and explicitly explained that she personally recognized that the handwriting on the back of the court's copy of the notice was that of Judge Abber's secretary.

. Visible post-1989 adverse change in attitude by the State appellate courts regarding due process for alleged incapacitated individuals

153. In the 1970s, the Supreme Judicial Court declared in Belchertown State Sch. v. Saikewicz, 373 Mass 728 (1977), that a person who is declared incompetent is not any less worthy of dignity or respect in the eyes of the law.  Reinforced in its written opinion of Doe v. Doe, 377 Mass. 272 (1979), the Supreme Judicial Court set forth that a judicial finding of incompetency does not obviate the necessity of a guardian or judge taking into consideration the ward's feelings or opinions regarding his care.

177

154. The Supreme Judicial Court firmly established that the mere assertion that a person was mentally ill was not sufficient by itself to warrant the imposition of a guardian—it was required that it be proven that the individual did not have the ability to take care of himself by reason of mental illness.  Fazio v. Fazio, 375 Mass 394 (1978).  The Court emphasized that a probate court judge must rely on actual presented evidence that show the person in question was unable to think or act for himself as to matters concerning personal health, safety and general welfare; and actual evidence showing that the individual in question was unable to make informed decisions as to property or financial interests.  Fazio v. Fazio, 375 Mass at 408.

155. The Appeals Court decision in the 1982 case of New England Merchants Nat. Bank v. Spillane, 14 Mass. App. Ct. 685, explicitly shows that it was the practice of the appellate courts to actually implement such above-described standards. During the 1970s and 1980s, the appellate courts made removals and vacatings of court appointed guardians and conservators— such orders for removal are now virtually nonexistent.

156. The written opinion, in New England Merchants Nat. Bank v. Spillane, is a specific illustration of the visible change in practices of the appellate court after the institution of the American Inns of Court.

157. Of significance, the Appeals Court, in New England Merchants Nat. Bank v. Spillane, emphasized the importance of probate court judges following the established procedural requirements set forth for appointments of guardian and conservator.  The Appeals Court highlighted that the failure of the probate court judge to follow the procedural requirements was not an oversight; having supported that conclusion *with a detailed discussion of numerous specific and concrete facts*.

II.      DELIBERATE DISREGARD BY ATTORNEY GENERAL MARTHA COAKLEY, THE SUPREME JUDICIAL COURT & OTHER REGULATORY ENTITIES OF PLAINTIFFS' DIRECT SUBMISSION OF CONCRETE AND OBJECTIVE EVIDENCE OF CORRUPTION IN THE PROBATE & FAMILY COURT

A.  Well-established overt knowledge by Attorney General Martha Coakley of prevalent elder abuse by nursing homes regardung unnecessary use of antipsychotics

39. As an overall custom and practice, Attorney General Martha Coakley has overtly disregarded the overwhelmingly open and obvious routine practice of nursing homes and other professional care-providers improperly giving antipsychotics to elders diagnosed with dementia.

178

40.   In 2005, the Food and Drug Administration (FDA) issued its most serious medication alert—known as a black-box warning—regarding the overuse of the antipsychotics (such as, Seroquel) for elderly dementia patients, specifically because they increase the risk of fatality for elders having dementia, arising from pneumonia and cardiovascular complications.  In addition, other common physical problems from use of these antipsychotics are sudden drop in blood pressure, abnormal heart rhythms and urinary problems.  Identical FDA black-box warnings followed regarding Zyprexa and Risperdal.

41.   Defendant Attorney Ledoux has explicitly acknowledged *in court* the above-described FDA black-box warnings—with no objection having been made by any other designated Defendant. (Exhibit 24).

42.   As researched by Krista Maier, Esq. elders are being given antipsychotics to "keep them from causing trouble for overworked and undertrained nursing [] staff."  Elders are put at risk daily.  Chemical Restraints and Off-Label Drug Use in Nursing Homes, 16 MSU Journal of Medicine and Law 243, 244 (2011-2012). (Exhibit 188).

43.   In 2009, Eli Lilly was prosecuted for off-label promotion of its antipsychotic drug (Zyprexa) for unapproved uses in the treatment of dementia.  It was alleged that Eli Lilly had specifically promoted Zyprexa as a way to "reduce nursing time and effort" because it sedated unruly nursing home residents. Eli Lilly paid $1.415 billion in federal fines, with a dozen states opting out and obtaining amounts ranging from $13 to $45 million.  Attorney General Coakley opted out of the federal settlement and pursued settlement in that manner.

44.   Also, in 2009 AstraZeneca—maker of the antipsychotic drug Seroquel—was prosecuted by the federal government for unapproved uses in the treatment of dementia and agreed to pay $520 million.

45.   In 2010 Johnson & Johnson was charged with paying kickbacks to the Omnicare nursing home chain for prescribing Risperdal—with the U.S. Attorney's Office in Boston having filed an action.  Attorney General Coakley issued a press release (April 2010) stating that she was "playing a lead role in the investigation and prosecution of cases involving the use of kickbacks and other illegal marketing of antipsychotic drugs"—*especially, "the use of its atypical antipsychotic drug Risperdal in nursing homes."* (Exhibit 189).

46.     In <u>2011</u> Attorney General Coakley filed a complaint against Janssen Pharmaceuticals, Inc. (a subsidiary of Johnson & Johnson) for promoting Risperdal to be used with elders having dementia.  A consent judgment was reached for $15.1 million.

47.     In <u>2011</u>, Attorney General Coakley reached a consent judgment of over $2 million with AstraZeneca for its unlawful promotion of the use of Seroquel with elders having dementia—which Defendant Attorney Ledoux explicitly brought to the attention of Judge Abber in court on January 30, 2012.

48.     In <u>2012</u> the Boston Globe reported and provided actual data showing that the Commonwealth has had actual knowledge of the *<u>pervasive</u>* and *<u>unnecessary</u>* use of antipsychotics in nursing homes; that <u>no</u> implementation of accountability has taken place *against these nursing homes*. (Exhibit 190).

49.     As published in the review authored by Krista Maier, a study of 2004 nursing home data showed that *over* 86.3% of nursing home patients had been given antipsychotics as *off-label use*.  Most of those patients had been diagnosed with dementia and 63% of those elders were *residents of a for-profit facility*.  75% of those elderly patients were enrolled in either Medicare or Medicaid.

50.     As a matter of standard custom and routine practice, court appointed guardians obtain court orders authorizing forced administration of antipsychotics for elders under their authority—which standard process is known as a Roger's order.  The ease in obtaining a Roger's order is well established and is the epitome of rubber-stamping.

51.     An overwhelming percentage of elders under guardianship in the Massachusetts Probate & Family Court system who are given antipsychotics, have <u>no</u> prior history of any psychosis or other mental illness warranting treatment with antipsychotics.

52.     As previously set forth, Attorney General Coakley filed an action against the manufacturers of Seroquel for the *specific illegal act of promoting the use of Seroquel for elderly people diagnosed with dementia*—it is axiomatic that given her prosecutions of several drug manufacturers, she had knowledge of the actual medical providers and medical facilities having been recipients of such promotions from the drug manufacturers.

53.     It is highly suspect that Attorney General Coakley pursued money actions against several drug manufacturers for illegal promotion of using

antipsychotics for elders having dementia, but completely refrained from prosecution of *nursing homes* and *prescribing doctors* for well-publicized and established abuse of the elderly by unnecessary use of antipsychotics.

54.     As evidenced, Attorney General Coakley has engaged in selective prosecution.  Egregiously she has espoused to the public how she has taken action to protect the elders in this Commonwealth, but, in reality, she has aided and abetted elder abuse through overt omissions.  The only action Attorney General Coakley took was to follow the money.

B.  Attorney General Martha Coakley and the Supreme Judicial Court have overtly disregarded presented concrete and objective evidence of unlawful and unjustified forced use of antipsychotics and other acts of elder abuse by public officials, with specific regard to In re Marvin H. Siegel

55.     In <u>March of 2012</u> Plaintiff Daughter Lisa filed an emergency civil action with a Single Justice of the Supreme Judicial Court that was wholly premised on illegal and unconscionable acts by multiple court officials of the Essex Probate & Family Court and sought immediate injunctive relief from continuous unlawful acts—specifically forcing Father to ingest or submit to injection of antipsychotics and other multiple acts of elder abuse. (Exhibit 143).

56.     Chief Assistant Attorney General Bill Porter had actual knowledge of substantiated illegal acts of Judge Jeffrey Abber and by the officials of the Essex Probate & Family Court, specific to the underlying matter of In re Marvin H. Siegel.

57.     The Massachusetts Attorney General's Office directly served as legal counsel for the Essex Probate & Family Court; as it was named as defendant in the matters of SJ-2000 and SJC-11193.  Accordingly, the Attorney General's Office reviewed substantial and independent evidence of grave criminal misconduct by the designated Defendants.

58.     The failure of the Attorney General's Office to address the allegations set forth in the petition filed by Plaintiff Daughter Lisa exceeds willful blindness, to actual condoning of illegal conduct—if not furthering and facilitating such misconduct.

i.  Evidence of opportunity for improper influence

59. Established is the fact that Attorney General Coakley and various assistant attorney generals (and other prosecutors) are affiliated with the American Inns of Court.  (Exhibit 191).

60. Already established is the fact that Judge Abber and various counsel of Defendant Burns & Levinson (representing Defendant BNY Mellon in the matter of In re Marvin H. Siegel) belong to the American Inns of Court, and particularly, the Massachusetts Family and Probate American Inn of Court— along with, Paula Carey, Chief Justice of the Trial Court (Former Chief Justice of the Probate & Family Court) and Angela Ordonez, current Chief Justice of Probate & Family Court.

61. Established is the fact that Attorney General Coakley is a Life member of the MBF Society of Fellows, along with Justice Margot Botsford (Life member), Justice. Barbara Lenk (Life member), Justice Francis X. Spina (Life member), Judge Abber and Judge Paula Carey.

62. The designated Defendants named in the emergency petition who belong to the MBF Society of Fellows are:  Defendant Attorney Marsha Kazarosian, Defendant Attorney Robert Ledoux, Defendant Attorney Maxa Berid, and Defendant Attorney Brian Cuffe.

63. As previously established, membership for the above-referenced chapters of the American Inns of Court and the MBF Society of Fellows is exclusive as well as contravening the professional rules of ethics for the Massachusetts judiciary.

ii. Specific evidence presented regarding unlawful concealed use of antipsychotics

64. The audio recording of the court proceeding held on December 12, 2011 (Exhibit 23) was provided to the Supreme Judicial Court and all parties, which contained the following evidence:

Defendant Attorney Cuffe admitting, in court, that he did not have authority to facilitate the concealed use of antipsychotics for Father; and

Defendant Attorney Cuffe admitting, in court, that he had actual knowledge that the home health care agency (Defendant Right At Home) was concealing antipsychotics in Plaintiffs' father's food.

65. An email from the staff of Defendant Right At Home explicitly described the act of concealing antipsychotics, at the *very* direction of Defendant Attorney Cuffe.  (Exhibit 192).

182

66.     Plaintiffs submitted indisputable evidence that Judge Abber did not take *any* remedial action regarding the above-described unlawful conduct, despite having overt and actual knowledge.

iii.     Nature and scope of other substantial evidence of unlawful conduct by public officials presented to the Attorney General's Office and the Supreme Judicial Court

67.     As set forth, Plaintiff's emergency civil action focused on seeking *court orders* to stop specific misconduct of Defendant Attorney Cuffe (as court appointed guardian) and Defendant Attorney Feld (as court appointed conservator)—which misconduct has been facilitated by Judge Abber and other opposing counsel involved in the matter of In re Marvin H. Siegel. Defendants' misconduct—individually and jointly—center around grave, emotional and physical abuse of Plaintiffs' father including the illegal act of unauthorized concealed drugging of Plaintiffs' father with the antipsychotic Seroquel.

iv.   No filed response by Attorney General's Office

68.     Attorney General Coakley has an overt pattern of conduct that evidences her refusal to prosecute public officials with whom she has apparent partisan ties—for example, the recent convictions for corruption in the Massachusetts Probation Department was pursued *by the* U.S. Attorney General's Office, <u>*not*</u> Attorney General Coakley.

69.     As evidenced by Attorney General Coakley's prior pattern of conduct, it lends much credibility that she, likewise, *deliberately chose* <u>not</u> to carry out her prosecutorial duties against the named Defendants in the afore-described emergency petition that Plaintiff Daughters served to the Attorney General's Office.

70.     Chief Assistant Attorney General Bill Porter—as counsel for a specific designated party (Essex Probate & Family Court) in the afore-referenced civil action—did not file any responsive pleading of any kind.  He *did not* file any denials or claims of defense to the allegations set forth against Judge Abber in his judiciary role for Essex Probate & Family Court; or for the specific allegations for illicit alterations of docket information by the Clerk's Office of the Essex Probate & Family Court.

v.  Suspect nature of Justice Botsford's dismissal of Plaintiff's emergency civil action against Defendants and the Essex Probate & Family Court

71. Justice Margot Botsford was the single justice assigned to preside over the Plaintiff's civil action. Justice Botsford is a member of the MBF Society of Fellows, along with the named misfeasors in the emergency petition: Judge Abber, Defendant Attorney Marsha Kazarosian, Defendant Attorney Robert Ledoux, Defendant Attorney Brian Cuffe, and Defendant Attorney Maxa Berid.

72. Justice Botsford demonstrates that she did not review the merits of the allegations presented in the emergency petition. (Exhibit 193).

73. As a matter of law, a single justice is _required_ to hold an evidentiary hearing _when_ a plaintiff/petitioner presents a _seemingly valid_ claim of a state and federal constitutional violation(s) of serious import; when a plaintiff/petitioner files a petition, pursuant to G.L. c. 211, § 3 and meets the standard, a subsequent hearing is not a matter of discretion but rather a _mandated requirement_. Ozenomic, Inc. v. Alcoholic Beverages Control Commission, 412 Mass. 100, 108-109 (1992); Collins v. Comm, 412 Mass. 349, 351-352(1992).

74. The emergency petition filed by Plaintiff Daughter Lisa, pursuant to G.L. c. 211, § 3, provided _more than ample_ evidence of _several_ state and Federal Constitutional violations, that set forth substantiated evidence of Plaintiff Daughters (and Father) being gravely and _irremediably_ deprived of substantial liberty and property rights.

75. The fact that Justice Botsford did not address the merits of Plaintiffs' allegations in her written Judgment and _completely_ avoided mention of explicitly pled constitutional violations, further bolsters Plaintiffs' claim that the Judgment issued by Justice Botsford was the result of improper incestuous influence used by Defendants and that Plaintiff Daughters have no adequate remedy in State Court.

Inherent conflict of interest between designated Defendants and        the Full Bench of the Supreme Judicial Court

76. Plaintiffs appealed the Judgment by Justice Botsford to the Full Bench of the Supreme Judicial Court, focusing particularly on Justice Botsford's failure to comport with cornerstone State and Federal constitutional requirements.

77. Justice Barbara Lenk is Past-President of the Boston Inn of Court, Attorney General Coakley is affiliated with the Frank J. Murray Inn of Court, Hon. Paula Carey and Judge Abber (Board member since 2012) are members of the Massachusetts Family and Probate American Inn of Court.

78.   Justices of the Supreme Judicial Court are members of the exclusive MBF Society of Fellows: Hon. Margot Botsford, Hon. Barbara Lenk and Hon. Francis X. Spina; along with: Attorney General Martha Coakley, Hon. Paula Carey, Judge Abber, Defendant Attorney Marsha Kazarosian, Defendant Attorney Robert Ledoux, Defendant Attorney Maxa Berid, and Defendant Attorney Brian Cuffe.

79.   The Board of Bar Overseers is an entity created and operated *by* the Supreme Judicial Court.  The members of the Full Bench of the Supreme Judicial Court have substantial communications with attorneys serving as hearing officers and special prosecutors for the Board of Bar Overseers. The Defendants who have been hearing officers and/or special prosecutors include: Defendant Attorney Marsha Kazarosian, Defendant Attorney Robert Ledoux, and Defendant Attorney Walter Costello.

80.   Defendant Attorney Maxa Berid served eight (8) years on the Massachusetts IOLTA Committee—an entity created and overseen by the Supreme Judicial Court.  In 2005, the Supreme Judicial Court appointed Defendant Attorney Berid to the Commission for Access to Justice. (Exhibit 11).

81.   As previously set forth, Defendant Attorney Marsha Kazarosian is current President of the Massachusetts Bar Association (MBA), and has been a high-ranking officer of the MBA for many years.  She has been a member of the Joint Bar Committee for Judicial Nominations and has served on the Supreme Judicial Court's Access to Justice Committee.  (Exhibit 8).

**82.** Both Defendant Attorney Ledoux and Justice Botsford are actively involved with National Alliance on Mental Health Illness (NAMI).  Justice Botsford's husband, Steve Rosenfeld, Esq., is on the Board of NAMI. (Exhibit 196 shows the substantial and active involvement that he and Justice Botsford have with NAMI)

Evidence of overt acts of influence

Multiple ex-parte communications by Defendants with the Supreme Judicial Court

83.   Defendant Attorney Cukier submitted an invoice, on behalf of Defendant Burns & Levinson, to the Essex Probate & Family Court in the matter of In re Marvin H. Siegel that evidences Defendant Attorney Cukier asked her colleague, Attorney Stenger, to use her inner connections *with* Susan Mellen, then-Supreme Judicial Court Clerk for the Commonwealth. Attorney Stenger, a Partner at Defendant Burns & Levinson, has specialized in the area of appellate law for a number of years.  (Exhibit 197).

185

84.    This invoice stated that on 05/02/12 Defendant Attorney Cukier placed a call to Attorney Stenger.  On the same date, under "SES" (Attorney Stenger), the invoice states: "Call from Attorney Cukier regarding appellate proceedings in Supreme Judicial Court."  (Exhibit 198)

85.    In the entry for 5/03/12, under "SES", it states forty (40) minutes billed for "*telephone conference with Susan Mellen.  Draft email to Attorneys Studen and Cukier regarding status and strategy*."

86.    As previously set forth, Defendant Attorney Studen of Defendant Burns & Levinson was specifically named as a party in the afore-described emergency civil action filed by Plaintiff Daughter Lisa.  It is highly suspect that Defendant Attorney Studen did not file *a responsive pleading* with the Supreme Judicial Court, nor did any of the other Defendants, especially given Attorney Stenger's call to her connections with individuals who have direct contact with the justices of the Supreme Judicial Court.

87.    Subsequently, on January 4, 2013, Defendant Attorney Cuffe *also* engaged in ex-parte communications with then-Clerk Mellen *just days prior* to the scheduled date for oral argument.  The invoice entry for 1/04/13 states that Defendant Attorney Cuffe had a "call with *Clerk Mellen* re: hearing." (Exhibit 199).

Altered docket of the Supreme Judicial Court

88.    *No* responsive pleading was filed by any designated Defendant in the matters of SJ-2000 and SJC-11193.  In fact, the Defendants—*all but* Chief Assistant Attorney General Bill Porter—sent a letter to then Clerk Mellen of the Supreme Judicial Clerk confirming that they were not filing a brief. (Exhibit 200)

89.    When the SJC sent notice that oral argument had been scheduled for January 7, 2013, Defendant Attorney Costello (counsel for Defendants Cuffe and Feld) sent a cover letter to then Clerk Mellen giving formal notice that he *would be* presenting oral argument on behalf of his clients. Defendant Attorney Costello's notice of appearance was physically entered onto the docket of SJC-11193.  (Exhibit 201).

90.    The night *prior* to oral argument (January 6, 2013) Plaintiff Daughter Lisa checked the electronic docket for SJC-11193 and discovered that the docket entry documenting Defendant Attorney Costello's Notice of Appearance had been deleted—as though the entry of Defendant Attorney Costello's Notice of Appearance had never ever been entered.  The electronic docket did not contain *any* notation that the entry had been deleted.

91.     The next day (January 7, 2013) Plaintiff Daughter Lisa was the *only* party who presented oral argument before the Full Bench.  Even more suspect than Defendant Attorney Costello not presenting argument after having given advance notice that he would do so was the fact that he was *physically present* for oral argument along with, Defendant Attorney Cuffe, Defendant Attorney Feld, Defendant Attorney Kazarosian, and Defendant Attorney Berid.

92.     Chief Assistant Attorney General Porter, as counsel for Essex Probate & Family Court, did not present oral argument on January 7, 2013 and as previously set forth he did not submit a brief.  During oral argument on January 7, 2013, Plaintiff Daughter Lisa explicitly informed the Full Bench about the alteration of the docket entries for SJC-11193. (Recorded on live webcam).

93.     *After* the Full Bench's issuance of its decision on March 19, 2013, the docket *again* had been altered.  This time the caption of the action had been changed.  The alteration even appeared on the rescript itself.

94.     *Prior* to January 7, 2013, the caption for SJC-11193 originally had been: "Lisa Siegel Belanger, Esq. v. Essex Probate & Family Court et al". (Exhibit 202).

95.     The docket has been changed to read: "Lisa Siegel Belanger vs. Brian Cuffe and others."  The party designation of "Essex Probate & Family Court" had been completely removed from the caption.

96.     Evidently there is a pattern of Clerk Mellen having tampered with evidence in other matters before the Supreme Judicial Court.  Aliana Brodmann E. von Richthofen had gone through the complete appeal process regarding the employment retaliation suit that she had filed against Dana-Farber.  In March of 2010, Ms. Richthofen had received the Supreme Judicial Court's denial for her Application for Further Appellate Review.  Upon review of the Supreme Judicial Court's electronic docket, she had discovered numerous misfilings and omissions in the electronic docket; consequently, she went to review the file when Clerk Mellen informed Ms. Richthofen that the entire file was "inexplicably missing".  When no efforts were made to locate the file, Ms. Richthofen filed a complaint with then Chief Justice Margaret Marshall.

97.     In February of 2012 on behalf of Ms. Richthofen then U.S. Senator Scott Brown filed a complaint with the U.S. Department of Justice.  (Exhibit 203).

187

Disparate treatment at oral argument

98.   The record shows the Plaintiff Daughters received significant and overt disparate treatment from all the other cases heard before the Supreme Judicial Court on January 7, 2013.

99.   Noticeably, each side for the other four (4) cases argued on January 7, 2013 received, at least, fifteen (15) minutes to present oral argument, if not *more*—Plaintiff Daughter Lisa received ten (10) minutes even though she directly brought it to the Full Bench's attention that the designated Defendants had indicated to the Supreme Judicial Court that they were not presenting oral argument.  Plaintiff Daughter Lisa specifically requested that the Full Bench afford her more than her reduced time of ten (10) minutes. Chief Justice Ireland summarily rejected Plaintiff's request.

100.   During oral argument, Chief Justice Ireland had overtly expressed that the justices, in fact, had not read Plaintiff Daughter Lisa's brief.  The Full Bench refrained from asking any substantive questions; which was a stark contrast from the justices' vigorous questioning of counsel in the other four (4) cases argued that same day (January 7, 2013).

101.   As an appellate practitioner of fifteen (15) years, January 7, 2013 was the *first time* that Plaintiff Daughter Lisa had ever been told, by any appellate court panel, that her allotted time "was all hers" and she could use it any way she liked.  Plaintiff's prior experience before the appellate courts as legal counsel for others, always, consisted of vigorous questioning.

**102.**   Of significance, this was the first time that Plaintiff Daughter Lisa had appeared before an appellate court as a pro se litigant.

Disparate treatment in the issued written decision

103.   The original civil action filed by Plaintiff Daughter Lisa with the Supreme Judicial Court was pursued under G.L. c. 211, § 3—which authorizes the Supreme Judicial Court to exercise its power of original superintendence when presented with extraordinary circumstances.

104.   As previously set forth, the afore-described petition filed by Plaintiff Daughter Lisa provided ***indisputable and uncontroverted proof*** that Defendant Attorney Cuffe facilitated the unlawful concealed use of antipsychotics with Father.

105.    Audio court recordings and court records for the matter of In re Marvin H. Siegel show Judge Abber's outright disregard of admitted guilt by Defendant Attorney Cuffe; that Defendant ESMV—as a state designated elder protective service agency—aided and abetted such unlawful conduct; and that Father's new court-appointed attorneys (Defendant Attorney Kazarosian and Defendant Attorney Myette) aided and abetted such unlawful conduct.

106.    The emergency petition made an overwhelming colorable showing of embedded corruption in the administration of the underlying matter by the Essex Probate & Family Court.  In prior matters, the Supreme Judicial Court has used its authority and power of superintendence upon demonstration of a trial court's prejudicial administration of a case.

107.    Prior to the creation of the various chapters of the American Inns of Court (in 1989), the Supreme Judicial Court had, in fact, specifically expressed that it was the Court's duty to provide relief to a petitioner who had been aggrieved by judicial misconduct—and specifically pursued under G.L. c. 211, § 3.  In *Foley v. Lowell Division of District Court*, 398 Mass 800 (1986), the Supreme Judicial Court stated: "we consider the matter under our broader inherent common law and constitutional powers to supervise the administration of justice"; with the Court relying on *Enbinder v. Commonwealth*, 368 Mass 214 (1975) as precedence.

108.    Both *Enbinder v. Commonwealth* and *Foley v. Lowell Division of District Court* involved dismissals based on improper judicial bargaining.

109.    After the institution of the American Inns of Court, the written decisions of the Supreme Judicial Court demonstrate the transition and implementation of its new attitude; that issues related to misconduct by judges, clerks and attorneys, persons aggrieved *must first* seek relief from the respective regulatory boards (for example, *Gorbatova v. First Assistant Clerk*, SJC-11194 and *Culley v. Cato*, SJC-10913*)*.

110.    In *Culley v. Cato*, the Supreme Judicial Court claimed that the Court was not the proper venue to seek disciplinary action for judicial misconduct—stating that the petitioners had another avenue that dealt with judicial misconduct, the Judicial Conduct Commission.  The petitioner had cited precedent that supported the Supreme Judicial Court having proper authority under its power of superintendence, which the Court explicitly claimed that the petitioner's reliance on those cases were "misplaced" because those cases were prior to the creation of the Judicial Conduct Commission. However, such claims by the Court are not legitimate.

111.   It is well established that, in 1986, at the time of *Foley v. Lowell Division of District Court*, the Judicial Conduct Commission had already been up and running.   The justices sitting on the Supreme Judicial Court at that time unequivocally reaffirmed the Supreme Judicial Court's obligation to provide relief to those aggrieved by misconduct inflicted by court officials. The only true difference between *Culley v. Cato* and *Foley v. Lowell Division of District Court* are the particular justices who sat on the Full Bench.

112.   Of significance, in 2002, Plaintiff Daughter Lisa, as private legal counsel, had previously succeeded in obtaining a hearing before the Single Justice of the Supreme Judicial Court when she filed a civil action, using the *very same avenue* of G.L. c. 211, § 3 in *Youngworth v. Commonwealth*, (SJ-2000-0378).   Single Justice, Ruth Abrams, granted a hearing and relief; which was affirmed by the Full Bench in its rescript of *Youngworth v. Commonwealth*, 436 Mass. 608 (2002).  (Exhibit 205).

113.   Like *Youngworth v. Commonwealth*, Plaintiff Daughter Lisa's petition regarding In re Marvin H. Siegel contained proof of substantive and grave deprivations of state and constitutional rights.   As a matter of law, Plaintiff Daughter Lisa demonstrated a colorable showing of her being deprived of life, liberty and property—*and* that of her father.   Plaintiff Daughter Lisa unequivocally demonstrated that it was a *matter of life and death*; and a matter of unconscionable depths of inhumane acts by the designated Defendants—well commensurate with the level of the well-established standard of "shocking to the conscience."

114.   The Supreme Judicial Court's decision issued by the Full Bench regarding Plaintiffs' father, did not address *in any manner* the merits of the emergency petition or constitutional violations.  (Exhibit 206).

115.   *Parents of Two Minors v. Bristol Division of the Juvenile Court Department*, 397 Mass 846 (1986) shows that the SJC's action regarding the emergency civil action filed by Plaintiff Daughter Lisa was based on bad faith.   In the case of *Parents of Two Minors*, the Full Bench declared that the circumstances required review under G.L. c. 211, § 3.   In that case, the circumstances consisted of the lower court judge not having authority to order the plaintiffs to submit to a non-emergency home visit by an employee of the DSS investigating an anonymous report of child abuse.   It is patently obvious that Plaintiff Daughter Lisa's petition presented far more severe circumstances than that of *Two Minors v. Bristol Division of the Juvenile Court Department* and that the SJC's rulings provide

190

corroborative evidence of designated Defendants having improperly used influence and connections to harm the interests of Plaintiff Daughters.

116.   The court record overwhelmingly evidences that the allegations set forth by the Plaintiff Daughters—de facto—*have* *not* *been* litigated in any State court.

117.   Through and through the underlying matter of In re Marvin H. Siegel is *all about* outright corruption—broad, wide, and up the echelon; and *nothing* to do with innocent or benign error on the part of the State judiciary and designated Defendants.

C.      Evidence of Defendants' improper use of influence with other regulatory entities

i. Federal Reserve Bank of New York

118.   The misconduct by Defendant Brian Nagle and Defendant BNY Mellon are described in detail in a 93A Demand letter that Plaintiff Daughter Lisa, as Father's attorney-in-fact, served Defendant BNY Mellon.  (Exhibit 207).

119.   At the end of July 2011, Plaintiff Daughter Lisa filed a complaint with the Federal Reserve providing substantiated claims of illicit financial acts by Defendant Brian Nagle and Defendant BNY Mellon.

120.   Charles Sanders, Senior Bank Examiner for the Federal Reserve Bank, responded to Plaintiff Daughter Lisa in a letter dated September 21, 2011 that the Federal Reserve Bank would not conduct any investigation into the matter.  (Exhibit 208).

121.   It is suspect that the Federal Reserve Bank sent the afore-described response *after* having substantial communications with Defendant Burns & Levinson, counsel for Defendant BNY Mellon.  Defendant Attorney Cukier filed an invoice on behalf of Defendant Burns & Levinson that shows *senior counsel* for Defendant Burns & Levinson had *direct discussions* with the Federal Reserve Bank.

122.   On page 4 of the previously described invoice, the entry of 8/30/11 contains the following corresponding notation: "Emails with Attorney Boylan and Attorney Arnold regarding [undersigned counsel's] latest complaint to the Federal Reserve."  (Exhibit 209).

191

123. The Federal Reserve Bank explicitly represented in its letter of <u>September 21, 2011</u> that it had no authority to *initiate any inquiry*—however, the Federal Reserve Bank did, in fact, do so with Defendant Burns & Levinson, and explicitly refused to discuss the matter with Plaintiff Daughter Lisa.

## III.  THE MASSACHUSETTS PROBATE & FAMILY COURT SYSTEM AS A CRIMINAL ENTERPRISE

**A.**  Means used to facilitate financial exploitation

Money laundering via the State Treasurer's Office

Evidenced in Exhibits 210-215

Money laundering involving the Massachusetts Attorney General's Office and use of judicial influence

Evidenced in Exhibits 216-271

Established pattern of forgery & undue influence

1. There is an established pattern of conduct, specific to Massachusetts Probate & Family Court cases, in which attorneys use forgery to facilitate financial exploitation; which is demonstrated by published disciplinary actions by the Office of Bar Counsel and the Board of Bar Overseers.

2. Often, the forgeries pertain to signatures of relatives and/or beneficiaries of an elder or other individuals deemed to be incapacitated.  These forgeries typically involve documents giving assent and unfettered discretion to the attorney in the administration of the estates.

3. A specific illustration is the matter of In re guardianship of Joseph O'Shea (ES06P1391-GC2) in which it is evidenced that Defendant Attorney Berid had personally committed forgery—having done so, <u>two (2) years</u> <u>*prior*</u> to her being court appointed as GAL in that very probate matter.

4. Further evidencing illicit conduct is the surrounding circumstances as to the individual who was the co-petitioner (Denise Leydon Harvey) of the subsequent guardianship petition, which was filed in August of 2006. Denise Leydon Harvey signed as co-petitioner as if she were petitioning as an ordinary private citizen; similar to the previously discussed examples with Defendant Attorney Ledoux.  Here, too, Denise Leydon Harvey listed

192

her residential address in Lynn, MA as co-petitioner, while also signing the petition in her capacity as attorney *representing* the purported petitioner, Shannon O'Shea.

5.　In the afore-described petition, the signature of Shannon O'Shea as petitioner is virtually identical to that of the handwriting of Defendant Attorney Berid.

6.　Upon Defendant Attorney Berid being court appointed as GAL in the matter of In re guardianship of Joseph O'Shea, she filed a GAL Report in 2008.  In the afore-described GAL report, Defendant Attorney Berid stated that Joseph O'Shea had sustained a brain injury resulting from a work accident that occurred in 2006, which was the underlying basis for the inception of the guardianship proceedings.  (Exhibit 279).

7.　Defendant Attorney Berid filed a Bond in 2006 that Joseph O'Shea had "0" value for personal estate and for real estate despite knowing that there was a worker's compensation action pending involving the likelihood of a substantial lump-sum settlement.

8.　In Defendant Attorney Berid's GAL Report she stated that Joseph O'Shea suffers from "various mental impairments, which affect his ability to make financial and personal decisions."

9.　Two (2) paragraphs later, in the very same above-described GAL report, Defendant Attorney Berid stated:

Mr. O'Shea *does understand* that his weekly check from the Fund would stop.  Further *he understands* that it is in his best interest to have the money placed in a Supplemental Needs Trust.  *He was aware* that Attorney Pierce's office had engaged the firm of Moschelle & Winston to draft the Supplemental Needs Trust and present to the Essex County Probate & Family Court to Approve the Estate Plan.  Mr. O'Shea had no problems with the concepts of the plan, and generally why it was necessary.

10.　It is suspect that the guardianship petition—filed in 2006—listed Joseph O'Shea as having two (2) brothers; Defendant Attorney Berid made no mention, whatsoever, in her filed GAL Report of 2008 about Joseph O'Shea having two brothers.

**B.**　SJC Rule 1:07—Fee Generating Appointments—used as a central instrument to facilitate exploitation of elders

193

1.  SJC Rule 1:07 was a creation wholly premised on the purported need for impartial and neutral individuals for two (2) distinct and separate type of roles: 1) to carry out duties and responsibilities as fiduciaries of elders, deemed wards of the State and   2) to act as investigator/consultant—by gathering factual information, specifically on behalf of the probate court judge, and to follow up with recommendations for judicial action. The specific purported reason for issuing court appointments under SJC Rule 1:07 is the need for a neutral and unconnected party.

2.  SJC Rule 1:07 court appointees are paid to "provide services" in their designated roles.  The first resource used to pay the public court appointment is the private estate of an elder, at a standard hourly rate of a private practitioner (usually, between $250-$300).  If a private estate is initially financially insufficient—or becomes depleted—the court appointee is paid by the Commonwealth at a pre-determined hourly rate.

3.It is a rare occasion for the Massachusetts Probate and Family Court judges to select a family member or friend as a fiduciary appointment.

4.In many probate cases, SJC Rule 1:07 appointees have already established partisan relationships with each other.  Often, these court appointees work together in multiple contemporaneous probate matters, taking varying and different roles in the unrelated probate matters—one may be court appointed guardian in one case and in another case, he/she will take the role as court appointed conservator or GAL or he/she may take a private counsel role or private petitioner.

5.Fiduciary court appointments, made under SJC Rule 1:07, routinely have complete and exclusive control over an elder's person and his/her estate. Court ordered appointments create the opportunity for state actors to embezzle money and property, as well as government benefits.

i.  Guardianship and conservatorship matters

1105.As a matter of standard custom and practice, the conduct of the judiciary for the Probate & Family Court contravenes the Massachusetts Uniform Probate Code (MUPC), which mandates that plenary guardianship and conservatorship are a means of last resort. G.L. c. 190B, § 5-306.

1106.As a matter of standard custom and practice, the conduct of the judiciary for the Probate & Family Court contravenes G.L. c. 190B, § 5-306(a), which states a probate court judge is mandated to exercise his or her authority in a manner that

194

"encourages[s] the development of maximum self-reliance and independence of the incapacitated person. . . ."

1107. As a matter of standard custom and practice, the conduct of the judiciary for the Probate & Family Court contravenes G.L. c. 190B, § 5-306(a), which states a probate court judge is mandated to issue orders "only to the extent necessitated by the incapacitated person's limitations or other conditions warranting the procedure."

1108. As a matter of standard custom and practice, the conduct of the judiciary for the Probate & Family Court contravenes G.L. c. 190B, § 5-306(b)(8), whereby the statute states that a probate court judge can only appoint a guardian when the elder's "needs cannot be met by less restrictive means"—such as an existing durable power of attorney.

**ii.** Pattern of caseload & financial gain

1109. There is an established systemic pattern of private practicing attorneys using court appointed work as a regular and steady source of income.

**1110.** The average payment for a quarterly invoice made by a court appointee for a single matter ranges from $10,000 up through and exceeding $30,000. (Exhibit 282)

1111. In their official capacities as SJC Rule 1:07 court appointed guardians, conservators and GALs, designated Defendants obtain ill-gotten gains by billing for unnecessary and excessive services.

**C.** Established pattern of conduct by Massachusetts Probate & Family Court judges evidencing collusion with attorneys regularly appointed as fiduciaries and GALs

**i.** Routine disregard by Probate & Family Court judges of the cornerstone directives by the Massachusetts Uniform Probate Code (MUPC)

**1112.** As a matter of law, a durable power of attorney is deemed a "less restrictive means" under G.L. c. 190B, § 5-306(b)(8). See *Guardianship of Smith*, 43 Mass. App. Ct. 493. 497-498 (1997).

**1113.** There is an established pattern of conduct by Probate & Family Court judges routinely issuing plenary guardianships and conservatorships, <u>without</u> conducting any inquiry as to the existence of alternatives or limited authorization.

195

**ii.** Established systemic pattern of probate court judges deliberately disregarding the explicit promulgated required standard for selecting court appointments

1114.   The Preamble of the Supreme Judicial Court's SJC Rule 1:07 Fee Generating Appointment states:

[t]he Justices have concluded that the fairest way to accomplish this goal, and at the same time avoid favoritism, is by requiring each court to create lists of qualified candidates and then generally make appointments from those lists in rotation or sequential order.

1115.   The Probate & Family Court has promulgated unambiguous rules that require probate court judges to select SJC Rule 1:07 Fee Generating Appointments from the court list and, *specifically*, doing so in *successive* order.

1116.   As shown from the explicit language used in the Preamble of SJC Rule 1:07, the Supreme Judicial Court is well aware of the inherent and likely incestuous-like conduct, particularly when people work together on a regular basis.

1117.   It is well documented that the overwhelming pattern of conduct that occurs in the Probate & Family courts consists of counsel, during court proceedings, *just* <u>outright requesting</u> the specific person whom *he or she wants appointed*.

1118.   Many times, like in In re Marvin H. Siegel, Probate & Family Court judges capriciously appoint a person based on *<u>his or her own</u>* particular preference, without even looking at the court appointment list.

1119.   The motive for Probate & Family Court judges to allow requests by counsel for particular individuals to be appointed—as well as judges making appointments based on their own preference—is an established systemic means for kickbacks and bribes which is bolstered by solid documentation of the standard custom and practice of the judges rubber-stamping the motions for payment by these court appointees. It is standard practice that court appointees—*when being paid <u>directly</u> by the estates of their wards* (*not* by CPCS)—submit by motion, inflated invoices that patently lack any real substantive detail of the services billed.

**iii.** <u>Established pattern of summarily disregarding valid pre-existing Durable Power of Attorneys</u>

196

1120. The Uniform Act "recognizes an individual's right to self-determination by permitting a principal to use a durable power of attorney to express his preference regarding any future court appointee charged with the care and protection of his person or estate" and that the Massachusetts courts explicitly "discourage appointing a guardian contrary to the individual's clearly expressed wishes." *Guardianship of Smith*, 43 Mass. App. Ct. 493, 497 (1997).

1121. One of the foremost well-established legal reasons for elders to execute a DPOA is for the specific purpose of the elder avoiding the risk of becoming a ward of the State.

1122. When an elder establishes in writing his or her specific desires through advance directives, such as a durable power of attorney, the existence of family dissension is *wholly* irrelevant; in particular, because the elder, *personally*, has set forth who *he or she wishes* to be attorney-in-fact and/or guardian and conservator.

1123. There is an overwhelming established pattern of Probate and Family Court judges declaring elders as incapacitated wards of the State, *despite* existing valid written advance directives that explicitly state the specific person(s) whom the elder has personally designated to act as his or her guardian and conservator, which is almost always immediately followed by a virtual automatic appointment of a public guardian and conservator with whom the judge has prior relationships— *despite* existing family members, who are capable and more than adequately suited to care for the elder as his or her guardian and conservator.

1124. It is a common and routine occurrence in guardianship and conservatorship matters for Massachusetts Probate Court judges to disregard an elder's existing advance directives and estate planning instruments with no real evidence proffered to question the validity of the advance directive and no real basis for disqualification of the elder's nominee.

1125. Deliberately disregarding family members designated as an elder's nominee of guardian and/or conservator and physically blocking their access to the elder is essential for judges and officials of the Probate & Family Court to gain access to the elder's estate.

1126. The dicta of the Appeals Court, in *Guardianship of Smith*, demonstrates that the probate court judge unjustly disqualified the elder's nominees in a knowing and deliberate manner.

**iv.** Established pattern of Probate & Family Courts disqualifying the elder's nomination for guardian and conservator, even though explicitly designated in advance directives

1127.   G.L. c. 190B, § 5-305 permits probate court judges to disqualify an elder's explicit designation of nominee for appointment of guardian and conservator "for good cause."

1128.   The written manual entitled "General MUPC Article V, Procedural Outline for Guardianship of an Incapacitated Person Conservatorship of a Protected Person" (herein referred as "General MUPC Outline") was issued on July 8, 2009.  On page 10 of the General MUPC Outline, it states that if a person "is being investigated" for "neglect of the Incapacitated Person" that he/she cannot be appointed as guardian.

**1129.**   As demonstrated the mere existence of a supposed "investigation" is the actual established modus operandi that is used by probate court judges to superficially support the disqualifying of an elder's nominee for guardianship and conservatorship.

1130.   There is an established common pattern that once a purported investigation has been initiated, no further action is pursued; often the allegations just linger without any closure—evidencing that the initiation of an investigation is deliberately manufactured for ill-motives.  (Demonstrated in the underlying matter of In re Marvin H. Siegel, the matters of In re James and Hope Pentoliros, the matter of In re Esterina Milano and the matter of In re Antoinette Carpinone).

1131.   In addition, there is established documentation to show that court appointees band together with private counsel (who often are on "the court list" of appointees) and the judge to carry out a concerted attack against the designated attorney-in-fact or nominated guardian/conservator designated in the elder's written durable power of attorney. (Demonstrated in the underlying matter of In re Marvin H. Siegel, In re Robert and Gertrude Pigeon, In re James and Hope Pentoliros, In re Esterina Milano and In re Antoinette Carpinone).

1132.   The other most prevalent means to superficially justify the court appointments of guardians and conservators is proclaimed family dissension— _even_ in the face of pre-existing valid written advance directives that unambiguously and explicitly set forth the elder's chosen family member(s) to act as guardian and conservator.  (Demonstrated in the

198

underlying matter of In re Marvin H. Siegel, the matters of In re James and Hope Pentoliros, the matter of In re Esterina Milano and the matter of In re Antoinette Carpinone).

1133.   When an elder has made a specific designation as to his or her nomination of guardian and conservator, family dissension is wholly irrelevant where a prime reason for the elder executing such advance directive, in the first place, is to override family dissension.

1134.   As demonstrated above, there is a motive for State actors to fabricate allegations of exploitation by the family member(s) to superficially support the court appointment of a guardian and conservator. Often, State actors utilize disgruntled family members' baseless and frivolous allegations of exploitations against the family member(s) suitable to act as guardian and conservator.

1135.   The established pattern is that State actors only proffer in-court blanket and empty allegations of exploitation against the family member seeking to be guardian and/or conservator; no true documentation is presented by State actors to prove exploitation; and no criminal complaints are initiated by State actors against the accused family members.  (Specific cases include: In re Marvin H. Siegel, In re Esterina Milano, In re James and Hope Pentoliros, and In re of Antoinette Carpinone).


D.  Modus operandi of SJC Rule 1:07 court appointees

1136.    A common method that court appointed fiduciaries use to minimize family members and/or close friends obtaining direct incriminating evidence is to isolate the elder from family and friends.  Isolation is carried out by court appointed fiduciaries obtaining a court order that forces the elder out of his or her home into a nursing home or other long-term care facility; by obtaining protective orders that severely restrict visitation of family and friends—even to the extent of seeking to preclude *all* visitation and communication; by obtaining court orders for authorized forced drugging of the elder with anti-psychotic medication (usually Seroquel and Risperdal); by refusing to provide requested information to family members, especially financial transactions regarding the elder's estate and medical treatment.  (Demonstrated in In re Marvin H. Siegel in Exhibits 283B, 283C, and 283D, In re James and Hope Pentoliros, In re Esterina Milano, In re Henry and Anna Sawicki, In re James Polando)

199

1137. It is a matter of routine for Probate & Family Court judges to summarily issue court-ordered authorization for forced administration of antipsychotics based solely on behaviors resulting from Alzheimer's and dementia—despite or because of well-known and long-established FDA black-box warnings of fatality in elders.

Out-of-court pre-arrangement of SJC Rule 1:07 court appointments of
      Defendant Attorneys Feld and Cukier

1138. On April 6, 2009, Attorney David Goldman was court appointed as GAL in the matter of Esterina Milano. Attorney Goldman is a member of the Massachusetts Family & Probate American Inn of Court—along with Jeffrey Abber and Defendant Attorney Lisa Cukier.

1139. GAL Goldman stated in his filed invoice with the court that he personally called Defendant Attorney Feld on April 8, 2009 to see if he was interested in being guardian. (Exhibit 282).

1140. Defendant Attorney Cukier was contacted by GAL Goldman prior to her being appointed co-guardian in the matter of In re Esterina Milano. Like Defendant Attorney Feld, Defendant Attorney Cukier already had been very intimately involved in the matter of In re Esterina Milano prior to any official appointment as temporary co-guardian—which took place on August 5, 2009. Defendant Attorney Feld transitioned to being conservator in that very same matter, with Defendant Attorney Cukier taking Attorney Feld's stead as co-guardian with then-Attorney Abber.

1141. Defendant Attorney Feld, Defendant Attorney Cukier, and then-Attorney Abber worked together as court appointed co-fiduciaries (in the matter of In re Esterina Milano) through February of 2010.

1142. Defendant Attorney Cukier faxed her bond application to Judge Keamy. (Exhibit 289). Despite Attorney Cukier's evidenced intimate knowledge of the details of the matter, she filled in the bond application saying that she did not know the estimated values of the real estate and personal estate.

1143. Defendant Attorney Cukier even filled out then-Attorney Abber's bond application form (see similarity of handwriting). The form states that then-Attorney Abber did not know the value of the real estate and personal estate, even though he was the original conservator as of December 22, 2008. (Exhibit 290).

1144. Refer to previously referenced Exhibit 282, which provides invoices submitted by then-Attorney Abber, Defendant Attorney Feld, Defendant Attorney Cukier and GAL Goldman; which demonstrate the substantial embedded partisan conduct amongst SJC Rule 1:07 court appointees.

200

1145.Defendant Attorney Feld was not appointed guardian until May 18, 2009—however, before being court appointed (on or about, May 5, 2009), then-Attorney Abber facilitated the production of a bank check in the amount of $270,272.74 from the estate of Esterina Milano and gave it to Defendant Attorney Feld.

1146.At the time of May 5, 2009, then-Attorney Abber was the only person who had the authority to facilitate the issuance of that bank check. That check was made payable to: "James E. Feld, temp. guardian" and dated May 5, 2009.  (Exhibit 291).

1147.De facto, May 18, 2009 was the first instance of any court appointment of Defendant Attorney Feld in the matter of In re Esterina Milano. (Exhibit 292).

1148.Defendant Attorney Feld requested that his court appointment as guardian be backdated so that the appointment would be judicially deemed to have occurred on May 6, 2009, even though it really did not.   (Exhibit 293).

1149.The decree of temporary guardianship that had been already issued on  May 6, 2009 exclusively referenced then-Attorney Abber—and immediately following his typewritten name on the form was the typewritten word "and" with a space provided for the name of a co-guardian that was left completely blank.  (Exhibit 294).

1150.The check was dated May 5, 2009—and even with back-dating the decree to May 6, 2009 still precluded then-Attorney Abber and Defendant Attorney Feld from having lawful authority for such transaction.

1151.As evidenced, there was no legitimate reason necessitating Defendant Attorney Feld's appointment to be made nunc pro tunc; to the contrary, the only reason to do so was to cover up then-Attorney Abber's unlawfully giving funds from Esterina Milano's estate to Defendant Attorney Feld.

Fraudulent billings

1152. *Both* Defendant Attorney Feld and then-Attorney Abber made alterations to their filed invoices with the Middlesex Probate & Family Court, pertaining to *the very same time period involving the "non pro tunc" appointment of Feld.*

1153. Defendant Attorney Feld filed two distinctly different invoices for the same time period—with the identical submission date of July 23, 2009. (Exhibit 282).  The two sets of invoices are not duplicates.  The original invoice shows that the very first entry was: "05/08/09".

201

1154. Then-Attorney Abber *also* filed two (2) distinctly different invoices <u>for the same time period</u>.  He did not put a designated date of submission on *either* invoice, yet the two (2) distinctly separate invoices cover *the exact same time period*.  (Exhibit 282).

1155. Not only did then-Attorney Abber's two submitted invoices cover the *same* time period, the first invoice had requested payment for $5,827.50 and states that the charged rate was "$175.00 per hour."  The second filed invoice had requested payment for $9,717.50 and the charged rate stated: "$325.00 per hour."

1156. Both Defendant Attorney Feld and then-Attorney Abber changed their invoices to make it look like there had been an actual hearing, specific to Feld's appointment on <u>May 6, 2009</u>.  Then-Attorney Abber's *first* filing shows that there was a court proceeding that was held on May 6, 2009, but that it was solely a "status conference"—there was no mention whatsoever of any appointment being made regarding Defendant Attorney Feld.

Other suspect filings with the Middlesex Probate & Family Court

1157. Then-Attorney Abber's Inventory was, de facto, filed *over* one year from the date of his original appointment as guardian (<u>December 22, 2008</u>).  The Inventory shows it was filed on <u>February 22, 2010</u>—then-Attorney Abber was no longer conservator as of <u>May 18, 2009</u>.  (Exhibit 295).

1158. Like the above-described Inventory, then-Attorney Abber filed his Notice of First and Final Account, also, on February 22, 2010—again, having been relieved as conservator as of May 18, 2009.  (Exhibit 296).

1159. Conspicuously *both* then-Attorney Abber and Defendant Attorney Feld filed their Inventory on <u>February 22, 2010</u>.  Then-Attorney Abber hand-dated his Inventory as "August 5, 2009".  Defendant Attorney Feld dated his Inventory, <u>May 30, 2009</u>—*even earlier* than that purported by then-Attorney Abber.  (Exhibit 297).

1160. Then-Attorney Abber declared Esterina Milano's personal estate as having a value of "0".  Nowhere does then-Attorney Abber mention the $270,272.74 of funds being transferred from Esterina Milano's estate to Defendant Attorney Feld, payable on May 5, 2009.

1161. Furthermore, GAL Attorney David Shwartz (another GAL appointed in the matter of In re Esterina Milano) stated in his GAL report that then-Attorney Abber did not include Esterina Milano's annuity life insurance because then-Attorney Abber had informed GAL Goldman that the clerk of the

202

Middlesex Probate & Family Court told him (Abber) that he could not write that the policy was stolen on the Inventory form.  (Copy of GAL Shwart'z report is provided in Exhibit 298. Letters from counsel for Enrico Milano to GAL Goldman regarding the handling of Esterina Milano's estate are provided in Exhibit 299).

1162.  Defendant Attorney Feld stated that in his submitted Inventory, on February 22, 2009 that Esterina Milano's personal estate was valued at $270,272.74— *the exact same amount of the afore-referenced bank check*.

1163.  *None* of the publicly filed reports showed disbursements for utilities to run the two homes owned by Esterina Milano, while she was in a nursing home—no disbursements were shown for medical care expenses.

1164.  Defendant Attorney Feld requested that a GAL be appointed to settle *then-Attorney Abber's* First and Final Account. Attorney David Shwartz was appointed as GAL.  He also happens to be affiliated with the Massachusetts Probate & Family American Inn of Court.  (Exhibit 300).


Evidence of extortion by then-Attorney Abber and Defendant Attorney Feld

1165.  Defendant Attorneys Feld and Abber vehemently and publicly claimed Esterina Milano's son (Enrico) had financially exploited his mother; yet, after Enrico obtained private legal representation, Attorney Feld entered into a stipulation, turning over Esterina Milano's valuables to Enrico. (Exhibit 301).

1166.  Of significance, then-Attorney Abber and Defendant Attorney Feld did not initiate <u>any</u> criminal charges against Esterina Milano's son.

1167.  Esterina Milano's daughters Brunella and Patricia Milano started scheming while their own mother was <u>*in*</u> surgery; making allegations, at that very time, about purported money being stolen by the brother.  (Refer to emergency motion filed by Youville Rehabilitation).

1168.  After then-Attorney Abber and Defendant Attorney Feld had filed civil contempt actions *against* Brunella and Patricia Milano, which contained allegations that described the sisters' activities as actual <u>conversion</u> (Exhibit 302), Brunella actually wrote a letter to Judge Keanny outright stating that she and her sister had taken money from accounts that belonged to the mother and Enrico.  Brunella Milano stated that she and her sister did so to keep their brother (Enrico) from having access to it.  (Exhibit 303).

203

1169. In outright disregard of undisputed facts and law, then-Attorney Abber—and other involved counsel and judges—acted with deliberate intent of unlawfully precluding Esterina Milano's son from being guardian and conservator for his mother.  Then-Attorney Abber and Attorney Feld *knew* that there was actual evidence *outright exonerating* Enrico Milano of any alleged wrongdoing; instead, then-Attorney Abber and Attorney Feld took unfair advantage of the family turmoil and used it to facilitate their own exploits.

1170. Then-Attorney Abber and Defendant Attorney Feld alleged that Esterina Milano's daughters (Brunella and Patricia Milano) committed financial exploitation.  Despite such grave allegations made by then-Attorney Abber and Defendant Attorney Feld, they did not file a criminal report with law enforcement.  Crucially no action was taken by elder protective services, despite its knowledge of such criminal allegations.

1171. Then-Attorney Abber and Defendant Attorney Feld did not pursue criminal action against Esterina Milano's daughters because such allegations were the very means used to carry out extortion.  Esterina Milano had given Brunella and Patricia Milano a financial interest in the Florida house.  Defendant Attorney Feld's and then-Attorney Abber's extortive acts centered around the forced sale of the afore-referenced Florida house—in exchange for Brunella and Patricia Milano agreeing, in writing, to turn over their entire share of the financial proceeds from the sale of the Florida house to "Esterina Milano's estate". It was stipulated that Defendant Attorney Feld would have the contempt judgment against Brunella and Patricia "modified"; as well as refraining from initiating a criminal complaint against Brunella and Patricia for financial exploitation of their mother. (Exhibit 304).

ii.     Other Probate & Family Court matters evidencing the use of extortion by SJC Rule 1:07 court appointees

1172. As previously set forth, Defendant Attorney Cuffe, Defendant Attorney Ledoux, and Defendant Attorney Berid (as well as Judges Abber and Ricci) were directly involved in the matters of In re James Pentoliros and In re Hope Pentoliros.  Like the matter of In re Esterina Milano, designated Defendants used the threat of criminal action to extort money from Perry and Larry Pentoliros.

1173. George and Tyler Pentoliros made false allegations of financial exploitation against Perry Pentoliros in September of 2011.

204

1174. The specific use by Defendant Attorney Ledoux of the threat of criminal action to have Perry Pentoliros give money (in excess of $1 million)—that *lawfully* belonged to Perry Pentoliros and *not* property belonging to the estate of Hope Pentoliros—and to give up his legal rights and interest in litigating the matters of In re Hope and James Pentoliros is described in detail in Attorney Gormley's invoice.  The invoice *specifically describes* the joint efforts of extortion.  The following is set forth in Attorney Gormley's invoice (refer to prior referenced Exhibit 282):

December 5, 2012

Attorney Gormley went to the Haverhill District Court to file three (3) criminal applications against Perry Pentoliros.

December 18, 2012

Discussion of plans for criminal complaint.

December 20, 2012:

Discussions with Bob Ledoux about bank issues and multiple telephone calls with Bill Sullivan about bank issues and criminal complaints, willingness to resolve if Perry returns funds immediately.  Email of motion filed for next court date to all counsel.  Scanned documents supporting criminal complaint sought against Perry and emailed to counsel with explanation of notations on front and back of instruments/money orders involved.  Attorney Sullivan agrees to get funds returned, we will remove case from list only after receipt of funds.  Transmit video from Perry's interview to *select* counsel.

December 21, 2012:

Met Bob Ledoux, up to Bill Sullivan's office and collected funds for Hope/James then to Haverhill DC to remove matters from list, then to Pentucket Bank, back to Salem.

December 31, 2012:

Deliver DVD of Perry's interview to court for Judge Ricci's viewing.

January 1, 2013:

Email exchange about Bob Ledoux's meeting with Attorney Sullivan to attempt settlement.  Detailed review of documents *provided by Haverhill PD –power of attorney in favor of Perry/Larry identified.*

January 23, 2013:

205

Based on current status (no return of funds, no settlement)

January 29, 2013:

Extended discussion of mechanisms and structures to settle case; trust for Hope, identity of settlor of trust.  Discussion of rights of respective spouses where there are assets held by one.  Several further discussions and telephone calls to/from Bill Sullivan.

February 1, 2013:

Discussion with Bob Ledoux regarding resolution of case; collateral but immediate issues of Hope's health.  Status of negotiations with Attorney Sullivan and that it may be timely for siblings to see Hope.  Attorney Sullivan reports that Perry may settle matter as early as next week.  Discussion of James' fate if settlement doesn't occur before Hope passes, statutory share issues in NH and MA law, will own Haverhill property as JTWROS or TBE.  Preparation of Bonds.  Judge Ricci has directed Bob Ledoux, concurrent with DNR/DNI to mark matter for hearing on issues of contempt and related motions for date certain in February.

1175.  In <u>November of 2010</u>, Hope Pentoliros had gifted, approximately, $3 million to each of her three (3) sons—in three (3) *equal* distributions; which was corroborated by sworn attestations of two individual officials of Sovereign Bank and filed with the Essex Probate & Family Court.  The officials for Sovereign Bank had first-hand knowledge and observations of Hope Pentoliros giving the money to her sons *initiated from her own desire, intentions and free will*.  (Exhibit 305).

1176.  In addition, in <u>November of 2010</u>, Hope Pentoliros executed a durable power of attorney, deeming Larry and Perry Pentoliros co-attorneys-in-fact—of significance, Hope Pentoliros omitted son George Pentoliros.

1177.  As set forth, Perry Pentoliros lawfully had possession of funds that his mother gifted *to him*. Upon Defendant Attorney Ledoux threatening Perry Pentoliros with criminal charges, Attorney Ledoux entered into agreement with Perry Pentoliros indicating that Defendant Attorney Ledoux would not pursue charges with the Essex County District Attorney's Office in exchange for Perry Pentoliros relinquishing his legal rights in the matters of In re Hope and James Pentoliros and Perry Pentolrios's "turning over" approximately $1 million to Defendant Attorney Ledoux. (Exhibit 306).

## III.  CORRUPTION SPECIFIC TO IN RE MARVN H. SIEGEL

### A.      Background

i. Father's 2003 DPOA & other estate planning instruments

1.  In <u>1999</u>, Plaintiffs' father hired Defendant BNY Mellon to manage investments of the DSL Trust, a profit sharing plan, and an IRA account.

2.  In 2003, Father had hired an independent and separate law firm to prepare his estate planning instruments and advance directives; at which time, Defendant Brian Nagle had been the direct and primary manager of Father's above-described investment accounts—on behalf of Defendant BNY Mellon.

3.  Before executing the documents, Father had provided drafts to Defendant BNY Mellon for review by Defendant Brian Nagle—as well as other representatives of Defendant BNY Mellon.

4.  Defendant BNY Mellon sent a letter to Father, with copy to Defendant Brian Nagle, that it would be adverse to Father's interest to have his daughters be trustees of the DSL Trust; that, instead, Father should have "a financial institution" be co-trustee with Father.  (Exhibit 307).

5.  Father rejected the recommendations made by the Representatives of Defendant BNY Mellon in the above-described letter. Father, specifically, <u>did</u> <u>not</u> want Defendant BNY Mellon to act in any capacity as trustee regarding Father's capacity.

6.  Father gave a copy of the executed documents to Defendant BNY Mellon. Defendant Brian Nagle was aware that Father had provided a copy of the executed DPOA of February 11, 2003; and he was aware of the contents of Father's executed 2003 DPOA.  (Exhibit 4).

7.  In written contractual agreements between Defendant BNY Mellon and Father, Father *did not* give unfettered discretion to Defendant BNY Mellon in its handling of Father's accounts.  Father signed written agreements that *explicitly* required Father's knowledge and authorization of transactions made.

8.  On February 11, 2003, Plaintiff Daughter Lisa and Defendant Daughter Sheryl were present when Father signed the 2003 DPOA, at the law office of Attorney Andelman.  Plaintiff Daughter Devora had not been physically present due to residing out of state, however she participated at that meeting by teleconference.

9.  As previously set forth, in the above-described estate planning instruments, Father designated that the co-trustees of the DSL Trust were Father and his

three (3) biological daughters (Devora, Sheryl and Lisa); and that Father had established in his prior Wills—and the codicil of February 11, 2003—that each of the three (3) biological daughters (Devora, Sheryl and Lisa) were to have equal beneficiary interests.

10. At the above-described meeting on February 11, 2003, Defendant Daughter Sheryl had actual knowledge that Father *intentionally* precluded her from having any role as attorney-in-fact for him.

11. Defendant Daughter Sheryl harbored resentment regarding Father's decision to make Plaintiff Daughter Lisa primary attorney-in-fact and Plaintiff Daughter Devora as successor attorney-in-fact.  Exhibit 308.

12. Defendant Daughter Sheryl had been estranged from Father for approximately five (5) years between the years of 1990 and 1994 and had cut-off all communications with Father.

13. In 1994 when Defendant Daughter Sheryl found that Father was scheduled to have surgery to remove his kidney because of cancer she *suddenly* resumed contact with Father and did so out of fear that Father may have removed her from his Will, of which she had inquired.  (Father had not removed her from his Will).

14. The other reason Father deliberately and purposefully did not include Defendant Daughter Sheryl as an attorney-in-fact was due to her having *a long-established history* of mental illness—which has been officially and medically diagnosed.  In addition, Defendant Daughter Sheryl explicitly stated that she has a history of mental illness in the affidavit that she signed on June 3, 2011, which was submitted to the Essex Probate & Family Court through Defendant Attorney DeNapoli.

15. The severity of Defendant Daughter Sheryl's mental illness was demonstrated in July of 2003 when she had a highly publicized psychotic episode—which involved her having hi-jacked a car, that led to a high-speed police chase, over a 30-miles stretch on a major highway, that ended with the police having to draw their weapons and actually fire a shot. (Exhibit 309).

ii.  Dynamics of Plaintiffs' family


Plaintiff Daughter Lisa & Father

208

16.     Provided in Exhibit 310 is a copy of the written attestation that was
        submitted to the Essex Probate & Family Court by Father's long-time close
        friend, Steven Kapsalis.  Father and Steven Kapsalis have been close,
        personal friends for over forty-seven (47) years.  In his affidavit, Steven
        Kapsalis described his personal observations and experiences with Father
        and Father's daughters.

17.     Steven Kapsalis attests to the fact that he has first-hand knowledge—from
        the time that Plaintiff Daughter Lisa was 5 years-old—of the close and
        loving, continuous relationship between Plaintiff Daughter Lisa and Father.

18.     Father personally told Steven Kapsalis—throughout the years— about how
        much he relied on Plaintiff Daughter Lisa in terms of her assisting him with
        his law office and with his personal affairs; that Father explicitly expressed
        that he unequivocally trusted Plaintiff Daughter Lisa.

19.     Plaintiff Daughter Lisa followed in Father's foot-steps and became a
        practicing attorney—the relationship between Father and Plaintiff Daughter
        Lisa was so close that Plaintiff Daughter Devora used to call Plaintiff
        Daughter Lisa: "Marvin, Jr."

20.     Provided in Exhibit 311 are photographs—spanning decades— showing the
        close bond that Father and Plaintiff Daughter Lisa have had since
        childhood; and the close bond between Father and Daughter Lisa's children
        and husband.

Sibling dynamics

21.     Plaintiff Daughter Lisa (the youngest daughter) is nine (9) years younger
        than Plaintiff Daughter Devora (the eldest daughter).  From early
        childhood, Plaintiff Daughter Lisa and Plaintiff Daughter Devora had an
        extremely close relationship.  Such closeness was fostered when Plaintiffs'
        mother had left home in 1972, with 13 year-old Plaintiff Daughter Devora
        having nurtured 4 year-old Plaintiff Daughter Lisa like a mother.

22.     Provided in Exhibit 312 are photographs showing the closeness that
        Plaintiff Daughters Lisa (and her family) and Devora have had since
        childhood; and the close bond between Plaintiff Daughter Devora and
        Daughter Lisa's children and husband.

23.     In the written report of Defendant ESMV—called the PS Collateral
        Interview, Defendant Michael Springman wrote that Plaintiff Daughter
        Devora had stated to him that "she had actually raised Lisa as a result of
        their mother leaving when they were young."

209

24. Plaintiff Daughter Devora attests, that from the earliest of memories that Defendant Daughter Sheryl showed resentment towards Plaintiff Daughter Lisa—beginning when Defendant Daughter Sheryl (at 7 years old) learned that their mother was pregnant with Plaintiff Daughter Lisa; as opposed to Plaintiff Daughter Devora who continuously bragged at school that her mother was having another baby.  Throughout childhood, Defendant Daughter Sheryl showed constant and continuous adverse feelings because she was no longer the youngest child in the family.

25. Plaintiffs have had continuously strained relations with Defendant Daughter Sheryl.   As previously set forth, Defendant Daughter Sheryl has long had a mental illness that has adversely affected her ability for family bonding and maintaining social relationships.  Defendant Daughter Sheryl's afore-described psychotic episode in 2003 had stemmed from her inability to bond with her infant son—she and her husband had given up custody, which they did not regain through the present.

26. During adulthood, the relationship between Plaintiff Daughter Devora and Defendant Daughter Sheryl has mostly consisted of limited or no communication.  In 2011— at Plaintiffs' mother's persistent urging, Plaintiff Daughter Devora attempted to mend her relationship with Defendant Daughter Sheryl.

27. With the above-described renewed communications in 2011, between Plaintiff Daughter Devora and Defendant Daughter Sheryl, Defendant Daughter Sheryl sought to alienate Plaintiff Daughter Devora from Plaintiff Daughter Lisa.

28. In May of 2011, Plaintiff Daughter Devora had been living in California— for over ten (10) years and periodically came home for visits.  Plaintiff Daughter Devora attested, in-court, that during this time period, she had been enduring a tremendous amount of stress—involving constant chronic pain as well as having significant financial worries because her husband's employment situation was in flux while Plaintiff Daughter Devora was unable to work full-time.

29. Likewise, Plaintiff Daughter Lisa had been enduring personal and financial stress because of severe physical injuries she had sustained in 2006 and in 2008—in effect creating a continuous period of limited physical activity, essentially, being house bound.  Consequently, Plaintiffs had significant stressors in their individual personal lives that were compounded by a 3,000 mile separation—with no specific confrontation or event having caused less contact.

30.    Due to Plaintiff Daughter Lisa's afore-described injuries, she had been prevented from her prior usual and regular assisting of Father with his personal and business affairs.  As a result, there was a significant time period that Plaintiff Daughter Lisa had no alternative but to rely on Defendant Daughter Sheryl to help Father with his personal and business affairs.  Even though Plaintiff Daughter Lisa knew that she and Defendant Daughter Sheryl did not get along, Plaintiff Daughter Lisa believed at the time that it was better to trust family than a stranger to help with Father's personal affairs.  At that time Plaintiff Daughter Lisa had no specific or concrete grounds to believe that Defendant Daughter Sheryl would engage in fraudulent behavior.

31.    Unforeseen by Plaintiff Daughter Lisa, Defendant Daughter Sheryl saw this as *her* opportunity to become Father's durable power of attorney—through deception and fraud, and with the assistance of Father's then-bookkeeper, Kathleen Enos.

32.    Father has never been computer literate and has always relied on others to perform tasks on the computer for him.  This is shown by an email that Kathleen Enos sent to the synagogue that Father belonged to.  (Exhibit 313).

33.    On January 11, 2011, Defendant Daughter Sheryl sent an email to Kathleen Enos, stating:

Kathleen,

I spoke with Atty. Michael Bass about creating a Durable Power of Attorney document for my father.

He asked me to have my Dad send him an e-mail from his e-mail account.  The e-mail should be sent to MBASS@BASSDOHERTY.COM.

The e-mail should request that a Durable power of Attorney document be drafted in the event that my Dad becomes incapacitated.  That I should be named as Durable Power of Attorney and that Al be named as a backup in case I am not able to serve in that role.  (Both Al and I reside in Norfolk County).  Also, we want the document to rescind/revoke any prior Durable Power of Attorney documents.

For a couple of years, my Dad says that he wants me to be Durable Power of Attorney but we have not done anything about it.  I am willing to pay the fee for Michael drafting this document.

Can you please print this email and show it to my Dad.

211

Thanks.

Sheryl

34.     On January 11, 2011, Kathleen Enos responded by email to Defendant
        Daughter Sheryl—using the email for Father's personal affairs
        ([marvin.h.siegel2@gmail.com](mailto:marvin.h.siegel2@gmail.com)) and stated:

Hi Sheryl,

Your father said he would do this and that he would pay the fee.  I will let you know once
        the email is sent.

35.     Over one month later, on February 15, 2011, Defendant Daughter Sheryl
        directly sent an email to Kathleen Enos, using the reply format from the
        afore-referenced email, and stated:

Kathleen,

Do you think that you could remind my Dad about sending an e-mail to Michael Bass
        today?

He's been saying that he wants to do this for over two years now.

Thanks.

Sheryl

36.     As evidenced above, it is suspect that Defendant Daughter Sheryl used
        Kathleen Enos as a means to facilitate the drafting of a new durable power
        of attorney where:

Defendant Daughter Sheryl expressed that she *had not* directly spoken to Father about the
        drafting of a new durable power of attorney;

Defendant Daughter Sheryl felt the need to use Kathleen Enos as an intermediary; that
        Defendant Daughter Sheryl *initiated* the implementation of new DPOA—not
        Father;

Defendant Daughter Sheryl stated that Father had supposedly expressed wanting a "new"
        DPOA *2 years prior*;

Father had not expressed the supposed intentions directly to Kathleen Enos—which was
        particularly suspect as Kathleen Enos was *Father's* personal assistant and
        bookkeeper;

212

Defendant Daughter Sheryl *explicitly* stated that Father was *not* the person to initiate contact with an attorney to draft a new DPOA—Defendant Daughter Sheryl explicitly stated that *she* contacted the attorneys (Gilbert and Michael Bass) who drafted the "new" durable power of attorney (Gilbert and Michael Bass were long-time family friends of Father); and

Gilbert and Michael Bass *did not* speak directly with Father.

37.   Prior to <u>August 2011</u>, Plaintiff Daughter Lisa had faxed to Defendant ESMV the afore-described email correspondence between Defendant Daughter Sheryl and Kathleen Enos.

38.   Plaintiffs have a copy of Father's 2003 DPOA that has handwritten intended modifications. The handwriting is that of Defendant Daughter Sheryl.  (Exhibit 314).

39.   Defendant ESMV documented that Defendant Daughter Sheryl provided Defendant ESMV a DPOA that was dated <u>March 29, 2011</u>; which stated that Defendant Daughter Sheryl was Father's attorney-in-fact and Defendant Alan Sidman (Defendant Daughter Sheryl's husband) as the successor attorney-in-fact.  (Exhibit 315).

40.   Father did not voluntarily and knowingly execute the DPOA, dated March 29, 2011 that was provided to Defendant ESMV by Defendant Daughter Sheryl.

41.   Defendant Supervisor Dailey of Defendant ESMV made notes in the computer system of Defendant ESMV stating: "Was he [Father] able to understand POA signed on 3/29/11?"

42.   Defendant Supervisor Dailey made notes in the computer system of Defendant ESMV that he had met with Father and that Father "did not remember signing a POA on 3/29/2011 naming his Dtr Cheryl as POA."

iii.  Father openly and vehemently expressed that he wanted Plaintiff Daughter Lisa and her family to permanently reside with him and to tend to his personal care and needs

43.   In January of 2011, Defendant Daughter Sheryl stopped assisting Father— in her written communications to Defendant ESMV (and wrote it as if she were a 3rd person), she stated that she had stopped taking Father to his medical appointments <u>after January 5 [2011] *because her dog died*</u>.

44.   When Defendant Daughter Sheryl stopped helping Father, Plaintiff Daughter Lisa and her family resumed their long-time role as Father's

primary caregivers.  Upon Father's request, in April of 2011 Plaintiff Daughter Lisa and her family moved in with Father.

45.     It has been Father's long-established and openly expressed wish, including in court directly to Judge Abber, to have his family live with him, enabling him to always remain in his own home, *surrounded by his loving family to care for him*.  Father requested that Plaintiff Daughter Lisa and her family permanently move in with Father to care for him. (The audio court recordings are provided in previously referenced Exhibit 23 and the transcripts in Exhibit 24)

46.     Defendant Attorney Marsha Kazarosian filed an affidavit with the Essex Probate & Family Court (on August 17, 2011), in the underlying matter of In re Marvin H. Siegel; in which she attested and confirmed that Father had personally expressed that *he* wanted Plaintiff Daughter Lisa and her family to live with him.  (Exhibit 22).

47.     Repeatedly and routinely, Judge Abber—then presiding judge in the matter of In re Marvin H. Siegel—would interrupt Father, precluding Father from fully and completely expressing himself.

48.     Notes made in Defendant ESMV's computer system repeatedly confirm and re-affirm Defendant ESMV's staff's knowledge—especially, Defendant Attorney Berid—regarding Father's explicit desire to have Plaintiff Daughter Lisa and her family live with him.

49.     The numerous afore-described notes in Defendant ESMV's computer system consist of:

On June 27, 2011, Defendant Caseworker Springman wrote that he made a home visit to Father; Defendant Caseworker Springman telling Father that he was there because Father had previously inquired about services offered by ESMV and to see if that he was there "to check to see that he [Father] had everything he needed"; that Father responded: "I do and I don't see why anyone called you guys.  I have everything I need and I am fine.  Leave me your card and I will have my daughter call you if I need anything."

On January 4, 2012, Defendant Diane Powell scanned in email correspondence involving she and Defendant Michael Novack, in which Defendant Michael Novack described Father responses to inquiries: "My kids are my life.  The more time I spend with them, the better.  I am upset when they don't come more often.  I want them here."  When asked about Plaintiff Daughter Lisa Belanger and her family, Father expressed: "*it was not better.  I want her here*.  When she moved out, they didn't do me a favor."

214

On January 17, 2012, Defendant Caseworker Springman wrote that he had visited with Father at Merrimack Valley Hospital; that Elder [Father] stated "that he was not doing well as he was in the hospital and the elder stated that he was there unnecessarily.  [Father] asked PSW [Michael Springman] to call dtr Lisa to have her come and see him."

On March 23, 2012, Defendant Diane Powell wrote that Defendant Attorney Myette informed her that Father wants to remain at home; that Defendant Attorney Myette reported "elder [Father] is bored, lonely, depressed."

B.  Events that led up to Father being taken to Defendant Beverly Hospital

50.    In 1999—when Father first moved to Boxford—the Boxford Police Department (especially the Police Chief) came to know Father on a personal level.  Early on, it was well known throughout the Boxford Police Department that Father had a license to carry a concealed firearm.

51.    By 2009, the Boxford Police Department knew full well that Father regularly carried a weapon on his person—and of Father's firearms collection.

52.    In 2009, Boxford Police took official action to have Father's driver's license revoked.  At that time, the Boxford Police stated in its incident report that        Elder Services had been notified.  (Exhibit 316).

53.    When Boxford Police sought the revocation of Father's driver's license, it did so on the belief that Father was suffering from mental confusion and claimed that Father's mental state posed a danger; yet, having well-established knowledge of Father's possession of firearms, the Boxford Police took no precautionary measures in that regard.

54.     As previously set forth, Defendant Daughter Sheryl stopped taking Father to his medical appointments in early January of 2011; which, initiated Father and Plaintiff Daughter Lisa making plans to fulfill Father's, *personal*, long-established desire for his family to live with him.

55.    Around mid-March of 2011, Plaintiff Daughter Lisa and her husband—and Father's close friend (of more than 45 years), Steven Kapsalis—observed that Father seemed to have a noticeable change in his cognitive functioning.  Consequently, Plaintiff Daughter Lisa had a generalized concern about Father having possession of firearms in their home; and not knowing what to do, Plaintiff Daughter Lisa—as well as her husband—spoke with Lt. Robert Hazelwood of the Boxford Police about their concerns on *multiple occasions* during the last week of March 2011.

215

56.     Lt. Hazelwood had informed Plaintiff Daughter Lisa and her husband that the Boxford Police had no authority to remove the guns.  Lt. Hazelwood told Plaintiff Daughter Lisa and her husband that the only avenue was for her to file a restraining order at Haverhill District Court.  Lt. Hazelwood advised them to speak with Bethany Balford at the Haverhill District Court. (The afore-described events and statements made by Lt. Hazelwood are corroborated by the screening report of Defendant ESMV, which was input in the computer system of Defendant ESMV on April 1, 2011).

57.     Plaintiff Daughter Lisa had reported detailed specifics to Lt. Hazelwood as to Defendant Daughter Sheryl having exploited Father—which Lt. Hazelwood completely disregarded.  Due to Lt. Hazelwood's repeated claims of the Boxford Police Department's inability to remove Father's firearms, Plaintiff Daughter Lisa had called Defendant ESMV to determine what avenues were available—*other than* Plaintiff Daughter Lisa having to pursue a court order.  This is corroborated by notes input into the computer system of Defendant ESMV by Defendant Diane Powell on April 1, 2011.

58.     On April 1, 2011, various staff of Defendant ESMV (including Defendant Diane Powell) informed Plaintiff Daughter Lisa that she could make a report with the crisis team of Defendant ESMV and then Defendant ESMV could have the firearms removed—with the, unequivocal, expressed implication that if Plaintiff Daughter Lisa did so, Father would end up in a psychiatric ward.  Where the circumstances *did not justify or warrant Father needing to be involuntarily admitted to a psychiatric ward, Plaintiff Daughter Lisa, specifically and purposefully, did not make a report to the crisis team of* Defendant ESMV.

59.     Consequently, on April 1, 2011, Plaintiff Daughter Lisa and her husband went to Haverhill District Court to speak with Bethany Balford—*as advised* by               Lt. Hazelwood.

60.     When Plaintiff Daughter Lisa and her husband spoke with Bethany Balford on April 1, 2011, she informed them that they had two options: 1) to file a petition for a "writ of apprehension"—in other words a civil commitment to a psychiatric ward or 2) to seek a court order from the District Court judge.

61.     As previously set forth, Plaintiff Daughter Lisa could not, *in good conscience and ethics*, seek a petition to have Father put in a psychiatric ward—and Plaintiff Daughter Lisa, had continuously and unwaveringly, reached out to the various designated public officials seeking assistance, *solely*, in terms of: 1) removing the firearms and 2) to obtain out-patient

216

help to evaluate Father's decline in memory and evident exacerbated anxiety and fear from Father being cognizant of his memory loss.

62.     As an alternative to subjecting Father to an unjustified and unwarranted involuntary civil commitment in a psychiatric facility—and to purposefully avoid that, Plaintiff Daughter Lisa had no other viable option other than to seek a court order for removal of the guns from the Haverhill District Court; which she was successful in obtaining.

63.     Unbeknownst to Plaintiff Daughter Lisa and her husband, after they had spoken with Bethany Balford, Lt. Hazelwood—on April 1, 2011— *personally*, went to speak directly with Bethany Balford at the Haverhill District Court.  This is corroborated by the afore-referenced screening report input in the computer system of Defendant ESMV.

64.     After Lt. Hazelwood spoke with Bethany Balford (on April 1, 2011), Bethany Balford called Defendant ESMV and made a report of self-neglect regarding Father.   Bethany Balford's report to Defendant ESMV was *exclusively* based on hearsay from her afore-described conversation with Lt. Hazelwood.

65.     There was an intake report made regarding the call Bethany Balford made to Defendant ESMV on April 1, 2011.  This intake report has a designated section for identifying information of an alleged perpetrator—this section was left completely blank.  There was no alleged perpetrator—which is consistent with a report of self-neglect.

66.     The afore-described screening report of April 1, 2011 labeled Plaintiff Daughter Lisa as a "participant" and states that an investigation was opened on that same date.  Defendant ESMV assigned the investigation to Defendant Caseworker Springman.

67.     Plaintiff Daughter Lisa had no indication, whatsoever, that Defendant ESMV had opened an investigation regarding self-neglect allegations regarding Father.

68.     Defendant ESMV treated the investigation under the classification as a "nonemergency report"; which 651 CMR 5.10 states that under a nonemergency report, Protective Services shall "complete the investigation within 30 calendar days."

69.     From mid to late April of 2011 through May 19, 2011, Plaintiff Daughter Lisa had actively sought adequate part-time home care assistance for Father.

217

70.     On <u>April 6, 2011</u>, Defendant Caseworker Springman had come
        unannounced to Father's home.  Plaintiff Daughter Lisa answered the door
        and informed Defendant Caseworker Springman that Father was sleeping.
        As shown by the report entered into the computer system of Defendant
        ESMV on April 6, 2011, Plaintiff Daughter Lisa was cooperative.

71.     On <u>April 13, 2011</u>, Defendant Caseworker Springman, again, came
        unannounced to Father's home.  As shown by the report entered into the
        computer system of Defendant ESMV on April 13, 2011, Father and
        Plaintiff Daughter Lisa and her family were not home.

72.     On <u>April 21, 2011</u>, Defendant Caseworker Springman came unannounced
        with caseworker Cyr and visited with Father.

73.     The report entered into the computer system of Defendant ESMV, on April
        22, 2011, documented that Father did the following activities
        independently: bathing, dressing, grooming, toileting, eating, transferring
        and socializing.  Defendant Caseworker Springman also documented that
        Father stated: that "his needs are being met"; that his daughter lives with
        him and helps him; and that everything was fine.

74.     Notes entered into the computer system of Defendant ESMV on
        <u>April 26, 2011</u> shows that Defendant ESMV and its staff *knew* that Father
        had a valid durable power of attorney that had been executed in February of
        2003, in which Plaintiff Daughter Lisa was Father's attorney-in-fact.

75.     Notes entered into the computer system of Defendant ESMV on
        <u>April 26, 2011</u> show that Defendant Supervisor Dailey had "concerns"
        about a durable power of attorney (dated March 29, 2011) that had been
        given to him from Defendant Daughter Sheryl which stated she was
        Father's attorney-in-fact.  Defendant Supervisor Dailey outright expressed
        that Father did not knowingly sign the purported durable power of attorney
        presented from Defendant Daughter Sheryl.

76.     In the same notes of April 26, 2011 where Defendant Supervisor Dailey
        outright knew the purported durable power of attorney presented by
        Defendant Daughter Sheryl was suspect, Defendant Supervisor Dailey
        stated that *<u>he had asked Defendant Sheryl to exercise the purported durable</u>*
        *<u>power of attorney to get him Father's financial documents</u>*—which he
        reported that Defendant Daughter Sheryl did as he requested.  <u>As</u>
        <u>evidenced, Defendant Supervisor Dailey engaged in egregious unjustifiable</u>
        <u>unethical and unlawful conduct</u> with only fraud in mind.

218

77. Further incriminating conduct by Defendant Supervisor Dailey is the fact that Defendant Daughter Sheryl gave him the name and contact information of the attorney who drafted the durable power of attorney.  *Nowhere* in the notes and reports of Defendant ESMV does it indicate that any contact—or effort to contact—was made regarding that attorney.

78. It is evidenced herein this Complaint that the attorneys (Gilbert & Michael Bass—who happened to be long-time family "friends" of Father) had aided and abetted Defendant Daughter Sheryl's exploitation of Father.

79. Investigation notes entered into the computer system of Defendant ESMV on April 26, 2011 show that Defendant Supervisor Dailey consulted with Defendant Attorney Berid "to discuss case status and seek advice on how best to handle case."

80. Investigation notes entered into the computer system of Defendant ESMV on April 26, 2011 show that Defendant Daughter Sheryl had made allegations that Plaintiff Daughter Lisa was financially exploiting Father.

81. Investigation notes entered into the computer system of Defendant ESMV on April 26, 2011 show that, as of April 26, 2011, Defendant ESMV and staff *did not* inform Plaintiff Daughter Lisa of Defendant Daughter Sheryl's allegations.

82. Investigation notes entered into the computer system of Defendant ESMV on April 29, 2011 show that Defendant Supervisor Dailey consulted with Defendant Attorney Berid.

83. Investigation notes entered into the computer system of Defendant ESMV on May 10, 2011 show that Defendant Caseworker Springman visited with Father at home.  It was reported that Father "presented as clean and well groomed."  Plaintiff Daughter Lisa was asked by case manager to see Father's financial statements—which it was documented that Plaintiff Daughter Lisa immediately retrieved and without any qualms.

84. Investigation notes entered into the computer system of Defendant ESMV on May 10, 2011, state that Defendant Caseworker Springman asked Father who was his power of attorney and *that Father responded that it was Plaintiff Daughter Lisa*.

85. Investigation notes entered into the computer system of Defendant ESMV on May 10, 2011, state that Defendant ESMV and its staff had information that:

Elder's assets are roughly $7 million including the home he lives in which is paid for;

Elder has a will that divides the elder's assets equally between the elder's three (3) children; and

Elder has a trust where the majority of his assets are managed by New York Mellon Bank and he has an investment banker by the name of Brian Nagle who is the personal banker for his account.

86.   Reports entered into the computer system of Defendant ESMV on May 11, 2011 (updated on May 16, 2011) show that Defendant Caseworker Springman wrote that he was actively obtaining "information regarding [Father's] will/trust and finances."

87.   Reports entered into the computer system of Defendant ESMV on May 17, 2011 (updated on May 20, 2011) show that Defendant Caseworker Springman spoke with Lieutenant Ryder of the Boxford Police Department. It was documented that Lt. Ryder had known Father for ten (10) years; that he had no experience with the elder being a legitimate threat; that the information that Defendant Caseworker Springman had concerning prior events were "more benign than indicated"; that as of May 20, 2011, there has been no legitimate reason to use a section 12.

88.   Investigation notes entered into the computer system of Defendant ESMV on May 13, 2011 (updated on June 8, 2011), state that "case substantiated for SN [self neglect] on this date and allegation of FE [financial exploitation] will continue to be investigated."

89.   Investigation notes entered into the computer system of Defendant ESMV on May 16, 2011 show that Defendant Caseworker Springman met with Father and Plaintiff Daughter Lisa at residence to discuss home care services.

90.   The home care assistant, who had been temporarily hired in mid-May of 2011, had been pressuring Plaintiff daughter to hire her full-time. Father did not want to do so, and Plaintiff Daughter Lisa abided by Father's wishes.

91.   On May 19, 2011, Plaintiff Daughter Lisa and her family were out of the home during the afternoon, having the part-time home care assistant stay with Father. During that time, the home care assistant made a call to 911, claiming fear for her safety and for Father's safety.

220

92.     The health care assistant knew Plaintiff Daughter Lisa's cell phone number, but she did not call Plaintiff Daughter Lisa to apprise her that there was any problem.

93.

C.

CLAIMS FOR RELIEF

2330.   In the following counts, Plaintiff Daughters incorporate by reference the numerical paragraphs above.

<u>Declaratory Claims</u>

2331.   The following requests for declaratory judgments involves matters in actual controversy that arise under the Constitution and laws of the United States compelling judicial declaration of the legal rights and interests of Plaintiff Daughters.  The below requested declaratory judgments impact redress of grave deprivation of Plaintiff Daughters' Federal Constitutional rights; such deprivations as the direct and exclusive result from Defendants' misconduct facilitated through color of law.

2332.   The following requests for declaratory judgments significantly and substantially serve the interest of the public; as the below requested declaratory judgments affect all similarly situated litigants appearing before the Massachusetts Probate & Family Courts.  The below issues routinely involve matters pertaining to significant and irremediable deprivation of life and liberty, with this Federal action positioned as a precedent on issues of law that substantially and materially affect litigants in the Massachusetts Probate & Family Courts.

Count 1

<u>To declare: G.L. c. 190B, § 1-109—standard of proof provision—violates           the Due Process Clauses of the Federal Constitution</u>

**2333.**   In 2012, the Massachusetts Legislature set forth the standard of proof to be used in matters regarding guardianship and conservatorship in G.L. c. 190B, § 1-109, which states: "In contested cases, the standard of proof is a preponderance of the evidence."

221

**2334.** Plaintiff Daughters seek a declaratory judgment that G.L. c. 190B, § 1-109 is unconstitutionally broad and ambiguous where the use of a preponderance of the evidence standard involves: 1) determination of incapacitation to impose court ordered guardianships and conservatorships and 2) determination of incapacitation to impose court ordered forced administering of antipsychotics; thereby, the carte blanche use of the preponderance of the evidence standard violates the substantive and procedural due process guarantees of the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution.

**2335.** As set forth in this Complaint, Plaintiff Daughters present substantial evidence that it has been long-established Massachusetts judicial philosophy that to declare a person incapacitated is a *significant deprivation of liberty*—as a judicially declared incapacitated person cannot vote or marry or have children.  A person judicially deemed incapacitated loses *all* rights to make *any* personal decision.  It is well-established Massachusetts case law that court ordered guardianship strips a person of his or her right to make *any personal decision*; and, therefore, is commensurate to being imprisoned.  In actuality, elders who are placed under court imposed guardianship and conservatorship, almost, always become deemed wards of the State.

**2336.** Set forth documentation demonstrates that SJC Rule 1:07 court appointees routinely—as a matter of standard custom and practice—strip elders of physical liberty by forced placement into nursing homes and other long-term facilities.  Documentation evidences that elders diagnosed with dementia are placed in long-term facilities consisting of a 24/7 locked-down existence.

**2337.** Set forth documentation demonstrates that SJC Rule 1:07 court appointees routinely—as a matter of standard custom and practice—strip elders of life and liberty by such court appointees seeking court orders for DNR/DNI.

2338. As set forth in this Complaint, Plaintiff Daughters present substantial and concrete evidence that SJC Rule 1:07 court appointees—as a matter of routine custom and practice—seek the above-described court orders for DNR/DNI in a covert and concealed manner so as to deliberately exclude input from family members.

**2339.** SJC Rule 1:07 court appointees seeking court ordered DNR/DNI when there is *no* established advance directive requesting such measures is the antithesis *for* the very reason that advance directives came into existence.

**2340.** As set forth in this Complaint, Plaintiff Daughters present substantial evidence that it has been long-established Massachusetts judicial philosophy that preservation of an elder's ability to retain dignity and respect is supposedly of the highest importance; yet, G.L. c. 190B, § 1-109 promotes such afore-described deprivations of life and liberty through the use of a preponderance of the evidence standard to declare a person incapacitated—people accused of being sexually dangerous are afforded *greater* protection of rights than the elderly (and other individuals alleged to be incapacitated).

**2341.** The standard used to determine whether a person is deemed sexually dangerous is that of clear and convincing. See  18 U.S.C. § 4247.  As the United States Supreme Court stated in *Addington v. Texas*, 441 U.S. 418, 425: "Adopting a standard of proof is more than empty semantic."  See *U.S. v. Jeffrey Shields*, Civil Action No. 07-12056-PBS (2007 District of Massachusetts).

**2342.** In citing *Addington v. Texas*, this Court, in *U.S. v. Jeffrey Shields*, declared the manner in which a burden of proof is established:

When a case – whether civil or criminal – involves individual rights, the selected standard of proof 'reflects the value society places on individual liberty.'

2343.   As a direct result of an elder being judicially declared incapacitated and a ward of the State, as set forth, there is solid and concrete evidence that SJC Rule 1:07 court appointees obtain court ordered forced administering of antipsychotics to elders diagnosed with dementia—with the judiciary of the Massachusetts Probate & Family Court rubber-stamping such court orders (despite knowledge of the well-established black-box warnings issued by the FDA not to give elders having dementia antipsychotics specifically due to increased risk of death due to the side-effects of the antipsychotics causing pneumonia and other fatal respiratory infections).

**2344.** The established custom and standard practice of the Massachusetts Probate & Family Courts is the use of a preponderance of the evidence standard to support court ordered forced administering of antipsychotics.  See *Guardianship of Jackson*, 61 Mass. App. Ct. 768 (2004).

223

2345.   As established in this Complaint, it is well-established that the Supreme
Judicial Court declared court ordered administering of antipsychotics to be
one of the most invasive and intruding type of deprivation of liberty.

2346.   Upon approximately, 2 years of public research by Plaintiff Daughters in
the various Massachusetts Probate & Family Courts, they have yet to find
an elder who is placed under SJC Rule 1:07 guardianship and
conservatorship and *not* being given antipsychotics. Elder deemed wards of
the State are being given antipsychotics *based solely on having dementia*.

2347.   As set forth in this Complaint, Plaintiff Daughters have presented
substantial and concrete evidence that facilities and providers selected by
SJC Rule 1:07 court appointees for placement and treatment of wards) give
these elders antipsychotics specifically to facilitate: 1) Medicaid fraud; 2)
the liquidation of real estate owned by elders having been forced out of
their homes into long-term facilities (using antipsychotics to initiate and/or
accelerate physical decline by the elder, so as to create a pretext for such
placement; and 3) to induce sleep during waking hours to keep elders
sedated for the convenience of health aides.

2348.   As set forth in this Complaint, Plaintiff Daughters have presented
substantial and concrete evidence that nursing homes and psychiatrists
obtained by SJC Rule 1:07 court appointees that demonstrate an
overwhelming percentage of elders and children are being given
antipsychotics unnecessarily and in excessive dosage.  (Refer to prior
referenced Exhibits 190).

2349.   There is well-established evidence showing that use of DSM is an
unreliable and invalid means on which diagnoses are based; including a
prevalent pattern of the DSM leading to false diagnoses.  See *The Reality of
the DSM in the Legal Arena: A Proposition for Curtailing Undesired
Consequences of an Imperfect Tool*, 13 Houst. J. Health L. & Policy 79
(2012).  (Copy of the afore-referenced journal article is provided in Exhibit
388).

2350.

2351.   There is substantial expert documentation showing that the use of
psychiatric diagnoses for forensic purposes is often misused and
misconstrued in court proceedings, such as guardianships and
conservatorships.  The determination of capacity is *supposed* to be focused
on evaluating the level of a person's *functioning—not* based on a
psychiatric diagnosis.

224

2352.   It is well-established Massachusetts case law that a diagnosis, in and of itself, is _not_ a sufficient basis to judicially declare a person incapacitated. There have been studies done that show judges (in general) *do not* have adequate scientific or medical training to distinguish between the application and significance of diagnostic categories; that there is too high of a risk that judges rely on a diagnosis for false sense of certainty and that they make misattributions about the causes of behavior.  See *Forensic psychiatric diagnosis unmasked*, 88 Judicature 200 (2004-2005).  (Copy of the afore-referenced journal article is provided in Exhibit 389).

2353.   Plaintiff Daughters present solid and credible evidence to show that Massachusetts Probate & Family Court judges—especially, in the matter of In re Marvin H. Siegel—rely on a diagnosis, rather than an actual evaluation of specific behavioral conduct or lack of conduct exhibited by an elder.

2354.   On multiple occasions, the issue regarding the constitutionality of using the standard of preponderance of the evidence in rendering a judicial determination of incapacitation in guardianship and conservatorship proceedings has been raised before the Supreme Judicial Court; however, the Massachusetts appellate courts have _repeatedly_ and explicitly refused to address this issue.   *Fazio v. Fazio*, 375 Mass. 394, 401 (1978); *John Doe v. Richard Doe*, 377 Mass. 272, 280 (1979); *In re Guardianship of McDonald*, 74 Mass. App. Ct. 1107 (2009).

2355.   As set forth above, to judicially declare a person sexually dangerous the standard of proof used is <u>clear and convincing evidence</u>.  Therefore, as it now stands, alleged sexually dangerous people have *greater rights* than the elderly.  It is in the public's interest that this Court declare that the use of the preponderance of the evidence standard in determining incapacitation for court ordered guardianships and conservatorships violates the Due Process Clauses of the Federal Constitution.

2356.   Plaintiff Daughters have been injured— as interested parties in the matter of In re Marvin H. Siegel—by the Essex Probate & Family Court's use of the preponderance of evidence standard in declaring Father incapacitated.

Count 2

2357.   Plaintiff Daughters seek a declaratory judgment that G.L. c. 190B, § 1-109 is unconstitutionally broad and ambiguous where the Legislature solely set forth the standard of proof for guardianship and conservatorship proceedings with regard to "contested cases"—the Legislature did not, in any way, indicate what standard of proof is to be applied in <u>uncontested cases</u>.

2358.   It is unconstitutionally unsound—in and of itself—to have differing levels of burden of proof for contested cased and uncontested cases.

2359.   Where the language of the statute *explicitly delineates* the preponderance of the evidence standard to apply <u>*only*</u> to "contested cases", it is axiomatic that the Legislature intended *a <u>lesser</u>* standard than preponderance of the evidence be applied to an uncontested case.

2360.   The Legislature's expressed designation of a different standard to be used for "contested cases" versus uncontested cases wholly contravenes the very essence of the foundational principles set forth in the Due Process Clauses of the Federal Constitution.

2361.   In view of the legislative history of G.L. c. 190B, the *only* logical and reasonable conclusion that can be drawn from the statutory provisions of G.L. c. 190B, § 1-109 is that the Legislature specifically and deliberately intended to use convoluted legalese to veil provided authority to the judiciary to engage in rubber-stamping.

2362.   Evidencing the above-described intent of the Legislature to purposefully allow judges to rubber-stamp is the fact that the foremost person spearheading the Legislature's promulgation of G.L. c. 190B was Senator Cynthia Creem—whose primary profession consists of practicing law concentrating almost entirely in probate and family law; operating the law firm of Stone, Stone & Creem with her daughter, Attorney Gayle Stone-Turesky.

2363.   Provided in Exhibit 390 is information consisting of the publicly published profile for the law firm of Stone, Stone & Creem and public information demonstrating the leading role that Senator Creem played in promulgating the statutory provisions of the "new" Municipal Uniform Probate Code.

**2364.** In addition, Senator Creem has accepted work as a SJC Rule 1:07 court appointed GAL for the Suffolk Probate & Family Court—during her tenure as Senator.  (Exhibit 391).

2365. Senator Creem has been serving as Co-Chair of the Judiciary Commission for the State Legislature.  She, also, had been a member of the Governor's Council from 1994-1998 and a Life member of the MBF Society of Fellows.

**2366.**  Other additional indicators of the opportunity for improper use of influence and power is Senator Creem's law firm's (Stone, Stone & Creem) association with the Massachusetts Family & Probate American Inn of Court, Senior Partners, and Massachusetts Bar Association.

**2367.** On behalf of Stone, Stone & Creem, Attorney Stone-Turesky—Senator Creem's daughter—has served as an appointed member of the Supreme Judicial Court's "Task Force" for Child Support Guidelines and Access to Justice.  She is, also, a member of the Massachusetts Family & Probate American Inn of Court.

**2368.** As an associate of Stone, Stone & Creem, Attorney Judith McKinnon previously worked as a law clerk in the Massachusetts Probate & Family Court, with her experience being described as having "had the opportunity to work closely with many of the State's Probate Judges."  She is also a member of the Joint Bar Committee on Judicial Appointments.

**2369.** As an associate of Stone, Stone & Creem, Attorney Katie Donahue served as a law clerk in the Massachusetts Probate & Family Court; having worked in the Administrative Office, Middlesex County, Norfolk County and Worcester County.

2370.

**2371.** As evidenced, it is in the public's interest that this Court declare G.L. c. 190B, § 1-109 unconstitutional based on the statutory language having created two (2) separate and different standards of burden of proof for contested cases and for uncontested cases; thereby, gravely contravening the foundational principles of Due Process guaranteed by the U.S. Constitution.

Count 3

<u>To declare: a durable power of attorney is a mechanism that can be used as an alternative</u>
<u>to the need for a court appointed guardian and conservator</u>

2372.  Pursuant to G.L. c. 190B, § 1-201, Father's 2003 DPOA is a governing instrument in guardianship and conservatorship proceedings.

2373.  Pursuant to G.L. c. 190B, § 5-306, the judiciary of the Massachusetts Probate & Family Court is precluded from appointing a guardian when the elder's needs can be met by least restrictive means—which Plaintiff Daughters set forth in this Complaint well-established Massachusetts case law that an executed durable power of attorney is an instrument that can satisfy the least restrictive means in context with G.L. c. 190B, § 5-306.

2374.  Designated Defendants held themselves out publicly to be the petitioners for permanent guardianship and conservatorship in the matter of In re Marvin H. Siegel; as well as, the Essex Probate & Family Court having officially deemed designated Defendants as such—especially, with regard to the trial held before the Essex Probate & Family Court in June of 2012 and July of 2012.

2375.  Of significance, Plaintiff Daughters requested in-court that the Essex Probate & Family Court formally determine the validity of Father's 2003 DPOA in court on: May 27, 2011, June 7, 2011, June 16, 2011, March 27, 2012, June 27, 2012 and July 11, 2012; however, through Judge Abber's own initiative and in no manner requested by the designated Defendants, Judge Abber repeated and continuously refused to address the validity of Father's 2003 DPOA.

2376.  Given the above-described repeated and continuous raising of the issue regarding validity and materiality of Father's 2003 DPOA by Plaintiff Daughters, it was incumbent upon designated Defendants to dispute the validity of Father's 2003 DPOA—especially, having been deemed to be petitioners in the matter of In re Marvin H. Siegel.  As purported petitioners for guardianship, G.L. c. 190B, § 5-306 required designated Defendants to prove that there were no other means available less restrictive than court-ordered guardianship and conservatorship.  At trial, the existence of Father's 2003 DPOA was not disputed by designated Defendants who in no manner attempted to dispute the validity of Father's 2003 DPOA.

2377.  As set forth, where the court record shows that the existence of Father's 2003 DPOA was explicitly raised by Plaintiff Daughters during the trial, Defendants had more than a full and fair opportunity to dispute the validity of Father's 2003 DPOA and were obligated to do so at that time; therefore,

228

the Defendants are precluded, as a matter of collateral estoppel, from disputing Father's 2003 DPOA now.  Accordingly, based on designated Defendants conduct, the validity of Father's 2003 DPOA from February 11, 2011 through May 25, 2011 is indisputable.

2378.   As previously set forth, Plaintiff Daughter Lisa has been unlawfully stripped of her rightful status as Father's attorney-in-fact and Plaintiff Daughter Devora of her rightful status as successor attorney-in-fact as a direct result of fraudulent and deceptive conduct by designated Defendants.

2379.   In addition, Plaintiff Daughters have established that Father's 2003 DPOA would be effective today, but for the fraudulent and deceptive conduct of designated Defendants (BNY Mellon, Brian Nagle, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Attorney Garmil, Whittier Pavilion, Sheryl Sidman and Alan Sidman).

2380.   As set forth in this Complaint, prior to the promulgation of the "new" MUPC provisions (G.L. c. 190B), it is long established by case law and legislative history that the *supposed* intent of the MUPC was to promote the philosophy that elders should be assisted in using "self-determination" as much as possible; that the execution of a durable power of attorney is specifically designed to avoid an elder from becoming a ward and to keep the the Probate & Family Court out of a person's private affairs.  The outwardly held out purpose of a durable power of attorney is to prevent the need for SJC Rule 1:07 court appointments; and to preserve and protect a person's expressed intentions and wishes of the elder—as so often heard in advertisements by lawyers on AM radio stations.

2381.   The above-described requests for declaratory judgment greatly serve the interests of justice and judicial economy; particularly, where a durable power of attorney is statutorily permitted as a least restrictive means to carry out the personal and financial affairs for an elder—*especially, it being well established statutorily and by case law that the whole purpose and essence for executing a durable power of attorney.*  It is well established by case law that a durable power of attorney should be used as an alternative to a court ordered guardianship and conservatorship—thereby relinquishing the need for involvement by the Massachusetts Probate & Family Court and elder protective services.

Count 4

To declare: G.L. c. 190B, § 5-305 violates the Due Process Clauses
       of the Federal Constitution

2382.    Plaintiff Daughters seek a declaratory judgment that the standard custom and practice of disqualifying family members as guardians and conservators by the Massachusetts Probate and Family Court judiciary violates the substantive and procedural due process guarantees of the Fifth and Fourteenth Amendments of the U.S. Constitution. G.L. c. 190B, § 5-305 governs the disqualification of family members as guardians and conservators—involving express advance directives and otherwise.

2383.    The language of G.L. c. 190B, § 5-305 unequivocally expresses that—with or without an advance directive—family members are supposed to be considered *prior* to any court ordered SJC Rule 1:07 guardian or conservator.

2384.    As set forth by Plaintiff Daughters in this Complaint, the standard custom and practice of Massachusetts Probate and Family Court judiciary is to automatically appoint a SJC Rule 1:07 guardian or conservator, without any formal consideration of family members to be appointed guardian and conservator.

2385.    Plaintiff Daughters have set forth solid facts and legal support in this Complaint establishing that the above-described manner in which the Massachusetts Probate & Family Courts routinely—without any substantiated basis of any kind—disregard an elder's written advance directive that explicitly set forth his or her nominated guardian and conservator (most often the nomination being a family member).

2386.    G.L. c. 190B, § 5-305 does not set forth any set procedure to be followed by judges in the disqualification of family members and other nominees from being appointed guardians and conservators. The statute does not even require the judge to make formal findings—the statute does not mandate that the judge set forth written findings on which disqualification is based; and there is no mandate that an evidentiary hearing be held.

2387.    The language set forth in G.L. c. 190B, § 5-305 regarding a judge's disqualification of family members from being guardian and conservator promotes capricious judicial conduct. The lack of any parameters in the statute shows that there are *no* safeguards of any kind to hinder corruption.

230

2388.  As Plaintiff Daughters set forth in this Complaint, there is an established pattern, throughout the Massachusetts Probate & Family Courts, of the judiciary failing to set forth reasons for the determination of disqualification of family members.

2389.  As Plaintiff Daughters set forth in this Complaint, there is an established pattern throughout the Massachusetts Probate & Family Courts of judges rubber-stamping baseless and unsupported claims of exploitation made by disgruntled family members and SJC Rule 1:07 court appointees.

2390.  As Plaintiff Daughters set forth in this Complaint, there is an established pattern throughout the Massachusetts Probate & Family Courts of SJC Rule 1:07 court appointees making false allegations and fabrications against family members and non-family nominations by an elder.

2391.  As Plaintiff Daughters set forth in this Complaint, there is an established pattern throughout the Massachusetts Probate & Family Courts of SJC Rule 1:07 court appointees deliberately using State elder protective service agencies to facilitate knowingly fraudulent and deceptive ousters of family members from being appointed guardian and conservator.

2392.  As Plaintiff Daughters set forth in this Complaint, there is an established pattern, throughout the Massachusetts Probate & Family Courts, of SJC Rule 1:07 court appointees making unlawful threats to family members of the pursuit of criminal prosecution on SJC Rule 1:07 court appointees' false allegations of exploitation.

2393.  For the reasons set forth above, Plaintiff Daughters seek a declaratory judgment that G.L. c. 190B, § 5-305 is unconstitutional based on: 1) statutory language being unconstitutionally broad and ambiguous; 2) the lack of procedural requirements for a judicial determination of a disqualification of family members as guardian and conservator contravening Federal Constitution guarantees for protection of the sanctity and integrity of the family unit; and 3) the lack of procedural requirements for judicial determination of the disqualification of family members as guardians and conservators contravening the Federal Constitutional protections of personal decision-making in private affairs.

Count 5

<u>To declare: the Massachusetts Attorney General's Office had a conflict of interest in representing the Essex Probate & Family Court as legal counsel in the original civil action filed with the Supreme Judicial Court by Plaintiff Daughter (SJ-2012-0125 and SJC-11193)</u>

**2394.** Plaintiff Daughters seek a declaratory judgment that the established custom and practice of the Commonwealth—having the Attorney General's Office represent public officials as legal counsel to defend civil actions brought by private parties premised on allegations of criminal misconduct—violates the substantive and procedural due process guarantees to private citizens under the Fifth and Fourteenth Amendments of the U.S. Constitution.

2395. *In the matter of Wanda W. Jones*, 379 Mass 826 (1980) shows that there have been substantial concerns previously raised before the Supreme Judicial Court about the duty of the Attorney General's Office acting with divided loyalties in its duty to represent the interests of the public.

2396. It is indisputable that the Attorney General's Office has an obligation to take corrective action regarding acts of abuse of power by public officials. As set forth in this Complaint, the Attorney General's duty to protect the public's interests is breached when the Attorney General's Office acts as legal counsel *for* public officials in civil actions brought by private citizens for injury sustained by alleged illegal conduct of public officials. Inevitably legal representation by the Attorney General's Office consists of *defending* public officials against allegations of illegal acts; therefore, it is axiomatic that the Attorney General's Office *cannot* abide by its duty to protect the public from criminality. De facto, when private civil actions against public officials are wholly based on allegations of unlawful acts, the Attorney General's Office has divided loyalties—this is a violation of the professional rules of ethics promulgated by the Board of Bar Overseers.

2397. As set forth in this Complaint, the Attorney General's Office represented the Essex Probate & Family Court in the emergency civil action filed by Plaintiff Daughter Lisa with the Supreme Judicial Court in March of 2012. As established, the Essex Probate & Family Court was explicitly and specifically designated a defendant in the afore-described emergency civil action. The Attorney General's Office was served directly a copy of the emergency petition.

2398. As set forth in this Complaint, Plaintiff Daughter Lisa's bringing a civil action seeking injunctive relief for illegal acts of public officials is *not* an

232

isolated matter.  As demonstrated, there is a long-established history of private citizens having pursued similar civil actions that are wholly based on illegal conduct, with the Attorney General's Office acting as legal counsel for the public officials.

2399.   As previously set forth, Plaintiff Daughter Lisa presented <u>numerous specific and concrete allegations of substantial *criminal* misconduct</u> by Judge Abber of the Essex Probate & Family Court and SJC Rule 1:07 Court Appointees (Defendants Attorney Cuffe, Feld and Myette) in the afore-described emergency civil action—which Plaintiff Daughter Lisa sought immediate and permanent injunctive relief.

2400.   As previously set forth, there is overt and blatant evidence of designated Defendants' evidencing the Attorney General's actual conflict of interest in its representation of the Essex Probate & Family Court in the afore-described emergency civil action—established acts of the Supreme Judicial Court in deleting the designation of the Essex Probate & Family Court as a specific party named in the electronic docket and the written issued decision.

## Count 6

To declare: actions by judges outside of the scope of lawfully presiding on a matter do not fall under the cloak of absolute judicial immunity

**2401.**   Plaintiff Daughters seek a declaratory judgment that communications outside the courtroom between the judiciary and litigants constitute acts beyond the scope of the duties of a judge; that judges be prohibited from being able to use the claim of absolute immunity regarding acts that are prima facie in violation of the Massachusetts Judicial Canons of Ethics.

**2402.**   Plaintiff Daughters seek a declaratory judgment that judges are prohibited from being able to use the of claim of absolute immunity regarding acts that have *no* bearing on carrying out legitimate duties of presiding over a matter and that are prima facie in violation of the Massachusetts Judicial Canons of Ethics.

**2403.**   Plaintiff Daughters seek a declaratory judgment that judges are prohibited from being able to use the claim of absolute immunity under the cloak of acting in a judicial capacity regarding prima facie evidence of criminal conduct.

233

**2404.** Plaintiff Daughters present substantial solid and concrete evidence that Judge Abber and Judge Ricci have violated the Massachusetts Judicial Canons of Ethics by having engaged in communications outside the courtroom with designated Defendants; colluding to facilitate financial exploitation in the matter of In re Marvin H. Siegel—as well as, in the matters of In re James Pentoliros and In re Hope Pentoliros, along with other numerous probate matters set forth in this Complaint.

**2405.** Plaintiff Daughters present substantial solid and concrete evidence that Judge Abber and Judge Ricci have engaged in accepting bribes and/or other improper personal benefits in exchange for rubber-stamping motions and other pleadings in favor of designated Defendants in the matter of In re Marvin H. Siegel and in exchange for denying motions and pleadings submitted by Plaintiff Daughters.

**2406.** Plaintiff Daughters present substantial solid and concrete evidence that Judge Abber and Judge Ricci have engaged in accepting bribes and/or other improper personal benefits in exchange for rubber-stamping motions and other pleadings in favor of designated Defendants in exchange for denying motions and pleadings in the matter of In re James Pentoliros and In re Hope Pentoliros.

**2407.** Plaintiff Daughters present substantial solid and concrete evidence that Judge Blake and Judge Sahagian have knowingly and intentionally facilitated embezzlement in several probate matters over a long-established period of time.

**2408.** Plaintiff Daughters present substantial solid and concrete evidence that there is a long-established history and prevalence of the judiciary of the Massachusetts Probate & Family Court facilitating SJC Rule 1:07 court appointees' acts of racketeering.

**2409.** Plaintiff Daughters present substantial solid and concrete evidence that there is a long-established history and prevalence of the judiciary of the Massachusetts appellate courts deliberately disregarding and/or condoning the above-described conduct.

**2410.** Plaintiff Daughters present substantial solid and concrete evidence that there is a long-established history and prevalence of the judiciary of the

234

Judicial Conduct Commission disregarding and/or condoning the above-described conduct.

2411.   Plaintiff Daughters present substantial solid and concrete evidence that there is a long-established history and prevalence of the Attorney General's Office deliberately disregarding and/or condoning the above-described conduct.

2412.   As set forth in this Complaint, the credibility of Plaintiff Daughters' claims is bolstered by substantial solid and concrete evidence of a long-established history and prevalence of corruption in the State's government—such as, RICO convictions as a result of corruption in the Probation Department; tampering of evidence by the State Drug Lab; years of the Commonwealth's lack of oversight over DCF (previously DSS), culpability by the Commonwealth and Board of Registration in Pharmacy in 166 deaths from fungal meningitis.

2413.   Plaintiff Daughters present substantial solid and concrete evidence that it is in the public's interests that judges be precluded from being able to avoid liability from acts that are *not* within the scope of judicial duties and violate the Massachusetts Code of Judicial Conduct; and that directly and proximately cause injury to a private citizen—especially, where there is a long-established pattern of zero accountability by the State regarding judicial misconduct.  Plaintiff Daughters have demonstrated, there is a long-established pattern of private citizens having no other avenue for redress of harm caused by unlawful conduct of the judiciary.

2414.   Plaintiff Daughters present substantial solid and concrete evidence that it is in the public's interest that judges be precluded from being able to avoid liability from criminal acts that directly and proximately cause injury to a private citizen.

WHEREFORE, Plaintiff Daughters requests that this Court grant the above-described declarative relief.

Count 7

Fraud:  Facilitation of obtaining Father's signature on written instruments of May 25, 2011 and knowingly promoting the use of fraudulently obtained written instruments

235

(Defendants: BNY Mellon-diversity jurisdiction, Brian Nagle, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Law Firm TBHR, Attorney Garmil, Whittier Pavilion)

2415.   Defendant BNY Mellon is a foreign corporation based in Delaware.  A substantial portion of underlying alleged misconduct involved the participation of officers, agents, servants or employees of Defendant BNY Mellon located in New York.

2416.   Defendant BNY Mellon—through its officers, agents, servants and employees—knowingly and fraudulently engaged in acts of deceptively obtaining Father's signature on written instruments.  The written instruments consisting of: a revocation of Father's 2003 DPOA, new durable power of attorney/healthcare proxy and retainer agreement for legal representation by Defendant Law Firm TBHR—signed by Father on May 25, 2011, while he was under involuntary commitment at Defendant Whittier Pavilion.

2417.   The new durable power of attorney and retainer agreement directly facilitated by Defendant Law Firm TBHR and designated Defendants (Attorney Tarlow and Attorney Watson) are replete with numerous provisions that explicitly gave Defendant BNY Mellon and Defendant Law Firm TBHR unfettered discretion to use the funds of DSL Trust, for designated Defendants' *own personal use*.

2418.

2419.   Since Father's first hiring Defendant BNY Mellon in 1999 to manage his funds—including the DSL Trust, Father explicitly signed a written agreement that Defendant BNY Mellon *did not* have unfettered discretion in the handling of funds.  In fact, Defendant Attorney Cukier—as counsel for Defendant BNY Mellon—provided a copy of that written agreement to Judge Abber in a clandestine manner.  (No notice was provided to Plaintiff Daughters that Judge Abber was provided documents outside of court.  Plaintiff Daughter Lisa had discovered this inadvertently upon review of the court files for In re Marvin H. Siegel—a copy of the document that Defendant Attorney Cukier provided Judge Abber is in Exhibit 392).

2420.   On May 24, 2011, Defendant Brian Nagle knew that Father did not have any intention or desire to give unfettered discretion in the use of his funds—especially with regard to the DSL Trust.

2421.   Plaintiff Daughters present concrete and specific evidence that Defendant Brian Nagle knew that Defendant Law Firm TBHR could not ethically act

236

as legal counsel for Father; as designated Defendants (Attorney Tarlow, Attorney DeNapoli and Attorney Watson) had served as co-members, for several years, on the Board of Directors and Officers of Family Business Magazine Inc. with Defendant Brian Nagle—in his specific official capacity with Defendant BNY Mellon).

2422. Plaintiff Daughters present concrete and specific evidence that, _prior_ to May 25, 2011, Father had no prior business dealings with Defendant Attorney Tarlow or Defendant Law Firm TBHR; that Father _did not_ personally initiate legal representation by Defendant Attorney Tarlow or Defendant Law Firm TBHR.

2423. Plaintiff Daughters present concrete and specific evidence that Defendant Brian Nagle breached his fiduciary duty to Father and to Plaintiff Daughters.

2424.   Defendant Brian Nagle had a fiduciary duty to Plaintiff Daughters in three separate and distinct respects: 1) on May 24, 2011, Plaintiff Daughters were valid and effective attorneys-in-fact for Father pursuant to Father's 2003 DPOA, 2) Plaintiff Daughters are co-trustees of the DSL Trust and 3) Plaintiff Daughters are co-beneficiaries of Father's estate.

2425. Defendant Brian Nagle directly solicited Defendant Law Firm TBHR and Defendant Attorney Tarlow on May 24, 2011 to provide legal services to Father.  Defendant Brian Nagle told them to go see Father at Defendant Whittier Pavilion while Father was under an involuntary commitment.

2426. On May 24, 2011 (and numerous years prior), Defendant BNY Mellon— through its officers, agents, servants and employees—and Defendant Brian Nagle knew that Father's 2003 DPOA was valid and effective.

2427. Defendant Law Firm TBHR, Defendant Attorney Tarlow, Defendant Attorney DeNapoli, and Defendant Attorney Watson knew _prior_ to designated Defendants going to see Father with the already prepared written instruments (signed by Father on May 25, 2011) that Father's 2003 DPOA was valid and effective.

2428. Defendant BNY Mellon—through its officers, agents, servants and employees in its offices in Boston and New York—knowingly and fraudulently engaged in acts of deception for intended conversion of funds belonging to DSL Trust for its own use including his having made

237

misrepresentations to Plaintiff Daughter Lisa that Defendant BNY Mellon would honor her authority as attorney-in-fact for Father.

2429.   The Board of Directors and President for Defendant BNY Mellon had knowledge of the above-described misconduct by Defendant Brian Nagle and other designated Defendants where Plaintiff Daughter Lisa sent copies of the 93A Demand letter.

2430.   High ranking officials of Defendant BNY Mellon had taken overt acts to aid and abet the misconduct of Defendant Brian Nagle—as evidenced, in this Complaint, by their communications with the Federal Reserve and the Federal Reserve's written refusal to Plaintiff Daughter Lisa that it was not going to conduct an investigation.

2431.   From the inception of Father being admitted to Defendant Whittier Pavilion, on May 20, 2011, Defendant Attorney Garmil knew about Father's 2003 DPOA and that Plaintiff Daughter Lisa was Father's attorney-in-fact.  Based on that knowledge, Defendant Attorney Garmil instructed the staff of Defendant Whittier Pavilion to prevent Plaintiff Daughter Lisa from seeing Father from, approximately, May 20, 2011 through and past May 25, 2011.  Defendant Attorney Garmil did so in collusion with designated Defendants.  Defendant Attorney Garmil had fraudulently and deceptively kept Plaintiff Daughter Lisa from seeing her Father.

2432.   On or about May 20, 2011, the social worker on staff with Defendant Whittier Pavilion directly informed Plaintiff Daughter Lisa that she was not permitted to see Father because the social worker specifically stated that legal counsel for Defendant Whittier Pavilion claimed that Father's 2003 DPOA was invalid.

2433.   As set forth in this Complaint, on May 24, 2011, Defendant Attorney Garmil—on behalf of Defendant Whittier Pavilion—filed a petition for a 6-month involuntary civil commitment of Father to a psychiatric facility.

**2434.**   On May 25, 2011, Defendant Whittier Pavilion—through its officers, agents, servants and employees—and Defendant Attorney Garmil knew, prior to Defendant Attorney Tarlow and Defendant Attorney Watson visiting with Father, that Defendant Attorney Tarlow and Defendant Attorney Watson were *private* attorneys—not court appointed counsel.

238

**2435.**   Designated Defendants kept Plaintiff Daughter Lisa from seeing Father until *after* Father had signed the documents given to him by Defendant Attorney Tarlow and Watson, and Plaintiff Daughter Lisa had retained private legal counsel, in her capacity as attorney-in-fact for Father.

2436.   As a direct proximate result of intentional acts of fraud and deception by Defendant BNY Mellon—through their officers, agents, servants and employees, Plaintiff Daughters have sustained considerable and substantial harm and other damages—including, but not limited to, emotional distress and loss of past, present and future income.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 8

Fraud Conspiracy: facilitation of obtaining Father's signature on written instruments of May 25, 2011

(Defendants: BNY Mellon, Brian Nagle, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Law Firm TBHR, Attorney Garmil, Whittier Pavilion)

2437.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2438.   Plaintiff Daughters present concrete and specific evidence that Designated Defendants and its officers, agents, servants and employees have engaged in the facilitation of Father's signing the afore-described documents of May 25, 2011 through fraud and deception.

2439.   Designated Defendants knowingly engaged in agreement to fraudulently and deceptively obtain Father's signature on the afore-described documents of May 25, 2011.

2440.    As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 9

<u>Breach of fiduciary relationship</u>

(Defendant BNY Mellon – diversity jurisdiction)

2441.  Since 1999, Defendant BNY Mellon has had a fiduciary relationship with
Father regarding custody and investment management of the DSL Trust
and other financial accounts of Father's.

2442.  Defendant BNY Mellon—through its officers, agents, servants or
employees—knew that Plaintiff Daughters were co-trustees and co-
beneficiaries of the DSL Trust and co-beneficiaries of Father's estate.

2443.  On or about February 11, 2003, Defendant BNY Mellon—through its
officers, agents, servants and employees—knew about the execution by
Father of his 2003 DPOA and the content of Father's 2003 DPOA.
Defendant BNY Mellon knew that Father had personally sought the
execution of the 2003 DPOA and of the validity of the 2003 DPOA.
Defendant BNY Mellon knew that Plaintiff Daughter Lisa was Father's
attorney-in-fact, at all relevant times.

2444.  On or about June 16, 2011 and at all other relevant times, Defendant BNY
Mellon knew that Father had executed a written re-affirmation of his 2003
DPOA; in particular, Defendant BNY Mellon—through its officers, agents,
servants and employees—knew that Father had re-affirmed his designation
of Plaintiff Daughter Lisa as his attorney-in-fact.

2445.  Defendant BNY Mellon—through its officers, agents, servants and
employees—had a fiduciary duty to Plaintiff Daughters in their capacities:
as attorneys-in-fact, as co-trustees of the DSL Trust, as co-beneficiaries of
the DSL Trust and co-beneficiaries of Father's estate.  Specifically,
Defendant BNY Mellon had a duty to not act for the benefit of itself in any
matter to which it has duties to perform or interests to protect another.

2446.  Defendant BNY Mellon—through its officers, agents, servants and
employees—breached its fiduciary duty to Plaintiffs Daughters by
engaging in acts of self-dealing, which include, but are not limited to:
Defendant Brian Nagle's soliciting the legal services of Defendant Attorney
Tarlow and Defendant Law Firm TBHR in purported representation of
Father; colluded with counsel of Defendant Law Firm TBHR in
purportedly revoking Father's 2003 DPOA; the inclusion of Defendant

240

BNY Mellon in the durable power of attorney signed by Father on May 25, 2011; the inclusion of Defendant BNY Mellon in the retainer agreement signed by Father on May 25, 2011; converting funds belonging to DSL Trust (which Plaintiff Daughters are co-trustees and co-beneficiaries) to its own use; stealing funds from DSL Trust; creating false documentation to obtain stolen funds from DSL Trust; engaging in acts to conceal fraudulent and deceptive activity of other Defendants; using office property, including, without limitation, facsimiles, telephones and mailing items to facilitate fraud.

2447.   Defendant BNY Mellon had knowledge of the above-described misconduct by Defendant Brian Nagle and other designated Defendants where Plaintiff Daughter Lisa sent copies of the 93A Demand letter to the Board of Directors and President of Defendant of BNY Mellon.

2448.   High-ranking officials of Defendant BNY Mellon had taken overt acts to aid and abet the misconduct of Defendant Brian Nagle—as evidenced by the result of communications with the Federal Reserve and the Federal Reserve's written refusal to investigate.

2449.   As a direct proximate result of intentional acts of self-dealing by Defendant BNY Mellon—through the officers, agents, servants and employees, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 10

Fraud: Involuntary commitment of Father to Defendant Whittier Pavilion

(Defendants: Beverly Hospital, Whittier Pavilion, Attorney Garmil, BNY Mellon, Brian Nagle, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson)-

2450.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2451.   Plaintiff Daughters present concrete and specific evidence Defendant Beverly Hospital fraudulently and deceptively directed and facilitated

241

the involuntary admission of Father to Defendant Whittier Pavilion on May 20, 2011.

2452.    Plaintiff Daughters present concrete and specific evidence that Defendant Beverly Hospital—through its officers, agents, servants and employees—and Defendant Whittier Pavilion—through its officers, agents, servants and employees—have a pattern of common design and acting in agreement to refer patients for the specific purposes of obtaining ill-gotten gain through facilitating Medicare fraud and obtaining kickbacks for facilitating patient admissions.

2453.    Plaintiff Daughters present concrete and specific evidence that Defendant Beverly Hospital and Defendant Whittier Pavilion knowingly and intentionally disregarded Plaintiff Daughter Lisa's authority as attorney-in-fact for Father.

2454.    Plaintiff Daughters present concrete and specific evidence that Defendant Beverly Hospital and Defendant Whittier Pavilion purposefully excluded Plaintiff Daughter Lisa from decisions that were made by Defendant Hospitals regarding Father's admission.

2455.    Plaintiff Daughters present concrete and specific evidence that Defendants Attorney Ledoux and Defendant Attorney Garmil, in their capacities as counsel for respective hospitals, have an established pattern of collusion with specific regard to filing petitions for guardianship and conservatorship over patients admitted at their clients' medical facilities.

2456.    Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Garmil engaged in fraudulent and deceptive conduct to prolong Father's involuntary commitment at Defendant Whittier Pavilion.

2457.    Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Garmil engaged in fraudulent and deceptive conduct to foist Father into the Massachusetts Probate & Family Court system.


WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.


Count 11

242

Conspiracy: attempt to frame Plaintiff Daughter Lisa for financial exploitation

(Defendants: BNY Mellon, Brian Nagle, Law Firm TBHR, Attorney Tarlow, Attorney
DeNapoli, Attorney Watson, Burns & Levinson, Attorney Studen, ESMV,
Attorney Berid,  Diane Powell, Scott Dailey, Michael Springman)

2458. Plaintiff Daughters present concrete and specific evidence that designated
Defendants have engaged in overt and specific fraudulent and deceptive
acts in furtherance of attempted set-up to induce Father to make
statements—on a recorded call—that Plaintiff Daughter Lisa was trying to
steal $6 million from Father's accounts held with Defendant BNY Mellon.

2459. As demonstrated in the Complaint, Plaintiff Daughters have set forth
concrete and specific evidence that shows the existence of a conspiratorial
agreement amongst the designated Defendants through the words, actions,
and the interdependence of activities and persons involved.

2460. Plaintiff Daughters present concrete and specific evidence that designated
Defendants used blatant and flagrant trickery in the afore-referenced
recorded call (of July 22, 2011) and outright attempt to put words in
Father's mouth to make allegations against Plaintiff Daughters Lisa—
which Father rejected.

2461. As demonstrated in the Complaint, Plaintiff Daughters have set forth
concrete and specific evidence of liability by the Essex Probate & Family
Court based on the established pattern of the judiciary's own overt
commission of intentional and deliberate acts in aiding and abetting
designated Defendants' false allegations against Plaintiff Daughter Lisa.

2462. Plaintiff Daughters present concrete and specific evidence that Plaintiff
Daughter Lisa has suffered—and continues to suffer—grave injury as a
direct result of designated Defendants' above-described actions.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 12

RICO violation under 18 U.S.C. §§ 1962 (c) and (d)

(All Defendants)

243

2463.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2464.   Plaintiff Daughters have standing to pursue claims of relief under
18 U.S.C. § 1962 as they have set forth solid and concrete evidence of their
having suffered—and continue to suffer—injury to their liberty and
property interests as a direct result of the criminal enterprise operated
through the Massachusetts Probate & Family Court system.

2465.   Plaintiff Daughters present concrete and specific evidence that the Essex
Probate & Family Court and the other Probate & Family Courts throughout
Massachusetts are subset entities—with the Massachusetts Probate &
Family Court system as the parent entity—have been operating for over *30
years* and continue to operate a criminal enterprise of financial exploitation.

2466.   The afore-described criminal enterprise—facilitated through the Essex
Probate & Family Court and the other Probate & Family Courts—affects
interstate and foreign commerce.  As set forth in this Complaint, Plaintiff
Daughters present concrete and specific evidence of the Massachusetts
Probate & Family Courts being used to money launder; and, specifically,
done so through the use of fictional decedents and forgery.  Also, presented
is evidence of SJC Rule 1:07 court appointees continuing to collect
government benefits of elders after they have died as wards of the State
and/or elders who have deceased in nursing homes.

2467.   Plaintiff Daughters present concrete and specific evidence that the afore-
described criminal enterprise is a nest of interlocking conspiracies that
involve overlapping conspiracies and smaller, discrete inner conspiracies of
fewer persons and smaller scope that are tied in with a larger conspiracy
whose members include some but not all of the members of the discrete
inner conspiracies.  *Aetna Casualty Surety Company v. P & B Autobody, Et
Al.*, 43 F.3d 1456 (District of Massachusetts, 1994).

2468.   Plaintiff Daughters present concrete and specific evidence that the common
purpose of the enterprise is the systemic and surreptitious embezzlement of
substantial sums of money from elders and other individuals who become
subjects of petitions that seek to impose court ordered guardianship and
conservatorship over the elder or other individual—*subsequent* to the filing
of such petition, the elder and other individuals alleged to be ill are

244

judicially deemed incapacitated, which then automatically triggers the court ordered appointments of a guardian and conservator.

2469.  Plaintiff Daughters present concrete and specific evidence that there is, also, the systemic and surreptitious embezzlement of substantial sums of money from estate administrative proceedings upon a person's death.

2470.  Plaintiff Daughters present concrete and specific evidence that the above-described scheme specifically targets elders; and exists because there is an established routine standard custom and practice by the judiciary of the Massachusetts Probate & Family Court issuing court orders and decrees that give SJC Rule 1:07 court appointees *absolute* control over the elder's person (literally), over the personal affairs of the elder and over the elder's estate—with the judiciary explicitly allowing SJC Rule 1:07 court appointees to act with complete exclusion of family members.

2471.   In 2009 and 2012, the Legislature formally effectuated changes to the Massachusetts Uniform Probate Code (MUPC)—spearheaded by Senator Creem.

2472.  Plaintiff Daughters present concrete and specific evidence that, _prior to 2009_, the Massachusetts appellate judiciary outwardly set forth—in their written decisions—the philosophy that the Probate & Family Court was to *limit* the authority of SJC Rule 1:07 guardians and conservators.  The appellate courts explicitly declared that SJC Rule 1:07 guardians and conservators were to actively facilitate expressed desires and intentions of an elder.

2473.  In direct contravention to the above-described long-established and publicly held appellate court philosophy, the Massachusetts Legislature specifically set forth language in G.L. c. 190B, § 5-305 that promoted and encouraged the issuance of plenary authority to SJC Rule 1:07 guardians and conservators—unlimited authority.

2474.  Senator Creem and her law firm financially benefit from the changes made to the MUPC; showing that she had a personal interest in facilitating the changes made to the MUPC—*which changes _take away_ rights from private citizens, not enhance rights*.

**2475.**  The legislative groundwork for the afore-described changes to the MUPC began around 2007.  Of significance, between 2007 through 2011, _6_ out of

7 seats on the Supreme Judicial Court were filled with <u>new</u> appointments: Justice Roderick, Justice Botsford, Justice Lenk, Justice Cordy, Justice Gants, and Justice Duffly.

**2476.** Senator Creem is a Life member of the MBF Society of Fellows—openly held out in her capacity with her law firm of Stone, Stone & Creem.  As previously set forth, the following justices of the Supreme Judicial Court are, also, Life members of the MBF Society of Fellows: Chief Justice Spina, Justice Botsford, and Justice Lenk.

2477. Senator Creem has significant connections with the justices of the Supreme Judicial Court from her past position with the Governor's Council, her current position as Co-Chair on the Justice Commission with the Legislature; along with the associate from her law firm (Judith McKinnon) being a current member of the Judicial Nomination Committee with the MBA.

2478. Of significance, the new language of G.L. c. 190B,  § 5-305 literally sets forth plenary authority as automatic, with the provision regarding limited authority at the very end of the statute—previously, the MUPC espoused that plenary authority was intended to the exception, not the rule. Evidencing that limited authority is now specifically and deliberately intended as an afterthought is that the language regarding limited authority is physically placed at the end of the provision.  The new statutory language was significantly changed to emphasize and to promote the automatic issuance of plenary authority to SJC Rule 1:07 guardians and conservators.

2479. Plaintiff Daughters present concrete and specific evidence that there is an established routine custom and practice by the judiciary of the Massachusetts Probate & Family Court give plenary authority to SJC Rule 1:07 guardians and conservators—otherwise known as unlimited authority.

2480. Plaintiff Daughters present concrete and specific evidence that designated Defendants' professional relationships with local hospitals, nursing homes and psychiatric facilities establish the opportunity for routine consigning of elders into the Massachusetts Probate & Family Court system by their filing of petitions for guardianship and conservatorship, which ultimately results in court ordered appointments of SJC Rule 1:07 guardians and conservators.

246

2481. Plaintiff Daughters present concrete and specific evidence that the motive for designated Defendants to engage in the above-described acts stems from the financial gain and other personal gains as designated Defendants also regularly accept work as SJC Rule 1:07 court appointees—while serving as legal counsel and in other professional capacities with the local hospitals, psychiatric facilities and nursing homes (facilitating opportunity for kickbacks and facilitating embezzlement).

2482. Plaintiff Daughters present concrete and specific evidence that designated Defendants who have a professional working relationship with State elder protective service agencies also engage in routine consigning of elders into the Massachusetts Probate & Family Court system by filing—and helping to facilitate filings—of petitions for guardianship and conservatorship, which ultimately results in court ordered appointments of SJC Rule 1:07 guardians and conservators.

2483. Plaintiff Daughters present concrete and specific evidence that, *for over 30 years*, Defendant Attorney Ledoux has been a direct leader and participant in this financial exploitation scheme carried out through the Massachusetts Probate & Family Court system—which is illustrated by Defendant Attorney Ledoux's private company that he originally established in 1984: CFD Liquidating Corporation.  The ultimate mode for obtaining ill-gotten money from elders judicially declared wards of the State is through the liquidation of their estates—which unrestricted access to the estates is attained through SJC Rule 1:07 court appointed guardians and conservators.

2484. Defendant Attorney Ledoux has provided private legal services to Defendant Beverly Hospital, North Shore Medical Center/Salem Hospital, Kindred Hospital, and Winchester Nursing Home.

2485. Defendant Attorney Garmil serves as private legal counsel for Defendant Whittier Pavilion and—in matters unrelated to In re Marvin H. Siegel— Defendant Merrimack Valley Hospital.

2486. Defendant Attorney Ledoux and Defendant Attorney Garmil—have a long-established practice of simultaneously working as SJC Rule 1:07 court appointed guardians and conservators, in addition to other types of SJC Rule 1:07 court appointments of the Essex Probate & Family Court.

2487.   There is an established pattern of Defendant Attorney Ledoux and
Defendant Attorney Garmil working alongside one another in an inordinate
number of probate matters and in various capacities.

2488.   There is an established pattern of Defendant Attorney Ledoux and
Defendant Attorney Garmil having specifically requested the Essex Probate
& Family Court to appoint one another at various times in numerous
probate matters.

2489.   There is an established pattern that other designated Defendants SJC Rule
1:07 court appointees (Attorney Cuffe, Attorney Feld, Attorney Berid,
Attorney Cukier, Attorney Myette, Attorney Saunders, Attorney McHugh)
work alongside one another in an inordinate number of probate matters and
in various capacities.  These designated Defendants also facilitate
embezzlement by making specific requests for one another.

2490.   Designated Defendants deliberately use local hospitals, nursing homes and
psychiatric facilities to repeatedly gain control over the elders' estates
through court ordered appointments of SJC Rule 1:07 guardians and
conservators.

2491.   Plaintiff Daughters present concrete and specific evidence that designated
Defendants—Attorney Ledoux, Attorney Garmil, Attorney Saunders,
Attorney Berid, ESMV, Attorney Cuffe, Attorney Feld —have a long-
established pattern of using their professional relationships with medical
facilities to facilitate elders being placed under a court imposed
guardianship and conservatorship,  The specific means used to do so is
designated Defendants, in their capacity as private legal counsel, filing
formal petitions for guardianship and conservatorship over elders *who are
admitted patients* of these local hospitals and psychiatric facilities—the
official petitioning parties being the local hospitals and psychiatric
facilities.

2492.   There is an established pattern of designated Defendant hospitals operating
in a *primary function* of the criminal enterprise by directly facilitating the
admittance of elders into Defendant Whittier Pavilion and the Adult
Behavioral Unit of Defendant Merrimack Valley Hospital.

2493.   Defendant ESMV also has a *primary role* in the criminal enterprise of
direct and indirect facilitation of the admittance of elders into Defendant

Merrimack Valley Hospital and other local hospitals/psychiatric facilities—
as Defendant ESMV has the opportunity and means to do so.

2494.  Defendant ESMV and Defendant Attorney Berid have the motive and
opportunity for obtaining ill-gotten gains by directly and indirectly
facilitating petitions for guardianships and conservatorships in the
Massachusetts Probate & Family Courts.

2495.  There is a long-established pattern of designated Defendants directly and
indirectly facilitating admissions of elders into Defendant Merrimack
Valley Hospital and other local hospitals based _solely_ on symptoms of
dementia and Alzheimer's.

2496.  Once elders are foisted into the Massachusetts Probate & Family Courts
there is a long-established pattern of the judiciary making automatic
appointments of SJC Rule 1:07 guardians and conservators, regardless of
known existing family and deliberately excluding family members from
being appointed guardian and conservator for an elder for the specific
purpose of facilitating embezzlement of an elder's estate.

2497.

2498.  There is a long-established pattern of Massachusetts Probate & Family
Court's judiciary deliberately selecting specific people to act as SJC Rule
1:07 guardians and conservators and knowingly rubber-stamping SJC Rule
1:07 guardians and conservators motions and pleadings—doing so for the
specific purpose of facilitating embezzlement of an elder's estate— directly
contravening the promulgated rules set forth by the Massachusetts Probate
& Family Court mandating the use of the respective court list of certified
appointees to assign appointments by sequential order.

2499.  The judiciary of the Massachusetts Probate & Family Court intentionally
and knowingly disregard previously executed advance directives—and
knowing that such disregard violated the Fifth and Fourteenth Amendments
of the Federal Constitution and the laws under the MUPC.

2500.  The judiciary of the Massachusetts Probate & Family Court intentionally
and knowingly rubber-stamp SJC Rule 1:07 conservators' financial reports
and pleadings; with the judiciary knowing that the filings have patently
insufficient and incorrect information.

2501.  The judiciary of the Massachusetts Probate & Family Court intentionally
and knowingly rubber-stamp SJC Rule 1:07 guardians' requests for forcing

elders into long-term care facilities and to liquidate elders' estates; and knowing that they are used as a means to obtain ill-gotten gains.

2502.   Plaintiff Daughters present concrete and specific evidence that the Essex Probate & Family Court intentionally and knowingly disregarded Father's 2003 DPOA—and knowing that such disregard violated the Fifth and Fourteenth Amendments of the Federal Constitution and the laws under the MUPC; and did so to facilitate financial exploitation of Father's estate.

2503.   Plaintiff Daughters present concrete and specific evidence that the Essex Probate & Family Court intentionally and knowingly excluded Plaintiff Daughters from being appointed guardian and conservator for Father based on the Essex Probate & Family Court colluding with designated Defendants to specifically financially exploit Father's estate.

2504.   Plaintiff Daughters present concrete and specific evidence that the Essex Probate & Family Court intentionally and knowingly made particular court appointments of Defendant Attorney Cuffe, Defendant Attorney Feld and Defendant Attorney McHugh in the matter of In re Marvin H. Siegel to specifically facilitate embezzlement of Father's estate.

2505.   Plaintiff Daughters present concrete and specific evidence that the Essex Probate & Family Court knew that its exclusion of Plaintiff Daughters from being appointed guardian and conservator for Father was done in violation of the Federal Constitution and other law—and that the Essex Probate & Family Court acted in concert with designated Defendants to fraudulently and deceptively preclude Plaintiff Daughters from being appointed guardian and conservator.

2506.   Plaintiff Daughters present concrete and specific evidence that the Essex Probate & Family Court knew that designated Defendants made continuous and repeated false representations in their filings of reports and pleadings in the matter of In re Marvin H. Siegel.

2507.   Plaintiff Daughters present concrete and specific evidence that designated Defendants—in particular, Attorney Ledoux, Attorney Garmil and Attorney Saunders—have a long-established pattern of using their attorney/client relationship with medical facilities to provide supposed supporting evidence to facilitate court ordered forced administering of antipsychotics to elders who have been judicially deemed wards of the State.

250

2508. Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of designated Defendants deliberately using the effects from unnecessary and excessive use of antipsychotics to substantiate judicial findings that the elder is purportedly incapacitated and that the elders purportedly do not have sufficient capacity to be self-aware and cognizant.

2509. Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of designated Defendants—Whittier Pavilion, Merrimack Valley Hospital, Dr. Funk, Dr. Cui, Dr. Hayes, Dr. Cohen, Dr. Portney— facilitating court ordered forced administering of antipsychotics to elders based _solely_ on symptoms of dementia and Alzheimer's.

2510. Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of designated Defendants using other types of court orders to keep elder's family from potentially becoming aware of illegal acts by severely restricting family members' and friends' visitation and communications with the elder.  One of the most commonly used mechanisms is removing elders from their home into forced placement into long-term care facilities.

2511. Plaintiff Daughters present concrete and specific evidence that there is a pattern of designated Defendants using extortion of family members to prevent family members from challenging them in court, as well as, to obtain purported assent to various requested motions filed with the Probate & Family Courts.  The most common means used by the designated Defendants is to force family members to give up their legal and financial rights by threat of criminal prosecution on baseless and fabricated allegations, as well as, the threat of losing visitation and communication with the elder.

2512.

2513. Specific to Plaintiff Daughters, designated Defendants filed motions seeking sanctions against Plaintiff Daughters; motions seeking to restrict Plaintiff Daughter's access to the Probate & Family Court; fabricated allegations of exploitation against Plaintiff Daughter to elder protective service agency; fabricated information provided to elder protective service agency; filing of various motions and other pleadings restricting Plaintiff Daughters' visitation and communications with their father; filing motions and pleadings that have unlawfully stripped Plaintiff Daughters of their established valid capacity as attorney-in-fact for their father.

251

2514. Plaintiff Daughters present concrete and specific evidence that there is a pattern of designated Defendants—through their officers, agents, servants and employees—having engaged in other type of racketeering activities that include, but are not limited to: bribing the judiciary, falsifying information in various filed pleadings (such as Inventories, Accounts, Financial Plans, petitions and motions related to court ordered appointment of guardian and conservator, motions and other pleadings relating to court ordered forced administering of antipsychotics and the like).

2515. Plaintiff Daughters present concrete and specific evidence that there is motive and opportunity for improper outside communications as well as actual improper outside communications between members of the judiciary of Essex Probate & Family Court and designated Defendants, as well as between the judiciary of the Supreme Judicial Court and designated Defendants.

2516. Plaintiff Daughters present concrete and specific evidence that the Essex Probate & Family Court has improperly altered electronic docket information.

2517. Plaintiff Daughters present concrete and specific evidence that the Supreme Judicial Court has improperly altered electronic docket information.

2518. In furtherance of the above-described schemes, violations of RICO have occurred through Defendants' use of mail, the internet in connection with emailing and the telephone lines in connection with mailing, faxing and the making of telephone calls.

2519. Liability in terms of participation under § 1962 does not require that designated Defendants have any formal position in the enterprise.  See *Aetna Casualty*, supra.

2520. Plaintiff Daughters present concrete and specific evidence that Designated Defendants have engaged in more than two acts of racketeering; and *continue to* engage in a pattern of racketeering.

2521. Plaintiff Daughters present concrete and specific evidence that there is a systemic pattern of designated Defendants conducting the criminal scheme carried out through the Massachusetts Probate & Family Court system; that the above-described acts are related and demonstrate a threat of continued criminal activity.

2522.   As demonstrated in this Complaint Plaintiff Daughters have incurred—and
continue to incur—great expenses, delays, emotional distress and other
harms by reason of designated Defendants' various acts of racketeering
(damages include, but are not limited to, investigation and preparation for
litigation, litigation costs).

2523.   As demonstrated in this Complaint, Plaintiff Daughters have set forth
concrete and specific evidence of liability by the Essex Probate & Family
Court based on the judiciary's established pattern of deliberate disregard
for designated Defendants' commission of financial exploitation and
criminal abuse.

2524.   As demonstrated in this Complaint, Plaintiff Daughters have set forth
concrete and specific evidence of liability by the Essex Probate & Family
Court based on the established pattern of the judiciary's own overt
commission of intentional and deliberate acts in aiding and abetting
designated Defendants' commission of financial exploitation and criminal
abuse.

2525.   As a direct result of designated Defendants' misconduct, Plaintiff
Daughters have been substantially and gravely harmed; especially, with
their being deprived of their Constitutional right to family integrity—the
right to unrestricted access and communication with Father and status as
Father's designated attorneys-in-fact, and loss of property.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 13

RICO Conspiracy violation under 18 U.S.C. § 1962

(All Defendants)

2526.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2527.   As demonstrated in this Complaint, Plaintiff Daughters have set forth
concrete and specific evidence that shows the existence of a conspiratorial
agreement, through the words, actions, and the interdependence of
activities and persons involved.

2528.   Liability as a conspirator still exists even if each defendant does not know all the details or the full extent of the conspiracy; a defendant is still jointly and severally liable for all acts in furtherance of the conspiracy. *Aetna Casualty*, supra.

2529.   As a direct and proximate result of intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.


Violations of 42 U.S.C. § 1983

2530.   Below are specific violations by designated Defendants causing the Plaintiff Daughters to suffer substantial deprivations of multiple Federal Constitutional rights.

2531.   At all times relevant to acts and omissions by designated Defendants in violations of Plaintiff Daughters' Federal Constitutional rights, designated Defendants are acting under color of law.

2532.   The following Defendants are state officials/state agencies: Supreme Judicial Court, Essex Probate & Family Court, ESMV, Attorney Berid, Michael Springman, Diane Powell, Scott Dailey, Attorney Cuffe, Attorney Feld, Attorney McHugh and Attorney Myette.

2533.   SJC Rule 1:07 court appointees are not immune from liability under § 1983 because their intentional misconduct, by virtue of alleged conspiratorial action, has deprived—and continues to deprive Plaintiff Daughters of their Federal Constitutional rights, especially to whom SJC Rule 1:07 court appointees have a fiduciary duty to protect Plaintiff Daughters' Federal Constitutional rights in their capacity as family, trustees of the DSL Trust and beneficiaries of Father's estate.

2534.   The piercing of the veil of presumed qualified immunity also applies to attorneys who are court appointed in the role of general legal counsel for the elder and attorneys who are court appointed to act as Roger's counsel for the elder.   See *Tower v. Glover*, 467 U.S. 914 (1988).

2535.   At all times relevant pertaining to the acts and omissions committed by designated Defendant State officials, a reasonable official would have understood that his or her actions were in violation of clearly established

rights of Plaintiff Daughters.  Where designated Defendant public officials knew—and should have known—that their actions violated a clearly established Constitutional right, they do not have immunity from liability as they had fair notice that their conduct was unlawful.  See *Meaney v. Dever*, 170 F. Supp. 2d 46, 58 (D. Mass. 2001).

2536.  At all times relevant pertaining to the acts and omissions of designated Defendant State officials, designated Defendants did not act objectively or reasonably; and they knew that they were not acting objectively or reasonably—and did so with deliberate intention and purpose.

2537.  Defendant State officials and State agencies do not have immunity from liability where their acts and omissions—individual and joint—are substantially and inextricably enmeshed with their having intentionally made false statements and acted in reckless disregard for the truth.  *Burke v. Town of Walpole*, 405 F.3d 66, 86 (1st Cir. 2005).

2538.  The means used by designated Defendants to deprive Plaintiff Daughters of their Federal Constitutional rights were able to be effectuated *only because* designated Defendants are clothed with the authority of state law.

2539.  At all times relevant pertaining to the acts and omissions by designated Defendants who have deprived Plaintiff Daughters of their Federal Constitutional rights, designated Defendants' conduct has been facilitated—and continues to be facilitated—with malicious intent.  The sole purpose for Defendants' conduct has been to cause harm (financial and emotional) to Plaintiff Daughters.

2540.  Designated Defendant private parties are liable for violating 42 U.S.C. § 1983 as they intentionally engaged—and continue to engage—in joint participation with designated Defendant State officials in violating Plaintiff Daughters' Federal Constitutional rights.  See *Lugar v. Edmondson Oil Company*, 457 U.S. 922, 929 (1982).

2541.   Designated Defendant private parties are deemed state actors for the purpose of 42 U.S.C. § 1983 as they have acted together with designated Defendant State officials and/or have engaged in conduct that is otherwise chargeable to the State.

2542.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 14

§ 1983 Claim: Deprivation of Plaintiff Daughters' Due Process right to Equal Protection

(Defendants: Supreme Judicial Court and Essex Probate & Family Court)

2543.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2544.   The Due Process Clause under the Fifth and Fourteenth Amendments of the Federal Constitution guarantees protection to private citizens that government will use fair procedures when dealing with private persons— *even in the face of <u>superficial </u>court proceedings*. *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1ˢᵗ cir. 2011).

2545.   The equal protection guarantee in the Due Process Clause requires State courts to apply its laws in the same manner amongst similarly situated litigants to prevent fundamental procedural unfairness. *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1ˢᵗ cir. 2011).

2546.   This equal protection claim is properly brought by "a class of two" where Plaintiff Daughters can demonstrate that they have been intentionally treated differently from others similarly situated who have private legal counsel; that no rational basis exists for that difference in treatment; and that the different treatment was based on a malicious or bad faith intent to injure. *Walsh v. Town of Lakeville*, 431 F. Supp. 2d 135, 145 (D. Mass. 2006).

2547.   Plaintiff Daughters have presented substantial and concrete evidence that they have been treated differently by the Supreme Judicial Court based on their status of being <u>pro se litigants</u>, as opposed to <u>litigants officially represented by legal counsel</u>.

256

2548.   Plaintiff Daughters have presented substantial and concrete evidence that
the Massachusetts Supreme Judicial Court and the Appeals Court have
engaged in acts that have disadvantaged pro se litigants and/or favored
litigants who are represented by legal counsel—specifically, such acts
pertain to differences in procedural aspects that occur during hearings, in
written decisions and various administrative acts taken and omissions by
the Clerk's Office.  In effect, pro se litigants are precluded from fully and
adequately being heard and precluded from being able to fully and
adequately present their case.  Procedural acts and omissions pertain to
rights that are guaranteed to Plaintiff Daughters under the Federal
Constitution.

2549.   As set forth in this Complaint, there is an established pattern of acts and
omissions by the appellate courts that exhibit abuse of power—often, in
matters that involve issues of substantial and irremediable deprivation of
life and liberty.

2550.   As set forth in this Complaint, there is an established pattern of bias by the
appellate court in written decisions *against pro se litigants*, as well as, the
favoring of certain litigants who have retained counsel having mutual
memberships in various professional associations with various judiciary
and administrative personnel—memberships that are expressly prohibited
by the Massachusetts Judicial Canons of Ethics.

2551.   Specifically evidenced herein the Complaint regarding the matters
involving Plaintiff Daughters, the judiciary and administrative personnel
include, but are not limited to:  then-Chief Justice Ireland, Chief Justice
Spina, Justice Botsford, Justice Lenk, Justice Duffly, now-Appeals Court
Justice Blake, Judge Abber, Judge Ricci, Judge DiGangi, then-Clerk
Mellen.

2552.   Plaintiff Daughters have set forth specific and concrete evidence that the
Supreme Judicial Court has engaged in acts of bias against Plaintiff
Daughters as pro se litigants, compounded by unethical acts of favoring
designated Defendants—Attorney Kazarosian, Attorney Berid, Attorney
Ledoux, Attorney Costello, Attorney Cukier, Attorney Cuffe, Attorney
Feld, Attorney Barbar, Attorney Myette—that have precluded Plaintiffs
from obtaining legal relief sought; thereby, causing substantial irreparable
Constitutional harm to  Plaintiff Daughters and their father (deprived access

257

and communication with Father, risk of death to Father by unwarranted and unlawful forced administering of antipsychotics, removal from permanent residence, financial exploitation of DSL Trust).

2553. Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the Essex Probate & Family Court and the Supreme Judicial Court, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, have been carried out through color of law.

2554. Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the Essex Probate & Family Court and the Supreme Judicial Court, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, have been capricious—beyond the pale, demonstrating an extreme lack of proportionality.  Even in the face of afforded broad discretion, widespread denials for arbitrary and purported technical reasons rise to the level of unreasonableness.  *Correia v. Department of Public Welfare*, 414 Mass 157, 164 (1993).

2555. Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the Essex Probate & Family Court and the Supreme Judicial Court, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, have been conducted in such a manner demonstrating concerted efforts by designated Defendants.

2556. Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the Essex Probate & Family Court and the Supreme Judicial Court, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, designated Defendants should have known—and did know—that they were violating Plaintiffs Constitutional rights where the law is clearly established and are reasonably expected to know that the law forbade their conduct.

2557. Even in the face of broad discretion in interpreting laws, this deference does not extend to an unreasonable interpretation.  *Correia v. Department of Public Welfare*, 414 Mass at 165.

2558. Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the Essex Probate & Family Court and the Supreme Judicial Court—involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action—have been conducted in such a

manner demonstrating a specific intent to cause harm to Plaintiff Daughters by deliberately and knowingly unlawfully precluding Plaintiff Daughters from obtaining legal relief.

2559.    Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the Essex Probate & Family Court and the Supreme Judicial Court, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, constitute an abuse of power.

2560.    As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 15

§ 1985 Conspiracy Claim: Deprivation of Plaintiff Daughters' Due Process right to Equal Protection

(Defendants: Supreme Judicial Court, Essex Probate & Family Court, BNY Mellon, Burns & Levinson, Attorney Cukier, Attorney Kazarosian, Attorney Cuffe, Attorney Feld, Attorney Costello, Attorney Berid, ESMV, Attorney Myette)

2561.    Plaintiff Daughters repeat and re-allege the allegations set forth above.

2562.    Plaintiff Daughters present specific and concrete evidence that designated Defendants and/or through its officers, agents, servants and employees have engaged in fraudulent and deceptive acts in furtherance of depriving Plaintiff Daughters of equal protection of the laws agreement of more than two designated Defendants.

2563.    Liability under § 1985 does not require that the agreement amongst the designated Defendants be an explicit agreement—agreement can be inferred from other evidence including a course of conduct; which such acts and omissions by designated Defendants are set forth in this Complaint.

2564.    Plaintiff Daughters present specific and concrete evidence that designated Defendants and/or through its officers, agents, servants and employees have engaged in fraudulent and deceptive acts in furtherance of depriving

259

Plaintiff Daughters of equal protection of the laws; which violations have been specifically facilitated through various designated Defendants' influence and connections with various judiciary of the Essex Probate & Family Court and the Supreme Judicial Court—as well as administrative personnel in the Clerk's Office of the Essex Probate & Family Court and the Clerk's Office of the Supreme Judicial Court.  As established in this Complaint, designated Defendants' use of established influence and connections stem from mutual memberships in certain professional associations, organizations and other entities.

2565.   Plaintiff Daughters present specific and concrete evidence that designated Defendants and/or through its officers, agents, servants and employees have engaged in overt acts and omission to injure Plaintiff Daughters—which were carried out in a deliberate and knowingly unlawful manner.

2566.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 16

§ 1983 Claim: Retaliation against Plaintiff Daughter's for exercising their          First Amendment right

(Defendants: Essex Probate & Family Court, BNY Mellon, Brian Nagle, Burns & Levinson, Attorney Cukier, Attorney Studen, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, ESMV, Attorney Berid, Attorney Kazarosian, Attorney Cuffe, Attorney Feld, Attorney Ledoux, Attorney Costello, Attorney Myette, Attorney Barbar)

2567.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2568.   Plaintiff Daughters as interested parties in the matter of In re Marvin H. Siegel have a Federal Constitutional right to present evidence in support of their position and claims. In such capacity, the Fifth and Fourteenth Amendment of the Federal Constitution guarantee Plaintiff Daughters be

afforded the opportunity to be heard as interested parties; and to present their claims fully and adequately before the State courts.

2569.   Plaintiff Daughters present specific and concrete evidence—from the inception of the matter of In re Marvin H. Siegel (May 27, 2011)—that they have continuously and repeatedly proffered evidence in open court, before the Essex Probate & Family Court, that has exposed unethical and criminal conduct of designated Defendants; as well as, multiple submissions of voluminous documentation to the Supreme Judicial Court, the Office Bar Counsel, Board of Bar Overseers, Judicial Conduct Commission and other regulatory entities.

2570.   As a direct result of Plaintiff Daughters above-described lawful actions of exposing designated Defendants misconduct and illegalities—which are set forth in detail in this Complaint—designated Defendants have, individually and jointly, maliciously engaged in continuous and repeated acts of unlawful retaliation against Plaintiff Daughters.

2571.   The content that Plaintiff Daughters' have exposed to the State courts and various regulatory entities directly and substantially interrelated with the interests of the general public; as the exposed unethical and criminal conduct of designated Defendants affect a broad scope of citizens—citizens who have litigated, are litigating and will be litigating in the Massachusetts Probate & Family Courts; citizens whose families were involved, are currently involved and families who are susceptible to involvement with State elder protective service agencies; and citizens who have in the past and present retained private legal services from the designated attorneys, as well as prospective clients.

2572.   The exposure of designated Defendants' misconduct and illegalities by Plaintiff Daughters have—at all times—been conducted in a manner that is reasonable and lawful; and substantiated with significant and objective concrete evidence.

2573.   Retaliatory acts and omissions of designated Defendants are directly a result of Plaintiff Daughters exposure of designated Defendants' unethical and criminal misconduct; with such retaliatory acts causing Plaintiff Daughters to suffer deprivation of loss of liberty and property.

2574.   Plaintiff Daughter present specific and concrete evidence that the retaliatory acts and omissions by designated Defendants—and officers,

261

agents, servants and employees of designated Defendants, include, but are not limited to:

making false allegations that Plaintiff Daughter Lisa financially exploited Father;

Defendant ESMV initiating an unwarranted and baseless investigation of Plaintiff Daughter Lisa as a purported perpetrator of financial exploitation of Father;

facilitating false and fabricated administrative findings by Defendant ESMV against Plaintiff Daughter Lisa of supposed financial exploitation;

filing of pleadings, motions and other actions with the Essex Probate & Family Court restricting Plaintiff Daughters' access and communications with Father;

filing of pleadings, motions and other actions with the Essex Probate & Family Court having forced Plaintiff Daughter Lisa and her family to be removed from their permanent residence (which is Father's home in Boxford);

seeking SJC Rule 1:07 court appointment of guardian and conservator—instead of following Father's explicitly expressed desires and intentions set forth in his 2003 DPOA;

filing pleadings with the Essex Probate & Family Court seeking to have Father removed from his own home to be forcibly placed into a long-term care facility;

filing pleadings with the Essex Probate & Family Court and Supreme Judicial Court requesting that Plaintiff Daughters be precluded access to the State courts;

making outside of court communications with officials of the Massachusetts Probate & Family Court, Supreme Judicial Court and other regulatory agencies (Office of Bar Counsel, Board of Bar Overseers, Judicial Conduct Commission, Federal Reserve and the like) to hinder Plaintiff Daughters from obtaining legal relief;

filing of motions Essex Probate & Family Court and Supreme Judicial Court seeking sanctions to be issued against Plaintiff Daughters for their afore-described whistleblowing.

2575. Designated Defendants' above-described retaliatory acts have caused Plaintiffs Daughters to suffer constitutional deprivations of liberty and property.  Plaintiff Daughters' inalienable right to family integrity has been trampled by unjustly and unlawfully restricting when daughters can be with their father; precluding daughters from being caregivers to their father; and precluding family from being able to live together.

262

2576.  Plaintiff Daughters have been deprived of property interest, in terms of having been stripped of their rightful capacity as attorneys-in-fact for Father per Father's 2003 DPOA; and their rightful capacity as nominated guardian and conservator; and in the funds of DSL Trust and other assets from Father's estate.

2577.  Plaintiff Daughter Lisa has been deprived of individual property interests, in terms of her permanent tenancy with Father in Father's home;

2578.  Plaintiff Daughters present specific and concrete evidence that designated Defendants engaged in the above-described retaliatory acts for the intentional and specific purpose of causing harm to Plaintiff Daughters.

2579.  Plaintiff Daughters present specific and concrete evidence that the above-described retaliatory acts by designated Defendants had no justifiable or legitimate basis, whatsoever.

2580.  Plaintiff Daughters present specific and concrete evidence that the above-described retaliatory acts by designated Defendants constitute conscience shocking; as designated Defendants' acts and omissions are so disproportionate to their proffered needs; and that were so inspired by malice.

2581.  Plaintiff Daughters present specific and concrete evidence that the above-described retaliatory acts by designated Defendants cannot reasonably be considered acts of mere carelessness or unwise excess of zeal.  See *Harron v. Town of Franklin*, 660 F.3d at 536.

2582.  As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the Essex Probate & Family Court based on the judiciary's established pattern of deliberate disregard to designated Defendants' commission of financial exploitation and criminal abuse as well as the judiciary's *own overt* commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of financial exploitation and criminal abuse as evidenced from knowing and intentional improper alteration of electronic docket entries and overt concealment of pleadings filed by designated Defendants.

2583.  As demonstrated in the Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the Supreme Judicial Court based on the judiciary's established pattern of deliberate disregard to

designated Defendants' commission of financial exploitation and criminal abuse as well as the judiciary's *own overt* commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of financial exploitation—as evidenced from knowing and intentional improper alteration of electronic docket entries.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 17

§ 1983 Claim: Abuse of Power involving fraudulent and deceptive investigation by Defendant ESMV and overt acts of attempting a set-up

(Defendants: ESMV, Attorney Berid, Diane Powell, Michael Springman, BNY Mellon, Brian Nagle, Law Firm TBHR, Attorney Tarlow, Burns & Levinson,  Attorney Studen,            Sheryl Sidman)

2584.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2585.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence there is an established pattern of Defendant ESMV—through its officers, agents, servants and employees—fraudulently and deceptively conducting investigations with no sufficient grounds to do so; having deprived Plaintiff Daughter Lisa of her Fourteenth Amendment right pursuant to the U.S. Constitution to be free from unwarranted government intrusion.

2586.   State law mandates that a State elder services protective agency is to make a determination within 30 days whether there is sufficient evidence to substantiate further action; and, if not, then the investigation must be closed.

2587.   Plaintiff Daughters present concrete and specific evidence that Defendant ESMV was legally mandated to close the investigation that it had opened

264

on April 1, 2011—which was exclusively based on a claim of self-neglect regarding Father.

2588.   Plaintiff Daughters present concrete and specific evidence that the notes and reports of Defendant ESMV show that multiple visits had been made by Defendant Caseworker Springman to Father's home by mid-May of 2011; with notes and reports of Defendant ESMV showing that Father was being well cared for by Plaintiff Daughter Lisa and her husband.

2589.   Plaintiff Daughters present concrete and specific evidence from the notes and reports of Defendant ESMV that on April 22, 2011, Father had refused any intervention of Defendant ESMV offered by Defendant Caseworker Springman.

2590.   Plaintiff Daughters present concrete and specific evidence from the notes and reports of Defendant ESMV that Defendant ESMV *did not* have sufficient grounds to keep open the investigation of April 1, 2011.

2591.   Plaintiff Daughters present concrete and specific evidence from the notes and reports of Defendant ESMV that the only reason Defendant ESMV kept the investigation of April 1, 2011 open was because of the staffs' knowledge that Father had a multi-million dollar estate and that there was dissension within the family.

2592.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Berid, in her official role with Defendant ESMV, deliberately kept Defendant ESMV involved in the private family affairs of Plaintiff Daughters and Father for illicit motives.  As established, on April 26, 2011, it was documented in the notes of Defendant ESMV that the staff knew of Father's 2003 DPOA.

2593.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Berid, in her official role with Defendant ESMV—along with Defendants Powell, Dailey and Springman—had repeatedly altered notes of Defendant ESMV;

2594.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Berid, in her official role with Defendant ESMV—along with Defendants Powell, Dailey and Springman—had also manufactured false information and had placed it in the notes and reports of Defendant ESMV.

2595.   Plaintiff Daughters present concrete and specific evidence that Defendant ESMV— through its officers, agents, servants and employees—colluded with designated Defendants (BNY Mellon, Brian Nagle, Attorney Tarlow, and Attorney Studen) in making false allegation of financial exploitation against Plaintiff Daughter Lisa.

2596.   Plaintiff Daughters have presented specific and concrete evidence that Defendant ESMV and Defendant Attorney Berid colluded with designated Defendants to attempt set-up of Plaintiff Daughter Lisa; specifically through the afore-described recorded call of conversation between Defendant Brian Nagle and Father.

2597.   As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact and loss of property.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 18

§ 1983 Claim: Deprivation of Due Process in Defendant ESMV's Administrative finding made against Plaintiff Daughter Lisa regarding false allegations of financial exploitation

(Defendants: ESMV, BNY Mellon, Brian Nagle, Attorney Berid, Diane Powell, Scott Dailey, Michael Springman, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Law Firm Burns & Levinson, Attorney Cukier, Attorney Studen, Attorney Ledoux, Attorney Costello, Sheryl Sidman, Alan Sidman, Supreme Judicial Court, Essex Probate & Family Court)

2598.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2599.   Plaintiff Daughter Lisa presents concrete and specific evidence that Defendant ESMV—through its officers, agents, servants and employees—made a formal determination on August 2, 2011, specifically as an

266

administrative agency, that Plaintiff Daughter Lisa purportedly financially exploited Father.

2600. Formal determinations made by Defendant ESMV of a person having committed financial exploitation constitute an adjudicatory proceeding being conducted in its capacity as an administrative agency. Plaintiff Daughter Lisa was deprived of Due Process by Defendant ESMV not giving Plaintiff Daughter Lisa notice of the adjudicatory proceeding held on August 2, 2011; depriving Plaintiff Daughter Lisa of the opportunity to present evidence to rebut the allegations made.

2601. Adjudicatory proceedings of administrative agencies shall afford all parties an opportunity for full and fair hearing. G.L. c. 30A, § 10. To comport with providing a full and fair hearing, pursuant to G.L. c. 30A, § 10, it was required by Defendant ESMV to provide Plaintiff Daughter Lisa:

notice of the adjudicatory proceeding that was held on August 2, 2011 by Defendant ESMV;

a reasonable opportunity to prepare and to present evidence and argument;

the right to call and examine witnesses,

to introduce exhibits;

to cross-examine witnesses and evidence that Defendant ESMV relied on in making its formal finding made on August 2, 2011; and

to submit rebuttal evidence.

2602. Plaintiff Daughter Lisa presents concrete and specific evidence that Defendant ESMV—through its officers, agents, servants and employees— did not provide Plaintiff Daughter Lisa with *any prior* notice of an adjudicatory proceeding to be held on August 2, 2011; Defendant ESMV did not provide any written notice or verbal notice.

2603. Plaintiff Daughter Lisa presents concrete and specific evidence that Defendant ESMV necessitated prior notice to have been provided to her regarding the August 2, 2011 adjudicatory proceeding and that she should have been afforded a full and fair opportunity to be heard where Plaintiff

267

Daughter Lisa has a protected Constitutional interest in her reputation—and, even more so, where such allegations directly affect her professional reputation as an attorney.  See *Pease v. Burns*, 719 F. Supp.2d 143, 154 (2010).

2604.  Plaintiff Daughter Lisa presents concrete and specific evidence that Defendant ESMV as a state actor threatened her professional reputation, with threat of unusually serious harm.

2605.  Plaintiff Daughters presents concrete and specific evidence that Defendant ESMV—through its officers, agents, servants and employees—and other designated Defendants *intentionally and knowingly* deprived Plaintiff Daughter Lisa of notice of the adjudicatory proceeding that took place on August 2, 2011.

2606.  Plaintiff Daughters present concrete and specific evidence that Defendant ESMV—through its officers, agents, servants and employees—and other designated Defendants had *bad faith motives* in depriving Plaintiff Daughter Lisa of notice of the adjudicatory proceeding that took place on August 2, 2011.

2607.  Plaintiff Daughter Lisa presents concrete and specific evidence that Defendant ESMV's formal determination of August 2, 2011 is not supported by any scintilla of evidence—let alone substantial evidence.

2608.  Plaintiff Daughter Lisa presents concrete and specific evidence that Defendant ESMV's formal determination of August 2, 2011 was based on designated Defendants consciously making fabricated statements.

2609.  Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendants have been carried out through color of law.

2610.  Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendants prove that Defendant ESMV's formal determination of August 2, 2011 that Plaintiff Daughter Lisa engaged in financial exploitation of Father was entirely capricious.

2611.  Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the designated Defendants have been conducted in

such a manner that demonstrates concerted efforts amongst designated Defendants.

2612.   Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendants that designated Defendants should have known—and did know—that they were violating Plaintiffs Constitutional rights where the law is clearly established, and a reasonably competent public official is expected to know that the law forbade his or her conduct.

2613.   Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendant have been conducted in such a manner demonstrating a specific intent to injure Plaintiff Daughter Lisa— especially, with regard to her legal rights and interests as an interested party in the matter of In re Marvin H. Siegel.

2614.   Plaintiff Daughter Lisa presents concrete and specific evidence that Defendant ESMV has an established pattern of making false allegations against family members who are involved in similarly situated litigation, in the Essex Probate & Family Court, like Plaintiff Daughters—an established pattern of Defendant ESMV and other designated Defendants not making reports to the District Attorney's Office, specifically using false allegations as a means of extortion.

2615.   Plaintiff Daughter Lisa presents concrete and specific evidence that designated Defendant public officials have intentionally fabricated information against Plaintiff Daughter Lisa; that designated Defendant public officials have intentionally omitted material facts in sworn statements that showed Plaintiff Daughter Lisa was entirely innocent of any wrongdoing.

2616.   Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendants constitute an abuse of power.

2617.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the Essex Probate & Family Court based on the judiciary's established pattern of deliberate disregard and/or indifference to designated Defendants' commission of financial exploitation and criminal abuse.

2618.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the Essex Probate & Family Court based on the established pattern of the judiciary's own overt commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of financial exploitation and criminal abuse.

2619.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the Essex Probate & Family Court based on the established pattern of the judiciary's own overt commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of constitutional violations.

2620.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the Supreme Judicial Court based on the judiciary's established pattern of deliberate disregard for designated Defendants' commission of constitutional violations.

2621.   As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact and loss of property.

2622.   As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact and loss of property.


WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.


Count 19

§ 1983 Claim: Deprivation of Due Process in judicial determinations that          Plaintiff Daughter Lisa supposedly financially exploited Father

(Defendants: Essex Probate & Family Court, Supreme Judicial Court, BNY Mellon, ESMV, Attorney Berid, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Law Firm Burns & Levinson, Attorney Cukier, Attorney Ledoux)

270

2623.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2624.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that Defendant ESMV—through its officers, agents, servants and employees—did not request in its motion to intervene (that was specifically designated to be heard on August 17, 2011) to conduct any proceedings to render a judicial determination by the Essex Probate & Family Court as to whether, in fact, Plaintiff Daughter Lisa had exploited Father.

2625.   It is standard custom and practice that if a State elder protective service agency (such as Defendant ESMV) intends to have a Probate & Family Court make a judicial determination that an alleged perpetrator has engaged in financial exploitation, the specific manner in which the agency is authorized to do so is by pursuing a petition pursuant to G.L. 19A—which as set forth in this Complaint that Defendant ESMV *did* *not* do so in the matter of In re Marvin H. Siegel.   (Defendant ESMV's motion to intervene filed with the Essex Probate & Family Court did not make that request and Defendant ESMV has not done so through any other pleading or action to-date).

2626.   Plaintiff Daughter Lisa presents concrete and specific evidence that there was no evidentiary hearing held, of any kind, on August 17, 2011 at the court proceeding presided over by Judge Abber.

2627.   Plaintiff Daughter Lisa presents concrete and specific evidence that Judge Abber made an explicit in-court finding—at the court proceeding held on August 17, 2011—that Plaintiff Daughter Lisa had financially exploited Father.

2628.   Plaintiff Daughter Lisa presents concrete and specific evidence that Plaintiff Daughter Lisa was overtly and entirely precluded by Judge Abber from being able to rebut allegations of financial exploitation made against her by Defendant ESMV (and other designated Defendants) at the court proceeding held on August 17, 2011.

2629.   Plaintiff Daughter Lisa presents concrete and specific evidence that Plaintiff Daughter Lisa was overtly and entirely precluded by Judge Abber, at the court proceeding held on August 17, 2011 from: having a reasonable opportunity to prepare and to present evidence and argument; the right to call and examine witnesses to introduce exhibits; to cross-examine

representations made by counsel and submitted affidavits by Defendant ESMV; and to submit rebuttal evidence.

2630.   Compounding prejudicial injury to Plaintiff Daughter Lisa by Judge Abber's explicit refusal to let Plaintiff Daughter Lisa be heard, in any respect whatsoever, at the court proceeding held on August 17, 2011 is that Judge Abber made an expressed finding in his written findings, regarding the trial he conducted regarding permanent guardianship and conservatorship, issued on October 22, 2012.

2631.   Plaintiff Daughter Lisa presents concrete and specific evidence that Judge Abber precluded her from being able to fully and adequately rebut the original allegations of financial exploitation against her.

2632.   Plaintiff Daughter Lisa presents concrete and specific evidence that at the afore-described trial proceedings, Judge Abber unlawfully and unjustifiably—with illicit motives—substantially and gravely precluded Plaintiff Daughter from having a fair and full opportunity to rebut the allegations of financial exploitation made against her. Judge Abber severely restricted Plaintiff Daughter Lisa's ability to rebut the allegations by: severely and unfairly having limited her examination of witnesses whom she called and proffered exhibits; and severely and unfairly having limited her cross-examinations of designated Defendants' witnesses and exhibits.

2633.   Plaintiff Daughter Lisa presents concrete and specific evidence that Judge Abber's afore-described judicial determinations are not supported by a scintilla of evidence—let alone, substantial evidence.

2634.   Plaintiff Daughter Lisa presents concrete and specific evidence that Judge Abber's afore-described judicial determinations were based on designated Defendants making fabricated statements and manufactured information.

2635.   Plaintiff Daughter Lisa has presented specific and concrete evidence that the acts and omissions by Judge Abber have been carried out through color of law.

2636.   Plaintiff Daughter Lisa has presented specific and concrete evidence that Judge Abber's afore-described findings are entirely capricious.

2637.   Plaintiff Daughter Lisa has presented specific and concrete evidence that acts and omissions by Judge Abber have been conducted in such a manner that demonstrates illicit collusion with designated Defendants.

272

2638. Plaintiff Daughters have presented specific and concrete evidence that Judge Abber should have known—and did know—that he was violating Plaintiffs Constitutional rights where the law is clearly established, and a reasonably competent judge is expected to know that the law forbade his or her conduct.

2639. Plaintiff Daughter Lisa has presented specific and concrete evidence that the acts and omissions by Judge Abber have been conducted in such a manner demonstrating a specific intent to injure Plaintiff Daughter Lisa— especially, with regard to her legal rights and interests as an interested party in the matter of In re Marvin H. Siegel.

2640. Plaintiff Daughter Lisa has presented specific and concrete evidence that Judge Abber knew that the allegations that he made in open court were false.

2641. As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the Supreme Judicial Court based on the judiciary's established pattern of deliberate disregard to designated Defendants' commission of constitutional violations.

2642. As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the Essex Probate & Family Court based on the established pattern of the judiciary's own overt commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of constitutional violations.

2643. As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with their being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact; and loss of property.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 20

273

§ 1983 Claim: Deliberate disregard by Defendant ESMV and the Essex Probate & Family
Court for Plaintiff Daughters' rightful capacity as attorneys-in-fact for Father

(Defendants: Essex Probate & Family Court, BNY Mellon, Brian Nagle, ESMV,
Attorney Berid, Diane Powell, Scott Dailey, Michael Springman, Law Firm
TBHR,          Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Law
Firm Burns & Levinson, Attorney Cukier, Attorney Studen, Attorney
Kazarosian, Attorney Feld, Attorney Cuffe, Attorney Ledoux, Attorney
Costello, Sheryl Sidman, Alan Sidman, Supreme Judicial Court)

2644.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2645.   As demonstrated in the Complaint, Plaintiff Daughters have set forth
concrete and specific evidence that there is an established pattern of
Defendant ESMV and Essex Probate & Family Court purposely
disregarding elders' written advance directives and estate planning
instruments; and, doing so, to enable SJC Rule 1:07 court appointed
guardians and conservators to embezzle funds from elders' estates under
the guise of lawful authority.

2646.   The United States Supreme Court has held that the Fourteenth Amendment
of the Federal Constitution encompasses a privacy right that protects
against significant governmental intrusion into personal decisions, such as
executed advance directives and estate planning instruments. *Brown v. Hot
Sexy and Safer Productions*, 68 F.3d 525, 531.

2647.   Even in the face of broad discretion of power given to State agencies and
the courts to interpret laws, this deference does not extend to an
unreasonable interpretation; such authorization is not intended to give
power to violate citizens' constitutional rights. See *Correia v. Department
of Public Welfare*, 414 Mass at 165.

2648.   The Supreme Judicial Court and the Supreme Court of the United States
have confirmed that the sanctity of the parent/child relationship is a
constitutionally protected interest. *Santosky v. Kramer*, 455 U.S. 745, 753
(1982); *Opinion of the Justices to the Senate*, 427 Mass. 1201, 1203 (1998).

2649.   Plaintiff Daughters present concrete and specific evidence that Defendant
ESMV and Essex Probate & Family Court have engaged in widespread
adverse actions based on arbitrary and purported technical reasons.

274

2650.   Plaintiff Daughters present concrete and specific evidence that Defendant
ESMV motion to intervene in the matter of In re Marvin H. Siegel
constitutes unreasonable conduct.  See *Correia v. Department of Public
Welfare*, supra.  Defendant ESMV used the motion to intervene as a
pretext; the use of color of authority as a guise to facilitate financial
exploitation of Father's estate.

2651.   Plaintiff Daughters have presented specific and concrete evidence that acts
and omissions by designated Defendants have been conducted in such a
manner that demonstrates illicit collusion with designated Defendants.

2652.   Plaintiff Daughters have presented specific and concrete evidence that
designated Defendants should have known—and did know—that they were
violating Plaintiffs Constitutional rights where the law is clearly
established, and a reasonably competent public official is expected to know
that the law forbade his or her conduct.

2653.   Plaintiff Daughters presented specific and concrete evidence that the acts
and omissions by designated Defendants have been conducted in such a
manner demonstrating a specific intent to injure Plaintiff Daughters—
especially, with regard to their legal rights and interests as interested parties
in the matter of In re Marvin H. Siegel.

2654.   Plaintiff Daughters present specific and concrete evidence that designated
Defendants knew that the allegations that they made in open court were
false.

2655.   As a direct result of designated Defendants' above-described conduct,
Plaintiff Daughters have been substantially and gravely harmed; especially,
with their being deprived of the Constitutional right to family integrity—
the right to unrestricted access and communication with Father, status as
Father's designated attorneys-in-fact; and loss of property.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 21

275

§ 1983 Claim: Essex Probate & Family Court deliberate and knowing unlawful
      deprivation of Plaintiff Daughters' Federal Constitutional right to be fully and
      fairly heard as interested parties in the matter of In re Marvin H. Siegel

(All Defendants)

2656.    Plaintiff Daughters repeat and re-allege the allegations set forth above.

2657.    As interested parties in the matter of In re Marvin H. Siegel, Plaintiff
Daughters were entitled under the Fifth and Fourteenth Amendments of the
U.S. Constitution to be afforded the opportunity to present their claims
before the Essex Probate & Family Court; that Plaintiff Daughters be
afforded the ability to fully and adequately present evidence in support of
their claims; and that Plaintiff Daughters be afforded the ability to fully and
adequately cross-examine the witnesses and evidence of the opposing
parties.  Over 3 years of numerous court proceedings held in the matter of
In re Marvin H. Siegel, the Essex Probate & Family Court has—
continuously and repeatedly—precluded Plaintiff Daughters from having
motions that they have filed, let alone being able to fully and adequately
present their claims; in addition to, the preclusion of Plaintiff Daughters
from being able to fully and adequately be heard *in opposition* to
designated Defendants' motions.

2658.    Plaintiff Daughters have presented specific and concrete evidence that acts
and omissions by Essex Probate & Family Court have occurred in such a
manner that demonstrates illicit collusion with designated Defendants to
preclude Plaintiff Daughters from being able to fully and adequately
present claims and opposition to designated Defendants' claims.  Plaintiff
Daughters' request to present and rebut claims have been continuously and
repeatedly denied *without any* proffered justification by the Essex Probate
& Family Court; evidencing an established pattern of repeated judicial
capricious conduct.

2659.    Plaintiff Daughters have presented specific and concrete evidence that the
Essex Probate & Family Court accepted financial and/or personal gain in
exchange for rubber-stamping designated Defendants' motions and
pleadings.

276

2660.   Plaintiff Daughters have presented specific and concrete evidence that the Essex Probate & Family Court had *actual knowledge* that numerous motions and pleadings filed by designated Defendants contained false statements and representations.

2661.   Plaintiff Daughters have presented specific and concrete evidence that the motive for the Essex Probate & Family Court's repeated capricious conduct was to assist designated Defendants in covering up incriminating evidence of illicit activities to protect designated Defendants and to be able to keep the financial exploitation of Father's estate going.  The requests made by Plaintiff Daughters to present evidence and rejected by the Essex Probate & Family Court include, but is not limited to:

Plaintiff Daughters made repeated pre-trial requests to have an evidentiary hearing to determine the validity of Father's 2003 DPOA;

at trial regarding permanent guardianship and conservatorship, Plaintiff Daughters requested that the issue of Father's 2003 DPOA as an alternative to imposing a court ordered guardianship and conservatorship be determined;

repeated requests by Plaintiff Daughters to obtain an evidentiary hearing to determine whether Defendant Attorneys Cuffe and Feld committed unlawful acts in their court appointed fiduciary capacities thus requiring their removal;

multiple requests prior to trial by Plaintiff Daughters to be allowed to have Father examined by a medical expert;

multiple requests by Plaintiff Daughters to examine Defendant Attorneys Cuffe and Feld at motion hearings to challenge the veracity of the pleadings that *were filed by* Defendant Attorneys Cuffe and Feld and the very basis of the motion hearings.

2662.   Plaintiff Daughters present concrete and specific evidence that designated Defendants—Attorney Kazarosian, Attorney Ledoux,  Attorney Cukier, Attorney Berid, Attorney Myette, Attorney Costello—took direct concerted efforts to facilitate Defendant Attorney Cuffe being judicially declared permanent guardian and Defendant Attorney Feld as permanent conservator in the matter of In re Marvin H. Siegel.  Designated Defendants were deemed by the Essex Probate & Family Court as the petitioners at trial; therefore, designated Defendants had the burden of meeting the standard of proof that Defendant Attorneys Cuffe and Feld were suitable to act in their respective court appointed capacities—yet designated Defendants *did not* call Defendant Attorneys Cuffe or Feld as witnesses.

2663.  Designated Defendants did not meet their burden of proving the suitability of Defendant Attorneys Cuffe and Feld as suitable permanent fiduciaries.

2664.  Even though Defendant Attorneys Cuffe and Feld were listed on the pre-trial conference report order issued by Judge Abber on March 27, 2012, Judge Abber <u>refused</u> to allow Plaintiff Daughters the ability to call Defendant Attorneys Cuffe and Feld as witnesses—even though Plaintiff Daughters properly subpoenaed Defendant Attorneys Cuffe and Feld to testify at trial.  Consequently, Judge Abber precluded Plaintiff Daughters from being able to fully and fairly present affirmative evidence that Defendant Attorneys Cuffe and Feld were <u>*not*</u> suitable permanent fiduciaries.

2665.  Plaintiff Daughters present concrete and specific evidence that the sole reason for Defendant Attorneys Cuffe and Feld refusing to testify and for Judge Abber's *quashing* of the subpoenas that would have compelled Defendant Attorneys Cuffe and Feld to testify was because they would have had to: 1) invoke their 5th Amendment right not to incriminate oneself or 2) subject themselves to risk of incrimination.  As evidenced, Judge Abber <u>knew</u> for a fact that Defendant Attorneys Cuffe and Feld had committed illegal acts and, therefore—without any real justification, Judge Abber precluded Plaintiff Daughters from being able to call Defendant Attorneys Cuffe and Feld as witnesses.

2666.  Plaintiff Daughters have presented specific and concrete evidence that designated Defendants should have known—and did know—that they were violating Plaintiffs Constitutional rights where the law is clearly established, and a reasonably competent public official is expected to know that the law forbade his or her conduct.

2667.  Plaintiff Daughters presented specific and concrete evidence that the acts and omissions by designated Defendants have been conducted in such a manner demonstrating a specific intent to injure Plaintiff Daughters— especially, with regard to their legal rights and interests as an interested parties in the matter of In re Marvin H. Siegel.

2668.  As a direct result of designated Defendants' above-described misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with their being deprived of the Constitutional right to family integrity— the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact; and loss of property.

278

2669.   WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 22

§ 1983 Claim & 42 U.S.C. § 2000a-2: Deliberate and knowing unlawful deprivation of Plaintiff Daughter Lisa's Federal right to protection and preservation of the practice of religion

(Defendants: Essex Probate & Family Court, Attorney Kazarosian, Attorney Feld, Attorney Cuffe, Attorney Ledoux, ESMV, Attorney Berid, Attorney Costello, Attorney Barbar, Attorney Myette, Right At Home, Sheryl Sidman, Supreme Judicial Court)

2670.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2671.   Since childhood up until the involvement of Defendant Right At Home in providing services in Father's home (June 17, 2011), Plaintiff Daugfhter Lisa and Father had regularly observed Jewish holidays *together*, as a family—in particular,                Rosh Hashanah, Yom Kippur, Passover, Hanukkah.

2672.   Plaintiff Daughter Lisa had repeatedly requested from designated Defendants that she and her family be permitted to honor the Jewish holidays with Father.  Designated Defendants unlawfully prevented Plaintiff Daughter Lisa and her family from doing so—designated Defendants specifically used their claimed color of authority to unlawfully and unjustly obstruct Plaintiff Daughter Lisa's usual observation of Jewish practice with her family; which Plaintiff Daughter Lisa raised before the Essex Probate & Family Court, which Judge Abber aided and abetted through his role as presiding judge.

2673.   Provided in Exhibit 393 are emails and correspondence demonstrating Plaintiff Daughter Lisa's persistent attempts for she and her family to observe their usual Jewish customs with Father, as they have done so as a family since childhood.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 23

279

Defamation: § 1983 Claim & Common Law

(Defendants: BNY Mellon, ESMV, Attorney Berid, Law Firm TBHR, Attorney Tarlow,
    Attorney DeNapoli, Law Firm Burns & Levinson, Attorney Cukier, Attorney
    Studen,              Attorney Kazarosian, Attorney Cuffe, Attorney Feld, Attorney
    Costello, Attorney Barbar, Attorney Ledoux, Sheryl Sidman, Essex Probate &
    Family Court)

2674.  As set forth in this Complaint, Plaintiff Daughters have presented specific
       and concrete evidence that on numerous occasions designated Defendants
       have made false and defamatory communications regarding Plaintiff
       Daughter Lisa to third parties—communications made in emails,
       correspondence and in open court.

2675.  As set forth in this Complaint, Plaintiff Daughters have presented specific
       and concrete evidence that on numerous occasions designated Defendants
       have knowingly and deliberately made false and defamatory
       communications regarding Plaintiff Daughter Lisa to third parties, with the
       specific intent to harm Plaintiff Daughter Lisa.

2676.  As set forth in this Complaint, Plaintiff Daughters present concrete and
       specific evidence that designated Defendants' false and defamatory
       statements consisting of allegations that Plaintiff Daughter Lisa financially
       exploited Father and allegations that Plaintiff Daughter Lisa has voluntarily
       not visited with Father; that Plaintiff Daughter Lisa's actions, with specific
       reference to her proficiency as an attorney, was substandard and
       incompetent.

2677.  As set forth in this Complaint, Plaintiff Daughters present concrete and
       specific evidence that designated Defendants made the above-referenced
       statements to third parties knowing that such statements were false.

2678.  As set forth in this Complaint, Plaintiff Daughters present concrete and
       specific evidence that designated Defendants' above-referenced statements
       made to third parties were not simple expressions of opinion; that
       designated Defendants used words of contempt, hatred, scorn, and ridicule
       with *deliberate* intentions to impair Plaintiff Daughter Lisa's standing in
       the social community and the professional legal community.

2679.  As set forth in this Complaint, Plaintiff Daughters present concrete and
       specific evidence that the false and defamatory communications made to
       third parties by designated Defendants were unnecessary, unreasonable and

excessive; that false and defamatory communications made to third parties by designated Defendants were done in actual malice.

2680.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that false and defamatory communications by Defendant State officials—including false and defamatory statements made by Judge Abber—were unnecessary, unreasonable and excessive.

2681.   As set forth in this Complaint, such intentionally made false and defamatory communications to third parties by designated Defendant State officials were specifically carried out as acts of abuse of power.

2682.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 24

Abuse of Process

(Defendants—in their private capacities: BNY Mellon, Brian Nagle, Law Firm TBHR, Law Firm Burns & Levinson, Attorney Studen, Attorney Cukier, Attorney Kazarosian, ESMV, Attorney Berid, Attorney Ledoux, Attorney Saunders, Attorney Myette, Merrimack Valley Hospital, Dr. Funk, Dr. Cohen, Dr. Hayes, Dr. Portney, Sheryl Sidman)

2683.   Plaintiff Daughters present concrete and specific evidence that designated Defendants filed motions and pleadings with the Essex Probate & Family Court for illegitimate purposes; and that they did so with deliberate intent to cause harm to Plaintiff Daughters.

2684.   Plaintiff Daughters present concrete and specific evidence that designated Defendants—individually and jointly— filed motions and pleadings with the Essex Probate & Family Court for the specific purpose to facilitate financial exploitation of the DSL Trust— which particularly illustrate illegitimate purposes, but are not limited to:

Defendant ESMV's motion to intervene;

Defendant Attorney Cuffe's motions to continue guardianship;

281

Defendant Attorney Feld's motions to continue conservatorship;

motions by Defendants Attorney Cuffe and Feld to vacate decrees;

Defendant Attorney Feld's filed Accounts and Inventories;

joint motion brought by Defendant Attorney Kazarosian to amend the DSL Trust;

Defendant Attorney Barbar's motion to amend decrees;

Defendant Attorney Cuffe's motion for court ordered forced administering of
        antipsychotics to Father;

designated Defendants' motion to be paid for legal services directly from Father's estate
        (DSL Trust);

Defendant Attorney Ledoux's motion to intervene as petitioner;

Defendant ESMV's motion to add Susan J. Miller as an interested party;

designated Defendants' motions pursued ex-parte.

2685.    Plaintiff Daughters present concrete and specific evidence that the above-described designated Defendants deliberately used false statements and representations in the above-described motions and pleadings to facilitate their financial exploitation of the DSL Trust.  The above-described motions were wholly based on deception and fraud.

2686.    Plaintiff Daughters present concrete and specific evidence that designated Defendants—individually and jointly— filed motions and pleadings with the Essex Probate & Family Court for the specific purpose to retaliate against Plaintiff Daughters for exposing designated Defendants' misconduct and deliberately cause emotional distress and financial harm to Plaintiff Daughters include, but are not limited to:

Defendant ESMV's motion to intervene;

Defendant Attorney Cuffe's motions for temporary orders against Plaintiff Daughter Lisa;

Defendant Attorney Cuffe's motion to vacate Plaintiff Daughter Lisa and her family from
        their permanent residence;

Defendant Attorney Cuffe's Complaint for Contempt against Plaintiff Daughter Lisa;

Defendant Attorney Kazarosian's motions seeking sanctions against Plaintiff Daughters;

Defendant Attorney Cuffe's motions for placement of Father into long-term care facility.

2687.  Plaintiff Daughters present concrete and specific evidence that the above-described designated Defendants deliberately used false statements and representations in the above-described motions and pleadings to facilitate malicious retaliatory acts—and did so, for the purposes of punishing Plaintiff Daughters for exposing designated Defendants' misconduct, to deter Plaintiff Daughters from exercising their legal rights, and to deliberately inflict grave emotional distress.  The above-described motions were wholly based on deception and fraud.

2688.  As a direct result of designated Defendants' above-described misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with their being deprived of the Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact; and loss of property.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.


Count 25

Intentional infliction of emotional distress

(Defendants—in their private capacities: BNY Mellon, ESMV, Attorney Berid, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Law Firm Burns & Levinson, Attorney Cukier, Attorney Studen, Attorney Kazarosian, Attorney Cuffe, Attorney Feld, Attorney Costello, Attorney Myette, Attorney Barbar, Attorney Ledoux, Attorney Garmil,          Sheryl Sidman, Alan Sidman)

2689.  Plaintiff Daughters repeat and re-allege the allegations set forth above.

2690.  Plaintiff Daughters present concrete and specific evidence that designated Defendants intended to inflict emotional distress upon Plaintiff Daughters.

2691.  Plaintiff Daughters present concrete and specific evidence that designated Defendants knew that their acts and omissions would result in emotional distress to Plaintiff Daughters; that designated Defendants did so in reckless disregard for truth—such acts include, but are not limited to: deliberately making false allegations of criminal wrongdoing against

Plaintiff Daughter Lisa; designated Defendants' perverse use of the litigation process to unlawfully and unjustly restrict Plaintiff Daughters' relationship with Father; designated Defendants' perverse use of the litigation process to facilitate financial exploitation of Father's estate.

2692.   Plaintiff Daughters present concrete and specific evidence that designated Defendants' conduct was extreme and outrageous, beyond all bounds of decency.

2693.   Plaintiff Daughters present concrete and specific evidence that Plaintiff Daughters suffered distress as a direct result of designated Defendants' actions and omissions.

2694.   Plaintiff Daughters present concrete and specific evidence that Plaintiff Daughters suffered distress that was severe and of such a nature that no reasonable person could be expected to endure.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 26

Common law: Misrepresentation by Defendant Attorney Kazarosian in legal representation of Father

2695.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2696.   Plaintiff Daughters present concrete and specific evidence that Father terminated the legal representation of Defendant Attorney Tarlow and Defendant Law Firm TBHR specifically due to their having deceived and defrauded Father.

2697.   Plaintiff Daughters present concrete and specific evidence that Plaintiff Daughter Lisa acted at the direct request of Father—and as Father's attorney-in-fact through Father's executed written re-affirmation of his 2003 DPOA on June 16, 2011 to retain new counsel to protect him from the motion to intervene filed by Defendant ESMV on June 16, 2011.

284

2698.   Plaintiff Daughters present concrete and specific evidence that Plaintiff
Daughter Lisa consulted with Defendant Attorney Kazarosian to represent
Father specifically to protect Father *and his family* from *any and all*
intervention by the State—which expressly included representation to
*vigorously* fight against intrusion of Defendant ESMV into the private
_family_ affairs of Father and to *vigorously* fight against any court
appointment of SJC Rule 1:07 guardian and conservator by the Essex
Probate & Family Court.

2699.   Plaintiff Daughters present concrete and specific evidence that Defendant
Attorney Kazarosian made the above-described representations to Plaintiff
Daughter Lisa—prior to Defendant Attorney Kazarosian meeting Father.

2700.   Plaintiff Daughters present concrete and specific evidence that Defendant
Attorney Kazarosian met with Plaintiff Daughter Lisa and one of Plaintiff
Daughter Lisa's colleagues days prior to Defendant Attorney Kazarosian
meeting with Father.

2701.   Plaintiff Daughters present concrete and specific evidence that Defendant
Attorney Kazarosian made the above-described representations to
specifically induce Plaintiff Daughter Lisa to have Father retain her legal
services.

2702.   Plaintiff Daughters present concrete and specific evidence that Defendant
Attorney Kazarosian made the above-described representations to Father in
writing.

2703.   Plaintiff Daughters present concrete and specific evidence that Defendant
Attorney Kazarosian made the above-described representations to
specifically induce Father to retain her legal services.

2704.   Plaintiff Daughters present concrete and specific evidence that Defendant
Attorney Kazarosian intentionally and knowingly abandoned her above-
described explicit promise to fight vigorously to preclude Defendant ESMV
and Rule 1:07 court appointments of guardian and conservator by the Essex
Probate & Family Court.

2705. Plaintiff Daughters present concrete and specific evidence that Defendant
Attorney Kazarosian expressly and impliedly agreed to give Plaintiff Daughter
Lisa advice and assistance with specific regard as to action and lack of action that

Plaintiff Daughter Lisa, personally, should take concerning Defendant ESMV, Defendant Attorney Cuffe and Defendant Attorney Feld.

2706.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Kazarosian did, in fact, give Plaintiff Daughter Lisa advice with specific regard as to action and lack of action that Plaintiff Daughter Lisa, personally, should take concerning Defendant ESMV, Defendant Attorney Cuffe and Defendant Attorney Feld.

2707.   Plaintiff Daughter Lisa and Father relied upon the above-described representations made by Defendant Attorney Kazarosian and did so to their detriment.

2708.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Kazarosian has overtly fraudulently and deceptively colluded with designated Defendants to financially exploit the DSL Trust.

2709.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Kazarosian has intentionally and knowingly colluded with designated Defendants to restrict Plaintiff Daughters' relationship with Father.

2710.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Kazarosian has intentionally and knowingly colluded with designated Defendants to fabricate false allegations of financial exploitation against Plaintiff Daughter Lisa.

2711.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 27

Embezzlement

(Defendants in their individual/private capacities: BNY Mellon, Brian Nagle, Attorney
        Tarlow, Attorney DeNapoli, Attorney Watson, Defendant Law Firm TBHR,

Law firm Burns & Levinson,  Attorney Cukier, Attorney Studen, Attorney Cuffe, Attorney Feld, Attorney Ledoux, Attorney Berid, Attorney Myette, Attorney Costello, Attorney Barbar, Attorney McHugh, Michael Novack, Right At Home, Sheryl Sidman, Alan Sidman)

2712.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2713.   Plaintiff Daughters present concrete and specific evidence that designated Defendants have engaged in a common design to siphon funds from the DSL Trust, which Defendant Attorney Feld attained exclusive possession and control of through color of authority.

2714.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Feld came to be court appointed conservator specifically because of his close connections with Judge Abber and Defendant Attorney Cukier as co-guardians in the matter of In re Esterina Milano.

2715.   Plaintiff Daughters present concrete and specific evidence that Defendant Attorney Feld, Judge Abber and Defendant Attorney Cukier engaged in prior fraudulent and deceptive acts for illicit gain through their roles as co-guardians in the matter of In re Esterina Milano.

2716.   Plaintiff Daughters present concrete and specific evidence that the following designated Defendants have an established pattern of fraudulent and deceptive conduct in siphoning funds from the estates of elders in private legal counsel and as SJC Rule 1:07 fiduciary appointees: Attorney Cukier, Attorney Cuffe, Attorney Ledoux, Attorney Berid, Attorney Tarlow.

2717.    Plaintiff Daughters present concrete and specific evidence that designated Defendants obtained ill-gotten gains by Defendant Attorney Feld making disbursements to designated Defendants through means such as, payment for fraudulent and deceptive billing of legal services and kickbacks.

2718.   Plaintiff Daughters present concrete and specific evidence that designated Defendants have the opportunity and means to facilitate embezzlement as there is no actual oversight of Defendant Attorney Feld's management of Father's estate—especially, where Plaintiff Daughters present concrete and specific evidence that Judge Abber, Judge Ricci, Judge Blake and Judge DiGangi have all acted in collusion with designated Defendants.

2719.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

WHEREFORE, Plaintiff Daughters claim their right to a jury trial for monetary damages.

Count 28

Injunctive Relief Claims

2720.   Plaintiff Daughters seek injunctive relief to redress the deprivation of their Federal Constitutional rights that has occurred because of Defendants'— individual or joint—misconduct facilitated through color of law.

2721.   Plaintiff Daughters are likely to succeed on the merits of their claims against designated Defendants—particularly pertaining, but not limited to: substantial deprivation of Plaintiffs' Federal Constitutional rights under the First, Fifth, and Fourteenth Amendments; fraud; conversion; harassment; and intentional infliction of emotional distress.

2722.   Plaintiff Daughters have provided solid and concrete objective evidence of their having suffered irreparable injury that will continue to surmount if immediate injunctive relief is not granted.

2723.   Specific to Plaintiff Daughter Lisa, she has suffered—and continues to suffer—compounding harm consisting of, but not limited to: being unlawfully and maliciously precluded from having communications with Father *since* December 16, 2011 (with indisputable proof that Father, personally, wanted an unrestricted relationship with Plaintiff Daughter Lisa and her family with Father—with Father, also, suffering irreparable physical and emotional harm as a result); the loss of time (years) and memories that can never be replaced.  Plaintiff Daughter Lisa and her family have been unlawfully and maliciously precluded from residing in their permanent residence with Father in Boxford, MA.

2724.   Plaintiff Daughter Devora has also suffered—and continues to suffer— compounding harm consisting of, but not limited to, severe restricted visitation with Father that is unwarranted, unlawful and maliciously facilitated.

2725.   Plaintiff Daughters suffer—and continue to suffer—irreparable harm by having been unlawfully and maliciously precluded from carrying out

288

Father's expressed intentions and desires regarding his personal and financial affairs.  But for designated Defendants unlawful conduct, Plaintiff Daughter Lisa would have been acting, for the past three years through the present, as attorney-in-fact for Father and Plaintiff Daughter Devora as successor attorney-in-fact; hence, entitling Plaintiff Daughters to carry out Father's expressed intentions and desires.

2726.  As provided through submitted emails, designated Defendants have maliciously acted in direct conflict with Father's expressed intentions and desires—in addition to correspondence regarding designated Defendants' acts pertaining to pre-arranged funeral arrangements.  (Copy of correspondence is provided in Exhibit 394).

2727.  As demonstrated in Defendant Attorney Kazarosian's affidavit of August 2011 (prior referenced Exhibit 22), *as of* July 2011, Father explicitly stated that <u>he</u> wanted to terminate the financial services of Defendant BNY Mellon; that he, personally, was upset with Defendant BNY Mellon and did not want Defendant BNY Mellon handling his money.  With actual knowledge of Father's afore-described intentions and desires, designated Defendants have continued to use Defendant BNY Mellon's services in handling Father's financial affairs—which designated Defendants have acted in concert with Defendant BNY Mellon to financially exploit the multi-million dollar DSL Trust; of which Plaintiff Daughters are co-trustees and co-beneficiaries.

2728.  As demonstrated designated Defendants have stripped the quality of Plaintiff Daughters' relationship with Father due to designated Defendants, knowingly and intentionally, seeking unlawful and unnecessary forced administering of antipsychotics to Father.  There is <u>no</u> legitimate basis for Father being prescribed antipsychotics—which antipsychotics are medically shown to *exacerbate* and *accelerate* the symptoms and progression of dementia; as well as, significantly increased risk of death.  As evidenced, designated Defendants have engaged in fraudulent and deceptive means in obtaining court ordered forced administering of antipsychotics.

2729.  The overall and core cause of irreparable injury to Plaintiff Daughters is a clearly established right to be free from unwarranted governmental intrusion into their family affairs under the due process clause of the Fourteenth Amendment of the Federal Constitution—which right Plaintiff Daughters had at all relevant times and through the present.

289

2730.   The Plaintiff Daughters' irreparable injuries are the direct and actual result of misconduct by designated Defendants—actions that are to the level of conscience-shocking and have continuously occurred through the knowing and intentional acts of designated Defendants.

2731.   There is no legitimate harm to designated Defendants by the sought injunctive relief—by <u>not</u> allowing Plaintiff Daughters' requested immediate, preliminary and permanent injunctive relief, it would only serve to allow designated Defendants to continue to engage in illegal conduct and reap ill-gotten gains.

2732.   Immediate, preliminary and permanent injunctive relief would serve the public interest, as other elders and families are being harmed by similar misconduct through the official and private capacities of designated Defendants—in terms of designated Defendants' roles as SJC Rule 1:07 court appointees and in their providing private services to citizens in areas such as: representation in legal matters, in financial banking, and medical care.

WHEREFORE, Plaintiff Daughters requests that this Court grant the following injunctive relief:

Ex-parte immediate injunctive relief

•an Order enjoining Defendants (Defendant Attorney Cuffe, Defendant Attorney Berid, Defendant ESMV, Defendant Attorney Kazarosian, Defendant Attorney Ledoux, Defendant Attorney Myette, Defendant Attorney Barbar, Defendant Right At Home) from restricting, in any manner, access and communication with Father by Plaintiff Daughters, their family, and friends;

•an Order enjoining Defendants (Defendant Attorney Cuffe, Defendant Attorney Feld, Attorney Berid, Defendant ESMV, Defendant Attorney Kazarosian, Defendant Attorney Ledoux, Defendant Attorney Myette, Defendant Attorney Barbar, Defendant Attorney Remillard, Defendant Attorney McHugh) from using any of Father's estate to retain legal representation in defense of this federal civil action;

•an Order enjoining all Defendants from filing any pleadings or actions in the underlying matters of In re Marvin H. Siegel (ES11P1466GD & ES11P1465PM);
•an Order enjoining the Essex Probate & Family Court from issuing any judgments, orders or decrees in any matter regarding Marvin H. Siegel;

290

•an Order requiring all Defendants to preserve and protect all written, computer and audio documents pertaining to Plaintiff Daughters and Father;

•an Order enjoining Defendants from transferring, selling, encumbering and/or disposing—in any manner—any individual or business interest in realty.

<u>Preliminary & permanent injunctive relief</u>

•an Order enjoining Defendant Attorney Cuffe from acting as guardian for Father;
•an Order enjoining Defendant Attorney Feld from acting as conservator for Father;

•an Order allowing Plaintiff Daughter Devora to serve as temporary guardian and conservator—until the determination by this Court regarding the validity of Father's 2003 DPOA (at which time, Plaintiff Daughters request that the 2003 DPOA be rendered effective).  As evidenced herein this Complaint, Defendants have never accused Plaintiff Daughter Devora of exploiting Father and Plaintiff Daughter Devora was explicitly designated by Father as successor attorney-in-fact;

•an Order specifically allowing Plaintiff Daughter Devora to retain a new financial institution to open an account in which Father's funds can be transferred to;

•when the afore-described account with a new financial institution is established, that an Order be issued requiring Defendant BNY Mellon to transfer all of Father's funds to that new financial institution;

•an Order enjoining Defendants (Defendant Attorney Feld, Defendant Attorney Cuffe, Defendant Attorney Kazarosian, Defendant Attorney Barbar, Defendant Attorney Remillard, Defendant Attorney Cukier, Defendant Law Firm Burns & Levinson ) from having any access to funds and property of Marvin H. Siegel and the DSL Trust;

•an Order requiring Defendant Attorney Feld to immediately provide Plaintiff Daughters physical access—in their capacities as co-trustees of the DSL Trust—to all his records and documents pertaining to his role as court appointed conservator in the matter of In re Marvin H. Siegel and to permit

291

Plaintiff Daughters to copy such information, which includes complete access to safety deposit boxes and all of Father's personal assets and documents;

•an Order requiring Defendant Attorney Cuffe to immediately provide Plaintiff Daughters physical access to all his records and documents pertaining to his role as court appointed conservator in the matter of In re Marvin H. Siegel and to permit Plaintiff Daughters to copy such information;

•an Order requiring Defendant Attorney Myette to immediately provide Plaintiff Daughters physical access to all her records and documents pertaining to her role as court appointed Roger's counsel in the matter of In re Marvin H. Siegel and to permit Plaintiff Daughters to copy such information;

•an Order having the matters of In re Marvin H. Siegel be transferred from the Essex Probate & Family Court and consolidated with this Federal action— as set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Plaintiff Daughters are precluded from obtaining adequate and appropriate relief by the State courts which are related to Plaintiff Daughters' substantial and grave independent claims having exclusive Federal jurisdiction.

•an Order allowing Plaintiff Daughters to add Judge Jeffrey Abber and Judge Susan Ricci as parties where it is established in this Complaint that they engaged in unlawful acts outside the courtroom; and where Plaintiff Daughters have presented substantial solid and concrete evidence that Judge Abber and Judge Ricci have engaged in criminal conduct that has directly caused injury to Plaintiff Daughters.

<u>Monetary Damages</u>

· an award of compensatory damages;

· an award of punitive damages;

· an award of reasonable attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988; and

· an award of statutory interest

292

By Plaintiff Daughters,

/s/  Lisa Siegel Belanger, Esq.


Lisa Siegel Belanger

Attorney at Law

BBO No.. 633060

300 Andover Street, No. 194

Peabody, MA  01960

(978) 998-2342

lisa@belangerlawoffice.com

/s/  Devora C. Kaiser


Devora Kaiser

PO Box 294

Rocky Ford, Colorado  81067

(978) 998-1359

devorakaiser@yahoo.com

DATED: April 23, 2015

293