UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS                    DOCKET NO. 15CV10198-ADB


LISA SIEGEL BELANGER,

DEVORA C. KAISER,

                    Plaintiffs

v.

BNY MELLON ASSET MANAGEMENT, LLC,

BRIAN NAGLE,
          in his then-official capacity with BNY Mellon and individually,

TARLOW BREED HART & RODGERS, PC,

EDWARD TARLOW, ESQ.,

in his official capacity with Tarlow Breed Hart & Rodgers, PC and individually,


ALBERT DeNAPOLI, ESQ.,

in his official capacity with Tarlow Breed Hart & Rodgers, PC and individually,


CATHERINE WATSON, ESQ.,

in his official capacity with Tarlow Breed Hart & Rodgers, PC and individually,

WILLIAM AUSTIN, CPA,
in his official capacity BRAVER INC, and individually,

BEVERLY HOSPITAL


MAXA BERID, ESQ.,

in her official capacity as a State actor, official capacity with Elder Services of Merrimack
Valley, Inc., official capacity with BERID & SCHUTZBANK, LLC, and individually,

ELDER SERVICES OF MERRIMACK VALLEY, INC.,

WHITTIER HEALTH NETWORK,
INC., d/b/a WHITTIER PAVILION,

RICHARD GARMIL, ESQ.,

in his official capacity with Whittier Pavilion and individually,

COMMONWEALTH OF MASSACHUSETTS,

        Defendants

## SECONDED AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF AND JURY TRIAL DEMAND

## I.  CORE UNDERLYING FACTS PERTINENT TO ALL CLAIMS

### A.  Legislative intent regarding estate planning and advance directives

1.    The Massachusetts Uniform Probate Code (herein referred as "MUPC")—and as incessantly stated in advertisements by estate planning attorneys on "talk radio" stations in Massachusetts (680 AM WRKO and 1030 WBZ), the purpose of creating and executing estate planning and advance directive instruments—trusts, durable power of attorneys—are to avoid having to be subjected to Probate & Family Court guardianship and conservatorship proceedings.  (See G.L. c. 190B, § 5-306(b)(8); *Guardianship of Smith*, 43 Mass. App. Ct. 493. 497-498 (1997)).

2.    Well-established Massachusetts case law declares that the very essence of estate planning and advance directive instruments are specifically implemented to preclude judicial intrusion into a private individual's personal affairs.

3.    Legislative promulgation of the MUPC regarding the use of trusts and durable power of attorneys was supposed to give a person peace of mind that the Massachusetts courts will abide by a person's memorialized desires and intentions as to the specific manner in which he or she wants his or her financial and personal affairs to be handled; and that the person's specific designation of his or her attorney-in-fact will be the one to carry out those memorialized desires and intentions. (G.L. c. 190B, §§ 1-102(4),  5-301, 5-305(b), 5-502, 5-503(b), 5-306A, 5-407(8), 5-409(1), 5-416(d), 5-426).

4.      As demonstrated by the caption of § 5-426 under the MUPC,  the Legislature has charged the Massachusetts Courts with "preserving" a person's existing estate plan, as well as the charge for the courts to act "consistent with the terms of [a] trust" as stated under § 7-201 of the MUPC.

5.      The Uniform Act "recognizes an individual's right to self-determination by permitting a principal to use a durable power of attorney to express his preference regarding any future court appointee charged with the care and protection of his person or estate." *Guardianship of Smith*, 43 Mass. App. Ct. 493, 497 (1997).


### B.  Background information of underlying federal civil action

6.      87 year-old Attorney Marvin H. Siegel has 3 full biological daughters: Devora Kaiser (eldest), Sheryl Sidman (middle), and Lisa Siegel Belanger (youngest).

7.      Attorney Marvin H. Siegel received his law degree from Boston University, beginning his practice of law in Massachusetts in 1955 and maintaining his private law practice in downtown Boston for over fifty (50) years.

8.      Following in Attorney Marvin H. Siegel's foot-steps, his daughter, Lisa Siegel Belanger, became a licensed practicing attorney in Massachusetts in 1996.


### C.  Estate planning and advanced directives executed by Attorney Marvin H. Siegel

9.      Attorney Marvin Siegel originated a trust on __January 5, 1982__, in which written instrument he explicitly expressed that he created such Trust for the specific intended purpose being "to provide for the disposition and holding of the Donor's estate and __for the benefit of the Donor and his said children__ [therein specifying Daughters Devora Kaiser, Sheryl Sidman and Lisa Siegel Belanger] and that the Donor expressly declares that the omission of any other person from this Trust is intentional and with full knowledge and contemplation on the Donor's part."  (See Article Two of the 1982 Trust—a copy of this Trust is provided in **Exhibit 1**).

10.     Attorney Marvin Siegel explicitly stated in Article One of the 1982 Trust that the Trust was to be specifically known as the "**D.S.L. TRUST OF 1982**".

11.     Attorney Marvin Siegel created the name of the 1982 Trust (**D.S.L. TRUST OF 1982**) by using the first initial of each of his three (3) biological daughter's first names and by birth order—"D" for the eldest daughter (Devora Kaiser), "S" for the middle daughter    (Sheryl Sidman) and "L" for the youngest daughter (Lisa Siegel Belanger).

12.     Further establishing that Attorney Marvin Siegel's specific intention in creating the **D.S.L. TRUST OF 1982** was for the benefit of his three (3) biological daughters is the designated caption Article Four: "Family Trust".

13.     The above-specified daughters of Attorney Marvin Siegel are beneficiaries of the **D.S.L. TRUST OF 1982.**

14.     In **February of 1999**, Attorney Marvin Siegel hired BNY Mellon Asset Management (herein referred as BNY Mellon) to provide investment management services for three (3) separate and distinct accounts.  (In 1999, BNY Mellon was known as Boston Safe Deposit and Trust Company).  The three accounts placed in the custody of BNY Mellon were:

    1)  **DSL Trust of 1982**—with funds at inception being, approximately, **$3.7 million**;

    2)  **Marvin H. Siegel's IRA**— with funds at inception being, approximately, **$426,000**; and

    3)  **Marvin H. Siegel's profit sharing**—with funds at inception being, approximately, **$55,000**.

(Provided is a copy of records issued by BNY Mellon showing its custodial capacity of the above-described accounts is provided in **Exhibit 2**).

15.     Since **February of 1999**, BNY Mellon has had continuous custody and control of the monies held in the three (3) above-described accounts through the present time.

### D.S.L. Trust of 2003

16.     Around **2003**, Attorney Marvin Siegel had openly expressed that he desired and intended to create a new trust due to his decision to remarry, which would merge the property of **D.S.L. Trust of 1982** into the new trust.

17.     When Attorney Marvin Siegel decided to take overt action in carrying out his overtly expressed desire to execute an updated estate plan and advanced directives, he purposefully sought the services of experienced and prominent attorneys who *specifically specialized* in preparing estate planning and advance directive instruments because Attorney Marvin Siegel explicitly and overtly expressed that he wanted to ensure that his estate planning and advance directives were done by experts because he did not have any experience or professional knowledge in that area of the law—his practice of law focused in the area of personal injury.

4

18.     As set forth, Attorney Marvin Siegel overtly expressed that because estate planning was not an area of law that he had sufficient knowledge or experience in, he exercised extraordinary careful thought and deliberation in retaining the expert services of David Andelman, Esq. and his law firm of Boston, MA to prepare his estate planning instruments and advanced directives, which he executed on **February 11, 2003**.

19.     The trust prepared by Attorney Andelman was specifically and explicitly named: the **"D.S.L. Trust"**.  (A copy of the D.S.L. Trust executed on February 11, 2003 is provided in **Exhibit 3**).

20.     As set forth, Attorney Marvin Siegel specifically intended that the existing property held in the **D.S.L. Trust Fund of 1982**—the very investment account held by **BNY Mellon**—be merged into the newly created **D.S.L Trust of 2003** (herein referred as to "2003 D.S.L. Trust").  There is no language whatsoever in the **D.S.L Trust of 2003** referencing revocation of the **D.S.L. Trust Fund of 1982**.

21.     The specific language used in the **2003 D.S.L. Trust** specifically designated Attorney Marvin Siegel's intention that the D.S.L investment account already held by **BNY Mellon** to be deemed under the control of the **2003 D.S.L. Trust**. The very first paragraph of the **2003 D.S.L. Trust** states that the newly executed Trust "will hold all securities, moneys, land, and other property, real or mixed, of whatever kind, nature and description, which may simultaneously with the execution of this instrument or at any time hereafter be assigned, conveyed, or transferred to such Trustees by Marvin Harold Siegel (hereinafter referred to as the "Settlor") during his lifetime, by the legal representatives of his estate in accordance with the terms of his will, or in any other manner whatsoever at the direction of the Settlor, in trust upon the terms, conditions and trusts hereinafter set forth [] and for the uses and purposes hereinafter set forth. []."

22.     Article D of the **2003 D.S.L. Trust** further shows that Attorney Marvin Siegel specifically intended that the D.S.L account held by **BNY Mellon** in 2003 was to be placed under the control and governance of the **2003 D.S.L. Trust**, wherein it is explicitly stated that **2003 D.S.L. Trust** that said Trust "may be known and referred to as the Marvin Harold Siegel Trust and may hold legal title to securities and other properties in such name."

23.     The **2003 D.S.L. Trust** designated Attorney Marvin Siegel as the settlor and a trustee, along with also designating the three (3) biological daughters of Attorney Marvin Siegel—Devora Kaiser, Sheryl Sidman and Lisa Siegel Belanger— as co-trustees.

24.     The three (3) biological daughters of Attorney Marvin Siegel—Devora Kaiser, Sheryl Sidman and Lisa Siegel Belanger—are also beneficiaries of the **2003 D.S.L. Trust**, as well as the **D.S.L. Trust Fund of 1982**.

### Arrowhead Farm Nominee Trust

25.     As desired and intended by Attorney Marvin Siegel, Attorney Andelman prepared a written **Direction by Attorney Marvin Siegel as Donor of the D.S.L. Trust** to place his unencumbered Boxford home into a nominee trust called the **Arrowhead Farm Nominee Trust—**which Attorney Marvin Siegel executed on **February 11, 2003**.  (A copy of the donor directive is provided in **Exhibit 4** and a copy of the executed Nominee Trust is provided in **Exhibit 5**).

26.     Pursuant to the **2003 D.S.L. Trust** and written directive by Attorney Marvin Siegel as donor, the three (3) biological daughters—Devora Kaiser, Sheryl Sidman and Lisa Siegel Belanger—are co-trustees and co-beneficiaries of the **Arrowhead Farm Nominee Trust**.

27.     Pursuant to the **2003 D.S.L. Trust**, the **Arrowhead Farm Nominee Trust** was placed under the control of the **2003 D.S.L. Trust**.

### Durable Power of Attorney

28.     As desired and intended by Attorney Marvin Siegel, Attorney Andelman prepared a durable power of attorney (herein referred as "**2003 DPOA**"), specifically designating his daughter, Lisa Siegel Belanger as his attorney-in-fact—which Attorney Marvin Siegel executed on **February 11, 2003**.  (A copy of the 2003 DPOA is provided in **Exhibit 6**).

29.     As previously set forth, in 2003, Daughter Lisa Siegel Belanger had been a practicing attorney since 1996 and assisted her father in his law practice.

30.     Attorney Marvin Siegel explicitly designated in his **2003 DPOA** that his eldest daughter, Devora Kaiser, be successor attorney-in-fact.

31.     In Paragraph 6 of the executed **2003 DPOA**, Attorney Marvin Siegel explicitly nominated Daughter Lisa Siegel Belanger as his guardian and conservator "in the event that protective proceedings instituted at any time in any court of the Commonwealth."

6

32.     On **February 11, 2003**, Daughter Lisa Siegel Belanger and Daughter Sheryl Sidman were physically present at the law office of Attorney Andelman to witness Attorney Marvin H. Siegel's execution of the **2003 DPOA**.

33.     Daughter Devora Kaiser participated by teleconference in the above-described meeting that was held on **February 11, 2003**, as at that she was residing out-of-state at that time.

34.     At the above-described meeting held on **February 11, 2003**, Attorney Andelman explained the content of the prepared estate planning instruments and advance directives (2003 DPOA) for Attorney Marvin H. Siegel in the presence of Attorney Marvin Siegel and Daughters Lisa Belanger and Sheryl Sidman—with Daughter Devora Kaiser participating via teleconference.

35.     The above-specified estate planning and advance directive instruments—signed and executed by Attorney Marvin H. Siegel on **February 11, 2003**—were validly prepared and executed.  Attorney Marvin H. Siegel did so knowingly, deliberately and with sound mind.

### First Amendment to the D.S.L. Trust

36.     As a result of Attorney Marvin Siegel's second wife having passed away in November of 2005, he desired to amend the marital provisions that were contained in the D.S.L. Trust, executed in February of 2003.

37.     Attorney Marvin Siegel retain the profession legal services of Attorney George Kilgore to prepare and execute the afore-described amendment to the **2003 D.S.L. Trust**.

38.     Attorney Marvin Siegel executed the **First Amendment to the D.S.L. Trust of 2003** on July 14, 2006.  (A copy of the First Amendment to the D.S.L. Trust is provided in **Exhibit 7**).

39.     In light of the specific changes specifically set forth in the First Amendment to the D.S.L. Trust of 2003, the executed First Amendment to the D.S.L. Trust explicitly states that in all other respects Attorney Marvin Siegel ratified and confirmed the D.S.L. Trust of February 2003.

40.     Section I of the First Amendment to the D.S.L. Trust of 2003 expressly refers to the D.S.L. investment account held in custody by BNY Mellon.

41.     As of **December 31, 2006**, the previously described D.S.L. investment account held in the custody of **BNY Mellon** had **$5,561,626.20**

## II. <u>JURISDICTION</u>

42.     Plaintiffs seek relief from unlawful and deliberate deprivation of the Plaintiffs substantive and procedural due process rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution—as well as, the Massachusetts Articles of Declaration and State Constitution.  Accordingly, this federal action is properly before this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, 28 U.S.C. § 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

43.     A substantial part of this federal action is properly before this Court based on diversity jurisdiction, involving Plaintiffs seeking damages for independent and direct tortious actions of foreign corporations **Defendant BNY Mellon** involving breach of fiduciary duty, fraud, conspiracy, unjust enrichment, intentional infliction of emotional distress.

44.     This federal civil action is properly before this Court seeking to redress the deprivation of rights and privileges guaranteed by the Federal Constitution, pursuant to 42 U.S.C. § 1983 (intentional abuse of power by State actors); 42 U.S.C. § 1985(3) (Federal Conspiracy Claim).  Civil rights claims are properly before this Honorable Court pursuant to 28 U.S.C. § 1391.

45.     The underlying federal constitutional deprivations, on which the above described cause of actions are based on State and Federal constitutional guarantees of right to privacy and family sanctity under the Fifth and Fourteenth Amendments of the U.S. Constitution and Article X of the Massachusetts Declaration of Rights.

46.     State law claims raised under this federal action are also properly before this Court pursuant to 28 U.S.C. § 1367 as they are so enmeshed with the claims having original jurisdiction in this Court.  Therefore raised state claims form part of the same case and controversy under Article III of the United States Constitution.

47.     Plaintiffs have no adequate avenue for remedy of law in the State court.

48.     Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 where a substantial part of acts and omissions on which this action is based occurred in Massachusetts.

## CAUSE OF ACTIONS SPECIFIC TO FRAUDULENT EXECUTION OF WRITTEN INSTRUMENTS AND AGREEMENTS

### PARTIES

#### Plaintiffs

49. **Plaintiff Lisa Siegel Belanger**, youngest daughter of 87 year-old Attorney Marvin Siegel (herein referred as "Daughter Lisa), is a resident of Massachusetts; designated attorney-in-fact of the **2003 DPOA**; beneficiary of the **D.S.L. Trust of 1982**; trustee of the **2003 D.S.L. Trust**; beneficiary of the **2003 D.S.L. Trust**; and beneficiary of the **Will** executed in 2003.

50**.** **Plaintiff Devora C. Kaiser**, eldest daughter of 87 year-old Attorney Marvin Siegel (herein referred as "Daughter Devora"), is a resident of Colorado and Massachusetts; designated successor attorney-in-fact of the **2003 DPOA**; beneficiary of the **D.S.L. Trust of 1982**; trustee of the **2003 D.S.L. Trust**; beneficiary of the **2003 D.S.L. Trust**; and beneficiary of the **Will** executed in 2003.

#### Defendants

51. **Defendant BNY Mellon Asset Management LLC** (herein referred as "BNY Mellon"—at the time named Mellon Private Asset Management) is the financial institution having physical custody and control of the **DSL Trust** since **1999**. Defendant BNY Mellon is registered with the Secretary of State for the Commonwealth as a foreign corporation, based in Delaware and the principal place of business is 201 Washington Street, Boston, MA.

52. **Defendant Brian Nagle** resides in Brookline, MA. At all times relevant, Defendant Brian Nagle was employed as Vice President and Senior Portfolio Manager for **Defendant BNY Mellon**—up until **August of 2013**. At all times relevant, Defendant Brian Nagle was the direct and primary investment manager of the DSL Trust as an agent and representative for Defendant BNY Mellon. As of **September 2013**, Defendant Brian Nagle is now Managing Director and Portfolio Manager at First Republic Investment Management East Coast.

53. **Defendant Tarlow, Breed, Hart & Rodgers, P.C.** is the law firm that through fraud and deception became privately-retained counsel for Father (Marvin H. Siegel) on **May 25, 2011**. In addition to below designated counsel, other members of TBHR who worked on the underlying matter include: **Richard Breed, III**, **Karen McKenna**, **John Stuebing**, **Patrick Minnihan**, and **Jacqueline Scott**. The principal office is at 101 Huntington Avenue, Suite 500, Boston, MA.

54.    **Defendant Edward Tarlow, Esq.** resides in Concord, MA.   He is a licensed attorney, as Partner and President of Law Firm TBHR.  At all times relevant, Defendant Attorney Tarlow served—and continues to serve—as representative for **Defendant Law Firm TBHR**.

55.    **Defendant Albert DeNapoli, Esq.** resides in Walpole, MA.   He is a licensed attorney employed by **Defendant Law Firm TBHR**, as well as being a shareholder and a director.  At all times relevant, Defendant Attorney DeNapoli served—and continues to serve—as a representative for and on behalf of Defendant Law Firm TBHR.

56.    **Defendant Catherine Watson, Esq.** resides in Norwood, MA.  She is a licensed attorney in the Commonwealth and employed by **Defendant Law Firm TBHR**.  At all times relevant, Defendant Attorney Watson served—and continues to serve—as a representative for and on behalf of Law Firm TBHR.

57.    **Defendant Beverly Hospital**, doing business as **Northeast Hospital Corporation**, has its principal office located at 85 Herrick Street in Beverly, MA.  On **May 19, 2011**, Father was taken by the Boxford Police Department to the Defendant Beverly Hospital, based solely on a call made by a part-time, home care assistant for Father—the Boxford Police did not observe conduct warranting an involuntary commitment, pursuant to G.L. 123, §12 (herein referred to as "Section 12").

58.    **Defendant Whittier Pavilion** is the psychiatric facility under the corporation **Whittier Health Network, Inc**., with principal office at 25 Railroad Square, Haverhill, MA.

59.    **Defendant Richard Garmil, Esq.** resides in Haverhill, MA.  He is an attorney licensed in the Commonwealth with his private law practice at 3 Washington Square, Suite 220, Haverhill, MA.  At all relevant times Defendant Attorney Garmil has served—and continues to serve—as a representative of Defendant Whittier Pavilion; and as a representative of the Law Office of Richard G. Garmil.

60.    **Defendant Wiliam Austin, CPA** resides in Massachusetts and is a CPA.

61.     **Defendant Elder Services of Merrimack Valley, Inc.** (herein referred as "**ESMV**") is a quasi-private nonprofit corporation that provides various services geared to the elderly.  Simultaneously, ESMV functions as a State designated protective service agency, which is governed under the Executive Office of Elder Affairs.  Defendant ESMV receives and investigates reports of elder abuse.  Defendant ESMV is located at 360 Merrimack Street, Building 5, Lawrence, MA.  At all times relevant, Defendant ESMV has served—and continues to serve—as a representative for, and on behalf of, the Commonwealth of Massachusetts.

62.     **Defendant Maxa Berid, Esq**. is an individual residing in Lowell, MA. At all times relevant, Defendant Attorney Berid was an attorney licensed in the Commonwealth until recently and has an established private law practice—**Berid & Schutzbank LLC**—that has been instituted in **2004**, while simultaneously serving as General Counsel for **Elder Services of Merrimack Valley, Inc**.

63.     The **Commonwealth of Massachusetts** is a defendant in this action pursuant to 42 U.S.C. § 1982 arising from deliberate and conscience-shocking acts and omissions by individual officials and agents of State elder protective service agency (**ESMV**) and based on acts of deliberate indifference; such acts and omissions of State officials having occurred while acting in their specific designated official roles

64.     Plaintiffs Daughter Lisa and Devora bring this civil action against the above-designated Defendants jointly and severally.

### Factual allegations

65.     Plaintiff Daughters repeat and re-allege the factual allegations set forth above.

### Defendant BNY Mellon's business relations with Father

66.     In February of 1999, Attorney Marvin Siegel (herein referred to as "Father") hired **Defendant BNY Mellon** to provide investment management services involving his personal funds, as well as his business funds.

67.     Upon retaining **Defendant BNY Mellon's** investment management services, Father gave **Defendant BNY Mellon** custody and control of funds from the **DSL Trust of 1982**; which the amount of the funds that **Defendant BNY Mellon** took custody was in excess of **$3.7 million.**

68.     Upon retaining **Defendant BNY Mellon's** investment management services, Father gave **Defendant BNY Mellon** custody and control of funds from Father's **profit sharing plan**; which the amount of the funds that Defendant BNY Mellon took custody was in excess of **$426,000**.

69.     Upon retaining **Defendant BNY Mellon's** investment management services, Father gave **Defendant BNY Mellon** custody and control of funds from Father's **IRA**; which the amount of the funds that Defendant BNY Mellon took custody of approximately of $**55,000**.

70.     **From Defendant BNY Mellon's** taking custody, in February of 1999, of the above-described finds, Defendant BNY Mellon has had continuous custody through the present of the funds that were originally provided by Father from the above-described account identified as the **DSL Trust of 1982**.

71.     Since the inception of **Defendant BNY Mellon** has identified the above-described account on its Statement of Accounts (in February of 1999) as: "Investment manager For Marvin H. Siegel Under The Marvin H. Siegel Declaration of Trust Dated January 5, 1982 Under Agreement Dated February 18, 1999".

72.     The above-described account name—originated by **Defendant BNY Mellon** in February of 1999—has remained the exact same name for the account through the present time.

73.     The original account number designated by **Defendant BNY Mellon** in February of 1999 for the **D.S.L. Account** has remained the same account number through present time.

74.     From February of 1999, **Defendant BNY Mellon** has had continuous custody through the present of the funds that were originally provided by Father from the above-described account identified as Father's **IRA.**

75.     From December of 2000 through August of 2013, **Defendant Brian Nagle** worked as Vice President for **Defendant BNY Mellon**.

76.     By **2002**, Defendant Brian Nagle became involved in investment management of the (3) afore-described accounts.

77.     Around **October of 2003**, Father had provided a copy of the estate planning documents prepared by Attorney Andelman that Father executed on **February 11, 2003** to **Defendant BNY Mellon**; which specifically included the **2003 D.S.L. Trust** and **2003 DPOA**.

78.     On **October 16, 2003**, **Defendant BNY Mellon** sent a letter to Father suggesting that Father should make changes to the **2003 D.S.L. Trust**.  The letter also expresses that **Defendant Brian Nagle** had actual and substantial knowledge regarding the content of the **2003 D.S.L. Trust** and other executed written instruments executed by Father on February 11, 2003.  (A copy of the letter is provided in **Exhibit 8**).

79.     In the above-described letter of October 16, 2003 to Father, **Defendant BNY Mellon** explicitly suggested that Father remove the three (3) daughters—Devora Kaiser, Shery Sidman and Lisa Belanger—as co-trustees to an "independent trustee," such "a corporation."

80.     Several high-ranking officials of **Defendant BNY Mellon**—including but not limited to, Rideway Powell, at that time Senior Director; Jerry Doyle and Allison Bibbins—were involved in the investment management of the above-described accounts and had direct and actual knowledge of Father's desires and intention set forth in the **2003 D.S.L. Trust**.

81.     In the above-described letter of October 16, 2003 sent to Father, **Defendant BNY Mellon** repeatedly expressed that the daughters were not "disinterested trustees."

82.     As demonstrated by the **First Amendment of the D.S.L. Trust**, executed in **July of 2006**, Father intentionally and overtly disregarded **Defendant BNY Mellon's** suggestion that the three (3) daughters be removed as trustees; and demonstrated that Father intentionally and overtly disregarded Defendant BNY Mellon's suggestion that Father appoint "an independent" person or corporation as trustee.

83.     **Defendant Brian Nagle** stated under oath on **July 2, 2012** before the **Essex Probate & Family Court** that the original account designated **D.S.L. Trust of 1982** was set up by **Defendant BNY Mellon** and that such account was in fact funded.

84.     **Defendant Brian Nagle** stated under oath on **July 2, 2012** before **Essex Probate & Family Court** that when Father had executed the **2003 D.S.L. Trust** that the **D.S.L. Trust of 1982** had been revoked.

85.     **Defendant Brian Nagle** stated under oath on **July 2, 2012** before the **Essex Probate & Family Court** that since the execution of the **2003 D.S. L. Trust** that the funds in the **D.S.L. Trust of 1982** were being held in an account that was "in title of a trust that was revoked."

86.      On **July 2, 2012**, when **Defendant Brian Nagle** was asked what the current balance was of the above-described account, he stated: "His [Father's] trust holds approximately 5.4 million and his IRA has about $400,000, so about 5.8 million all in,"

87.      At no time did Father revoke the **D.S.L. Trust of 1982**; as demonstrated by the **2003 D.S.L. Trust**, the property of the D.S.L. Trust merged into the **2003 D.S.L. Trust**.

88.      In view of all three (3) afore-described trust instruments—**D.S.L. Trust of 1982**, **2003 D.S.L. Trust** and **First Amendment of the D.S.L. Trust**, Father's desire and intention remained continuous that the funds in the original **D.S.L. Trust of 1982** was always remain, uninterrupted, in a trust and for such funds to remain for the benefit of his three biological daughters.

89.      When **Defendant Brian Nagle** testified on July 2, 2012, he knew—in 2003—that Father had desired and intended for the funds that existed in the **D.S.L. Trust of 1982** to be merged into the updated **2003 D.S.L. Trust**; Defendant Brian Nagle knew that the purpose of the **2003 D.S.L. Trust** was to change trustees and modify the terms of the Trust for his re-marriage.

90.      When **Defendant Brian Nagle** testified on **July 2, 2012** before the **Essex Probate & Family Court**, he knew his statement that the original **D.S.L. Trust of 1982** had been revoked was false.

91.      **Defendant Brian Nagle** stated under oath on **July 2, 2012** before the **Essex Probate & Family Court** that Father told him not to fund the **2003 D.S.L. Trust**.

92.      When **Defendant Brian Nagle** testified on **July 2, 2012** before the **Essex Probate & Family Court**, he knew that his statement that Father told him not to fund the **2003 D.S.L. Trust** was false.

93.      The language of the **First Amendment of the D.S.L. Trust**, executed in July of 2006, shows that Father did, in fact, desire and intend **for Defendant BNY Mellon** and **Defendant Brian Nagle** the **2003 D.S.L. Trust** to be funded.

**Daughter Lisa's valid exercise of her capacity as attorney-in-fact
pursuant to Father's 2003 DPOA**

94.   On **May 19, 2011**, a private third-party—who was not a family member and not a family friend—made a call to 911 claiming that Father was a danger to himself and others.  Such report entirely based on hearsay statements by that third-party.

95.   As a result of the above-described 911 call, the Boxford Police had taken Father by ambulance to the Emergency Room of Beverly Hospital.

96.   Plaintiff Daughter Lisa and her husband immediately went to the Emergency Room of Beverly Hospital.

97.   At the time of **May 19, 2011**, Plaintiff Daughter Lisa had valid and effective capacity as Father's attorney-in-fact pursuant to the **2003 DPOA**.

98.   Daughter Lisa had informed the staff at the emergency room of **Beverly Hospital** of her capacity as Father's attorney-in-fact.

99.   Prior to Father being taken to the Beverly Hospital on **May 19, 2011**, electronic notes of **Elder Services of Merrimack Valley, Inc.** state that, on **May 10, 2011**, **Caseworker Michael Springman** had asked Father who his power of attorney was and that Father stated that it was his daughter Lisa.

100.   Also prior to Father's being taken to the Beverly Hospital on **May 19, 2011**, **Caseworker Michael Springman's** written report **dated May 13, 2011** for **Elder Services of Merrimack Valley, Inc.**—called Investigation Summary—stated: "Elder [Father] has a durable POA who is his daughter Lisa."

101.   Upon arrival at the emergency room of **Beverly Hospital**, Daughter Lisa requested to see her father; the staff did not permit Plaintiff Daughter Lisa to see her father for, at least two (2) hours.

102.   During the clinical evaluation, the evaluator for **Defendant Beverly Hospital** had been aware that Father's estate was valued at, approximately, $6 million.

103.   Prior to Plaintiff Daughter Lisa being able to see her father in the emergency room of **Defendant Beverly Hospital**, the clinic evaluator for **Defendant Beverly Hospital** met with Plainff Daughter Lisa and her husband.

104.   The clinic evaluator for **Defendant Beverly Hospital** introduced herself as "the clinical evaluator" and informed Plaintiff Daughter Lisa and her husband that an evaluation of Father had been already conducted and completed.

105.    The clinic evaluator for **Defendant Beverly Hospital** stated that Father had shown her a Statement of Account from **Defendant BNY Mellon** that showed Father had financial funds over $6 million.

106.    Prior to the clinic evaluator of **Defendant Beverly Hospital** meeting with Plaintiff Daughter Lisa, the clinic evaluator had already made a final decision that she was admitting Father to a psychiatric facility.

107.    The clinical evaluator for **Defendant Beverly Hospital** did not seek information from Daughter Lisa before making a final decision that she was admitting Father to a psychiatric facility.

108.    The evaluator for **Defendant Beverly Hospital** had already made a final decision regarding Father's admission to a psychiatric facility without having any input from Daughter Lisa.

109.    The clinical evaluator of **Defendant Beverly Hospital** had actual knowledge that Plaintiff Daughter Lisa was attorney-in-fact for Father.

110.    Paragraph 2(f) of the **2003 DPOA** expressly states that Plaintiff Daughter Lisa, in her capacity as attorney-in-fact, is to be involved in making medical decisions on behalf of Father.  It explicitly states that the attorney-in-fact has authority "to execute and file on [Father's] behalf any applications, certificates or other instruments which may be necessary or appropriate to obtain [Father's] admission to any institutions, public or private, for medical treatment, hospitalization, and convalescent or nursing care or otherwise for [Father's] health and welfare."

111.    The clinical evaluator of **Defendant Beverly Hospital** did not inform Daughter Lisa that Father was being admitted to **Defendant Whittier Pavilion** based on an involuntary psychiatric commitment (G.L. c. 123, § 12).

112.    The clinical evaluator of **Defendant Beverly Hospital** informed Plaintiff Daughter Lisa and her husband that Father was being admitted to **Defendant Whittier Pavilion** based on a clinical diagnosis of Alzheimer's and Dementia; that the admission was to get a more extensive and detailed evaluation regarding a diagnosis of Alzheimer's and Dementia.

113.    Daughter Lisa and her husband were not informed, in an manner, by the clinical evaluator of **Defendant Beverly Hospital** that **Defendant Whittier Pavilion** was a psychiatric facility.

114.    The clinical evaluator of **Defendant Beverly Hospital** did not mention, in any manner, that antipsychotics could be—or would be—a potential result of Father's admission to **Defendant Whittier Pavilion**.

115.    Approximately at 4:00 a.m. on **May 20, 2011**, Father was directly transferred from the emergency room of **Beverly Hospital** to **Defendant Whittier Pavilion**.

116.    From the inception of Father's involuntary admission to **Defendant Whittier Pavilion**, the staff of Defendant Whittier Pavilion and **Defendant Attorney Garmil**—outside private counsel for Defendant Whittier Pavilion—were aware that Father had an estate value of $6 million.

117.    From the inception of Father's involuntary admission to **Defendant Whittier Pavilion**, **Defendant Attorney Garmil**—and the medical staff of Defendant Whittier Pavilion—had knowledge that Plaintiff Daughter Lisa was the attorney-in-fact for Father and that Father had executed a durable power of attorney.

118.    From the inception of Father's involuntary admission to **Defendant Whittier Pavilion**, **Defendant Attorney Garmil**—and the medical staff of Defendant Whittier Pavilion—had knowledge that Father resided with Plaintiff Daughter Lisa and her family.

119.    For years, **Defendant Attorney Garmil** has simultaneously accepted numerous paid SJC Rule 1:07 court appointed work as guardian and conservator by the **Essex Probate & Family Court**.  (Provided in **Exhibit 9** is a copy of the Massachusetts Probate & Family court record of court appointments accepted by Defendant Attorney Garmil).

120.    **Defendant Attorney Garmil**, as a representative and agent of **Defendant Whittier Pavilion** prohibited Plaintiff Daughter Lisa from seeing Father at the inception of Father's involuntary admission.

121.    Upon Father's involuntary commitment to **Defendant Whittier Pavilion**, **Defendant Richard Garmil** had an actual copy of Father's **2003 DPOA**.

122.  A social worker from the **Defendant Whittier Pavilion** telephoned Plaintiff Daughter Lisa and stated that Daughter Lisa was not allowed to see Father specifically due to **Defendant Attorney Garmil** having instructed that Father's 2003 DPOA was not a health care proxy.

123.    **Defendant Attorney Garmil** had no valid basis to prohibit Plaintiff Daughter Lisa from seeing Father while he was under involuntary commitment.

124.    **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that Father had told him on **May 24, 2011** that no one has come to see him since his involuntary admittance at **Defendant Whittier Pavilion**.

125.    On or about **May 21, 2011**, as a direct result of **Defendant Attorney Garmil** and **Defendant Whittier Pavilion** not permitting Plaintiff Daughter Lisa allowed to see her Father while he was under a 3-day involuntary commitment, Daughter Plaintiff Lisa immediately sought to retain private legal counsel.

126.    At no time did **Defendant Whittier Pavilion** seek to obtain information regarding family history or inquire from Plaintiff Daughter Lisa in its evaluation and treatment of Father.

127.    Within four (4) days of Father's involuntary admission to **Defendant Whittier Pavilion**, on **May 24, 2011**, **Defendant Attorney Garmil** filed a petition with the Haverhill District Court to have Father involuntarily committed for a six (6) month period at a psychiatric facility.

128.    **Defendant Attorney Garmil** concealed his filing of the six-month civil commitment petition from Plaintiff Daughter Lisa.

129.    **Defendant Whittier Pavilion** did not notify Plaintiff Daughter Lisa about its intention to file the above-described 6-month petition for involuntary civil commitment Haverhill District Court.

130.    **Defendant Whittier Pavilion** financially benefit from court ordered long-term involuntary civil commitments.

131.    Plaintiff Daughter Lisa inadvertently found out about the above-described petition for long-term civil commitment filed with Haverhill District Court on **May 24, 2011**.

### Conversation of May 24, 2011 between Plaintiff Daughter Lisa and Defendant Brian Nagle

132.    In early **April of 2011**, Father had personally re-confirmed that his **2003 DPOA** was still in effect and valid, by telephone to **Defendant BNY Mellon** and to **Defendant Brian Nagle**.

133.    On **April 6, 2011**, **Defendant BNY Mellon** faxed written confirmation of Father's communications that the **2003 DPOA** was still in effect and valid.

134.    Pursuant to the **2003 DPOA**, Plaintiff Daughter Lisa called **Defendant Brian Nagle** in her capacity as attorney-in-fact for Father in the late afternoon of **May 24, 2011**.

135.     Plaintiff Daughter Lisa called the office of **Defendant BNY Mellon** and directly spoke with **Defendant Brian Nagle**, as he was the primary financial manager of Father's accounts.

136.     During that conversation of **May 24, 2011**, Plaintiff Daughter Lisa specifically informed **Defendant Brian Nagle** as to the events that took place surrounding Father being involuntarily admitted to **Defendant Whittier Pavilion** and that she had just found out **Defendant Whittier Pavilion** had filed a petition with the Haverhill District Court for a 6-month involuntary civil commitment.

137.     During that conversation of **May 24, 2011**, Plaintiff Daughter Lisa specifically informed **Defendant Brian Nagle** she had already secured legal counsel to defend Father against being involuntarily committed.

138.     **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that, during the conversation of **May 24, 2011**, Plaintiff Daughter Lisa had specifically informed him that Father had been involuntary admitted at **Defendant Whittier Pavilion**; he stated that Plaintiff Daughter Lisa had given him the name and telephone number for **Defendant Whittier Pavilion**.

139.     Plaintiff Daughter Lisa specifically informed **Defendant Brian Nagle** that, as attorney-in-fact for Father pursuant to the **2003 DPOA**, she needed to transfer money into Father's Citizen checking account so that she could pay the retainer fee to obtain legal counsel for Father to specifically fight for Father's release from **Defendant Whittier Pavilion** and to fight, on Father's behalf, against the petition for a 6-month civil commitment filed by **Defendant Whittier Pavilion** and **Defendant Attorney Garmil**.

140.     During the conversation of **May 24, 2011**, Plaintiff Daughter Lisa informed **Defendant Brian Nagle** that legal counsel had advised her to seek guardianship and conservatorship.

141.     **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that, during the conversation of **May 24, 2011**, that he was aware of Father's existing **2003 DPOA**.

142.     **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that, during the conversation of **May 24, 2011**, Plaintiff Daughter Lisa had exercised her authority as attorney-in-fact under the **2003 DPOA**.

143.   During that conversation of **May 24, 2011**, **Defendant Brian Nagle** led Plaintiff Daughter Lisa to believe that, on behalf of **Defendant BNY Mellon**, he (Brian Nagle) would comply with Plaintiff Daughter Lisa's request for transfer of funds to Father's Citizen Bank account as attorney-in-fact for Father.

144.   **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that it was not uncommon conduct for Father to call him—as a representative and agent of **Defendant BNY Mellon**—and request transfers of funds to Father's Citizen's Bank Account.

145.   During the conversation of **May 24, 2011**, **Defendant Brian Nagle** made statements to Plaintiff Daughter Lisa that he would be affirmatively taking steps to process a transfer of funds to Father's checking account.

146.   At no time did **Defendant Brian Nagle**, or any agent of **Defendant BNY Mellon**, contact Plaintiff Daughter Lisa to inform her that Defendant BNY Mellon would not be complying with Plaintiff Daughter Lisa's afore-described request as attorney-in-fact of **May 24, 2011**.

**Defendant Brian Nagle's call to Father at Defendant Whittier Pavilion immediately following his conversation of May 24, 2011 with Plaintiff Daughter Lisa**

147.   On that same day (**May 24, 2011**), after speaking with Plaintiff Daughter Lisa, **Defendant Brian Nagle** called Father at the psychiatric facility of **Defendant Whittier Pavilion** while Father was involuntarily committed and under lock-down.

148.   At the time of the above-described conversation of **May 24, 2011** with Plaintiff Daughter Lisa, **Defendant Brian Nagle** was Vice President and Senior Portfolio Manager for **Defendant BNY Mellon**.

149.   At the time of the above-described conversation of **May 24, 2011** with Plaintiff Daughter Lisa, **Defendant Brian Nagle** had obtained a J.D. and a master's of law in taxation from Suffolk University Law School.

150.   At the time of the above-described conversation of **May 24, 2011** with Plaintiff Daughter Lisa, **Defendant Brian Nagle** knew that Plaintiff Daughter Lisa had been Father's attorney-in-fact, under the 2003 DPOA, for at least eight (8) continuous years.

151.     At the time of the above-described conversation of **May 24, 2011** with Plaintiff Daughter Lisa, **Defendant Brian Nagle** knew that Father had verbally re-affirmed to him and other representatives of **Defendant BNY Mellon** the validity of his **2003 DPOA**; that Father's expressed intention and desire that Plaintiff Daughter Lisa act as his attorney-in-fact still remained.

152.     **Defendant Brian Nagle** has outwardly held out to the public that he has legal knowledge and expertise regarding estate planning instruments and advance directives.

153.     Massachusetts General Laws Chapter 201B, § 1 provides the definition of a durable power of attorney, which states that the very purpose of a durable power of attorney is to remain effective if the principal becomes disabled or incapacitated.

154.     The nature of responsibilities and duties of **Defendant Brian Nagle** in managing investment accounts for **Defendant BNY Mellon** and from his legal education establishes that he knew—or should have known—that a durable power of attorney remains effective upon the disability or incapacity of a principal, which due to his actual knowledge of Father being involuntarily committed to a psychiatric ward call into called Father's capacity into question; that he was familiar—or should have been familiar—with Massachusetts law that a durable power of attorney remains effective upon the disability or incapacity of a principal.

155.     At the time of the above-described conversation of **May 24, 2011** with Plaintiff Daughter Lisa, **Defendant Brian Nagle** has directly acted in a fiduciary capacity on, behalf of **Defendant BNY Mellon**, in conservatorship/administration of estate matters before the **Essex Probate & Family Court**.  (Copies of filings specific to Defendant Brian Nagle are provided in **Exhibit 10**) with the Essex Probate & Family Court and Defendant BNY Mellon's role as fiduciary in probate cases before the Essex Probate and Family Court).

156.     **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that he had initiated the call to Father **on May 24, 2011** to obtain his permission for Daughter Lisa to act as attorney-in-fact in the withdrawing of funds from **Defendant BNY Mellon**.

157.     **Defendant Brian Nagle** did not inform Father during their conversation that Plaintiff Daughter Lisa requested a transfer of funds to be made to Father's checking account.  Through specific omission, Defendant Brian Nagle intended for Father to think that Plaintiff Daughter Lisa asked to have money transferred to her own checking account.

158.    **Defendant Brian Nagle** testified before the **Essex Probate and Family Court** that Father had verbally revoked his 2003 DPOA at the time of their conversation on **May 24, 2011**.

159.    Massachusetts General Laws Chapter 190B § 5-504 explicitly states that a verbal revocation by a principal of a durable power of attorney is deemed invalid; that in order for a principal's purported revocation of a durable power of attorney to be valid, the third-party must have actual possession of a signed revocation by the principal.

160.    At no time during the **May 24, 2011** conversation between **Defendant Brian Nagle** and Father, did Father request **Defendant Brian Nagle** to call a specific attorney on his behalf.

161.    The only statements that Father made to **Defendant Brian Nagle,** regarding getting him counsel, during their conversation of **May 24, 2011** was a general plea to get legal counsel so that he could get out of **Defendant Whittier Pavilion**.

162.    **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that he directly went to the Legal Department of **Defendant BNY Mellon** (in-house counsel) to inform of them of the above-described conversations that he had with Plaintiff Daughter Lisa and Father that took place on **May 24, 2011**.

163.    **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that he sought names of legal counsel that could provide legal services to Father; that the Legal Department of **Defendant BNY Mellon** (in-house counsel) gave him the name of Attorney Edward Tarlow.

### **Defendant Brian Nagle's telephone call on May 24, 2011 to Defendant Attorney Tarlow and Defendant Law Firm Tarlow, Breed, Hart & Rodgers**

164.    In **2008**, **Defendant Brian Nagle** co-founded a business called Family Business Association, Inc. with **Defendant Attorneys Tarlow** and **DeNapoli** of **Defendant Law Firm Tarlow Breed Hart and Rodgers**.  (A copy of the Articles of Organization submitted with the Secretary of State's Office is provided in **Exhibit 11**)

165.    As part of the function of Family Business Association, Defendant Brian Nagle and his above-named co-founders consists of publishing and distributing a magazine, in which **Defendant Brian Nagle**, specifically used his official title with **Defendant BNY Mellon**.  (A copy of a listing of Officers for Family Business Association is provided in **Exhibit 12**).

166.     Likewise, **Defendant Attorneys Tarlow, DeNapoli and Watson** specifically used their official capacities with **Defendant Law Firm Tarlow Breed Hart and Rodgers**.

167.     By **May 24, 2011**, **Defendants Brian Nagle, Attorney Tarlow, Attorney DeNapoli and Attorney Watson** had served years together on the Board of Directors for Family Business Association.

168.     **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that he had personally called **Defendant Attorney Tarlow**; and that during his conversation with Defendant Attorney Tarlow, that he (Defendant Brian Nagle) "gave him a brief 30,000 foot view of what was going on and indicated that if this is a situation he might be of assistance for [Defendant Attorney Tarlow] to please contact Marvin."

169.     Prior to **Defendant Brian Nagle** calling **Defendant Attorney Tarlow**, Defendant Attorney Nagle had actual knowledge that Plaintiff Daughter Lisa, in her capacity as attorney-in-fact had already obtained legal counsel for Father.

170.     As set forth above, **Defendant Brian Nagle** called **Defendant Attorney Tarlow** for specific objective of ousting Plaintiff Daughter Lisa as Father's attorney-in-fact to conceal Defendant Brian Nagle's handling Father's investment accounts in a manner that contravened Father's direct desires and intentions.

**Defendant Attorney Tarlow's and Defendant Attorney Watson's visit with Father while he was under a 3-day involuntary commitment**

171.     On **May 25, 2011**—*the very next day* after **Defendant Brian Nagle** spoke with **Defendant Attorney Tarlow**—**Defendant Attorneys Tarlow and Watson** went to see Father while locked-down at **Defendant Whittier Pavilion**.

172.     Father did not call or speak with **Defendant Attorney Tarlow** on May 24, 2011 or any agent or representative from **Defendant Law Firm Tarlow, Breed, Hart, and Rodgers**.

173.     **Defendant Attorney Tarlow**, in his official capacity with **Defendant Law Firm Tarlow, Breed, Hart, and Rodgers**, and **Defendant Attorney Garmil**, in his official capacity as legal counsel for **Defendant Whittier Pavilion** had schemed to keep Plaintiff Daughter Lisa from seeing Father so as to carry out their scheme to defraud Father to put his signature on purported instruments that would facially oust Plaintiff Daughter Lisa as attorney-in-fact and Plaintiff Daughter Devora as successor attorney-in-fact.  (Provided in **Exhibit 13** is a copy of an email between the Defendants that bolsters the existence of collusion).

174.     When **Defendants Attorney Tarlow and Watson** went to see Father at **Defendant Whittier Pavilion** while he was under locked down involuntary commitment and given antipsychotics, they had already prepared typed-up documents that consisted of three (3) written instruments for him to sign: 1) a purported revocation of Father's 2003 DPOA,  2) a new durable power of attorney, naming Father's CPA as attorney-in-fact and 3) a retainer agreement for the legal services of **Defendant Attorney Tarlow** and his law firm.

175.     **Defendant Attorneys Tarlow, DeNapoli and Watson** had prepared the above-described documents without having spoken to Father.

176.     **Defendant Attorney Tarlow** was the one to notarize the signing of the above-described documents.

### The retainer agreement

177.     The above-referenced retainer agreement did not contain even one reference about providing legal services to defend Father against the petition for a six-month civil commitment filed by **Defendant Attorney Garmil**, on behalf of **Defendant Whittier Pavilion**.  (A copy of the retainer agreement is provided in **Exhibit 14**).

178.     The only legal services expressed in the above-described retainer agreement had to do with *future* estate planning and other financial related matters.

179.     With **Defendant Attorneys Tarlow, DeNapoli and Watson** having knowledge of Father's multi-million dollar estate, **Defendant Law Firm TBHR** overtly allowed and intended for *court-appointed counsel* from the Committee for Public Counsel Services (CPCS) to represent Father in the pending petition filed in Haverhill District Court that was filed by **Defendant Attorney Garmil**, on behalf of **Defendant Whittier Pavilion**, which sought a six-month civil commitment.

### Durable Power of Attorney

180.     **Defendant Attorney Tarlow** and/or his agents drafted the durable power of attorney signed by Father on **May 25, 2011**—which was procured through fraud and deceit.  (A Copy of the DPOA is provided in **Exhibit 15**).

181.     The durable power of attorney stated that the attorney-in-fact was Father's CPA, **Defendant William Austin** of Braver.

182.    Father has used **Defendant William Austin** for accounting services as far back as 1999.

183.    **Defendant Brian Nagle** testified before the **Essex Probate & Family Court** that he had "regular interaction" with **Defendant William Austin,** on Father's behalf.

184.    Paragraph numbered 8 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To pay any and all bills, accounts, claims and demands now or hereafter payable by me including, without limiting the generality of the foregoing, the power to settle or compromise any such bills, accounts, claims and demands, and to specifically approve payment of professional legal fees incurred by [Father] with counsel at Tarlow, Breed, Hart & Rogers, P.C., and to authorize Bank of New York Mellon to distribute funds in payment of said professional legal fees within thirty (30) days of receiving an invoice.

185.    Paragraph numbered 10 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To act for [Father] in any business in which I have been, am now or hereafter may be engaged or interested.

186.    Paragraph numbered 12 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To sell, manage, invest and reinvest any or all of [Father's] property as [Father's] said attorney-in-fact shall deem expedient, changing investments according to [Father's] said *attorney-in-fact's* judgment.

187.    Paragraph numbered 14 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To borrow money in my name, and to give promissory notes or other obligations therefor, and to deposit as collateral, pledge as security for the payment thereof or mortgage any or all of my securities or other property of whatever nature.

188.    Paragraph numbered 15 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To borrow upon or collect monies due from all insurance policies which now or in the future stand in [Father's] name.

189.   <u>Paragraph numbered 18</u> of the durable power of attorney, signed by Father on **May 25, 2011** stated:

[]to employ <u>specifically</u>, TARLOW, BREED, HART & RODGERS, P.C. as counsel.

190.   Paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on **May 25, 2011** allowed the attorney-in-fact to have unfettered discretion to act, regardless of Father's desires.

191.   The paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on **May 25, 2011** even authorized the attorney-in-fact to act contrary to Father's intentions or desires.

192.   The paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on **May 25, 2011** included the following language:

. . . hereby giving and granting unto my said attorney –in-fact full power and authority to do and perform <u>all and every</u> act and thing <u>whatsoever</u>. . . . as fully to all intents and purposes as I might <u>or could do</u> if personally present.

193.   The paragraph entitled "Delegation of Powers; Compensation**"** of the durable power of attorney, signed by Father on **May 25, 2011**, allowed **Defendant Attorney Tarlow**—designated as attorney-in-fact—could delegate his powers to investment counsel, brokers, attorneys or "any other agent".

194.   The DPOA stated:

[Father's] said attorney-in-fact may deal with himself or herself or with <u>any concern</u> in which <u>he or she may be interested</u> <u>as freely</u> and effectively as though dealing with a third party.

195.   The paragraph entitled "<u>HEALTH CARE PROXY</u>" of the durable power of Attorney, signed by Father on **May 25, 2011**, designated that Father's attorney-in-fact would be given full HIPAA rights.

196.   The paragraph entitled "<u>HEALTH CARE PROXY</u>" of the durable power of Attorney, signed by Father on **May 25, 2011**, designated the CPA to have <u>complete</u> access to <u>any and all</u> of Father's <u>medical information and records</u>.

197.     Father's **2003 DPOA** precluded the attorney-in-fact from being able to act with free reign.  The language of the 2003 DPOA precluded any attorney-in-fact from being able to dismantle Father's already well-established estate planning instruments.

198.     Counsel of **Defendant Law Firm Tarlow, Breed, Hart & Rodgers** did not have any intentions of providing legal services to protect Father against **Defendant Whittier Pavilion's** petition for a six-month civil commitment.

199.     **Defendant Attorney Tarlow** and his law firm had **Defendant William Austin** sign a "Release and waiver of Tarlow, Breed, Hart & Rodgers, P.C. by William J. Austin as Attorney-in-Fact for Marvin H. Siegel."  (A copy of the Release and Waiver is provided in **Exhibit 15**).

200.     After Plaintiff Daughter Lisa, through counsel, commenced action in the **Essex Probate and Family Court** on **May 27, 2011**, **Defendant William Austin** informed **Defendant Attorney Tarlow** and his law firm he was declining to act as attorney-in-fact under the purported durable power of attorney dated May 25, 2011.

201.     Through communications with **Defendant Brian Nagle—**acting on behalf of **Defendant BNY Mellon**, **Defendant Law Firm Defendant Law Firm Tarlow, Breed, Hart & Rodgers** knew that Father had validly executed his desires and intentions in a durable power of attorney and trust on **February 11, 2003**,

202.     In a signed pleading submitted to the **Essex Probate & Family Court** on **June 7, 2011**, **Defendant Attorney DeNapoli** stated that "[in] order to accomplish his goals of protecting and preserving [Father's] assets, [Father] *may need only to finalize his estate plan and set up a trust with himself and the present holder of his funds, BNY Mellon, as co-trustee, to protect his assets and assure that his wishes are followed*."

203.     **Defendant Attorney DeNapoli** sent correspondence to counsel obtained for Father, in Plaintiff Daughter Lisa's capacity as attorney-in-fact, **dated May 25, 2011**, stating that the law firm of **Defendant Law Firm Defendant Law Firm Tarlow, Breed, Hart & Rodgers** as Father's newly retained counsel and stated that Father had revoked the 2003 DPOA on **May 25, 2011**.

204.     Subsequent legal counsel privately retained by Father, **Attorney Marsha Kazarosian** filed an affidavit with the **Essex Probate & Family Court** on **August 17, 2011**, attested that Father had thoughtfully, comprehensively and cohesively explained to her that the documents presented to Father and signed on **May 25, 2011** were not knowingly and voluntarily executed by Father; that Father did not have knowledge of the content of the documents in which he signed.  (A copy of the Attorney Kazarosian's Affidavit is provided in **Exhibit 16**).

205.     However, the content set forth in afore-described purported written retainer agreement, drafted by **Defendant Attorney Tarlow** and **Defendant Attorney Watson**—and signed while Father was under lockdown in a psychiatric facility, via a three-day involuntary psychiatric commitment—is *very extensive and specific* as to intended services for *estate planning*.

206.     The afore-described content of the purported written retainer agreement—prepared by **Defendant Attorney Tarlow**—and signed by Father while under lockdown, in a psychiatric facility, for a three-day involuntary commitment is very detailed and specific as to the scope of legal services offered to Father by **Defendant Law Firm Tarlow, Breed, Hart & Rodgers**.

207.     There is no reference to, in any manner, regarding legal services to free Father from involuntary commitment at **Defendant Whittier Pavilion**.

208.     As of **May 20, 2011**, records of **Defendant ESMV** show that **Defendant Attorney Berid** and staff of Defendant ESMV knew that Father was going to be given antipsychotics by **Defendant Whittier Pavilion**.

209.     As of **June 3, 2011**, records of **Defendant ESMV** show that **Defendant Attorney Berid** and staff of Defendant ESMV knew the above-described manner in which **Defendant Attorney Tarlow** obtained the signed documents of **May 25, 2011**.

### Evidence of ill-motives

210.     **Defendant Attorney Tarlow** has a n established pattern rendering estate-planning services to private clients and inducing them to appoint him as fiduciary, such as trustee and executor.

211.     For example, **Defendant Attorney Tarlow's** suspect conduct in the matter of Estate of Richard R. Vazza (Suffolk Probate & Family Court No. 07P-1667-EP1).

212.    In **March of 1993**, **Defendant Attorney Tarlow** prepared estate-planning instruments for Richard R. Vazza; he drafted and executed the Will for Richard R. Vazza.  (Provided is a copy of the Will for Richard R. Vazza in **Exhibit 17**).

213.    At the time of **Defendant Attorney Tarlow's** having provided legal services to Richard Vazza for estate planning purposes, Richard Vazza's financial worth was in excess of $20 million.

214.    **Defendant Attorney Tarlow** was specifically named in Richard R. Vazza's Will as co-executor, along with with Richard R. Vazza's then wife and children.

215.    In the above-described Will, the wording of provision numbered 3.1—regarding the manner in which decisions were to be made by the executors—gave unfair advantage and influence, specifically, to **Defendant Attorney Tarlow**.

216.    **Defendant Attorney Tarlow's** knowingly and pre-meditated illegal conduct is evidenced in the following provisions of the above-described Will:

> **Provision 3.2** which states: "No one dealing with my executors need inquire concerning the validity of anything that they purport to do or need see the application of any money paid or any property transferred to, or upon order of, my executors";

> **Provision 4.1** gives unconscionable unfettered discretion in the "retaining and investing of stocks, shares and obligations of corporations, unincorporated associations (including, but not limited to, capital investments in joint ventures and limited or general partnerships), trusts and investment companies, common trust funds or securities."  The provision ***explicitly*** and ***expressly*** gives the executor(s) permission to make investments that are "in such amounts, upon such terms, and of such character [] that *would not be considered proper for executors to make or retain" and "that might violate the principles of investment diversification"*; and

> **Provision 4.3** states that the executors are permitted to "hold bonds, shares or other securities in bearer form, or in the name of the executors or in the name of a nominee, *without* indication of *any fiduciary* account in a bank, *without* indication of *any fiduciary* capacity."

217.     In addition to **Defendant Attorney Tarlow** drafting the above described Will for Richard R. Vazza, he, also, <u>*acted as the notary for the execution of the Will*</u>—purportedly certifying that *his own client* signed the Will of his own free will and full knowledge; *the very document that explicitly made Defendant Attorney Tarlow a co-executor.*

218.     The above-described Will explicitly declared that Richard Vazza was a resident of Florida.  In addition, on **April 27, 2007**, Richard Vazza filed his written attestation, in his then-pending divorce matter in Norfolk County that his primary domicile was Florida.  (Copy of Richard R. Vazza's affidavit is provided in **Exhibit 18**).

219.     **Defendant Attorney Tarlow** acted as notary for Richard Vazza's execution of the afore-described affidavit of **April 27, 2007** that his primary domicile was Florida.

220.     Two (2) months after Richard Vazza's having executed the above-described affidavit—and having been *notarized by* **Defendant Attorney Tarlow,** Richard Vazza suddenly and unexpectedly died on **July 10, 2007.**

221.     On **August 7, 2007**, when **Defendant Attorney Tarlow** commenced the estate administration for Richard Vazza, he did so in the Suffolk Probate & Family Court, filing an Affidavit of Domicile attesting that Richard Vazza's primary domicile was Massachusetts—which *explicitly contradicted* the previously described affidavit of Richard Vazza filed in the divorce matter with Norfolk County.   (Copy of Defendant Attorney Tarlow's affidavit is provided in **Exhibit 19**).

222.     Subsequent to the afore-described filing of **Defendant Attorney Tarlow's** Affidavit of Domicile, the adult children of Richard Vazza obtained independent counsel and filed a motion to dismiss Defendant Attorney Tarlow's petition for probate and for release of Will.  They did so because Defendant Attorney Tarlow had filed false information in the filed pleadings to begin probate of the estate for Richard R. Vazza—a copy of the motion and stipulated agreement are in **Exhibit 20**.

223.     In the above-referenced probate matter, **Defendant Attorney Tarlow**, knowingly and deliberately, prepared and filed false information with the Suffolk Probate & Family Court.

224.     Another example is **Defendant Attorney Tarlow's** conduct in provided private legal services to Everett N. Cole, Jr. for estate planning purposes.  In **January of 1977, Defendant Attorney Tarlow** prepared and drafted an irrevocable trust for Everett N. Cole, Jr., called the North Street Irrevocable Trust—Everett N. Cole, Jr. was owner of real property located at 937 North Street, Tewksbury, MA.  (A copy of the above-described Trust is provided in **Exhibit 21**).

225.     In the afore-described Irrevocable Trust, **Defendant Attorney Tarlow** was declared _sole_ Trustee of such Irrevocable Trust.

226.     As evidenced by the main substance of the above-described Irrevocable Trust, Everett N. Cole, Jr. was induced to transfer the property of 937 North Street, Tewksbury, MA to **Defendant Attorney Tarlow**.

227.     In the afore-described Irrevocable Trust, Everett N. Cole, Jr., transferred the property to **Defendant Attorney Tarlow**, as if Defendant Attorney Tarlow were a private individual—it was _not_ transferred to Defendant Attorney Tarlow in his capacity as an attorney for Everett N. Cole, Jr.

228.     The afore-described Irrevocable Trust provided that **Defendant Attorney Tarlow**, as sole Trustee, had unfettered discretion to do as he pleased with the trust estate.  The Irrevocable Trust stated that Defendant Attorney Tarlow, as Trustee, could act "with the same freedom and lack of restriction as the Donor [Everett N. Cole, Jr.] would have were he the sole individual owner thereof of free of trust"; that Defendant Attorney Tarlow was not, _in any manner_, restricted "by the degree of risk and/or speculation involved."

229.     The above-described Irrevocable Trust explicitly gave **Defendant Attorney Tarlow** authority "to borrow money, and to encumber or hypothecate trust property by mortgage, by deed or trust, pledge or otherwise."

230.     Everett N. Cole, Jr. signed the execution of the above-described Irrevocable Trust on **January 17, 1977**.  Two (2) days later, on **January 19, 1977**, **Defendant Attorney Tarlow** took out a personal loan for **$38,000**, using estate property in the above-described Irrevocable Trust as collateral.  (Copy of the mortgage is provided in **Exhibit 22**).

231.     In **November of 1987**, **Defendant Attorney Tarlow** took out a loan for **$120,000** with Bank Five for Savings using estate property in the above-described Irrevocable Trust as collateral.  (Copy of the mortgage is provided in **Exhibit 23**).

232.     In **June of 1988**, **Defendant Attorney Tarlow** took out another loan for **$35,000** with Bank Five Savings using estate property in the above-described Irrevocable Trust as collateral.  (Copy of the mortgage is provided in **Exhibit 24**).

233.     In **1989**, the daughter of Everett N. Cole, Jr. filed a civil action against **Defendant Attorney Tarlow** in her capacity as beneficiary.  She sought to compel Defendant Attorney Tarlow to provide her an accounting for the above-described Irrevocable Trust.  (Copy of the Complaint and docket sheet are provided in **Exhibit 25**).

234.     The above-described Irrevocable Trust explicitly provided that **Defendant Attorney Tarlow** would, at the minimum, affirmatively provide the beneficiaries an accounting.

235.     It is suspect that **Defendant Attorney Tarlow** did not file an Answer to the Complaint until, almost, *three (3) years later* in **1992**.  (Copy of the afore-referenced Answer is provided in **Exhibit 26**).

236.     In **Defendant Attorney Tarlow's** filed Answer to the above-referenced Complaint, he denied that he did not provide an accounting—however, he *did not* affirmatively claim to have, in fact, provided an accounting.

237.     In the afore-described civil action, **Defendant Attorney Tarlow** was represented by **Defendant Attorney DeNapoli**.

238.     After the commencement of the above-described civil action against **Defendant Attorney Tarlow**—which was *one (1) year prior* to his filing the above-referenced Answer, took out another loan for **$87,000** with Bank Five Savings using estate property in the above-described Irrevocable Trust as collateral.  (Copy of the mortgage is provided in **Exhibit 27**).

239.     Also, in **July of 1998**, **Defendant Attorney Tarlow** assigned leased property in the above-described Irrevocable Trust to Bank Five Savings.  (Copy of the afore-described assignment is provided in **Exhibit 28**).

240.     Over two (2) years *after* the above-described civil action was brought—but *before* filing an Answer, it is suspect that **Defendant Attorney Tarlow** resigned as Trustee of the above-described Irrevocable Trust.  (Provided is a copy of Defendant Attorney Tarlow's filed Resignation with the Middlesex County Registry of Deeds in **Exhibit 29**).

241.    **Defendant Attorney Maxa Berid** was a party formally named in a civil action pertaining to the sale of marital property, specifically, involving the afore-discussed **North Street Irrevocable Trust**.  Defendant Attorney Berid had represented Everett Cole, III in his divorce and the sale of marital property.   The civil action naming Defendant Attorney Berid was brought in Middlesex County—which Complaint explicitly identified **Defendant Attorney Tarlow** as co-trustee of North Street Irrevocable Trust with Everett Cole, Jr.  (Copy of Complaint of the afore-referenced Middlesex civil action and docket sheet are provided in **Exhibit 30**).

**Defendant Attorney Tarlow and his Law Firm had attempted to lead the Essex Probate & Family Court to believe Father had retained their legal services on an illusory 30-year professional relationship**

242.    In sworn pleadings and affidavit, **Defendants Attorney Tarlow and DeNapoli** had stated that Father had initiated their legal services.

243.    In making the above-described representation, **Defendants Attorney Tarlow and DeNapoli** knew that such representation was false.

244.    **Defendant Attorney DeNapoli**, during the court proceeding of **June 7, 2011** before Essex Probate & Family Court was asked by the judge asked how **Defendant Attorney Tarlow** and their firm first came to be retained by Father.

245.    **Defendant Attorney DeNapoli** intentionally tried to give the impression that Father, personally, initiated and sought out **Defendant Attorney Tarlow** based on a legal representation because they had known each other for thirty (30) years, as attorneys sharing a suite.

246.    Immediately after the above-described representations had been made, **Judge Abber** conducted a series of inquiries that revealed **Defendant Attorney DeNapoli's** initial representation was not credible.

247.    **Judge Abber** asked **Defendant Attorney DeNapoli** whether Father, *prior* to **May 25, 2011**, had ever used **Defendant Attorney Tarlow**'s legal services or that of his law firm; which Defendant Attorney DeNapoli stated that Father had <u>not</u>.

248.    **Defendant Attorney DeNapoli's** answers to **Judge Abber's** successive questioning showed that **Defendant Attorney Tarlow** and Father had been only mere acquaintances—they just happened to have offices in the same building.

249.    The above-described in-court inquiry went as follows:

| | |
|---|---|
| Judge Abber: | And, counsel, let me ask you a question.  Has your firm of Mr. Tarlow done business for Mr. Siegel before? |
| Attorney DeNapoli: | No. |
| Judge Abber: | When did you first meet him?  Or when did Mr. Tarlow first meet him? |
| Attorney DeNapoli: | Well, Mr. Tarlow had known him in the past, from being somewhat of a contemporary of his and shared office space.  And they recognized each other at that time, but we had not done any business with him.  So at that meeting— |
| Judge Abber: | Well on May 24th, was this the first that Mr. Siegel had spoken to Mr. Tarlow? |
| Attorney DeNapoli: | Since years when they shared – not shared offices, but had adjoining offices in the building together. |
| Judge Abber: | Is Mr. Siegel an attorney as well? |
| Attorney DeNapoli: | He is. |
| Judge Abber: | And they practiced in the same office? |
| Attorney DeNapoli: | The same building years ago. |
| Judge Abber: | The same building? |
| Attorney DeNapoli: | Yes. |
| Judge Abber: | **And when was the last time they shared the same building as an office?** |
| Attorney DeNapoli: | **I want to say it was <u>probably 30 years ago</u>.** |
| Judge Abber: | **And in that 30 years ago, had he any contact, communications or conversations with Mr. Siegel?** |
| Attorney DeNapoli: | **I don't believe he did.** |
| Judge Abber: | **Not until the 24th?** |
| Attorney DeNapoli: | **Yes, your Honor.** |

**<u>Acts of extortion by Defendant Attorney DeNapoli, as representative of
Defendant Tarlow Breed Hart Rogers</u>**

250.     A few days after the above-described court proceeding, on **June 9,
2011**, **Defendant Attorney DeNapoli** called Attorney Long (counsel for Plaintiff
Daughter Lisa) to propose what he characterized as an "offer of settlement"—which
just because he called it an "offer of settlement", does not make it so.

251.     As previously set forth, **Defendant Attorney DeNapoli** knew that
Plaintiff Daughter Lisa and her husband had been having continuous and grave
financial difficulties due to severe physical injuries that Plaintiff Daughter Lisa first
sustained in **<u>August of 2006</u>**.

252.     When **Defendant Attorney DeNapoli** spoke with Attorney Long, and
informed her that *if* Plaintiff Daughter Lisa would withdraw her petitions that she filed
in the **Essex Probate & Family Court** (In re Marvin H. Siegel), *he* would facilitate
Plaintiff Daughter Lisa *immediately* receiving **$100,000** *from Father's estate*—which
he attempted to veil the bribe by stating that Defendant Daughter Sheryl and Plaintiff
Daughter Devora would, also, receive $100,000 each.

253.     When Attorney Long relayed the above-statements made by **Defendant
Attorney DeNapoli** to Plaintiff Daughter Lisa, Plaintiff Daughter Lisa immediately
responded that Defendant Attorney DeNapoli's "offer" was an outright bribe; upon
which, Plaintiff Daughter Lisa, without hesitation, refused.

254.     At that time, Plaintiff Daughter Lisa, also, conveyed to Attorney Long
that **Defendant Attorney DeNapoli's** supposed settlement was, in fact, attempted
extortion; that a monetary settlement was *not* consistent with the nature of this type of
legal action—a petition for guardianship and conservatorship is *not*, in any manner,
commensurate with tort actions that use monetary settlements as a valid and legal
custom and practice (such as a personal injury case or breach of contract claim).

255.     After the above-described discussion between Attorney Long and
Plaintiff Daughter Lisa, Attorney Long called **Defendant Attorney DeNapoli** the
following day and informed him that Plaintiff Daughter Lisa refused his above-
described proposition.

256.     Subsequent to Attorney Long's above-described telephone conversation
with **Defendant Attorney DeNapoli**, the previously discussed submitted invoice
shows that he and **Defendant Attorney Tarlow** *re-checked* the status of the
Complaint of foreclosure regarding property owned by Plaintiff Daughter Lisa and her
husband.

257.     **Defendant Attorney DeNapoli** admitted to making the above-described propositions in the descriptions contained in the submitted invoice, as well as, in an affidavit that he filed with the **Essex Probate & Family Court** on **November 8, 2011**—which was filed in support of Defendant Attorney DeNapoli's opposition to pleadings filed by Plaintiff Daughter Lisa, through counsel.

258.     The pleadings filed by Plaintiff Daughter Lisa explicitly set forth in detail  the above-described events surrounding the offered $100,000 to Plaintiff Daughter Lisa by **Defendant Attorney DeNapoli** in exchange for her dropping her filed petitions for guardianship and conservatorship.  (Copy of the pleadings filed on behalf of Plaintiff Daughter Lisa are provided in **Exhibit 31** and Defendant Attorney DeNapoli's opposition and affidavit are provided in **Exhibit 32**).

259.     In **Defendant Attorney DeNapoli**'s affidavit, he outright admitted to having made an offer of money to Plaintiff Daughter Lisa.  He explicitly admitted that he stated Plaintiff Daughter Lisa would receive $100,000 based on the condition that she were to _not_ pursue her legal action seeking to validate Father's **2003 DPOA**.

260.     In the afore-described affidavit**, Defendant Attorney DeNapoli** made statements directly relating the offer of money to his explicit representation that Plaintiff Daughter Lisa and her family were having financial difficulties.  **Defendant Attorney DeNapoli** expressed that he, intentionally and knowingly, made the $100,000 offer *based on his belief that Plaintiff Daughter Lisa was having financial difficulties*.

**Evidence of Defendant Attorney Garmil's collusion with Defendant Law Firm Tarlow, Breed, Hart & Rodgers**

261.     During the court proceeding of **June 14, 2011** before the Essex Probate & Family Court, unsolicited, **Defendant Attorney Garmil** proffered to explain to Judge Abber why he had initiated a petition, in the Haverhill District Court, for a six-month involuntary commitment of Father to a psychiatric facility.  The discourse that took place concerning **Defendant Attorney Garmil's** above-described explanation, went as follows:

> Attorney Garmil:   Thank you.  Your Honor, Mr. Siegel has now been a patient on the locked psychiatric unit at the Whittier Pavilion for several weeks.  We did file a petition for civil commitment, and the reason for that was because Mr. Siegel refused to sign himself into the hospital and we were, therefore,
>
> posed with two options: file a petition or discharge him to the street.  We had a civil commitment hearing

scheduled for last Tuesday.  On Monday, I got a call from Mr. Siegel's attorney; he has another attorney involved with him in the civil commitment.

Judge Abber:   That's Attorney Favaza?

Attorney Garmil:   Favaza.  He requested to have an independent medical evaluation done and continue the civil commitment case, which they have a right to do, Your Honor, so we never had a civil commitment hearing.  It is now scheduled for Wednesday, the 22nd.

However, I am not going to win that hearing if I have to go forward, and the reason is because, Your Honor, civil commitment is not a capacity issue.

Judge Abber:   Right.

Attorney Garmil:   It's a dangerousness issue, in essence.  There are other things that have to be proven, but it boils down to a dangerousness issue.

The doctor is of the opinion that with the appropriate services in place in the community, Mr. Siegel can go home.  Whether or not that means his daughter living in the home or not, there's no opinion- -

Judge Abber:   That's a separate issue.

Attorney Garmil:   And I'm trying to report to the Court, the doctor does not have an opinion of that issue.  But there must be twenty-four hour services, seven days a week, put in place.

But the point is that he's ready to discharge now.  If it was not for all of the strife going on at this time, I wouldn't be here; Mr. Siegel would no longer be a patient at Whittier Pavilion.

What's going to end up happening, your Honor, is that they can't safely discharge him.  They can't keep him.  His insurance company is going to stop paying, because it's not necessary for him to be there.  And if we are now just going to end up housing him because of the strife, he's going to end up having to pay privately.  I don't know what the daily charge is, but I would suggest that it is somewhere in the seven-to-nine-hundred-dollar-per day range, because this is a psychiatric hospital.

37

We need to get Mr. Siegel discharged safely.  We need the parties at hand – either we need the Court to appoint a guardian independent of everybody else so that they are free to make decisions that are solely in the best interest of Marvin Siegel or we need to negotiate something with everybody, because Mr.  – Your Honor, if you were to appoint a guardian now and if – it's not possible, but if we were able to put the services in before 4:00 this afternoon, he would be discharged at 4:00 this afternoon. . . .

He's almost being incarcerated against his will for no reason whatsoever, but what are we going to do?

262.    Upset by Judge Abber's declaring that he was not going to appoint a guardian, **Defendant Attorney Garmil** initiated the below discourse with Judge Abber:

Attorney  Garmil:    And I would suggest then, we are not going to be able to discharge Mr. Siegel until June 22nd when the judge of the Haverhill District Court - ***because my client is not going to take the liability of discharging him*** - -

Judge Abber:    I understand - -

Attorney Garmil:  - - at this point.

Judge Abber:    I understand that fully.

Attorney Garmil:  Thank you.

Judge Abber:    And that, with all due respect, as you sit here, counsel, or stand here before me, and you equated this to an incarceration as well, I understand what needs to occur before he can be released, but maybe that gives everybody some time, including, Mr. Siegel to arrange for those support services twenty-four hours and for this family to possibly get together to unify for those support services **so** that we're not back here, and back here very quickly.

263.    As demonstrated by the above discourse, **Defendant Attorney Garmil** made it clear to **Judge Abber** that, he—as private legal counsel for **Defendant Whittier Pavilion**—was not going to discharge Father based solely on the fact that a guardian was not going to be appointed.  Still, Judge Abber did not appoint a guardian at the proceeding held on **June 14, 2011**.

**<u>Further evidence tending to show deliberate acts of fraud</u>**

264.    **Defendant Attorney Tarlow**—and the **Defendant Law Firm**—filed a motion with the Essex Probate & Family Court seeking an Order to be paid approximately, **<u>$110,000</u>**, for purported legal services.  (Copy of the motion and invoices filed by Defendant Law Firm are in **Exhibit 33**).

265.    The **Essex Probate & Family Court** did not allow the specific amount requested —but did issue an Order for payment to be issued to **Defendant Law Firm TBHR** for the amount of **<u>$6,500.00</u>**.

266.    The afore-referenced Order for payment to be made to **Defendant Law Firm** by **Judge Abber** was explicitly placed on the docket sheet of In re Marvin H. Siegel—in the entry dated **11/22/2011**, stating:

> After review of all the submissions and the invoice the motion is allowed in the amount of **$6,500.00**.  The court finds that the respondent did benefit from the services, but the time charged is excessive in light of the issues dated 11/21/11.

267.    Excessive billing for legal services is a violation of the Massachusetts Rules of Professional Conduct.  The Board of Bar Overseers has published several opinions about excessive fees constituting professional misconduct.

268.    Under the Massachusetts Judicial Canon of Ethics, judges are required to report known professional misconduct to the Office of Bar Counsel/Board of Bar Overseers.  There are prior published decisions by the Board of Bar Overseers sanctioning attorneys for excessive billing.

269.    At no time has there been a specific evidentiary hearing held in any State court to render a determination as to the validity of the **2003 DPOA** executed by Attorney Marvin H. Siegel.

270.    But for fraudulent and deceptive conduct committed on May 24, 2015 and May 25, 2015 by direct agents of BNY Mellon, the **2003 DPOA** executed by Father would still be in effect at this present time.

**<u>Evidence of Defense Attorney Berid's refusal to take legal action against Attorney Tarlow and his law firm based on their prior working relationship</u>**

271.    Investigation notes entered into the computer system of **Defendant ESMV** on **<u>May 10, 2011</u>**, state that **Defendant ESMV** and its staff had information that:

> Elder's assets are roughly $7 million including the home he lives in which is paid for;

> Elder has a will that divides the elder's assets equally between the elder's three (3) children; and

> Elder has a trust where the majority of his assets are managed by New York Mellon Bank and he has an investment banker by the name of Brian Nagle who is the personal banker for his account.

272.    Reports entered into the computer system of **Defendant ESMV** on **<u>May 11, 2011</u>** (updated on **<u>May 16, 2011</u>**) show that **Defendant Caseworker Springman** wrote that he was actively obtaining "information regarding [Father's] will/trust and finances."

273.    Reports entered into the computer system of **Defendant ESMV** on **<u>May 17, 2011</u>** (updated on **<u>May 20, 2011</u>**) show that **Defendant Caseworker Springman** spoke with Lieutenant Ryder of the Boxford Police Department.  It was documented that Lt. Ryder had known Father for ten (10) years; that he had no experience with the elder being a legitimate threat; that the information that Defendant Caseworker Springman had concerning prior events were "more benign than indicated"; that **as of May 20, 2011**, there has been no legitimate reason to use a section 12.

274.    Investigation notes entered into the computer system of **Defendant ESMV** on **<u>May 13, 2011</u>** (updated on **June 8, 2011**), state that "case substantiated for SN [self neglect] on this date and allegation of FE [financial exploitation] will continue to be investigated."

## Count I

### Breach of Fiduciary Duty by Defendants BNY Mellon and Brian Nagle

Plaintiffs incorporate by reference the above allegations as if fully alleged here.

275.    **Defendant BNY Mellon** is a foreign corporation based in Delaware. A substantial portion of underlying alleged misconduct involved the participation of officers, agents, servants or employees of **Defendant BNY Mellon** located in New York.

276.    **Defendant BNY Mellon**—through its officers, agents, servants and employees—knowingly and fraudulently engaged in acts of deceptively obtaining Father's signature on written instruments.  The written instruments consisting of: a revocation of Father's **2003 DPOA**, new durable power of attorney/healthcare proxy and retainer agreement for legal representation by **Defendant Law Firm Tarlow, Breed, Hart & Rodgers**—signed by Father on **May 25, 2011**, while he was under involuntary commitment at **Defendant Whittier Pavilion**.

277.    **Defendants BNY Mellon and Brian Nagle** had a fiduciary duty to Plaintiff Daughters in three separate and distinct respects: 1) on **May 24, 2011,** Plaintiff Daughters were valid and effective attorneys-in-fact for Father pursuant to Father's **2003 DPOA**, 2) Plaintiff Daughters are co-trustees of the DSL Trust and 3) Plaintiff Daughters are co-beneficiaries of Father's estate.

278.    **Defendant BNY Mellon**—through its officers, agents, servants or employees—knew that Plaintiff Daughters were co-trustees and co-beneficiaries of the **DSL Trust** and co-beneficiaries of Father's estate.

279.    By **October of 2003**, **Defendant BNY Mellon**—through its officers, agents, servants and employees—knew about the execution by Father of his **2003 DPOA** and the content of Father's 2003 DPOA.  Defendant BNY Mellon knew that Father had personally sought the execution of the 2003 DPOA and of the validity of the 2003 DPOA.  Defendant BNY Mellon knew that Plaintiff Daughter Lisa was Father's attorney-in-fact, at all relevant times.

280.    **Defendant BNY Mellon**—through its officers, agents, servants and employees—had a fiduciary duty to Plaintiff Daughters in their capacities: as attorneys-in-fact, as co-trustees of the **DSL Trust**, as co-beneficiaries of the **DSL Trust** and co-beneficiaries of Father's estate.  Specifically, Defendant BNY Mellon had a duty to not act for the benefit of itself in any matter to which it has duties to perform or interests to protect another.

281.     **Defendant BNY Mellon**—through its officers, agents, servants and employees—breached its fiduciary duty to Plaintiffs Daughters by engaging in acts of self-dealing, which include, but are not limited to: **Defendant Brian Nagle's** soliciting the legal services of **Defendant Attorney Tarlow** and **Defendant Law Firm** in purported representation of Father; colluded with counsel of Defendant Law Firm TBHR in purportedly revoking Father's **2003 DPOA**; the inclusion of Defendant BNY Mellon in the durable power of attorney signed by Father on **May 25, 2011**; the inclusion of Defendant BNY Mellon in the retainer agreement signed by Father on **May 25, 2011**; converting funds belonging to **DSL Trust** (which Plaintiff Daughters are co-trustees and co-beneficiaries) to its own use; creating false documentation to obtain  funds from DSL Trust; engaging in acts to conceal fraudulent and deceptive activity of other Defendants.

282.     **Defendant BNY Mellon** had knowledge of the above-described misconduct by **Defendant Brian Nagle** and other designated Defendants where Plaintiff Daughter Lisa sent copies of the 93A Demand letter to the Board of Directors and President of Defendant of BNY Mellon.

283.     High-ranking officials of **Defendant BNY Mellon** had taken overt acts to aid and abet the misconduct of Defendant Brian Nagle—as evidenced by the result of communications with the Federal Reserve and the Federal Reserve's written refusal to investigate.

284.      As a direct proximate result of intentional acts of self-dealing by **Defendant BNY Mellon**—through the officers, agents, servants and employees, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

**Count II**

**Fraud  committed by Defendants BNY Mellon, Nagle, Tarlow, Watson,**
**Law Firm Breed Tarlow Rodgers & Hart, Whittier Pavilion and Garmil**

285.    Plaintiffs incorporate by reference the above allegations as if fully alleged here.

286.    The new durable power of attorney and retainer agreement directly facilitated by **Defendant Law Firm TBHR** and designated Defendants (**Attorney Tarlow** and **Attorney Watson**) are replete with numerous provisions that explicitly gave **Defendant BNY Mellon** and **Defendant Law Firm TBHR** unfettered discretion to use the funds of **DSL Trust**, for designated Defendants' *own personal use*.

287.    Since Father's first hiring **Defendant BNY Mellon** in **1999** to manage his funds—including the **DSL Trust**, **Father** explicitly signed a written agreement that **Defendant BNY Mellon** *did not* have unfettered discretion in the handling of funds.

288.    On **May 24, 2011**, **Defendant Brian Nagle** knew that Father did not have any intention or desire to give unfettered discretion in the use of his funds—especially with regard to the **DSL Trust**.

289.    As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Brian Nagle** knew that **Defendant Tarlow and Defendant Law Firm** could not ethically act as legal counsel for Father; as designated Defendants (**Attorney Tarlow**, **Attorney DeNapoli** and **Attorney Watson**) had served as co-members, for several years, on the Board of Directors and Officers of Family Business Magazine Inc. with Defendant Brian Nagle—in his specific official capacity with **Defendant BNY Mellon**).

290.    As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that, *prior* to **May 25, 2011**, Father had no prior business dealings with **Defendant Attorney Tarlow** or **Defendant Law Firm TBHR**; that Father *did not* personally initiate legal representation by Defendant Attorney Tarlow or Defendant Law Firm TBHR.

291.    On **May 24, 2011** (and numerous years prior), **Defendant BNY Mellon**—through its officers, agents, servants and employees—and **Defendant Brian Nagle** knew that Father's **2003 DPOA** was valid and effective.

292.    As set forth in this Complaint**, Defendant**s **Attorney Tarlow DeNapoli**, and **Watson** knew _prior_ to designated Defendants going to see Father with the already prepared written instruments (signed by Father on **May 25, 2011**) that Father's **2003 DPOA** was valid and effective.

293.    **Defendant BNY Mellon**—through its officers, agents, servants and employees in its offices in **Boston and New York**—knowingly and fraudulently engaged in acts of deception for intended conversion of funds belonging to **DSL Trust** for its own use including his having made misrepresentations to Plaintiff Daughter Lisa that Defendant BNY Mellon would honor her authority as attorney-in-fact for Father.

294.    High ranking officials of **Defendant BNY Mellon** had taken overt acts to aid and abet the misconduct of **Defendant Brian Nagle**—as evidenced, in this Complaint, by their communications with the Federal Reserve and the Federal Reserve's written refusal to Plaintiff Daughter Lisa that it was not going to conduct an investigation.

295.    From the inception of Father being admitted to **Defendant Whittier Pavilion**, on **May 20, 2011**, **Defendant Attorney Garmil** knew about Father's **2003 DPOA** and that Plaintiff Daughter Lisa was Father's attorney-in-fact.  Based on that knowledge, Defendant Attorney Garmil instructed the staff of Defendant Whittier Pavilion to prevent Plaintiff Daughter Lisa from seeing Father from, approximately, **May 20, 2011** through and past **May 25, 2011**.  Defendant Attorney Garmil did so in collusion with designated Defendants.  Defendant Attorney Garmil had fraudulently and deceptively kept Plaintiff Daughter Lisa from seeing her Father.

296.    On **May 25, 2011**, **Defendant Whittier Pavilion**—through its officers, agents, servants and employees—and **Defendant Attorney Garmil** knew, prior to **Defendant Attorney Tarlow** and **Defendant Attorney Watson** visiting with Father, that Defendant Attorney Tarlow and Defendant Attorney Watson were _private_ attorneys—not court appointed counsel.

297.    Designated Defendants kept Plaintiff Daughter Lisa from seeing Father until _after_ Father had signed the documents given to him by **Defendant Attorney Tarlow** and **Watson**, and Plaintiff Daughter Lisa had retained private legal counsel, in her capacity as attorney-in-fact for Father.

298.     As a direct proximate result of intentional acts of fraud and deception by **Defendants**—through their officers, agents, servants and employees, Plaintiff Daughters have sustained considerable and substantial harm and other damages—including, but not limited to, emotional distress and loss of past, present and future income.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count III

### Fraud Conspiracy (§1 985): facilitation and furtherance of fraudulent written instruments of May 25, 2011 (All Defendants)

299.     Plaintiff Daughters repeat and re-allege the allegations set forth above.

300.     As set forth above, representative and agents of Defendant Beverly Hospital deliberately misled Plaintiff Daughter Lisa as to nature of its admission of Father to Defendant Whittier Pavilion for purported medical treatment.

301.     As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Designated Defendants and its officers, agents, servants and employees have engaged in the facilitation of Father's signing the afore-described documents of **May 25, 2011** through fraud and deception.

302.     Designated Defendants knowingly engaged in agreement to fraudulently and deceptively obtain Father's signature on the afore-described documents of **May 25, 2011**.

303.     Defendant Attorney Berid, in her capacity as General Counsel, and other representatives/agents of Defendant ESMV knowingly and deliberately disregarded substantial information evidencing fraud by Defendant Attorney Tarlow and his Law Firm; as set forth, Defendant Maxa Berid had a prior established working relationship with Defendant Tarlow.

304.     Defendant Attorney Berid, in her capacity as General Counsel, and other representatives/agents of Defendant ESMV engaged in deceptive acts for the specific purpose of aiding and abetting by covering up for Defendant Tarlow and Defendant BNY Mellon.

305.    As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count IV

### Violations of 42 U.S.C. § 1983 by Defendant ESMV

306.    Plaintiff Daughters repeat and re-allege the allegations set forth above.

307.    At all times relevant to acts and omissions by Defendant Attorney Berid and Defendant ESMV in violations of Plaintiff Daughters' Federal Constitutional rights, designated Defendants are acting under color of law.

308.    At all times relevant pertaining to the acts and omissions committed by designated Defendants State officials, a reasonable official would have understood that his or her actions were in violation of clearly established rights of Plaintiff Daughters in their capacity as attorney-in-fact and as trustees/beneficiaries.

309.    Where designated Defendant public officials knew—and should have known—that their actions violated a clearly established Constitutional right, they do not have immunity from liability as they had fair notice that their conduct was unlawful.  See *Meaney v. Dever*, 170 F. Supp. 2d 46, 58 (D. Mass. 2001).

310.    At all times relevant pertaining to the acts and omissions of designated Defendant State officials, designated Defendants did not act objectively or reasonably; and they knew that they were not acting objectively or reasonably—and did so with deliberate intention and purpose.

311.    Defendant State officials and State agencies do not have immunity from liability where their acts and omissions—individual and joint—are substantially and inextricably enmeshed with their having intentionally made false statements and acted in reckless disregard for the truth.  *Burke v. Town of Walpole*, 405 F.3d 66, 86 (1st Cir. 2005).

312.    The means used by designated Defendants to deprive Plaintiff Daughters of their Federal Constitutional rights were able to be effectuated *only because* designated Defendants are clothed with the authority of state law.

313.    At all times relevant pertaining to the acts and omissions by designated Defendants who have deprived Plaintiff Daughters of their Federal Constitutional rights.

314.    Designated Defendant private parties are liable for violating 42 U.S.C. § 1983 as they intentionally engaged—and continue to engage—in joint participation with designated Defendant State officials in violating Plaintiff Daughters' Federal Constitutional rights.  See *Lugar v. Edmondson Oil Company*, 457 U.S. 922, 929 (1982).

315.    Private parties are deemed state actors for the purpose of 42 U.S.C. § 1983 as they have acted together with designated Defendant State officials and/or have engaged in conduct that is otherwise chargeable to the State.

316.    As a direct proximate result of the above-described intentional acts of Defendant Attorney Berid and Defendant ESMV, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## <u>Monetary Damages</u>

- an award of compensatory damages;

- an award of punitive damages;

- an award of reasonable attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988; and

- an award of statutory interest

**By Plaintiff Daughters,**

**/s/**  Lisa Siegel Belanger, Esq.

Lisa Siegel Belanger
Attorney at Law
BBO No.. 633060
300 Andover Street, No. 194
Peabody, MA  01960
(978) 998-2342
lisa@belangerlawoffice.com

**/s/**  Devora C. Kaiser

Devora Kaiser
PO Box 294
Rocky Ford, Colorado  81067
(978) 998-1359
devorakaiser@aol.com

DATED: September 30, 2015