UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LISA SIEGEL BELANGER and DEVORA C. KAISER, | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 15-cv-10198-ADB |
| BNY MELLON ASSET MANAGEMENT, LLC, et al., | * * * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

      Lisa Siegel Belanger and Devora Kasier ("Plaintiffs"), two daughters of Marvin H. Siegel ("Siegel"), have filed suit against various defendants[1] involved in their father's estate planning and medical care, including BNY Mellon Asset Management, LLC ("BNY Mellon"); Brian Nagle; Tarlow Breed Hart & Rodgers, PC (the "Law Firm"); Edward Tarlow; Albert DeNapoli; Catherine Watson; William Austin, CPA; Beverly Hospital; Maxa Berid;[2] Elder Services of Merrimack Valley, Inc. ("ESMV"); Whittier Health Network, Inc. (d/b/a "Whittier Pavilion"); and Richard Garmil (collectively, "Defendants"). Plaintiffs allege breach of fiduciary duty against BNY Mellon and Nagle (Count I); fraud against BNY Mellon, Nagle, Tarlow, Watson, the Law Firm, Whittier Pavilion, and Garmil (Count II); fraudulent conspiracy in violation of 42 U.S.C. § 1985 against all defendants (Count III); and violation of 42 U.S.C. § 1983 against ESMV (Count IV). Defendants have moved to dismiss the complaint in its entirety pursuant to

---

[1] All individuals are sued in their official capacities and individually. The Commonwealth of Massachusetts is no longer a party to this suit. See [ECF No. 143].

[2] Plaintiffs name Maxa Berid in her individual capacity, but also in her official capacity "as a State actor" with Elder Services of Merrimack Valley, Inc. and with Berid & Schutzbank, LLC.

Federal Rules of Civil Procedure Rule 12(b) [ECF No. 154]. For the reasons explained below,

the Court <u>GRANTS</u> Defendants' Joint Motion to Dismiss, and dismisses all counts.

## I.      BACKGROUND

Plaintiffs initiated this action against Defendants on February 12, 2015. [ECF No. 1].

Since then, the Court has twice dismissed Plaintiffs' complaints for failing to comply with

Federal Rule of Civil Procedure 8. <u>See</u> [ECF Nos. 86, 108]. On September 30, 2015, Plaintiffs

filed their Second Amended Complaint ("SAC") with 33 exhibits. [ECF No. 128]. On March 21,

2016, Defendants  filed a joint motion to dismiss the SAC [ECF No. 154], an Omnibus Brief in

support of the motion [ECF No. 160], and several supplemental briefs specific to each defendant

[ECF Nos. 155, 157, 158, 159]. On April 8, 2016, Plaintiffs opposed the motion to dismiss [ECF

No. 171].[3]

The following facts are taken from Plaintiffs' Second Amended Complaint. [ECF No.

128]. While Plaintiffs have shortened the most recent version of the SAC, the Court continues to

find it challenging to follow, but has endeavored to accurately summarize its core allegations.

Plaintiffs Belanger and Kaiser are two of Siegel's three biological daughters.[4] On January 5,

1982, Siegel originated a trust "to provide for the disposition and holding of the Donor's estate

and for the benefit of the Donor and his said children." SAC ¶ 9. The Trust was known as the

"D.S.L. Trust of 1982." Siegel's three daughters, Kaiser, Belanger, and Sheryl Sidman, were

beneficiaries of the DSL Trust of 1982. In February 1999, Siegel hired Defendant BNY Mellon

to provide investment management services for three accounts: the DSL Trust of 1982, Siegel's

---

[3] Plaintiffs filed two identical copies of the opposition brief [ECF Nos. 167, 171], and the Court refers only to the one filed following the Court's order [ECF No. 170] granting Plaintiffs' motion for leave to file the opposition.
[4] Siegel's third daughter, Sheryl Sidman, is no longer named as a party to the SAC.

IRA, and Siegel's profit sharing account. At inception, the accounts contained approximately $3.7 million, $426,000, and $55,000, respectively. Defendant Nagle was employed by BNY Mellon during the relevant period and was the direct and primary investment manager for the D.S.L. Trust.

On February 11, 2003, after re-marrying, Siegel, through experienced attorneys, transformed the DSL Trust of 1982 into a new DSL Trust. According to Plaintiffs, Siegel intended that the existing property in the DSL Trust of 1982 be merged into the newly created DSL Trust of 2003. Siegel was designated as settlor and trustee, and his three daughters, including both Plaintiffs, were designated as co-trustees.

That same day, Siegel, through an attorney, executed a durable power of attorney (hereinafter, the "2003 DPOA") naming Belanger as his attorney-in-fact. Devora Kaiser was designated as the successor attorney-in-fact. The 2003 DPOA specified, in relevant part, that "in the event that protective proceedings are instituted at any time in any court of the Commonwealth of Massachusetts to appoint a conservator, guardian of the estate, or guardian of the person for me, I hereby nominate Lisa Siegel Belanger." [ECF No. 128, Ex. 6].

On May 19, 2011, Siegel was involuntarily committed to Defendant Beverly Hospital based on a 911 call that suggested that he was a danger to himself and others. Plaintiffs allege that the 2003 DPOA was in effect during this time period. A clinical evaluator at Beverly Hospital committed Siegel to a psychiatric facility, which Plaintiffs allege was done without Belanger's input despite the fact that the clinical evaluator had actual knowledge that Belanger was the attorney-in-fact for her father. On May 20, 2011, Siegel was transferred from Beverly Hospital to Defendant Whittier Pavilion, a psychiatric facility in Haverhill, Massachusetts. Belanger was not told that Siegel was admitted to Whittier Pavilion for an involuntary

psychiatric commitment, but rather was informed that he was being admitted based on a diagnosis of Alzheimer's and dementia. Belanger was also not told that Whittier Pavilion was a psychiatric facility or that anti-psychotic drugs might be administered to her father. Plaintiffs allege that Whittier Pavilion and Whittier Pavilion's outside private counsel, Defendant Garmil, were aware of the value of Siegel's estate and had a copy of Siegel's 2003 DPOA. Plaintiffs further allege that Garmil prohibited Belanger from seeing Siegel at the inception of his involuntary admission.

On May 24, 2011, Garmil, without notifying Belanger, filed a petition with the Haverhill District Court to have Siegel involuntarily committed for an additional six months at a psychiatric facility. Plaintiffs allege that Whittier Pavilion financially benefits from long-term civil commitments. Once Belanger became aware of the petition,[5] she attempted to retain private legal counsel to fight the involuntary commitment and requested that Nagle instruct BNY Mellon to transfer funds to Siegel's account for such representation. BNY Mellon failed to do so for reasons Plaintiffs do not explain. Plaintiffs claim that Siegel spoke with Defendant Nagle to confirm the validity of the 2003 DPOA in April 2011, and that these communications were faxed to BNY Mellon on April 6, 2011.

On May 24, 2011, Nagle called Siegel at Whittier Pavilion. According to Plaintiffs, he testified before the Essex Probate and Family Court in Massachusetts that he had called Siegel to obtain permission for Belanger to act as attorney-in-fact and for her to withdraw funds from BNY Mellon. Plaintiffs claim that Nagle gave Siegel the impression that Belanger wanted to withdraw Siegel's funds for her own use. On the May 24, 2011 call, Siegel orally revoked the

---

[5] Plaintiffs do not state how Belanger became aware of petition, only that she did so inadvertently.

2003 DPOA. That same day, Nagle called attorneys at the Law Firm, with whom he had prior business dealings, regarding potentially needing their services.

On May 25, 2011, Nagle and Tarlow visited Siegel at Whittier Pavilion. According to Plaintiffs, Siegel was on anti-psychotic drugs at the time. At this meeting, Siegel executed a written revocation of the 2003 DPOA, a new durable power of attorney that named Siegel's CPA, Defendant William Austin of Braver, as his attorney-in-fact, and a retainer agreement for the legal services of Tarlow (hereinafter, the "May 25, 2011 Documents"). Plaintiffs allege that the Law Firm "through fraud and deception became privately-retained counsel for" Siegel. SAC ¶ 53. The SAC specifically names as defendants the following Law Firm attorneys: Edward Tarlow, Albert DeNapoli, and Catherine Watson.[6]

On May 27, 2011, Belanger filed a Petition for Guardianship and Conservatorship of her father in Essex Probate & Family Court (the "Probate Court"). Belanger v. Cuffe, 464 Mass. 1016 (2013) (hereinafter, the "Probate Action").[7] At some point, Siegel retained Attorney Marsha Kazarosian, who participated in the Probate Action. Plaintiffs claim that the individual attorneys at the Law Firm misrepresented to the judge in the Probate Action the nature of their

---

[6] The SAC also specifies that the following attorneys from the Law Firm were involved: Richard Breed, III, Karen McKenna, John Stuebing, Patrick Minnihan, and Jacqueline Scott. It is unclear whether Plaintiffs intended to name them as defendants because they are not included in the caption along with the other Law Firm defendants and because Plaintiffs make no additional allegations about their individual involvement outside of the paragraph stating that they were involved with the underlying matter. SAC ¶ 53. To the extent that the Plaintiffs intended to name these attorneys as defendants, the claims as against them are dismissed for the same reasons that the Court dismisses the claims against the named Law Firm defendants.

[7] "[E]ven within the Rule 12(b)(6) framework, a court may consider matters of public record and facts susceptible to judicial notice." United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 208 (1st Cir. 2016); see also Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000) ("a court ordinarily may treat documents from prior state court adjudications as public records").

relationship with Siegel, but go on to detail how the judge was able to correct his understanding. Plaintiffs further allege that Defendant DeNapoli tried to "bribe" Belanger, in the guise of a thinly veiled settlement offer, to withdraw her petitions from the Probate Action by offering her $100,000 from Siegel's estate, which she refused. In November 2011, DeNapoli submitted an affidavit detailing the settlement offer in the Probate Action. Plaintiffs allege that there was never a "specific evidentiary hearing" on the validity of the 2003 DPOA in the Probate Action. On October 22, 2012, following a five-day trial in June and July 2012, the Probate Court issued "Findings of Fact and Conclusion of Law" (the "Probate Order"). [ECF No. 160, Ex. 1]. The Probate Court found, among other things, that Belanger financially exploited Siegel and that it would be unsuitable for her to act as his guardian or conservator. Following the Probate Order, Belanger filed a petition pursuant to Mass. Gen. Laws ch. 211 § 3 with the Massachusetts Supreme Judicial Court ("SJC"), and the SJC declined to exercise its supervisory powers because she had "adequate alternative remedies" for relief related to the Probate Court's rulings. Belanger v. Cuffe, 985 N.E.2d 114, 115 (Mass. 2013). The SJC noted that Belanger did not show that she pursued alternative remedies in the trial court or the Appeals Court. Id. at 116.

Several years later, Plaintiffs filed the instant action. In Count I of the SAC, Plaintiffs allege breach of fiduciary duty against BNY Mellon and Nagle; specifically, that BNY Mellon "knowingly and fraudulently engaged in acts of deceptively obtaining [Siegel's] signature on written instruments," which the Court understands to refer to the May 25, 2011 Documents. Plaintiffs claim that BNY Mellon and Nagle owed them a fiduciary duty in connection with the 2003 DPOA, as co-trustees of the DSL Trust, and as co-beneficiaries of Siegel's estate. Further, they allege that BNY Mellon and Nagle breached that duty when Nagle engaged in self-dealing by "soliciting the legal services of Defendant Attorney Tarlow and Defendant Law Firm in

purported representation of [Siegel]; collud[ing] with counsel of Defendant Law Firm TBHR in purportedly revoking [Siegel's] 2003 DPOA; [including] Defendant BNY Mellon in the durable power of attorney signed by [Siegel] on May 25, 2011; [including] Defendant BNY Mellon in the retainer agreement signed by [Siegel] on May 25, 2011; converting funds belonging to DSL Trust (which Plaintiff Daughters are co-trustees and co-beneficiaries) to its own use; creating false documentation to obtain funds from DSL Trust; engaging in acts to conceal fraudulent and deceptive activity of other Defendants." SAC ¶ 281. Plaintiffs argue that BNY Mellon was put on notice of Nagle's misconduct when Belanger sent copies of a 93A Demand Letter to BNY Mellon's board of directors and president.

In Count II, Plaintiffs allege fraud by BNY Mellon, Nagle, Tarlow, Watson, the Law Firm, Whittier Pavilion, and Garmil because they obtained a new durable power of attorney on May 25, 2011 that granted BNY Mellon and the Law Firm unfettered discretion to use the funds of the DSL Trust for their own personal use, which was not permitted under the 2003 DPOA. Further, Plaintiffs allege that Siegel had informed Nagle that he did not want to give BNY Mellon unfettered discretion over the funds. Moreover, certain defendants prevented Belanger from seeing Siegel while he was committed, during which time he revoked the 2003 DPOA.

In Count III, Plaintiffs allege fraud conspiracy under 42 U.S.C. § 1985 against all defendants. They claim that Beverly Hospital misled Belanger as to the nature of Siegel's admission at Whittier Pavilion. The SAC further alleges that Defendants knowingly engaged in an agreement to fraudulently and deceptively obtain Siegel's signature on the May 25, 2011 Documents, and that Berid, as General Counsel for ESMV (Elder Services of Merrimack Valley)

engaged in deceptive acts to aid and abet Tarlow and BNY Mellon by covering up for them.[8]

Plaintiffs state that ESMV is a "quasi-private nonprofit corporation that provides various services

geared to the elderly . . . . [that] functions as a State designated protective service agency." SAC

¶ 61.

　　In Count IV, Plaintiffs allege violations of 42 U.S.C. § 1983 against ESMV. They argue

that ESMV acted "under color of law" when it violated Plaintiffs' federal constitutional rights.

SAC ¶ 307. In order to make sense of Count IV, which is largely filled with conclusory legal

allegations, the Court must look to other portions of the SAC. Prior to Count IV, the SAC only

makes reference to federal constitutional rights in the jurisdictional statement. In the

jurisdictional statement, the SAC alleges that the Court has jurisdiction over this case because

Plaintiffs' substantive and procedural due process rights have been violated under the Fourth,

Fifth, and Fourteenth Amendments. Plaintiffs do not mention these rights anywhere else in the

SAC. In an earlier section discussing each defendant, the SAC claims that ESMV served as a

representative for the Commonwealth of Massachusetts during the relevant time period, which

the Court infers to be relevant to the allegation in Count IV that ESMV somehow acted with the

state or engaged in conduct that was "chargeable" to the state. Plaintiffs allege that ESMV and

Berid, its General Counsel, refused to take legal action against Tarlow and the Law Firm despite

having knowledge of, among other things, the fact that Siegel was on anti-psychotic drugs while

at Whittier Pavilion and during the execution of the May 25, 2011 Documents. Plaintiffs aver

that this is because Berid had a prior working relationship with Tarlow.

---

[8] It is not clear to this Court what actions underlie the "cover up." Plaintiffs have alleged that
ESMV failed to take legal action against Berid and the Law Firm, but do not allege what
deceptive acts it undertook to "cover up" for Tarlow and BNY Mellon.

As relief, Plaintiffs request compensatory damages, punitive damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988; and statutory interest.

## II.    LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most hospitable to the Plaintiffs' theory, and draw all reasonable inferences from those facts in favor of the Plaintiffs. United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). In ruling on a motion under Rule 12(b)(6), the Court "must consider the complaint, documents annexed to it, and other materials fairly incorporated within it," which "sometimes includes documents referred to in the complaint but not annexed to it" and "matters that are susceptible to judicial notice." Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 12 (1st Cir. 2004).

Although detailed factual allegations are not required, a pleading must set forth "more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action" is not enough. Id. To avoid dismissal, a complaint must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations and citation omitted). Further, the facts alleged, when taken together, must be sufficient to "state a claim to relief that is plausible on its face." A.G. ex rel. Maddox v. v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570).

The First Circuit has noted that "[t]he plausibility standard invites a two-step pavane." Id. "At the first step, the court 'must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Id.

(quoting <u>Morales-Cruz v. Univ. of P.R.</u>, 676 F.3d 220, 224 (1st Cir. 2012)). "At the second step, the court must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (internal quotations and citation omitted). "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." <u>Sepulveda-Villarini v. Dep't of Educ. of P.R.</u>, 628 F.3d 25, 29 (1st Cir. 2010). "Although evaluating the plausibility of a legal claim requires the reviewing court to draw on its judicial experience and common sense, the court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable." <u>Ocasio-Hernandez v. Fortuno-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011) (internal quotations and citations omitted). Finally, "[t]he district court may grant a motion to dismiss based on a defendant's affirmative defense of a statute of limitations 'when the pleader's allegations leave no doubt that an asserted claim is time-barred.'" <u>DeGrandis v. Child. Hosp. Bos.</u>, 806 F.3d 13, 16–17 (1st Cir. 2015) (quoting <u>LaChapelle v. Berkshire Life Ins. Co.</u>, 142 F.3d 507, 509 (1st Cir. 1998)).

### III.    DISCUSSION[9]

#### a.    Timeliness of filings in connection with the Joint Motion to Dismiss

In their opposition to Defendants' Joint Motion to Dismiss, Plaintiffs argue that the motion should be denied because some of the underlying briefings were filed shortly after 6:00 P.M. on the deadline date. Under Local Rule 5.4(D), a filing is considered filed on a given date if it is filed by 6:00 P.M. that day. In this case, the Joint Motion to Dismiss and some of the underlying briefings were timely filed under the local rules, but some of the other supporting briefs were not filed until 6:34 P.M. Given that the Joint Motion to Dismiss and some of the supporting briefs were timely filed, it is not clear that the situation warrants dismissal under Local Rule 5.4. Even assuming there was a violation, the Court would not dismiss on those grounds. "To deviate from a local rule, the district court (1) must have a sound reason for doing so, and (2) must ensure that no party's substantial rights are unfairly jeopardized." Jackson v. United States, No. 08-40024-FDS, 2011 WL 6301425, at *3 (D. Mass. Dec. 15, 2011), aff'd, 708 F.3d 23 (1st Cir. 2013) (quoting P.R. Am. Ins. Co. v. Rivera-Vazquez, 603 F.3d 125, 132 (1st Cir. 2010)). There appears to be no prejudice in this case from the 34-minute delay, especially when the motion itself was timely filed. See id. ("Here, it is difficult to see any meaningful prejudice that resulted from the 44-minute delay.").

Moreover, the Court believes it would be unfair to hold the parties to different standards. The Plaintiffs filed their entire opposition brief late. They claim that they tried to file it by 6:00

---

[9] For reasons of judicial economy and efficiency, the Court declines to more exhaustively identify and discuss the deficiencies in Plaintiffs' SAC, although there are certainly other issues with the SAC. For example, the Court seriously questions whether Plaintiffs have standing to bring this suit. BNY Mellon and Nagle argued only that Plaintiffs lacked standing to assert the claims in Count I, although the Omnibus Brief [ECF No. 160] referenced a general lack of standing. As will be discussed below, the Court declines to exercise supplemental jurisdiction over Count I and thus does not reach the standing issue. Because the question of standing was

P.M. on April 5, 2016, their deadline, but they did not actually file it until April 7, 2016. [ECF No. 167]. On April 7, 2016, they moved the Court to allow them to file the belated opposition [ECF No. 165], which motion the Court granted [ECF No. 170]. It seems that the Plaintiffs distinguish their situation because the Defendants indicated that they would not oppose the filing of the opposition after the deadline and the Plaintiffs ultimately sought leave of the Court. Plaintiffs, however, obtained such permission from the Defendants after the passage of the deadline and only sought permission from the Court after the fact. Accordingly, given the lack of discernible prejudice, the Court will overlook both parties' short delay in filing their briefs.

### b.  Abstention

#### i.  Federal Probate Exception

"[T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." Marshall v. Marshall, 547 U.S. 293, 311–12 (2006). The exception, however, "does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction." Id. at 312. The probate exception also applies to suits ancillary to probate matters where the exercise of jurisdiction would impair the policies underlying the exception, which are "(1) to encourage legal certainty, (2) to promote judicial economy, (3) to use 'relative expertness,' and (4) to avoid unnecessary interference with the state system of probate law." In re Whatley, 396 F. Supp. 2d 50, 56 (D. Mass. 2005). As Defendants seem to admit, it is unclear whether the Plaintiffs'

---

not briefed for the remaining counts, the Court does not decide the issue in this Memorandum and Order. Plaintiffs are instructed, however, that if they seek to amend the SAC and fail to make a sufficient showing of proper standing, any subsequent complaint may be dismissed for lack of standing or motion to amend denied on futility grounds.

requested relief would necessarily require this Court to "dispos[e] of property that is in the custody of a state probate court." See Marshall, 547 U.S. at 312. Unlike In re Whatley, it is possible that providing the relief requested in this case would not "require this Court to assume the powers of the Massachusetts Probate & Family Court." In re Whatley, 396 F. Supp. 2d at 56. Accordingly, the Court finds that it is premature to dismiss pursuant to the federal probate exception.

### ii.   Younger Abstention

Younger v. Harris, 401 U.S. 37 (1971), Moore v. Sims, 442 U.S. 415 (1979), and their progeny counsel against interference by federal courts in ongoing state proceedings under certain circumstances. Although "federal courts may stay actions for damages based on abstention principles, [the Supreme Court] ha[s] not held that those principles support the outright dismissal or remand of damages actions." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 721 (1996). As the SAC is currently pled, Plaintiffs do not request any injunctive or declaratory relief, and Defendants invoke abstention doctrines in order to argue that Plaintiffs' claims should be dismissed. Under these circumstances, the Court cannot dismiss on abstention grounds. See DeMauro v. DeMauro, 115 F.3d 94, 98 (1st Cir. 1997) (noting that, following Quackenbush, "the district court's remedy—dismissal on abstention grounds—is not permissible"); see also Deabay v. Phila. Indem. Ins. Co., No. 1:15-CV-35-NT, 2015 WL 4041735, at *1 n.1 (D. Me. July 1, 2015) ("[D]ismissal on abstention grounds is not permissible for suits seeking damages.").[10]

---

[10] The First Circuit has declined to fully explicate the applicability of abstention doctrines in suits for damages. See Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 516–17 (1st Cir. 2009). "There is mixed authority on the question of whether abstention doctrines are only available to challenge the exercise of a federal court's *equitable* power, or alternatively, whether they may apply to actions for damages as well." Id. at 516 n.14.

Finally, although Defendants argue that finding for Plaintiffs in this instant action would be inconsistent with the findings underlying the Probate Court's judgment, such issues would seemingly be more appropriately resolved by application of the res judicata doctrine rather than abstention doctrines. See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 293 (2005) (holding federal court maintained jurisdiction despite entry of state court judgment because "[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law."); cf. Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 71 (1st Cir. 2005) (noting, in case where federal court action might affect future state court action, "that the mere possibility of inconsistent results in the future is insufficient to justify Younger abstention").

### c.  Res judicata

Defendants argue that res judicata (specifically, collateral estoppel or issue preclusion) bars Belanger's claims that rely on the validity of the 2003 DPOA and Kaiser's claims to the extent they are inconsistent with positions she took in Probate Court. Assuming this to be true, it remains unclear whether a finding that the validity of the 2003 DPOA has been wholly resolved would require or warrant the dismissal of all claims. Although Plaintiffs would be estopped from relying on the validity of the 2003 DPOA in support of their claim, it is not clear that all of the claims require a valid 2003 DPOA to survive a motion to dismiss. Dismissal based on res judicata at the motion to dismiss stage is only appropriate if two conditions are met: (1) "the facts that establish the defense must be definitively ascertainable from the allegations of the complaint, the documents (if any) incorporated therein, matters of public record, and other matters of which the court may take judicial notice . . . ," and (2) "the facts so gleaned must conclusively establish the affirmative defense." In re Colonial Mortg. Bankers Corp., 324 F.3d

12, 16 (1st Cir. 2003). Nonetheless, because the claims are being dismissed on other grounds, the Court need not resolve the issue at this time. Should Plaintiffs seek to file an amended complaint, the Court will revisit the res judicata issues and Plaintiffs should keep that in mind when considering whether to file an amended complaint.

### d.   The 42 U.S.C. § 1985(3) claim (Count III)

Section 1985 "confers a private right of action for injuries occasioned when 'two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'" Burns v. St. Police Ass'n, 230 F.3d 8, 12 n.3 (1st Cir. 2000) (quoting 42 U.S.C. § 1985(3)). "To state a claim under § 1985(3), a plaintiff must, among other requirements, allege the existence of a conspiracy intended to deprive an individual or class of persons of protected rights based on 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" Id. at 12 (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (lst Cir. 1996)). In pleading their § 1985(3) claim, the Plaintiffs have failed to allege any cognizable discriminatory animus or any facts that would plausibly support such an inference. See Riley v. O'Brien, No. 16-11064-LTS, 2016 WL 6562113, at *1 (D. Mass. Nov. 3, 2016) (holding that plaintiff "failed to state plausible claims pursuant to 42 U.S.C. §§ 1981 and 1985 insofar as there were no allegations of a conspiracy nor was there any factual allegations of discriminatory animus").

Further, Count III is time-barred. "Affirmative defenses, such as the statute of limitations, may be raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), provided that the facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'" Santana-Castro v. Toledo-Dávila, 579 F.3d 109, 113–14 (1st Cir. 2009) (alteration in original) (internal quotation marks omitted) (quoting Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524

F.3d 315, 320 (1st Cir. 2008)). "Where the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to 'sketch a factual predicate' that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate." Trans-Spec, 524 F.3d at 320 (citing Lachapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509–10, (1st Cir. 1998)).

"Sections 1981, 1983, and 1985 borrow the forum state's statute of limitations for personal injury claims." Rodriguez-Garcia v. Municipality of Caguas, 354 F.3d 91, 96 (1st Cir. 2004); see also Wilson v. Garcia, 471 U.S. 261, 266–67 (1985) ("When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."). Accordingly, the statute of limitations for Plaintiffs' claim brought pursuant to § 1985(3) is three years. See Mass. Gen. Laws ch. 260, § 2A (three-year statute of limitations for personal injury claims). "[I]n the context of a continuing conspiracy to violate civil rights, the statute of limitations runs separately from the occurrence of each civil rights violation that causes actual damage to the plaintiff (as long as the plaintiff knows or should have known of the injury)." Nieves v. McSweeney, 241 F.3d 46, 51 (1st Cir. 2001).

Plaintiffs' claim for fraud conspiracy under § 1985(3) (Count III) is based only on actions and events leading up to the execution of the May 25, 2011 Documents and vague allegations of "cover up." See SAC ¶ 299–305. Count III alleges no civil rights conspiracy apart from acts connected to the May 25, 2011 Documents. In the SAC, Plaintiffs include and reference a 93A Demand Letter [ECF No. 128, Ex. 31], written by Belanger and dated July 28, 2011, in support of the argument that it put BNY Mellon on notice of alleged wrongdoing. See SAC ¶ 282. This 93A Demand Letter, which the Court will consider in determining whether the statute of

limitations has run,[11] makes it overwhelmingly clear that Belanger was aware of the supposedly

wrongful conduct underlying the events surrounding the execution of the May 25, 2011

Documents by the date of the letter. The 93A Demand Letter thoroughly details the events and

acts described, and also indicates that Belanger was well-aware of the potentially "fraudulent and

deceptive" nature of the Defendants' conduct. For example, she referred to "[h]arm incurred by

Mellon's motivation to engage in fraudulent and deceptive conduct & its lack of good faith in

resolving the situation." While the 93A Demand Letter is addressed to BNY Mellon, it covers

the entirety of the events underlying Count III. Thus, Plaintiffs were clearly on notice of the

alleged wrongdoing underlying Count III by July 28, 2011. The statute of limitations on Count

III therefore ran until July 2014. Plaintiffs did not initiate this action until February 2015, and

Count III is thus time-barred.

Plaintiffs' arguments that they have alleged a continuous violation or that the statute of

limitations should be tolled because they could not have discovered information essential to the

suit is unpersuasive. First, Count III clearly does not assert a continuing violation beyond the acts

involving the execution of the May 25, 2011 Documents.[12] Second, the 93A Demand Letter

indicates that Plaintiffs were aware of essential information underlying these causes of action by

July 28, 2011 at the latest. Accordingly, Count III is dismissed with prejudice.

---

[11] See Rodi, 389 F.3d at 12.

[12] Plaintiffs' allegations of a "cover up" are too vague to show a continuing violation or to require the Court to undertake a separate statute of limitations inquiry.

### e.   The 42 U.S.C. § 1983 claim (Count IV)

Section 1983 provides a cause of action for violations of the U.S. Constitution and federal

law. 42 U.S.C. § 1983; Graham v. Connor, 490 U.S. 386, 394 (1989). Section 1983 states, in

relevant part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress, except
> that in any action brought against a judicial officer for an act or
> omission taken in such officer's judicial capacity, injunctive relief
> shall not be granted unless a declaratory decree was violated or
> declaratory relief was unavailable.

To succeed under § 1983, a plaintiff must prove the following elements of the offense: "[f]irst,

the challenged conduct must be attributable to a person acting under color of state law (including

Puerto Rico law); second, the conduct must have worked a denial of rights secured by the

Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).

Without reaching the question of whether alleging that a defendant is a state-designated

protective service agency is sufficient to satisfy the state action requirement for § 1983 purposes,

Plaintiffs have failed to sufficiently allege the second prong of a § 1983 claim: that ESMV's

"conduct must have worked a denial of rights secured by the Constitution or by federal law." Id.

The SAC alleges that ESMV did something to "cover[] up" for Tarlow and BNY Mellon, SAC

¶ 304, but it fails to state what the actual conduct was with an adequate degree of specificity. The

SAC also alleges that ESMV disregarded certain information and declined to continue an

investigation, but does not allege sufficient facts for the Court to analyze whether a constitutional

right might have been implicated. Plaintiffs allude to due process violations and a "right to

privacy and family sanctity under the Fifth and Fourteenth Amendments," SAC ¶ 45, but the Court cannot infer how ESMV might be involved in whatever those constitutional violations might have been. To the extent that Plaintiffs mean to allege that the failure to further investigate Siegel's case amounted to a denial of protective services, the Supreme Court has recognized that "the Due Process clause does not require the State to provide its citizens with particular protective services." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989). The allegations of constitutional violations are simply too vague and conclusory as they are currently pled to state a claim under § 1983. The Plaintiffs' opposition brief does not provide the Court with any additional insight as to what constitutional violations Plaintiffs might have suffered at the hands of ESMV or assist in helping to make sense of how the facts alleged make out a constitutional violation.

### f.   State law claims (Counts I and II)

Given the dismissals of Counts III and IV, there is no federal question remaining. Based on the allegations in the SAC, the Plaintiffs and at least some of the Defendants are from Massachusetts. See Mach. Project, Inc. v. Pan Am. World Airways, Inc., No. 14-10022-NMG, 2016 WL 4098551, at *3 (D. Mass. July 28, 2016) (accepting the jurisdictional averments in the complaint because there was no reason to doubt them). "The complete diversity requirement is consistently imposed on a case-by-case, rather than a claim-by-claim, basis: 'In a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action.'" Picciotto v. Cont'l Cas. Co., 512 F.3d 9, 21 (1st Cir. 2008) (quoting Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 553 (2005)). Accordingly, the Court does not have diversity jurisdiction under 28 U.S.C. § 1332(a)(1) over the remaining claims.

The Court declines to exercise supplemental jurisdiction. See 28 U.S.C. § 1367(c) (district courts "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"); see also Massó-Torrellas v. Municipality of Toa Alta, 845 F.3d 461, 469 (1st Cir. 2017); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right . . . . Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties . . . . Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."). Because this case has not proceeded to trial and the remaining claims all arise under state law, they are more appropriately litigated in state court.

## IV.    CONCLUSION

For the reasons explained above, the Defendants' Joint Motion to Dismiss pursuant to Rule 12(b) [ECF No. 154] is GRANTED. Counts I, II, III, and IV are hereby dismissed. Finally, the Court notes that there are several defendants who were named in earlier versions of the Plaintiffs' complaints, but are not named in the SAC. The Court dismisses all such defendants from the case.[13]

**So Ordered.**

Dated: March 28, 2017

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

---

[13] These defendants include: Burns & Levinson LLP; Lisa Cukier; Laura Studen; Marsha Kazarosian; Kazarosian Costello O'Donnell LLP; Walter Costello Jr.; Brian Cuffe; James Feld; Thomas Barbar; Mary Ann Remillard; Robert Ledoux; Diane Powell; Scott Dailey; Michael Springman; Cheri Myette; Michael Novack; Dr. Ping Cui; Dr. Janice Funk; Merrimack Valley Hospital; Dr. Kai Hayes; Pierce & Mandell PC; Dr. Robert Portney; Dr. Peter W. Cohen; Kenney Enterprises; RN Brenda Wojick; Sheryl Sidman; and Alan Sidman.